IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH KEVIN DIXON,

Petitioner,

v.

RON RACKLEY,

Respondent.

Case No. 1:14-cv-01149 AWI MJS (HC)

**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Tami Krenzin of the office of the California Attorney General. Respondent declined magistrate judge jurisdiction. (ECF No. 11.)

I. **Procedural Background**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on March 20, 2009, for three counts of first degree murder, two

counts of attempted murder, conspiracy, shooting at an occupied vehicle, active participation in a criminal street gang, two counts of possession of a firearm by a felon, and multiple enhancements. (Lodged Doc. 11.) On April 20, 2009, Petitioner was sentenced to three consecutive terms of life without the possibility of parole in addition to an indeterminate term of 238 years to life in prison. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District on May 10, 2010. (Lodged Doc. 1.) On April 26, 2012, the appellate court reversed the conviction for conspiracy and noted several sentencing errors, but otherwise affirmed the conviction. (Lodged Doc. 4.) Both Petitioner and Respondent sought review by the California Supreme Court on June 1, 2012. (Lodged Doc. 6.) Petitioner's petition for review was summarily denied, however, the California Supreme Court granted Respondent's petition for review on August 15, 2012. (Lodged Doc. 7.) On July 18, 2013, the California reversed the Court of Appeal's decision regarding elements of the criminal gang participation enhancements. (Lodged Doc. 8.) On September 25, 2013, the Court of Appeal issued a revised and amended opinion in light of the reversal from the California Supreme Court. (Lodged Doc. 9.) On October 22, 2014, the Kern County Superior Court issued a corrected abstract of judgment. (Lodged Doc. 11.)

Petitioner filed his federal habeas petition on July 14, 2014 raising the following twelve claims for relief:

1) That the trial court erred in admitting and instructing the jury regarding irrelevant and inflammatory prior gang-related offenses;

2) That the trial court violated Petitioner's due process rights by admitting witness Agustin's testimony of co-defendant Johnson's statements which were against Petitioner's interests at trial;

3) That the trial court violated Petitioner's due process rights by admitting the Jackson's testimony that Petitioner made incriminating statements after he was arrested;

4.) That Petitioner's due process was violated by the admission of the erroneous statements of prosecution's gang expert;

1    5.) That the trial court erred in denying Petitioner's <u>Wheeler</u>/<u>Batson</u> motions

2    regarding the striking of disabled and African-American persons from the jury;

3    6.) That the trial court violated Petitioner's due process by denying Petitioner's

4    motion for change of venue;

5    7.) The trial court violated Petitioner's right to a fair trial by ordering Petitioner to

6    be restrained;

7    8.) The trial court violated Petitioner's due process rights by not dismissing two

8    jurors that may have been engaged in premature deliberation of Petitioner's case;

9    9.) That the trial court improperly instructed the jury with CALCRIM No. 373

10    regarding uncharged participants;

11    10.) That the instructions regarding gang evidence and enhancements were in

12    error, violating Petitioner's due process rights;

13    11.) That the accomplice liability jury instructions were in error and violated

14    Petitioner's due process, right to a fair trial, and right to a jury determination; and

15    12.) Cumulative error.

16    (<u>See generally</u>, Pet., ECF No. 1.) Respondent filed an answer to the petition on

17    November 21, 2014. (Answer, ECF No. 18.) Petitioner did not file a traverse.

18    **II.    Statement of Facts[1]**

19        I.    <u>Prosecution Evidence</u>

20        <u>Events Surrounding March 21, 2007</u>

21        Early on the morning of March 20, 2007, someone shot Venesta
     Grinnage's vehicle, which was parked in front of her home in the 4300
22    block of Deborah Street in Bakersfield.[fn4] Grinnage's son, Daniel Davis,
     frequented the house, although he did not live there. Multiple shell casings
23    from three different semiautomatic firearms were found in the street.
     Although no suspects could be developed, a neighbor reported seeing a
24    burgundy Honda drive slowly by shortly after 3:30 a.m. and again about 15
     minutes later. The car had tinted windows and she could not see inside it.
25    About 4:00 a.m., she heard what sounded like numerous gunshots.

26

27    [1] The Fifth District Court of Appeal's summary of the facts in its September 25, 2013 opinion is presumed
     correct. 28 U.S.C. § 2254(e)(1).

28

                                        3

**FN4**: All dates are in the year 2007 unless otherwise stated.

Some of the law enforcement officers who testified had received promotions or retired by the time of trial. To the extent possible, we refer to them by the titles they had at the time of events.

A number of peripheral actors in the case were regularly referred to at trial by their nicknames or monikers. For the most part, we use the same appellations for the sake of clarity.

Last, exact addresses were given at trial.

Just after midnight on March 21, Bakersfield Police Officers Shaff and Williamson, both members of the police department's Special Enforcement Unit (also known as SEU or the gang unit) were dispatched to an address on Myrtle Street in response to a call in which the reporting party said he had been shot at and his vehicle had been hit with bullets. Upon arrival, Shaff contacted Lee, who reported he had been standing by his vehicle in front of a residence in the 800 block of Deanna Way, talking with some friends, when an older silver or green Jeep drove by and shots were fired at him and his friends. Lee said the incident occurred about half an hour before he called the police, and that he had left the area and gone home. Shaff noted that Lee seemed unusually vague in terms of information he was giving. For instance, he would not identify the friends who had been present, and he seemed very hesitant when Shaff asked for specifics about the other vehicle and its occupants.

There were what appeared to be bullet holes in Lee's vehicle, a 2000 Chevrolet Tahoe that belonged to his father. Shell casings and bullet fragments from at least one gun were found in the 800 block of Deanna Way, where Lee said the shooting had occurred.

As of March 21, the area of Monterey and Inyo in Bakersfield was known to SEU officers as an area that was controlled by the Bloods criminal street gang, a group that was associated with the color red. The Country Boy Crips, who were associated with the color powder blue, were active rivals of the Bloods at the time. The Bloods had somewhat of an alliance with the Westside Crips, and were not actively quarrelling with the Eastside Crips. The corner was a known narcotics location, with sales being made out of the apartment complex there. The territory of a local Hispanic gang, which also sold narcotics, began nearby.

Around 6:45 that evening, Edwin McGowan was talking to friends outside the apartments when he heard some shots. He tried to run, but fell, having been struck. He saw a male wearing a burgundy hoodie shooting a little gun over the top of a car. When McGowan fell, the person ran behind him and shot him two more times, then took off running. McGowan could see the eyes and upper nose of this person, who was not wearing a mask. McGowan denied ever having seen defendants.

Officer Meek interviewed McGowan in the emergency room. McGowan described the shooter as a tall, light-skinned African-American male, 17 to 21 years old, wearing a red hooded sweatshirt, dark pants, a dark ball cap, and clear glasses. Meek confirmed that McGowan was

4

certain the race was African-American and not Hispanic. When asked, McGowan said he would be able to identify the person if he saw him.[fn5]

> **FN5**: McGowan denied telling Meek that a light-skinned African-American male shot him. Rather, he told Meek the shooter could have been Hispanic or "a bright-skinned" male. McGowan told the grand jury that the shooter was a very light-skinned person, but he could not tell his race. McGowan did not consider any of the defendants to be light-skinned. They all appeared to be African-American to him.

On October 4, Bakersfield Police Detective Darbee showed McGowan a photographic lineup that included a picture of Johnson, whom Darbee considered to be light to medium-skinned. McGowan said he did not recognize anyone, and did not know who shot him because the person had a hoodie over his face. When confronted with the fact that he had told Meek he would be able to identify the shooter, McGowan was hesitant to answer and asked if Darbee knew what would happen to his family if he were to identify anyone or testify against anyone in court.

At the scene, adult-sized footprints, with a stride length suggesting the person had been running, led from the area in which McGowan had lain in front of one of the apartments, toward where a hole had been cut in the chain-link fence at the far corner of the parking lot.[fn6] Three spent .25-caliber shell casings were found near the door of the apartment where McGowan had lain, and another was recovered from the parking lot. All four had been fired from the same gun.

> **FN6**: A canal ran parallel to Monterey Street about a block away. A traversable alleyway ran along both sides of the canal.

All told, McGowan was struck three times in the back. He suffered major abdominal injuries that necessitated multiple surgeries. Taken together, his injuries were life-threatening.

Sometime between 8:00 p.m. and 10:45 p.m. on March 22, Michael Wilcox was inside his home in the 4200 block of Deborah Street, when he heard six to 10 gunshots. Looking out, he saw a person, who appeared to be in the area of the Grinnage house, shooting at a van that was driving away. The van was white with blue trim, and Wilcox had seen it before in the neighborhood. The driver was an African-American male; Wilcox could not tell if anyone else was in the vehicle.

Around 10:45 p.m., Jorge Garcia, who lived in the vicinity, was cleaning his garage when he heard around three gunshots. Before that, there had been some males behind his house, drinking and playing loud music. When he heard the shots, he went to the back to see if they were having a fight, but nobody was around. Garcia returned to cleaning the garage with the door open, then Lee walked in, said he had been shot, and asked Garcia to give him a ride around the corner. Lee had been shot in the left arm and the right hand and fingers. Garcia took him to the location in the 800 block of Deanna Way at which Lee's vehicle had previously been shot. The people there called the police and an ambulance.

Bakersfield Police Officer Hernandez responded to the scene. At the same time, the Kern County Sheriff's Deputies Chandler and Moreno were responding to a report of "an illegal shooting" in the 4300 block of Kenny Street, one street east of Deborah Street.[fn7] Chandler attempted to talk to Lee, but Lee did not respond to any of Chandler's questions. Lee was not in possession of a handgun.

> **FN7**: The 4300 blocks of Deborah, Kenny, and Eve Streets are in a county pocket; hence, the different law enforcement jurisdictions.

Investigation revealed broken automobile glass and what appeared to be part of an automobile window frame near the Grinnage house. On the east side of Deborah Street were a number of spent shell casings. Some were grouped in one place, while two were apart from the others. Eight had been fired from the same gun, while one was from a different firearm — the same firearm as some of the shell casings recovered from the March 20 shooting of Grinnage's vehicle.

Chandler and Moreno contacted Lee in the hospital emergency room. Told shell casings had been found in the 4300 block of Deborah Street, Lee said he had been walking southbound in the 4300 block of Deborah Street, when he saw subjects in a green 1995 or 1996 Jeep pull up alongside him. He saw a flash and heard five to six shots. He described the route he ran before reaching Garcia's garage. A blood trail was found in that area, but no weapon.

Events Surrounding April 19, 2007

As of April 19, James Wallace resided with his mother, Kathie Oats, not far from McNew Court in Bakersfield. Dixon's mother and Wallace's father, who lived on Watts Drive in a part of town called the Country, were cousins, although Oats believed Dixon and Wallace had only been introduced once. Wallace had never been arrested and was not in a gang.

On April 19, Wilma Shaw, the aunt of Wallace's best friend, held a barbecue in the front yard of her residence in the 1300 block of McNew Court. Her guests, who included Wallace and her nephews, Anthony and Othelon Lyons, were outside off and on most of the day, talking and playing music in the front yard.[fn8] When it began to get dark, Shaw went inside to attend to her grandchildren. Not long after, she heard multiple gunshots.

> **FN8**: For the sake of clarity, we refer to Anthony and Othelon Lyons, and Mikeshiea and Myeshia Herring, by their first names. No disrespect is intended.

Anthony had been at his aunt's house all day, as he usually was during this time period. Just before 8:00 p.m., he was in the front yard, hooking up music with his cousin, Curtis Miller, in Miller's Tahoe. The vehicle was parked in the driveway of Shaw's apartment complex. Helping him were his younger brother, Othelon, and Wallace. At some point, another cousin, Albert Darrett, arrived with his girlfriend in a black Tahoe and parked on the wrong side of the street.

Anthony went up to the driver's side of the vehicle to talk to Darrett,

and leaned in as they conversed. Anthony was moving away from the vehicle when he saw a tall person, weighing about 200 pounds, in the middle of the street. The person, who was dressed all in black, started shooting toward the house. Anthony only saw one person, and could not tell if it was a man or a woman or the person's race, because the person had on a hoodie with the hood up.[fn9]

> **FN9**: Anthony had no vision in his right eye, having been shot in 2004. He was also grazed in the head in 2005. His older half-brother, Deshawn Peterson, was shot and killed on Feliz Drive about four years earlier. Anthony had met Johnson, who was Peterson's cousin, one time about six years earlier. Anthony was a child when he last saw Johnson, and would not recognize him if he saw him again. He did not see Johnson on the night of April 19, although he had heard that Johnson used to cut people's hair in the area.

At some point, Anthony was shown photographic lineups containing Johnson's and Lee's pictures. Anthony did not identify either defendant as one of the shooters. He said it was dark and he did not get a good look at the people who shot him.

Anthony ran toward the back door of Shaw's residence. He believed Wallace was by Miller's truck, and Miller was inside the truck. Wallace was running ahead of Anthony toward the house, then Anthony saw Wallace fall down. Anthony ran through the back entrance and out the front. Wallace was on the front porch, lying on his stomach on the step in a pool of blood.

Anthony believed he heard about five shots. He was struck above the right hip. The bullet remained in his body at the time of trial, as he refused to have it removed for fear of possible complications.[fn10]

> **FN10**: Sheriff's Sergeant Marshall interviewed Anthony at the hospital on the evening of the shooting. Anthony related that he saw a Black male, about five feet eight or nine inches tall, wearing a black hoodie, walking from west to east across the street near a white van. The shooter was by the white van, and when the shooting started, Anthony ran. He was in the parking lot of the apartment complex when he felt himself get hit with a bullet. When Marshall explained that he really needed the bullet as physical evidence, Anthony agreed to have an elective procedure so it could be retrieved. He did not express any hesitation about having the surgery.

As of April 19, Albert Darrett resided in Bakersfield with his girlfriend, Vanessa Alcala, and her mother and child. Alcala was pregnant with Darrett's son.

Darrett worked in oilfield construction.[fn11] On April 19, he needed to cash his paycheck, so he picked up Alcala and they drove in his black Chevrolet Tahoe to the store on the corner of Feliz Drive and Cottonwood Road. After he cashed his check, they went south on Cottonwood Road to the first street, McNew Court, and went to Shaw's house. Shaw was Darrett's aunt, and it was his habit to stop by her house for a few minutes

every day after work. On April 19, family and friends were in her driveway. Curtis Miller was one of the cousins who was there. Like Darrett, Miller drove a black Chevrolet Tahoe, which was parked at Shaw's residence.

> **FN11**: Darrett admitted being booked into the Kern County jail four days before the shooting, and stating at that time that he associated with the Crips. He denied saying, however, that he wanted to be kept away from Country Boy Crips. He initially denied, but then admitted, once having a tattoo on his arm that read "805 ESC," meaning the area code for Bakersfield and Eastside Crip. He was about 15 years old when he got the tattoo. He was older by the time of trial and not in a gang, although he knew people who were in the Eastside Crips.

Darrett pulled over on the wrong side of the street (facing west) next to the driveway, left his vehicle running, and started talking to his cousin, Anthony, who was at the driver's side door. Alcala remained in the passenger seat. Darrett and Anthony conversed for a couple of minutes. It was light out, but getting dark. Darrett saw two people walking up the opposite side of the street, headed in the direction of Cottonwood Road. They were about halfway down the block when he first saw them, and he did not pay much attention to them. He did not see either of them get out of an automobile or come out of a house, and he saw nothing in either one's hands.

Darrett continued to talk to Anthony, then glanced at the two and saw them crossing the street in a diagonal direction toward him. They crossed the street together, then came up to the car and spread out so they were a couple of feet apart. One was toward the passenger's side of the vehicle, while the other was right in front of it. Both were no more than five feet from the vehicle, and both then started shooting. One shot toward the apartment complex, while the other shot toward the vehicle. Darrett tried to duck. He did not hear anything from Alcala or see what she or anyone else did.

After the shooting stopped, Darrett saw the two men running back in the direction from which they had come. Although he did not see their faces, he believed they were African-American. They appeared to be around 5 feet 10 or 11 inches tall, and were thin. Although Darrett could not tell their approximate ages, he believed they were younger than him.[fn12] Both were dressed all in black. At least one, and possibly both, wore a black hooded sweatshirt with the hood pulled over his head. Darrett tried to run them over, but was unsuccessful because they ran back the other direction, toward Cottonwood Road. They separated, with one running north toward Feliz Drive, and one running south toward Cannon, via the dirt alleyway next to Shaw's apartment. Darrett did not see either of them taking off their clothes or trying to jump a fence to get away.

> **FN12**: Darrett was 31 years old as of December 19, 2008. Dixon was between five feet six and five feet seven inches tall.

Halfway up the block, Darrett turned to look at Alcala. She was bleeding and unresponsive, and he realized she had been shot. He drove

8

her to Kern Medical Center. He did not see either of the shooters exit onto Feliz Drive or any cars leaving or trying to flee, but he was not really paying attention.

At 7:58 p.m., the Kern County Sheriff's Department received a 911 call from the McNew Court address, reporting a shooting. Senior Deputy Lostaunau arrived four minutes later, and the helicopter and other deputies shortly after that. Lostaunau, who was in the gang unit at the time, had driven down several of the streets in the area before the shooting was reported, looking for people to contact or anything that appeared to be out of the ordinary. He did not come across any parked car containing three African-American males or make contact with a group of three African-American males on foot. He did not see anybody jumping fences or running, or any vehicle fleeing at a high rate of speed.

Lostaunau parked a few feet west of the driveway into the apartments and found empty cartridge casings on the ground at his feet when he got out of his car.[fn13] He also smelled gunpowder and saw a person down on the ground in front of the apartment. He could hear screaming coming from the apartment.

**FN13**: Five spent .38-caliber Super Plus P shell casings were found. That kind of ammunition normally is used in semiautomatic firearms. No fingerprints were found on the casings. The core of a round of jacketed ammunition was found in the front passenger side door of Darrett's vehicle. The spent shell casings found on McNew Court were fired from the same firearm. A partial fingerprint, which could not be identified when compared to the prints of defendants, Darrett, and Alcala, was found on the rear passenger window exterior.

Detective Armendariz investigated a number of vehicles at or near the scene of the shooting. None were registered to or associated with any defendant. The white van parked across the street and to the west of Shaw's residence belonged to the Fuentes family.

Lostaunau approached the apartment and asked what happened and who did it. Someone inside yelled that it was a Black male, and Lostaunau broadcast that over his radio. He then started attending to Wallace. When he put his hand on Wallace's back, he felt it rise at least once with a breath. Within seconds, however, Lostaunau could feel no more breathing and was unable to find a pulse. Deputy Adams, a former paramedic, determined Wallace was deceased.

Around 8:00 p.m., Leon Reyes was asleep in the back room of his house on the south side of McNew Court, in the same block as Shaw's residence, when he heard a racket at the fence separating his front yard from his back yard on the west side of the house. He stepped out onto his back porch and saw someone jump the fence separating his back yard from his neighbor to the south. He could not see who it was, but the person could have been wearing dark clothing.

Reyes immediately went to the front yard to check on his car. As he did, he saw Deputy Ollague going down McNew Court. Reyes informed Ollague that a subject wearing white tennis shoes and dark clothing had

just gone over his fence. Ollague and a K-9 deputy searched the front and back yards, but found nothing.

One of the units responding to the scene was the helicopter, Air One. It did not report anyone who appeared to be fleeing the scene, although it did report a subject walking on Feliz Drive near Cottonwood Road, a location one block north of the shooting and east of where the dirt alley from McNew Court came out onto Feliz Drive. The subject appeared to be wearing dark clothing and white shoes. Contact was made with this person, a teenager, who was searched, questioned, and released.

Just before 8:00 p.m. on April 19, Rebecca Martinez, who lived in the 1200 block of McNew Court, heard five to six gunshots, a scream that sounded female, and tires "peeling out." Martinez called 911. When Sheriff's Sergeant Rennie contacted her, she pointed him to the house directly across the street, where a large dog was barking near the east fence line. Martinez suggested Rennie check that yard, because the residents were not home and the dog rarely barked.

Rennie checked the house and saw that it appeared to be secure. When he looked under one of the vehicles parked in the driveway of the house immediately to the east, which was across the street and four houses down from the location of the shooting, however, he saw a small pile of dark clothing that consisted of a dark-colored baseball cap bearing the Boston Red Sox logo (a red B), a Nike brand U.S.A. Basketball Michael Jordan jersey, a dark blue or black Navy-style Volcom-brand pea coat, and a beige or tan American Dawn-brand smock-type shirt. A Samsung cellular telephone was found in one of the coat pockets. The clothes did not belong to anyone in that household, and had not been there earlier that evening.[fn14]

> **FN14**: From March 16 through April 12, Johnson attended Bakersfield Barber College. Students were required to wear a tan, short-sleeved smock. The school generally issued students a Brick McMann-brand smock with an American Dawn logo.

Following their arrests, DNA samples were obtained from defendants and compared to DNA extracted from various places on the items of clothing. All three defendants were among the five or more contributors to the DNA found on the coat. Because of the number of contributors, the astronomically rare frequencies (probability of finding that genetic profile in the general population) typically found with a single-source genetic profile were not obtained. Thus, for example, although Johnson was included as a contributor to the mixture found on the coat collar, approximately one in 25 people could also have had the same profile and been contributors. The frequencies were similarly common with respect to Lee and Dixon. Where such common frequencies were obtained, Gary Harmor, the senior forensic serologist at the Serological Research Institute who conducted the DNA analysis in this case, could not say with certainty that a particular defendant touched the particular item.

DNA extracted from various places on the smock was also a mixture of contributors, with all three defendants included. Frequencies again were common, except with respect to the three-contributor mixture found on the inside front collar. Johnson's genetic types showed up

10

strongly enough that it could be determined only approximately one out of every 1.1 million people would have genetic types consistent with what was found in the evidence compared to Johnson.

DNA extracted from the jersey was also a mixture of contributors. Lee was excluded as a possible contributor. Dixon could not be excluded. Johnson was included as a possible contributor; with respect to the mixture found on the inside front collar, only one in 8.8 million people could have the same types. A frequency calculation of that magnitude was quite significant where a mixture was concerned.

DNA extracted from the sweatband of the cap was a mixture of at least four contributors. Johnson could not be excluded as a contributor, but the statistical analysis showed that approximately one in 1144 persons would have a type similar to that contributor. Lee and Dixon were excluded as contributors to the DNA on the baseball cap.

Senior Deputy Little contacted Othelon at the scene. After learning that Othelon had witnessed some of what happened, Little took Othelon to his patrol car, activated his tape recorder, and took his statement. Othelon was cooperative.

Othelon told Little that he was sitting in the backseat of his cousin's truck, eating and hooking up music, when his cousin Darrett and Alcala pulled up. They were facing west, and Anthony, Miller, and Wallace were standing by the driver's side, talking to Darrett. Othelon heard shots. He opened the door and looked back, and saw one of the assailants jump the fence into a field. This person was wearing a black hoodie with the hood up, and a white Pro Club shirt over the black hoodie. He was African-American, 18 to 20 years old, around six feet tall and 180 to 185 pounds, and with a dark complexion. Othelon did not see this one with a gun. The other one ran down the alley. He was dressed all in black. He had a handgun pointed toward Shaw's house and was running southbound. He was African-American, 18 to 19 years old, about 5 feet 10 inches tall, weighed 160 or 165 pounds, and was dark-complected. One of the two had a "punk" hairstyle, a "short bush [A]fro."[fn15] The gun was all black and sounded like a nine-millimeter. Nothing was said before the shooting started. After, everyone ran into the house. Wallace only made it to the porch.

> **FN15**: Little was in contact with Johnson sometime after the shooting. Johnson did not have an Afro, nor was a small Afro wig found. Little also saw Dixon two days after the McNew Court shootings. There was no indication Dixon shaved or cut his hair in the preceding couple of days, nor were any wigs found on him.

Othelon related that he did not see any cars come up and stop anywhere in the area before the shooting started, and that he did not notice the shooters until after they had stopped shooting. Othelon estimated he heard at least eight shots, and that it sounded like they all came from the same gun. He did not recognize either of the assailants, although he believed he would probably recognize them if he saw them again.[fn16]

**FN16**: At trial, Othelon testified that just before the shooting, he was sitting in Miller's truck, installing stereo speakers. He further testified that the only time he ever saw Dixon was when they both were in prison sometime after the shooting, but the two were in different locations and never met. Beyond that, Othelon claimed that he was unable to remember anything, did not want to testify, and was not going to identify anyone. He did not remember talking to Little or what he told the grand jury.

Kern County Sheriff's Senior Deputy Pratt spoke to Othelon on February 1, 2008, while Othelon was in prison. Othelon admitted being a gang member. He said he was Eastside or Stroller Boys, and that at the time of the shooting, things had been "pretty tense" between Eastside and the Country. Pratt again talked to Othelon on December 10, 2008, after Othelon paroled, with respect to a rumor Pratt had heard about Othelon being threatened by Dixon while in prison. Othelon denied being threatened and said that if Dixon had threatened him, Othelon would have "taken him out." Othelon told Pratt that he used to live in the Country and knew Dixon from his childhood, when they would ride dirt bikes together. Othelon said Dixon told him, as kind of an apology, "I didn't know it was your auntie's house."

When brought into the hospital, Alcala was in a deep coma. She had a penetrating injury to the posterior portion of the occipital area of the brain, with the entry site on the right lower back portion of the skull and the bullet's direction of travel upward to the left, and back to front. There were bone and metallic fragments in her brain. She died during surgery performed in an attempt to control her continued rapid bleeding. The cause of death was gunshot wound of the head. Alcala was pregnant with a boy whose gestational age was approximately 12 to 14 weeks. The fetus was medically healthy and died as a result of the mother's gunshot wound to the head.

Wallace suffered an entrance gunshot wound to the right side of his chest, underneath the armpit, with an exit wound in the left shoulder area. The bullet traveled right to left and slightly upward. The absence of soot or stippling indicated the weapon was more than three to four feet from him when the shot was fired. The cause of death was gunshot wound of the chest. As the bullet injured internal organs and major vasculature of the heart, he lived a matter of a minute to minutes after he was shot.

The day after the shooting, Marshall and Little began investigating the Samsung cell phone found in the coat pocket. Marshall ultimately was able to determine the phone's number. At about 2:00 p.m., the phone rang, and the caller asked for "Dodo." Little checked some law enforcement databases and discovered that Dixon used the moniker Dodo. Little obtained photographs of Dixon maintained by law enforcement. They revealed that Dixon bore tattoos related to the Country Boy Crips and its Watts and Lotus clique. There were photographs of Dixon stored in the phone's memory. The screensaver for the phone read, "Watts wit it."

Further investigation into Dixon led Little to an apartment in the 2600 block of Chandler Court, Bakersfield, which was the residence of Myeshia Herring. Myeshia related that Dixon had called her and said he

needed a place to stay because of some parole issues. She texted him the address. He moved in Wednesday, April 18; she did not see him at all on Thursday, April 19; they left together on Friday, April 20; when she got back early Saturday morning, he was not there, but he was there when she got up later that day; later on Saturday, he left with Myeshia's friend, Gina Stewart, in a white 1990's Chevrolet Caprice. Little examined Myeshia's cell phone, which contained the number of the Samsung cell phone found in the coat pocket in the address book under the name "friend."

Little told Myeshia to tell Dixon to call Little when she saw Dixon. About three hours later, Dixon contacted Little and then voluntarily came to the sheriff's office. Little took identifying photographs and more detailed photographs of Dixon's tattoos. Dixon, who was wearing dark blue pants and light blue boxers, was allowed to leave after he was photographed.

On April 25, Little interviewed Myeshia again.[fn17] Myeshia reiterated that Dixon needed a place to stay, and she simply replied by text message to whatever number he used to contact her. Dixon moved into the apartment Wednesday and spent the night. Thursday, the night of the McNew Court shootings, he was at the apartment in the daytime, but not at night. When Myeshia woke Friday morning, Dixon was not there, but he did spend the night Friday. Myeshia related that he had Dixon's number stored in her phone as "friend," and that he had grown suspicious of her after Little interviewed her the first time.

> **FN17**: At trial, Myeshia either denied, or testified she did not recall, telling Little anything about Dixon during the interview. A video recording of the interview was shown to the jury.

Myeshia related that her nickname was "Messy 1," and that she had known Dixon since they were in junior high school. She said she saw Dixon on the day he got out of prison. With respect to the Samsung cell phone found in the coat pocket, Myeshia related that her sister Mikeshiea gave the cell phone to Dixon shortly after his release from prison. Myeshia said that every time she called that phone, Dixon answered.

Myeshia related that about a week before this interview, Dixon called Myeshia from a number she did not recognize. When she asked him about why he was calling from that number, he said he did not have his other phone because he had lost it. When she asked how he lost it, he told her not to worry about it.

Myeshia said she had known Johnson for several years. He had a girlfriend who was Hispanic and several years older than him. Myeshia said she had never known Johnson and Dixon to be close. Dixon was always by himself or with "the girls."

Meanwhile, Marshall obtained a search warrant for the subscriber information and tolls for the Samsung cell phone found in the coat pocket. Records listed the phone's subscriber as Dominique S. Clayton, with an address in the 4400 block of Balboa Drive, Bakersfield. The phone was activated on March 10. On the evening of April 27, Rennie and Little went to an apartment in the 4400 block of Balboa Drive — the same street address as the subscriber of the phone found in the coat — to interview

Mikeshiea. Mikeshiea's middle name was Dominique, and she had a child by Gary Clayton.

Mikeshiea gave Little and Rennie permission to enter to look for Dixon. They did not find him. Mikeshiea denied knowing anyone named Dominique Clayton or ever giving Dixon a cell phone, although she admitted knowing someone named Dodo and identified Dixon's photograph.

Little examined Mikeshiea's cell phone. The screen read "Messina #2." When he inquired of Mikeshiea, she said that she and her sister Myeshia used the names "Messy 1" and "Messy 2." Mikeshiea said she was Messy 2, while Myeshia was Messy 1. Little found no reference in Mikeshiea's phone's contents to the number of the Samsung cell phone found in the coat pocket or to the name Dodo. There was, however, a number for "Pook," whom Mikeshiea identified as Columbus Holford and with whom Little was familiar.[fn18]

> **FN18**: Mikeshiea testified at trial that she and Myeshia never went by the nicknames Messy 1 and Messy 2. On Mikeshiea's MySpace page, however, she referred to herself as Messy, while people who posted messages to her referred to her as Messy or Messy 2. At trial, Mikeshiea testified that she had never heard of or called the number of the cell phone found on McNew Court and did not know Dixon personally, although she knew him to be a friend of her sister. She denied ever giving him a cell phone.

Myeshia also denied telling Little the things to which he testified. She testified that she had only known Dixon, whom she knew as Dodo, for a couple of years. Although she was aware he went to prison, she did not meet with him the first day he got out. She did not know if Dixon had a cell phone. She and Mikeshiea did not help him get that phone. Myeshia had seen Johnson and knew who he was, but had not spoken to him. Myeshia knew Lee, as he had lived on the same street as her grandmother, and he and Myeshia went to the same church. However, she denied ever talking to him. Myeshia admitted allowing Dixon to use her address as a mailing address, but denied that he ever moved in with her. She denied ever texting Dixon her address.

The phone found at the scene listed Messy 1 and Messy 2 as the first two contacts in its address book. A text message stored in the phone from Messy 2, dated April 21, read, "Friend, are you okay? Call me. It's important. Please call me." Another text message in the phone, dated April 16 and from Messy 1, gave an address in the 2600 block of Chandler Court. The address, which was the same as that determined to belong to Dixon, was Myeshia's apartment. One of the text messages from Messy 1 was directed to Dodo. One of the texts, dated March 27, read, "F-u-c-c U." Kern County Sheriff's Senior Deputy Pratt had seen that spelling in the course of gang investigations. According to some people, "CK" is not used because it stands for "Crip Killer." According to others, "CC" stands for "Country Boy Crips."

Cell phone records showed calls between Dixon's phone that was found in the coat pocket at the McNew Court crime scene and Mikeshiea's

and Holford's phones. Records further showed a series of eight calls, beginning at 7:19 p.m., made from Dixon's phone to a number determined to belong to Lee's cell phone. A search warrant was obtained, and records seized, for Lee's phone number.

Cell phone and cell tower records for Dixon's phone showed a grouping of calls occurring in the vicinity of the cell phone antenna with coverage of the McNew Court area, from 7:14 p.m. through 7:45 p.m. The first six were made on the antenna consistent with the shooting scene in the 1300 block of McNew Court. The seventh call, which was made beginning at 7:45 p.m., was almost four minutes long. It began on the antenna consistent with the 1300 block of McNew Court, but ended on the antenna consistent with the 1200 block of McNew Court. The eighth call did not register on an antenna, which was consistent with the phone being powered off, either intentionally or because the battery died. This last call was an incoming call from Lee's phone that occurred at 7:54 p.m. Records further showed activity that was consistent with Dixon's phone being in the area of Inyo and Monterey at 6:45 p.m. on March 21.

Records for Lee's phone showed that when the 7:19 p.m. call was received from Dixon's phone, Lee's phone was north of Highway 58, which in turn was north of McNew Court. By the time the 7:25 p.m. call was received, Lee's phone had moved south of Highway 58, in an area covered by the antenna that had coverage of the McNew Court vicinity. The third call from Dixon's phone to Lee's phone occurred at 7:40 p.m. Dixon's phone was on the antenna that encompassed the 1300 block of McNew Court. The next incoming call was the nearly four-minute one; Lee's phone was still on the same antenna. The outgoing call at 7:54 p.m. was moving away from that antenna. The next call, made at 8:02 p.m., which was after the shootings were reported, was from the antenna that covered Cottonwood Road and Highway 58. The phone was probably north of the highway at the time; the call was outgoing to a number associated with Joseph Gage, whose moniker was "Gage." Dixon's phone had contact with that number before the shootings.

Events Surrounding August 11, 2007

Sometime after 9:00 p.m. on March 25, Adrian Bonner was getting a tattoo at a tattoo parlor in the vicinity of H and 20th Streets, in downtown Bakersfield, when Lee and a light-skinned, green-eyed Black male came in. Bonner knew of Lee, although he did not know him personally, because each had once dated Saleta Roseburr. Bonner last saw Lee about a month before Lee walked into the tattoo parlor.

When Lee walked in, he and Bonner made eye contact, and Lee acknowledged the people he knew there. He asked Bonner's female friend if this was her "dude." When she said yes, Lee talked a little more and then walked back outside.

Lee was outside a minute or two. Bonner did not know what he was doing. Lee then walked back inside, went up to Bonner, and asked if Bonner was a Blood. He also said something like, "[T]his Little Gunner Loc from South Side Crip. I just want you to know where you're at." Bonner was aware the Bloods were a criminal street gang and that their color was red. He did not believe he was wearing any red that night.

The tattoo artist said it was a place of business and that they did not have to worry about any of that there. The situation caused Bonner to start feeling nervous, and so he asked for a cell phone so he could call a family member and let that person know his whereabouts. His girlfriend handed him her phone, and he dialed all the relatives he thought would be home, but got no answer.

During this time, Lee produced a cell phone and started showing everyone the pictures on it and telling them to look at what was done to his hand, which was bandaged, and his truck. Curious, Bonner asked to see. He saw a picture of injuries to Lee's finger, and of a truck with bullet holes in the windshield.

The artist was still doing Bonner's tattoo, and Lee went outside and came back in a couple more times. At some point, one of the other males said, "your homeboy Rifle's here." Lee walked outside, then returned a few seconds later with Johnson, whom Bonner had never seen before. Lee sat down, but Johnson kept walking in and out of the parlor and looking at Bonner in an awkward kind of way. By this point, Bonner was feeling very intimidated.

When the tattoo was finished, Bonner got up, shook the artist's hand, and paid him. Lee was sitting on the couch a few feet from Bonner, talking about how his pain medicine had him tired. Bonner also shook another male's hand. He then extended his hand to the third male, but that person just looked at him and said, "nah, Watts."[fn19] Bonner knew what this meant and that Watts was located in the Country.

**FN19**: Neither of these males was Dixon, who was not in the tattoo parlor.

Bonner turned to leave. As he was on his way out, however, Johnson, who was standing in the doorway, struck him in the face with his fist. The person to whom Bonner had extended his hand also started hitting him. Both Johnson and the other man struck Bonner multiple times. Dazed and almost unconscious, Bonner tried to cover up as he lay on the floor of the tattoo parlor, being hit and kicked. He did not know where Lee was.

At some point, the blows stopped. Bonner got up and ran. He could hear voices coming from the alley, threatening to get him and kill him. He ran until he felt he was a safe distance away, ending up a couple of blocks away at a men's shelter. He went inside and stayed there for 45 minutes to an hour, then one of the residents was able to contact Bonner's girlfriend. She took him to his cousin's house, and Bonner contacted his father. Although Bonner did not give a statement to police that night, his father did.

Bonner was not a Blood, but he had friends and family members who were. He associated with Bloods "all the time." The Eastside, Westside, and Country were the Bloods' rivals. As of March, Bonner was acquainted with Daniel Davis (Grinnage's son), who lived on Deborah Street. Bonner would regularly visit Davis at that house, as would Bloods. In Bonner's estimation, that house was a Blood hangout. A couple blocks away, on Deanna Street, was a house where Country Boys tended to congregate. Bonner had seen Lee there on a couple of occasions. Lee

was driving a Tahoe at the time, the same one in the pictures in Lee's cell phone. At the time, the Bloods did not really have a territory, just certain places they would be at. One of these places was on the east side, near Monterey Street.

Between March 25 and August 11, Bonner saw Lee a couple of times in traffic. Both times, Lee was in a black Volkswagen Jetta or Passat.

On August 11, Bonner was living with his sister in the southwest part of Bakersfield. About 10:30 that morning, he borrowed a car and drove to the Denny's on White Lane. He was alone. While he waited for his order, which he had already called in, he talked to Saleta Roseburr, who worked there. Bonner felt someone staring at him, and turned to see a person he knew as "Cutty Pete." Bonner knew him from a prior incident in which he and Bonner's cousin had had an altercation. At that time, Cutty Pete said he was from the Country, meaning he was a Country Boy Crip.

Bonner and Cutty Pete exchanged words. Cutty Pete threatened to hurt Bonner, who laughed at him. Bonner got his order and got back in his vehicle, at which time Cutty Pete came to the door of the restaurant and started "[t]hrowing up signs" through the window and saying things Bonner could not hear. This occurred shortly after 11:00 a.m. Bonner did not see Cutty Pete any other time that day.

Later that morning, Bonner picked up his friends, Paul and Dwayne, who lived directly south of the Foods Co. at White Lane and South H Street, and headed toward a barbershop in the vicinity of Real and Wilson Roads. They were at the barbershop for approximately three hours. Another friend was there, and he asked for a ride. Bonner took him home, then took Paul and Dwayne back to their house.

Bonner next went to the Taco Bell by Foods Co. to eat. It was around 4:00 or 5:00 p.m. Although he was wearing all red that day, he was not trying to dress like a Blood; it simply happened to be what he had on. As he was leaving the parking lot, he saw Lee two, to two and a half, car lengths away from him in a 2001 or later small, four-door, reddish-burgundy car that Bonner believed was a Suzuki Forenza. Lee, who appeared to be alone, did a double- or triple-take, and Bonner made eye contact with him. Bonner then pursued him in the vehicle, and ended up directly behind him, headed east on White Lane. Bonner wanted to fight Lee because of what had happened at the tattoo parlor.

The light at South H Street and White Lane turned red, and both cars stopped. It looked like Lee was going to go straight, but then he ran the red light and turned left, heading north on South H Street. Bonner did not follow, but instead made a U-turn and headed back to Paul's house. He wanted to let Paul know that Lee was in the area. Bonner was concerned that if Lee had seen Bonner in the car earlier in front of Paul's house, something could happen at the house.

Bonner remained at Paul's house for five or 10 minutes, then headed out to return the car. His route took him north on South H Street, then west on Planz. As he came to where Real Road dead-ends into Planz, the light turned red for traffic on Planz. Bonner stopped. His was the fourth car back from the intersection. He was listening to music when

he heard a loud popping sound and felt his body jolt. Out of the corner of his eye, he saw a burgundy vehicle passing by the passenger side of his car. He did not know if it was the same car Lee had been driving earlier, although it was the same color, or even if the shots came from that car. He did not see who or how many were in the vehicle.

Bonner knew immediately it was a gunshot, but did not know if it was more than one, as it all sounded like one drawn-out noise. He felt something hit him, and checked himself over. His vision blurred, and when he began to move, he started to feel a burning sensation in his abdomen. He tried to get out of the car, but could not move his legs. He felt only tingling in his lower body. He was able to get the car to roll, and so made a right turn onto Real Road, and the first left turn possible, which was into the driveway of someone's house. Someone there called 911 and an ambulance. About 20 minutes had elapsed from when he saw Lee on South H Street to when he was shot.

When talking to the officer at the scene, Bonner never mentioned Lee or the other defendants. He said he did not know who shot him and could not describe the suspects, although he thought the shooter was the person with whom he had had the altercation at Denny's. In light of Cutty Pete's belligerence and aggressiveness, Bonner had considered the incident with him more significant than the incident with Lee in the parking lot.

Christopher Calloway lived at the house on the corner of Real Road and Planz. Around 7:22 p.m., he was outside when he heard at least two gunshots. He saw a car waiting at the red light. A second car pulled up on the right side and someone in the second car shot toward the other car. Calloway believed there were three individuals in the car from which the shots were fired. The shooter was a darker-skinned African-American male wearing a black hat or do-rag, sitting toward the left side of the vehicle in the back seat. The driver and front passenger also were African-American and, Calloway believed, male. The shooter's arms, shoulders, and head were outside the window until after the second shot. The gun was a black handgun. The car was a burgundy color, possibly a newer-model (late-1990's or early 2000's) Ford Taurus or something of that nature. Calloway believed it was a four-door model. The car rounded the corner and then sped north on South Real Road. Calloway could not say whether any defendant was in the car from which the shots were fired.

Ruben Gonzaga and some friends were outside a house on the south side of Planz, talking, when Gonzaga heard a loud pop. He saw gun smoke outside one of the windows of a cherry red, four-door car — possibly a Chevrolet sedan or Ford Taurus — that sped off. He believed he heard two shots. He could see at least two people in the car, but believed there may have been three or four. Gonzaga was unable to tell who in the car was shooting or the race of anyone in the vehicle.

Talia Zarate and Bryan Kunzmann were traveling westbound on Planz and had to stop for a red light at Real Road. There was one car stopped in front of them. They had been at a full stop for a couple of seconds when a small, four-door, maroon or cranberry-colored car pulled up beside the vehicle stopped in front of Zarate. A young, dark-complected African-American rolled down the driver's side rear window. He was wearing a black beanie cap and had a goatee. Half of his body

came out of the vehicle, and he started shooting a black gun at the vehicle in front of Zarate. He was using a two-handed grip. Zarate did not know if anyone other than the shooter and the driver was in the car. She did not know if any defendants were in the car.

Kunzmann described the car as being either dark red or burgundy. It was a late, four-door model, and either a Ford Taurus or something with that type of rounded body style.[fn20] The shooter, whose arms were outside of the car window, was an African-American male in his early 20's, wearing a black sweatshirt or long-sleeved T-shirt, and a black hat or beanie. He had a neatly trimmed goatee. There were three people in the car, all African-American males: the driver, the front passenger, and the driver's side rear passenger.

> **FN20**: In his 911 call, Kunzmann said the car was red and looked like a Toyota Corolla.

Bonner was shot in the right side of the chest, close to the armpit.[fn21] The bullet caused major, life-threatening abdominal injuries, including the loss of a kidney and damage to the spinal cord. He underwent almost immediate surgery to control internal exsanguinating hemorrhage. As a result of the gunshot wound, Bonner was left a permanent paraplegic. The bullet was not recovered, because it was lodged in the spine, and the neurosurgeons felt it would be too dangerous to attempt to remove it.

> **FN21**: He suffered a second injury in the same area, but it could not be identified with certainty as a bullet wound. When Kunzmann spoke to him immediately after the shooting, however, Bonner said he had been hit twice. In addition, Officer Vasquez saw two bullet holes in the car, one on the right rear passenger quarter panel, and the other on the passenger-side front by the door handle. Two expended nine-millimeter shell casings were found on the east side of the intersection. They had been fired from the same gun.

Later that month, Kunzmann was shown three photographic lineups, one containing each defendant. He did not identify, select, or eliminate anyone. However, records for Lee's cell phone showed that calls made or received between 10:17 a.m. and 3:52 p.m. were routed through the cell antenna site near Lee's residence on Myrtle Street. Calls between 4:22 p.m. and 4:34 p.m. were routed on the antenna at South Real and Wilson Roads. Calls between 4:58 p.m. and 6:48 p.m. were routed on the antenna that covered an apartment complex at Eye Street, although the calls moved from the side of the antenna facing due north to the side facing southeast during that time. Between 6:48 p.m. and 7:01 p.m., there were several calls between Johnson's residence on Thoreson Court and Lee's phone. At 7:18 p.m., a call was made from Lee's phone that, given the cell phone tower on which it originated, was consistent with the phone being to the east, or at the corner, of South Real Road and Planz. At 7:28 p.m., the antenna registered a call that was consistent with the phone being in the Thoreson Court area. The phone then moved north.

On August 16, Kern County Sheriff's Senior Deputy Little, and Bakersfield Police Detectives Heredia and Darbee, flew to Las Vegas,

Nevada, to interview Sara Agustin, a woman who had been in a prior relationship with Johnson. The detectives returned her to Bakersfield, where she pointed out various locations to them. Agustin also provided telephone numbers of people she knew during the time she lived with Johnson, together with photographs and credit card statements.

Shortly after 8:00 p.m. on August 23, Bakersfield Police Officer Finney and his partner, Officer Ursery — both assigned to SEU — were on patrol on Dobrusky Drive in Bakersfield, an area within the traditional boundaries of the Westside Crips. They observed a gray Nissan, motor running, parked in front of a house from which Finney previously had seized firearms. Columbus Holford, who lived there and whom they knew to be a Country Boy Crip with the moniker "Pookie," was speaking to three subjects inside the car.

As the officers approached, Finney recognized Dixon as the Nissan's driver. Aware Dixon was on parole, Finney yelled at him a couple of times to turn off the car and step out so he could perform a parole search. At first there was no reaction, but then Dixon accelerated away. A vehicle pursuit ensued.

In front of an apartment complex in the 100 block of L Street, Dixon stopped, and the occupant in the front passenger seat jumped out of the vehicle. Ursery pursued him on foot. The individual was a dark-skinned African-American male, six feet or six feet one inch tall, about 175 pounds, with short hair. Ursery was unable to catch him.

Meanwhile, Dixon again sped off. At one point, he drove through the 200 block of Eye Street, then subsequently returned to the apartment complex on L Street. There, the car again stopped. The driver's door opened, then, after about 15 seconds, closed again and the pursuit resumed. On northbound Chester, the vehicle pulled into the center turn lane in the 200 block and slowed significantly. Dixon jumped out and ran, eventually climbing the back wall of the parking lot for an apartment complex in the 200 block of Eye Street. The vehicle continued on until it hit a curb and came to a stop. Finney followed it and found Lee sitting in the rear passenger-side seat. In a partially unzipped lunch pouch on the left rear seat, directly behind the driver, were a loaded Tec-9 pistol and additional rounds of ammunition.

The Nissan had been reported stolen from an apartment in the complex in the 200 block of Eye Street, although investigation revealed it had not actually been stolen. Officers determined that Dixon had jumped a wall to the east of the complex. On the west side of the wall, in the apartment complex's rear parking lot, were three live rounds of ammunition. One of the cars parked in the lot at the back of the complex at that time was red.

Dixon was arrested shortly after midnight on August 24. He was taken into custody at his residence in the 2900 block of Half Moon.

On October 1, Kern County Sheriff's Senior Deputy Lopez and other officers executed a search warrant at the residence on Myrtle Street in which Lee lived with his father. Lee was in custody at the time. Lopez found letters referencing gang activity that were addressed to Lee and appeared to be from his brother in prison, photographs depicting persons

throwing gang signs, and rap lyrics containing references to gang activity. Also found were a gas mask, some articles of powder blue clothing, multiple rounds of various calibers of ammunition, and a baggie containing a usable amount of marijuana.

That same day, Lopez and his team executed a search warrant at the apartment in the 2900 block of North Half Moon at which Dixon had been residing. Dixon was in custody at the time of the search. In addition to some bills addressed to Dixon at that address, officers found a California identification card for Johnson.

Sara Agustin's Testimony

Sara Agustin, who testified under a grant of immunity, first met Johnson in late September 2006, when he was 20 years old and she was 36. She was driving to a market on Cottonwood Road and Casino to purchase marijuana, when she saw Johnson and his friend, "Fat-Fat," walking to the market. Agustin pulled over and asked Johnson if he knew where she could purchase marijuana. Johnson eventually directed her to the house of a drug dealer, about three blocks away. The dealer's nickname was "Reese," and he lived on Reese Street. With money provided by Agustin, Johnson purchased marijuana, then he, Agustin, and Fat-Fat went to the latter's apartment and smoked some. Agustin and Johnson exchanged telephone numbers.

During the next month to month and a half, Agustin and Johnson shared the common bond of smoking marijuana, and they had fun together. At the same time, Agustin's relationship with her husband deteriorated, and they separated just before Thanksgiving 2006. Johnson and Agustin then moved into an apartment in the 2500 block of Encina Street in Bakersfield. Agustin was employed at the time, but Johnson was not. He told Agustin he was selling crack cocaine, and showed her white rocks. He said he "post[ed]" himself at the market where they first met, meaning he sold the drugs there. Johnson said he got his cocaine from his uncle and "Two C's."

When Agustin first met Johnson, she did not know whether he was in a criminal street gang. She became suspicious, however, when he would take her to the Country and she would see his behavior.[fn22] They would be at an intersection, and he would see one of what he called his homies, and he would make what sounded like bird noises and make signs with his hand. Early in 2007, Johnson told Agustin that he was a member of the Country Boy Crips, and that they "pushed the hood," meaning they protected the neighborhood from rival gangs. Although Johnson did not grow up in the Country, he said he became a Country Boy Crip around the age of 14 or 15. Johnson explained that he was jumped by rival gang members then. They broke his jaw, and he began to "have hate towards certain types of individuals." That was what got him interested in being part of a gang. Johnson said the rivals of the Country Boy Crips were the Bloods and the Eastside, whom he derogatorily called "slobs" and "eggs." Johnson told Agustin that the Country Boy Crips did drive-by shootings and sold drugs.

**FN22**: The Country is considered the southeast part of Bakersfield. The main street is Cottonwood Road.

Johnson had several monikers, but was most commonly called "Rife" and "Rifle."[fn23] Johnson explained to Agustin that his "big hom[ie]," "Big Rifle," had given him that name because Johnson was someone "who was bold enough to really push the hood." Johnson said he admired Big Rifle, who was now deceased.

**FN23**: Agustin's daughter heard one person call him "Rifleman."

When Agustin first met Johnson, Johnson had several tattoos. On the first three fingers of one hand were an "E," an "S," and a "K," which Johnson said meant Eastside Killers. A tattoo on his chest read, "fuc[c] them other niggas." Johnson explained it was derogatory to his rival gangs. While they were living on Encina Street, he got a tattoo on his lower back that said "2007" and "NC." Johnson explained that 2007 was "the year of the Country," and that NC stood for Neighborhood Crips. He also pointed out Watts and Lotus to her and said he claimed or "pushed" Watts.

Agustin encouraged Johnson to quit selling drugs and learn a trade. He began going to barber school in early 2007. She also discouraged him from participating in the gang. Over the course of their relationship, however, Johnson began to tell Agustin about his gang activities. With respect to the gang, Johnson said he was the boss, so he pretty much did what he wanted to do. In order to have that position of leadership, he said he did anything necessary. During the middle of the relationship, while they were living on Encina Street, Johnson told Agustin that he was a hit man. He said that if other people in the gang needed something done, they called him, because he was the one who could get the job done. He was not afraid of anybody.

Agustin met Lee in around October 2006, when she had known Johnson a couple of weeks to a month. She met him through Johnson. Johnson referred to his friends as homies, loc, and cuz. He explained that Crips called each other Cuz. He also explained that powder blue was the color of the Country Boy Crips. Johnson sometimes wore that color, but he would wear any color. Sometimes his friends wore powder blue, but not on a regular basis.

After Agustin met Lee, she saw him often, as he was Johnson's best friend. Johnson said they had known each other since childhood. Lee lived on Myrtle Street with his father. Myrtle Street was in Central Bakersfield, not in the Country. However, Lee's mother lived in the Country. At some point, he told Agustin that he worked in Los Angeles as a respiratory therapist. She saw him in various automobiles during the time she lived on Encina Street, most often a powder blue Magnum that he liked to rent. He also had his own car, a small black vehicle. In the first part of 2007, Agustin and Johnson were at Lee's house on Myrtle Street. Somehow, the topic came up, and Lee said he hid guns in the backyard. He did not give a specific location.

Sometime after February, while living on Encina Street, Agustin heard Johnson and Lee talk about being Country Boy Crips. They carried

22

on conversations about their neighborhood and activities. They discussed drive-by shootings. On August 13, Agustin heard Johnson call Lee "Gunman." This was the only time she heard Lee called anything but "Dave." Agustin never saw Lee flash hand signs. Johnson was more blatant about being in a gang than Lee. Lee did not dress like a gang member.

Agustin knew Dixon only as Dodo. Although she did not meet him until the spring of 2007, he and Johnson were together almost daily during the time Agustin and Johnson lived on Encina Street. They were together even more frequently in July and August, after Agustin moved away and then returned to Bakersfield with Johnson. Agustin also often saw Lee with them while she lived on Encina Street, and more often during July and August. Occasionally, Dixon talked to Johnson, in Agustin's presence, about being a Country Boy Crip. In addition, Johnson told Agustin that Dixon was a Country Boy Crip, as was Lee. Johnson also identified "Big Gage," "Little Gage," "Nip," a woman named "Cece," her husband Jim Herron (also known as "Big Boy" or "Big Jim"), Bradley Walker (also known as "Bus Loc" or "Buzz Loc"), "Goo," "D-Keys," "Two C's," and someone Johnson referred to as "the light hom[ie]" as Country Boy Crips. Johnson obtained marijuana from Herron whenever he wanted. Agustin never saw him pay Herron. Herron also provided Johnson with Ecstasy. Agustin saw Dixon at Herron's house one time, and Lee there more than once but not often.

In January, around Martin Luther King, Jr.'s birthday, Johnson and Agustin attended a barbecue in Casa Loma Park, which was located in the Country. Johnson said it was the year of the Country, and they were going to celebrate it.[fn24] Johnson wore a black shirt that he designed. Lee had an identical shirt. According to Johnson, he and Lee drove to Los Angeles and had the shirts made specifically for them. Johnson's shirt read, from top to bottom, "2007," "S," "Wingstone," "Watts Blocc," "monstas." Johnson explained that S stood for Southerner, the side of town on which their gang neighborhood was located. Watts was the name of a street in Johnson's neighborhood in the Country, and the block he represented was Watts block. Monstas meant monsters, and Johnson said he was a monsta. The back of the shirt read, again from top to bottom, "Naybors," "Southsiders," "Shell Killa," "Country." Shell was one of the monikers used for rival gangs. It meant eggs. The phrase meant Johnson was a shell killer, i.e., someone who would kill an egg. Country was Johnson's neighborhood. Each sleeve bore the letters "SSC," for Southsider Country.

**FN24**: Dixon was in prison at the time. Agustin did not believe Lee was present, as she did not see him that day.

Two or three times in early 2007, Agustin went with Johnson to purchase marijuana at a house a couple of blocks off Pacheco Road. Agustin never met anyone who lived at the house, and never saw Dixon or Lee there. However, in the first part of 2007, Agustin was present when Lee and Johnson discussed Lee's car being hit by gunfire in the area of Pacheco Road.[fn25] Lee said he and Johnson had gone to the location on Pacheco Road to purchase some marijuana, and in the process, they were shot at by some individuals. Both told Agustin they themselves were not armed. Lee said his vehicle was shot numerous times. He and Johnson both were angry, and Johnson said they needed to go back and retaliate. Lee wanted to submit the damage to his insurance company, but

he said he regretted submitting the claim because the insurance company required a police report, and that was how the police department found out the shooting had taken place. Lee and Johnson did not talk about the specifics of what they were going to do or when.

**FN25**: The neighborhood containing Deborah Street and Deanna Way is north of Pacheco Road and just east of Monitor Street.

Within a day or two, Lee came to the house on Encina Street with his arm bandaged. Agustin and Johnson were present. Lee unwrapped his arm and talked about how he had gotten shot in the arm when they went back to retaliate for the initial shooting on Pacheco Road.[fn26] Lee said they parked away from where the initial shooting occurred so that their vehicle would not be spotted by those who lived in that location. Johnson said that after they parked, they began walking toward the location where the initial shooting had taken place. Lee said they were walking toward where the individuals lived, or were thought to live, when they spotted a vehicle driving toward them. The individuals in the vehicle were the same ones who had shot at Lee's vehicle, and they now began to shoot toward Lee and Johnson. Johnson told Agustin that he pulled out his gun, but as he went to fire, the gun jammed. He and Lee then began to run from the individuals in the vehicle, who continued shooting at them. Johnson related that he and Lee ran in different directions. Lee said he jumped over a fence, but it broke and he injured himself. Lee was very angry and said he wanted to get them back. Johnson said those who had shot Lee were their rival gang on the east side.

**FN26**: Agustin was already aware Lee had been shot, because Johnson had told her.

During this time, Johnson was attending barber college on the east side of Bakersfield, on Niles Street. One day within a couple of days after Lee was shot, Agustin picked Johnson up from school. Johnson then drove on a dirt road beside a canal in a neighborhood in the area of Monterey and Niles. He said he was scouting rival gang members who were hanging out in that location, and he pointed out a residential area. He drove through and pointed out some African-American males who were standing outside, right off of Monterey Street. One was wearing red, which Johnson also pointed out. Johnson said they were coming into the barbershop, and he was scared for his safety. He said he could not take his gun into the barbershop because the owner, who was his teacher, had security cameras, and he was feeling really helpless without his gun. He said that now he would have to start taking his gun to the barbershop, but that he would leave it in the vehicle.

One morning after this time, Johnson gave Agustin a pair of white Nike tennis shoes with red on the emblem and a red hoodie sweatshirt Agustin had bought him, and told her to destroy the items because they had been involved in a drive-by shooting he had committed in the canal area. He said that a couple of days earlier, he and Lee went to the area. Lee was driving his black vehicle. Lee parked in an alley and Johnson got out. He put on a mask and walked to the front of a residence, where a couple of individuals were sitting.[fn27] Johnson walked up to one and started shooting. Johnson said he shot this person several times and thought he had killed him. Johnson told Agustin that Lee wanted to go and

retaliate for the shooting that took place on Pacheco Road, but Lee could not shoot the gun himself because his arm had been injured and so Johnson had to shoot on Lee's behalf.

> **FN27**: When Agustin and Johnson lived on Encina Street, Johnson possessed a black mask that looked almost like a gas mask. Agustin's credit card receipt showed she bought the mask for him on March 30. Johnson said he wanted it for smoking marijuana. Johnson did not tell Agustin what he was wearing or the kind of mask he used during the shooting. During the time the couple lived on Encina, Agustin's daughter observed a black ski mask in a duffel bag Johnson kept in Agustin's closet. On one occasion, Agustin's daughter saw Johnson leaving the house with the duffel bag. He appeared to be in a hurry.

Agustin burned the sweatshirt in the fireplace of the Encina Street residence, and discarded the shoes in her trash can, because Johnson told her to get rid of the items. She did not feel she had a choice. By that time in the relationship, he often hit her. Although she knew she was helping Johnson cover up a crime, she felt helpless, because he had told her he would kill her if she ever left him or told on anything he did. Johnson subsequently told her that the person he shot had survived.

On March 25, Johnson and Agustin went to Disneyland and Santa Monica. They came straight home, because Johnson was in a hurry to get home and be with his friends. Agustin believed they reached Bakersfield around nightfall, and she was almost certain he then went out with his friends. Johnson said nothing to her around this date about beating up a Blood gang member or someone at a tattoo parlor.

For Christmas of 2006, Agustin bought Johnson a black Volcom-brand pea coat. For Johnson's birthday on April 12, Agustin bought him a blue hat with "B" or "S" on it and a white jersey. While attending barber college, Johnson had to wear a tan, zippered smock.[fn28]

> **FN28**: At trial, Agustin identified the pea coat, hat, and shirt found on McNew Court as the ones she had purchased for Johnson. The smock found on McNew Court was the same kind worn by Johnson at the barber college.

Johnson normally came home around 11:00 p.m. or midnight. Agustin did not know what he was doing at those times, although he went out a lot with Lee. About a week after his birthday, however, he came home several hours earlier than usual. He was very startled. He told Agustin that he had done something and that they needed to go back to the location, but that they had to wait until 3:00 a.m., when it would be safe and there would be no police around.

A few hours later, Johnson told Agustin that he, Lee, and Dixon had driven to a certain location on McNew Court. Lee was driving. He parked the car, and they watched a particular vehicle. Lee and Dixon then stayed in the car while Johnson got out, approached the other vehicle, and started shooting. Johnson said he could not see inside the vehicle, but he thought there was someone inside. Johnson told Agustin that after he shot, he ran to another location, then took off the clothes he was wearing

and hid them underneath a vehicle. He did not specify what he was wearing. Johnson wanted Agustin and her daughter, who was living with Agustin at the time, to say that he was at home with them, watching movies, if anything ever came up about that night. He said he needed to go pick up a gun, but he wanted to wait until 3:00 a.m. because he thought all the police would be gone from the area.

At exactly 3:00 a.m., Johnson told Agustin that it was time to go. Agustin drove, with Johnson directing her, through the McNew Court area. Because she did not have her glasses and could not see well, her driving was somewhat erratic. Upset, Johnson told her that she needed to be more careful, because they could get pulled over by the police and that would jeopardize him.

They drove past McNew Court. As far as Agustin could see, there were no law enforcement officers in the area. Johnson directed Agustin to turn one block past McNew Court, and then to make a U-turn. He then had her park as close to the curb as possible by the mailbox of a house with a brick wall and wrought-iron fencing, and that had a van or similar large vehicle parked in front. Johnson then reached out of Agustin's vehicle, took a dark-colored gun out of the mailbox, and placed it on his lap.[fn29] Johnson had guns at the house on Encina Street, and this appeared to be one of them.[fn30]

FN29: When Agustin subsequently pointed out locations to law enforcement officers, she identified a house in the 1000 block of Feliz Drive, near Jastro, as the place where Johnson retrieved the gun. Senior Deputy Little determined that the mailbox in front of that house was too far from the curb for a person sitting in the passenger seat of a car to reach inside. Two houses to the west, however, was a similar-looking house with a mailbox much closer to the curb.

FN30: Agustin observed Johnson to have a small revolver that he referred to as a .22, another revolver that jammed frequently and which he called a .38, and a large gun, about three feet long, that Agustin believed was a Tec-9 because she had heard Johnson use the term. He also had a grayish-black gun that was about the same length as the .38, but it was not a revolver and had a slide on it. He also had a black one like police officers carry. It was an older model. The .22, .38, and large gun began appearing at the residence in the early part of 2007. At some point, she did not see the large gun or the .38 anymore, but she still saw the .22. Agustin was unable to tell which gun Johnson retrieved from the mailbox because it was too dark. She knew from its size that it was not the .22. It appeared to be the same size as the .38, but did not appear to be a revolver.

Agustin and Johnson went straight home. Johnson told her how scared he was, then went to the back yard and hid the gun. He told Agustin that he needed to get rid of it right away. Johnson subsequently told Agustin he had sold the gun, but did not say to whom.

A day or two after Agustin took Johnson to the McNew Court area, Johnson received a telephone call from Dixon. Dixon was extremely upset

at Johnson because Johnson had left the clothing he was wearing at the shooting, and inside the coat pocket was Dixon's cell phone. The police had found the phone and were harassing Dixon. Dixon was upset that Johnson had gotten very careless. Johnson wanted to know what the police were asking and what kind of information Dixon was giving them. Johnson did not tell Agustin why he had Dixon's cell phone, but just that Dixon was angry at him because he had taken off his clothes and put the cell phone in the pocket. Johnson said he put the clothes underneath a vehicle not far from the crime scene. Johnson expressed concern that since the police had found the clothes, he and the others were going to get caught.

On Saturday, April 21, Agustin and Johnson went to Pismo Beach alone for a night. The trip was unplanned. Johnson said he wanted them to get out of town to have some quality time together.

After the McNew Court shooting, Johnson's demeanor changed and he began drinking heavily. About a week after the shooting, Agustin asked him why. He said he had found out that he had killed a pregnant woman. Johnson seemed remorseful.

After the shooting, Dixon stopped coming to Agustin and Johnson's house for a few weeks. After that time, however, he started coming over to the house again. He said the police had stopped coming to his house as often as they had in the beginning. Dixon told Johnson that Johnson had gotten careless. Dixon was concerned he would end up being blamed, since the police had no evidence that Johnson was involved. Johnson and Dixon discussed the car used in the shooting on McNew Court; both said it was Lee's black car.

At some point in early May, Johnson told Agustin that things were "getting pretty hot" and he was afraid he was going to get caught, so he left the Encina Street house and moved to San Jose to live with his sister, Lynell Johnson. Johnson asked Agustin to move with him, because he wanted to start over. He said he was going to change his life. She did not believe him, but, hoping he really was going to change, moved in with Johnson and his sister in late May. After Johnson moved, but before Agustin joined him, Johnson telephoned and asked if she could park Lee's vehicle, a Volkswagen, in her garage. She said no, because she wanted no involvement in what they had done. He then asked if she could at least drive the vehicle to the light homie's house and park it there. Agustin agreed and took the car to 19th Street, just off of Cedar. She locked the keys inside it and left it there. A day or so later, Johnson telephoned and said that Lee had tried to retrieve the vehicle, but the police had towed it.[fn31]

> **FN31**: On the morning of May 2, police received a complaint of an illegally parked vehicle in the 2500 block of 19th Street, between Pine and Cedar Streets. There, a 1999 four-door Volkswagen Passat, without current registration tags, was blocking a construction dumpster. Because the registration tags had been expired more than six months, the vehicle was impounded.

After Agustin and Johnson moved back to Bakersfield from San Jose, they moved in with P.G. and Dreenie, who were close friends of

Johnson. Dreenie had a wig that she occasionally wore. The hair was black and short, but not curly. One evening in late June or early July, Johnson asked if he could borrow it. Dreenie gave him the wig. After it grew dark, Johnson said he had something to do and would be back. He left the house with Lee in Agustin's Expedition. They were gone for 45 minutes to an hour or so.

When Johnson, Dixon, and Goo returned, Agustin did not see her Expedition. Johnson told her that she needed to go get Lee "in the hood," by Reese's house. Agustin did not have a car, so she asked Dreenie to drive her. She and Dreenie drove around by Reese's house but could not find Lee, so they returned to Dreenie's house. When they arrived, Agustin's Expedition was there, and Johnson, Dixon, Lee, and Goo were on the floor of the front room. There was a bunch of money all over the floor, along with three large sandwich bags of marijuana. The men were kneeling on the floor, counting the money and sorting it out among themselves. Agustin overheard them say that they had robbed Reese. Two of them went inside to make it look like they were going to buy marijuana like usual, then Johnson and the fourth one went in, disguised and with guns. When they came in, they pointed the guns toward the others and demanded the money. Johnson said that one of the people got so scared, he "pretty much went to the bathroom on himself." Johnson said that to make it look good, he had to sock Lee in the face. Johnson, Goo, Dixon, and Lee were all discussing the robbery and laughing about how easy it had been.

Since they now had money, Johnson told Agustin to get her things, as they were going to get a room somewhere else. They then moved out of P.G. and Dreenie's house to a motel in Oildale. Johnson made Agustin use the $400 he had given her from the robbery proceeds to pay for their room and food. When the money ran out after less than a week, Agustin contacted her best friend, Alethia Larios, who lived on Thoreson Court, just down the street from Big Jim Herron. Larios allowed Agustin and Johnson to move in with her. This was during July.

In early 2007, before Lee was shot, Johnson began getting physically violent with Agustin, often because she refused to give him the keys to her Expedition. There were multiple incidents; they included him striking her with his fist and "busting" her nose, holding her head underwater in the bathtub, attempting to shoot her but having his gun jam, biting her hard enough to leave scars, dragging her by a belt around her neck, and threatening her with bodily harm and death.[fn32]

    **FN32**: Lee was not present on any of these occasions. Lee never threatened Agustin, and she was not afraid of him. Although she saw Johnson and Dixon with a gun, she never saw Lee with one.

Agustin and Johnson lived with Larios for slightly more than a month. During that time, their relationship was worse than it had been when they were living on Encina Street. They fought all the time, and on August 7, Agustin contacted a battered women's shelter. She was tired of the abuse and feared for her life, as Johnson had gone so far as to get his semiautomatic out of the closet and stick it in her mouth.[fn33] Agustin went to the shelter on August 7, and was in telephone contact with them for several days after, but they had no beds available.

**FN33**: As far as Agustin saw, the black semiautomatic was the only gun Johnson had at this time. He kept it in a pillowcase in the closet, along with the mask that looked like a gas mask, a wig, and black clothing.

Early on August 9, Johnson received a telephone call. He subsequently told Agustin that he needed to take the car, and that something had happened. He did not go into any details, but was in a hurry. He left in Agustin's Expedition. Concerned, Agustin telephoned Lee and then Dixon. Each told her not to worry, and that he would get a hold of Johnson.

Several hours later, Johnson returned to the house in the Expedition. He told Agustin that Cuckoo's wife's cousin had gotten shot. Johnson related that the person had been shot in the face and several times in the chest on Cheatham Street, which was in the Country next to Reese Street. Johnson said that one of his "hom[ie]s" had seen the shooting take place, and that the shooter had been a Mexican male. Johnson related that he (Johnson) had contacted the shooter on his cell phone and asked him to meet somewhere so they could talk. When the individual refused, Johnson told him that Johnson was going to "get him where it hurt him the most." Johnson said that he and Dixon had found out where the individual's father lived, which was out in the bluffs, and they had gone in Agustin's car to that location.[fn34] When they were walking toward the house, a vehicle approached. The individuals in that car saw them and made eye contact, and Johnson and Dixon got scared and acted as if they were tying their shoes. When Agustin said she could not believe Johnson would do such a thing in her car, Johnson said he did not want to "do" her like that and have a shootout in her car, so he and Dixon left the area.

**FN34**: Johnson did not say Lee was with them. Agustin assumed that by "the bluffs," Johnson meant the area in northeast Bakersfield, by Bakersfield College and Panorama Drive.

On August 11, Johnson and Agustin were still living on Thoreson Court, and Agustin was still trying unsuccessfully to get into the battered women's shelter. That afternoon, the couple got into a physical altercation over Johnson taking Agustin's vehicle. Johnson eventually said Agustin could go with him, but, once she got into the driver's seat and he got in on the passenger side, he retrieved the black semiautomatic from between the passenger seat and the center console, and he pointed it at her. She got out of the vehicle and ran back into the house. He followed her in and told her to come on, and she went with him. He had the gun stuffed in his pants at the time.

The two ran an errand, then, near the intersection of Ming Avenue and Real Road, Johnson got into an argument with a lady driving a green Tahoe over who had cut off whom. Johnson got mad, pulled out the semiautomatic, and pointed it toward the lady. She immediately got on her cell phone, and Agustin feared that if she got the license plate number for Agustin's Expedition, it would lead the police to Agustin.

The lady and Johnson and Agustin went in different directions at

the intersection. Johnson and Agustin ran several more errands, which included Johnson buying some Ecstasy pills and forcing Agustin to ingest one. They returned to Larios's house around 4:30 p.m., but Agustin was feeling the effects of the drug and drove alone to a market to purchase some beer. When she returned, she felt like someone was following her. She told Johnson and warned him to hide his gun. Agustin then returned to the market, contacted her ex-husband, and ended up spending the night at his house. She did not have any contact with Johnson the night of August 11.

On Sunday, August 12, Agustin checked her messages and learned Johnson had been looking for her and wondering why she never came home. She lied and told him that she had gone to a battered women's shelter. Johnson asked to see her, and she told him she could only get away from the shelter for a certain period of time.

At 8:00 p.m., Agustin arrived at Lee's house on Myrtle Street, and Johnson greeted her at her car. As they talked, Agustin heard a couple of noises. Johnson saw a vehicle approaching, and he grabbed Agustin's hand and said something had happened the night before. They then ran to the back of Lee's house. Lee and Dixon, who were by a tree in the front yard, also ran to the back. The vehicle that drove by was large, possibly a van or an SUV, and Johnson said he suspected the occupants were rival gang members.

After a few minutes, Agustin told Johnson she needed to get back to the shelter. She then left and returned to her ex-husband's house. She did not have further contact with Johnson that night, although while at Lee's house, she had made arrangements to pick Johnson up from Dixon's house on Monday morning to take him to an appointment with his public defender. Instead, at 8:00 a.m. on Monday, August 13, Agustin went to the shelter in person. She was in fear and desperate to get away. Again unable to get a bed and with nowhere else to go because her ex-husband did not want her coming back, she went to meet Johnson at his attorney's office.

After they left the office, Johnson said he wanted Agustin to see something. They went to the intersection at Planz and Real Road, where Johnson told Agustin to look up at the signal light and asked what she saw. When she said she saw a camera, he asked her what she thought it did. She said she did not know. She told him that the big square cameras in certain intersections took pictures if someone ran a red light, but that she did not know what this little camera did. She said it possibly recorded things, but she was not sure. He then got scared.

Johnson told Agustin that he had done a drive-by shooting at that intersection on Saturday night. He said Lee was driving, Dixon was in the front passenger seat, and Johnson was in the back seat.[fn35] Johnson said he saw someone walking on the sidewalk, and so he stuck his head out and fired twice, and he was concerned that if the camera was recording, the incident would have been caught on camera. Johnson said he and Agustin needed to get out of town, and that his plan was for them to go to Las Vegas. He said he had a friend and extended family there.

**FN35**: Agustin never saw Lee driving a vehicle that was red, burgundy, cranberry, or maroon.

Johnson said he had some guns that he needed to sell so they could get some money. They then drove to a house in the 400 block of Eye Street. Agustin remained in the car; when Johnson came back a few minutes later, he said the individuals at the house had made him an acceptable offer of $400 and he needed to get the guns.

Johnson and Agustin then drove south on Eye Street to a set of apartments. Dixon, Lee, and Lee's young son were outside, and there were several women in the front yard. Johnson told Dixon and Lee to get in the car, because he had something to show them. Lee's son stayed behind; when Agustin asked, Lee said some friends lived there, and that his son was in good hands. Johnson then drove back to the intersection, pointed toward the pole, asked them if they had seen the camera and what they thought that camera did. They said they did not know. Johnson said that if the camera was actually recording, it would be bad because it would show that Lee was driving, the vehicle and the license plate, and that Dixon was in the front seat. Dixon responded that if it was going to show that, it was also going to show when Johnson put his head out of the window and started firing. Johnson then told them that he wanted to get out of town, and Dixon and Lee tried to discourage him from leaving.

Johnson said he had found someone to purchase the guns, and so they drove back to the house on Eye Street. There, the three men went inside. When they came back out a few minutes later, Johnson was excited because the people had actually raised the offer to $500. Johnson told Agustin that she needed to drive the three of them to the Country so that they could dig up the big gun. Johnson actually drove, and they went to the home of Lee's mother. There, Dixon retrieved a shovel, and they directed Agustin to drop them off at Watts and Lotus. She was then instructed to go to Larios's house and get packed and ready to move. Johnson told her to wait for a phone call to come back and pick them up. Agustin left all three of them standing in the middle of the intersection with one shovel.

About 15 minutes later, Agustin received a call from Johnson, telling her to come and get them. Only Johnson and Dixon were there. They went to a market on Casino Street, off Cottonwood Road, and Lee drove up in what looked like a white Explorer. Lee said it was his mother's car. They then all went to his mother's house. Johnson made some phone calls, trying unsuccessfully to sell the guns. Dixon called D-Keys to see if he was interested. Although D-Keys was out of town, Dixon told Johnson that D-Keys had asked Dixon to pay Johnson, and that D-Keys would reimburse Dixon when he returned. Dixon then handed Johnson $150 for the black semiautomatic. The last time Agustin saw that gun, Dixon had it. Johnson, Dixon, and Lee discussed how they had been unable to unbury the big gun, and Johnson instructed Lee to make sure he got rid of it.

Johnson and Agustin then went to the home of one of Johnson's friends to get directions to Las Vegas. By now, it was dark. They headed for Las Vegas that night, sleeping in a rest area outside of that city and arriving the next morning. They then went directly to a homeless shelter and then to the welfare department to apply for emergency food stamps. While there, Agustin was just staring off, but a woman in line apparently

thought Agustin was staring at her, and said something. Johnson said something to the woman, then got angry at Agustin for making him "look bad" when Agustin refused to respond rudely to the woman. Johnson then decided he did not want to stay in Las Vegas, and demanded that Agustin take him home. She refused, and he eventually calmed down.

Johnson and Agustin did not return to the homeless shelter in time to get beds, but Johnson said he had enough money for them to be able to get a room. They spent the night of August 14 in a hotel. That evening, they walked to a couple of casinos. After they had both had some drinks, Johnson brought up the incident at the welfare office and chastised Agustin for her response. Eventually, he got up and started walking out of the hotel. He cursed at Agustin, threatened her, threatened to have his mother beat her up, and threatened to mess up her vehicle. Perhaps feeling the effect of the alcohol, Agustin got "a little bold" and told him that the last time he hit her was going to be the last time he hit her. She told him that if he hit her again, she would go to the police and tell them everything she knew about him. Johnson became extremely angry, and Agustin ran inside a McDonald's when he came toward her. She asked the assistant manager to call the police.

Agustin went to her car, but Johnson reached it just before she did. He threw a rock through one of the Expedition's windows. Agustin saw someone walking and asked to borrow his cell phone to call the police. Johnson started walking away, and Agustin called the police. She then waited with her vehicle, but, when no one came after what seemed like a long time, she drove it back to the hotel. By the time she reached her room and fell asleep inside, it possibly was after midnight of Wednesday, August 15.

Agustin was awakened by a knock at the door. Looking through the peephole, she saw someone who appeared to be the light homie. She stepped away from the door, frightened, then looked through the peephole again. This time, she saw Johnson. He asked her to let him in. She refused. She saw him walking toward the office, then he entered the motel room with the light homie. Johnson ran toward Agustin and struck her in the forehead with his fist right above the left eye. She started gushing blood, and he started to punch and kick her. He told his friend to get everything out of the room. Agustin begged the friend to get Johnson to stop.

Johnson got Agustin down onto the ground, then grabbed a pillow and began smothering her with it. At last, he let up. He told her that if he had his gun on him, he would kill her because she called the police. He then told her to get inside the bathtub. She obeyed. The last thing he said to her was that he was going to go back and kill her son. She believed he would do it.

When Agustin heard the door close, she called 911 and begged the Las Vegas police to call the Bakersfield Police Department and alert them to the threat Johnson had just made against her son's life. At first, the Las Vegas police did not take her seriously and accused her of being drunk. As she told the officer about the incidents in which Johnson had been involved, however, the officer's attitude toward her changed. A short time later, she was able to talk to Bakersfield Police Detective Burdick and tell him what had happened and what Johnson had told her.

Upon her return from Las Vegas to Bakersfield, Agustin lived in battered women's shelters. At some point, she agreed to testify if this case went to court. In September, she was placed in the Witness Relocation Program and remained there as of January 2009, when she testified at trial. Through the program, her rent was paid, and she was given $450 a month for her other expenses, by an investigator for the district attorney's office. In addition, in late August, the district attorney's office or law enforcement gave her money so she could return to Las Vegas and get her vehicle out of impound, as well as food and travel expenses. They also bought her a cell phone.

Prior to the Las Vegas incident, Agustin did not report any of the domestic violence to law enforcement, nor did she report any of the crimes Johnson had told her about committing. She continued to live with and support Johnson despite the various incidents, even after learning a pregnant woman had been killed. She left Bakersfield for Las Vegas because Johnson asked her to, and she wanted to be with him. She estimated that, between January and August, she spent thousands of dollars on Johnson.[fn36]

> **FN36**: Psychologist Michael Musacco testified concerning Battered Women's Syndrome (BWS), its cycle of violence, and its effects. He also discussed common symptoms of victims suffering from BWS, and why a battered woman would stay in an abusive relationship and not report the abuse to law enforcement. As defendants raise no issues concerning this testimony and the jury was instructed the testimony was not evidence Johnson committed any acts of violence, we do not summarize it further.

Dupree Jackson's Testimony

At the time of trial, Dupree Jackson, who testified under a grant of immunity, was imprisoned on a parole violation. For most of his life, he lived in the south part of Bakersfield known as the Country. When he was little, he often saw sales of rock cocaine going on in front of his home. He also saw guns and drive-by shootings. When he was around 13 years old, he began thinking about becoming a member of the Country Boy Crips. All his family was "from there," and he did not see anything else to do. He hoped to make money selling drugs. Someone was not allowed to do that "in the hood" unless the person was in the gang.

Jackson was "jumped in" to the gang, meaning two people physically beat him, when he was not quite 14. The point of being "jumped in" is to show the person is not scared of anything, and to give that person more reputation. Reputation for being tough is important "in the hood."[fn37] Once in the gang, Jackson got to know other members. He had daily contact with them, and they would discuss their various activities. At the time, the Country Boy Crips were engaged in selling drugs, gangbanging, and "riding on the enemies," meaning they would shoot at rival gang members. Older people in the gang were called big homies, which was the same thing as an OG, meaning someone who had been there for a long time and had "a lot of say-so over the hood." Younger gang members had a personal big homie, who looked out for the younger member and taught him things.

33

**FN37**: Jackson explained that if a person grew up in the Country or spent a lot of time there, he was then Country automatically and did not really need to get jumped in. Jackson was familiar with Wingstone. It was off of Watts, in the Country.

(Jackson made a brief reference to the Country Girl Crips. Because we have no information concerning whether the practices of female gang members are the same as the practices of male gang members, we use only masculine pronouns to refer to gang members in general.)

During the time Jackson was a Country Boy Crip, the gang's enemies were the Eastside Crips and Westside Piru Bloods. Eastside was considered worse than the Bloods.[fn38] The Country Boy Crips were different than the Eastside, in that the Country Boy Crips did not jump in outsiders. They were more like a family, with generation after generation growing up in the gang. By contrast, the Eastside jumped anybody in.

**FN38**: Prior to Jackson's involvement in the gang, the Westside Crips and Country Boy Crips were enemies. By the time he had joined the gang, however, the "beef" between the two had died down and there was some sort of truce.

There were roles within the Country Boy Crips that certain gang members would have. Some — like Jackson — would sell drugs, particularly rock cocaine and marijuana, the proceeds from which would go toward buying guns, providing money for gang members in custody, and the like.[fn39] Some were "pretty boys," who would affiliate with the gang and bring in females, but who otherwise did not do much for the gang or get involved in anything serious. Some would patrol the boundaries of "the hood," keeping out outsiders and enemies.[fn40] Some would "hang out." Others would "ride with the guns, go put it down," killing the gang's enemies by walk-up and drive-by shootings. The OG's basically would "call shots." Those who "r[o]de on the enemies" had the highest status in the gang. They were respected and feared. Firearms played an important role in the gang. They were used to protect the hood, to protect the gang member himself, and to go "riding on" the enemies. Gang members might trade or sell guns to other members, or might keep a gun on one's person sometimes and hide it other times. Jackson had never heard of hiding a gun underground.

**FN39**: Jackson's role in the gang was a drug dealer. He sold rock cocaine.

**FN40**: Seeing a rival gang member in one's hood would be a sign of disrespect to the Country, unless the rival had a relative in the Country. In that case, the rival would be given a pass, and it would not be disrespectful for him to be there. A rival might also be given a pass if he was incarcerated with one of the gang members and became friends with him. Crip factions are not kept separate in prison, and Crips in prison from Kern County have a kind of bond and call themselves "805," for the old Bakersfield area code.

At a Country Boy meeting, one of the OG homies instructed that walk-up shootings were preferable, because in drive-bys the enemy was often missed and innocent bystanders were hit instead. Jackson explained that a walk-up shooting involved taking a car to the enemy's territory, getting out, and shooting at the enemy. A drive-by shooting involved shooting out of a car toward the enemy. If a participant in a walk-up shooting did not have a gun, he would not get out of the car. The driver would remain with the car; his role would be to get the shooter to and from the location in rival gang territory at which the shooting took place. The driver would use a cell phone to communicate with the shooter about when the shooter would return, that the driver was to have the car started, and similar subjects.

During the time Jackson was a teenager, he estimated the Country Boy Crips had about 100 to 200 members. He personally knew the majority of them, or was aware of their reputation in the gang. The gang had subsets, called cliques. Jackson was in the Cottonwood clique, also called the Deep because it was in the area of the Country that was farthest to the south, away from the Eastside. Other Country Boy Crip cliques were Reese and Cheatham, Mad Blocc, and Watts and Lotus. There were no territorial boundaries among the cliques, which all got along together.

The territorial boundaries of the Country Boy Crips were Belle Terrace on the north, Panama on the south, Union on the west, and Cottonwood Road on the east. There was a rival gang to the north of Belle Terrace, namely the Stroller Boys, who were part of the Eastside Crips. On the other side of the western border were the Westside Crips. There was nothing beyond Cottonwood Road, as it was mostly fields. The Bloods did not have a big territory. Their territory consisted of a large apartment complex near Bakersfield Memorial Hospital, in the area of 31st Street, Jewett Avenue, Columbus, and Union. Bloods would also congregate in the area of Pacheco Road and Calcutta. The boundaries remained pretty much the same the entire time Jackson was in the gang.

During the time Jackson was a Country Boy Crip, he observed that some Country Boy Crip members had tattoos, while others did not. Some people had tattoos that were not gang related, while others had gang tattoos. Typical ones were "CBC," which stood for Country Boy Crip; "SS," which stood for South Side; and Watts and Lotus. There were also tattoos about rival gangs. For instance, "ESK" stood for Eggshell killer, with eggshell being a derogatory term for the Eastside Crips.[fn41] Some tattoos would be pictures rather than letters or words. For instance, someone might have a portrait of a dead homie, which would show that person respect; or a picture of an egg, which would be disrespecting the Eastside. Someone might have a tattoo of hands throwing gang signs.

**FN41**: Bloods were derogatorily called "dead rags" or "slobs."

Powder blue was the color associated with the Country Boy Crips.[fn42] Although someone did not have to wear that color to be in the gang, doing so let people know where the individual was from. Wearing the color meant both that the person was from the Country and that he was a gang member. Although gang members did not wear powder blue every day, every gang member wore the color at some time or another. Country Boy Crip members also used graffiti to label their territory and let

people know where their hood was at. Jackson had seen words in which CK was replaced with CC. This was because CK stood for Crip killer, which would be disrespecting one's own hood.

**FN42**: The colors of the Eastside Crips were royal blue and dark blue. The Eastside Crips were enemies of the Country Boy Crips because they killed some Country Boy Crips "back in the days."

In 2005, when he was 17 years old, Jackson pled guilty to possession of cocaine for sale and served 22 months in prison. He was initially released on parole in October or November of 2006, returned to Bakersfield, and again lived in the Country. Following a parole violation for assault with a deadly weapon against his sister, he was imprisoned from January 7 to June 7, then out of custody and living in the Country until his arrest on August 23 for absconding from parole. He was released again in December 2007 or January 2008, and was in the Witness Relocation Program from then until June 2008, in connection with this case. In June 2008, he again violated parole, this time by being around gang members, and was returned to custody. He expected to be released later in the month that he testified at trial (February 2009).

Jackson and Johnson were cousins, although they first met in junior high school. After that, they got to know each other fairly well. Johnson did not grow up in the Country Boy Crip neighborhood, but would visit about every other day and claimed Country Boy Crip. Jackson and Johnson both were active gang members. Jackson saw Johnson sell rock cocaine, "ride," pack a gun, steal cars, and similar activity. Jackson was aware of Johnson's reputation; from that reputation, Jackson knew that Johnson's role in the gang was as a shooter. Johnson's moniker was Little Rifleman; he took the name from a big homie.

When Jackson was released from prison in the fall of 2006, he made contact with Johnson, who was living with his girlfriend, a Hispanic woman in her late 30's. When Jackson was released again in June, he became active in the gang again, hanging out, selling drugs, and smoking marijuana. During June, July, and August, he saw Johnson "[a]ll the time" "[i]n the hood." Johnson was hanging out, selling a bit of drugs, smoking marijuana, drinking, and "banging" — being wild, packing a gun, and having an I-don't-care attitude. Johnson was still claiming Watts and Lotus clique, and was active during that time, riding for the Country. Jackson knew these things because he saw them, and heard them from Johnson and other people in the hood.

Jackson first met Dixon when Jackson was nine or 10. When Jackson was young, he was aware that Dixon went to prison for manslaughter for killing an Eastside Crip named "Freeway Joe." Jackson knew Dixon fairly well before Dixon went to prison and knew, from Dixon's tattoos, associates, and the colors he wore, that he was a Country Boy Crip in the Watts and Lotus clique. His moniker was Dodo.

When Jackson was released from prison in June 2007, Dixon was also out of custody. The two got together almost every day in the hood. Dixon was in the gang at that time. Jackson saw him selling drugs, hanging with the homies, smoking marijuana, and riding for the hood. He was kind of a leader in the gang. He had status based on going to prison

for what he did, and he also had family status, because his mother's family had a lot of reputation in the hood. Dixon grew up in the Country Boy Crip neighborhood.

Jackson also knew Lee, having met him long ago at Lee's mother's house. Lee did not grow up in the neighborhood, but had relatives who lived there. Jackson knew Lee to be a member of the Country Boy Crips, because Lee was from Watts and Lotus. Lee's role was "kind of low key," basically hanging out with other people. Lee was "on the down low," almost like undercover. For instance, he did not dress like a gang member. Lee got his reputation from his older brothers, "Big Critter" and "Little Critter." Before Jackson went to prison the first time, however, he saw Lee selling drugs, hanging out on the corners, and riding.

When Jackson was out of custody during the summer of 2007, he would see Lee at various locations in the hood, including at functions at homies' houses, and at Lee's mother's house.[fn43] Lee claimed Country Boy Crip at that time. His role in the gang was being a driver. He would drive people around or rent cars for them, as he had money. Lee hung out with Johnson and Dixon, his brothers, and some of the other homies from the hood. During that summer, Jackson saw Lee in the neighborhood about every other day. Jackson did not know Lee to have a moniker, but he would see Lee sometimes wear the hood's colors. Jackson and Lee were not best of friends; Jackson learned, when he was released from prison, that the mother of his child had had a sexual relationship with Lee while Jackson was in custody. Jackson never discussed it with Lee, and it was his impression the relationship had ended.

**FN43**: Lee's mother lived on Wingstone.

Jackson knew the roles of a number of people who were Country Boy Crips during the summer of 2007. For instance, Tonriko Shropshire's role was drug dealer and gangbanger, meaning an active member in a gang. The role of Big Gage (true name, Joseph Gage) was hustling (selling drugs) and banging, and he was an OG. The role of D-Keys (true name, Darius Keys) was selling drugs, hanging out, and being an active gang member. The role of Bus Loc (true name, Bradley Walker) was gangbanger and drug dealer. Walker and Dixon were fairly close friends. Jackson did not know anyone whose moniker was Big Boy. He did, however, know Big Jim, who had been a volunteer football coach when Jackson was growing up. Big Jim was an OG who sold marijuana, hung around, and "produce[d] a lot of stuff for the Country," meaning he distributed money to buy guns and "call[ed] some shots." Jackson also knew Two C's (true name, Marcus Bolden or Bowen), whose role was a drug dealer; he would push "major weight" by selling ounces of rock cocaine. Jackson also knew Nip (true name, Trent Abraham); his role was a drug dealer, active gang member, gangbanging, and riding.

Jackson knew someone referred to as the light homie. The person's name was Chris Haynes; he was very light skinned, with hazel eyes, and was a member of the gang. He drove a Lexus with Nevada license plates. His role was being a pretty boy, gangbanging, and hustling. Fat-Fat's last name was Killebrew. He was from the Country, although he had family who were Eastside. Before Jackson went to prison, Fat-Fat's role was being a hustler and active gang member. Jackson did not remember if he saw him out on the streets in the summer of 2007. Jackson also knew

Goo, although he could not remember his real name. Goo was a member of the Country Boy Crips; he was like a little homie, but always listened to what older homies said and "was down for whatever." Pookie (true name, Columbus Holford) drove people around and sold Ecstasy and marijuana. Maniac (true name, Sterling Endsley) had the role of being an older homie, gangbanger, selling drugs, and riding. During the summer of 2007, Jackson saw defendants associate with each other, Bus Loc, Goo, Maniac, Two C's, Big Jim, and a couple of others.

During the summer of 2007, a number of people sold marijuana from a house in the vicinity of Cheatham Street and Cottonwood Road. The house belonged to John B. It was called the dodie house, because Jackson and the others were selling chronic (high-grade marijuana).[fn44] Jackson heard of a robbery that took place at the dodie house in the summer of 2007, and learned that Johnson and Dixon were suspected. John B told Jackson that he believed his cousin, Big Jim, sent them over to rob him because he was making more money selling marijuana in the hood than Big Jim. John B also believed they robbed him because his cousin "Third," an Eastsider, was allowed to sell marijuana there. It angered Jackson to learn the perpetrators were members of the same gang as the victims, and he started to question the loyalty of the Country Boy Crips toward each other.

> **FN44**: Jackson knew a female named Teresa who went by "Reese," but no male who went by that moniker.

Johnson also told Jackson about this robbery, and admitted defendants were the perpetrators. He said that Barry, Third (whose real name was Keathon), and Keshawn were the only people in the house. Lee acted as a decoy to go into the house, then Dixon entered and then Johnson. They pointed weapons toward everyone's heads and told them to get down. Johnson said they took an ounce of chronic, about $3,200 in cash, and things like video games, computers, and laptops.

That same summer, "Raybo," one of Jackson's older homies and someone with whom he was very close, was murdered. Jackson learned about it on August 9, when Two C's called him to say that Raybo had been found dead at the chronic spot.[fn45] Jackson learned that Keshawn Johnson, "Fumes" (David Taylor), and John B were suspected of involvement. Raybo, Keshawn, and John B were all Country Boy Crips. Fumes was not, but had grown up around a couple of the older homies and was the father of Jackson's sister's baby. There had been bad blood between Fumes and Raybo; Fumes had told Jackson that Raybo had broken into Fumes's house and robbed him of some guns. Fumes had told Jackson that he knew who did it and was going to get the person back. After Raybo was killed, Keshawn told Jackson that Keshawn set Raybo up and then Fumes gunned Raybo down in the house.

> **FN45**: The certified death certificate showed that Larry Raymond Bowen was killed on August 9 at an address in the 1300 block of Cheatham Street, Bakersfield, and that the cause of death was gunshot wounds of the head.

The fact one Country Boy had set up another Country Boy made Jackson feel depressed and angry. As a result, Jackson "hooked up" with defendants later the same day, and told them that he knew where

Fumes's father lived. He also gave Johnson Fumes's cell phone number. Jackson did not know what street the father's house was on, but offered to take defendants there.

Everyone got in the Expedition. Johnson was driving, Dixon was the front passenger, and Jackson and Lee were in the back seat, with Jackson behind the driver. Jackson saw a Tec-9, a nine-millimeter semiautomatic, what appeared to be a Glock semiautomatic that was a bigger handgun than a nine-millimeter, a .32-caliber revolver, and a 12-gauge shotgun with the stock sawed off and duct tape wrapped around it, all in the cargo area of the vehicle. Lee started handing them out. He gave Jackson the .32-caliber revolver, Johnson the Tec-9, Dixon the Glock, and kept the nine-millimeter for himself. The shotgun remained in the cargo area in the back.

Jackson and defendants discussed their plan, which was for Jackson to show the others Fumes's father's house, where Jackson believed Fumes was hiding out. They were "[g]oing to go get revenge back for the hom[ie]," i.e., kill Fumes at his father's house.[fn46] To this end, they got on a freeway. Jackson was able to find the house after getting lost a couple of times. Fumes's father lived by Bakersfield College, off of Panorama Drive.[fn47]

FN46: Jackson did not believe he was going up there to kill Fumes's father; his intention was simply to point out the location. He took the gun when they offered it to him because he did not want to look scared or like "a punk."

FN47: Records for Lee's cell phone showed a call made at 8:58 p.m. on August 9, that registered on the cell phone antenna near Bakersfield College. Phone records also showed three calls on August 9, and two on August 10, from Lee's phone to what may have been Fumes's cell phone. Those were the only calls to that number between February and September. (Tam Hodgson, the district attorney's investigator who obtained and analyzed the various phone records, had information from some sources that Fumes had one cell phone number, and from other sources that he had a slightly different number. Hodgson could not say which number was correct.)

After Jackson located the house, the group circled around for a while to plan their escape route. They then parked across the street and "scop[ed] out" the house. Nothing got done that day, however. Defendants said they were going to come back and get Jackson later on that night, but they never did. Jackson did not know whether anybody went back to the house. He himself abandoned the plan to shoot Fumes.

Johnson drove them back down from the bluffs to the apartment complex on Eye Street, then defendants took the guns and headed toward the apartments. They did not say why they were taking guns into those apartments or what was going on; Jackson just knew it was "a spot," meaning a hangout. Defendants had always told him they were going to Eye Street, that they had a spot over on the Westside. Jackson remained in the Expedition. During the five to eight minutes before defendants returned to the vehicle, he saw a newer-model, red, four-door compact car, possibly a Toyota or a Kia, without tinted windows. On August 23, the

day Jackson was arrested for violating parole, he saw the car again, this time in the area of Casino Street and Cottonwood Road. Dixon and Bus Loc were in it.

During the time Jackson was out of custody in the summer of 2007, Johnson talked to him about his involvement in some shootings and robberies. Near the end of June or early July, the two were sitting in the Expedition on Cheatham Street, smoking marijuana, when Johnson talked about a shooting that had happened in the Stroller Boys area, off McNew Court. He also talked about a shooting off South Real Road and Planz. Johnson said he was stressing, and that if stuff hit the fan, it would link him back to the crimes.[fn48]

> **FN48**: The record is somewhat confusing as to when Jackson claimed to have first been told about the Real Road and Planz shooting by Johnson. Jackson was specifically asked how long it was after he got out of custody on June 9 until he had the conversation with Johnson in the Expedition about the Stroller Boys (McNew Court) shooting. Jackson responded that the conversation occurred at the end of June or beginning of July. Jackson also testified, however, that Johnson told him about two shootings during this conversation. One was in the Stroller Boys area of McNew Court, and the other was off of South Real Road and Planz. On cross-examination, Jackson testified that Johnson told him about the Real Road shooting while they were in the Expedition on Cheatham Street, and that this was more than three weeks before Raybo was killed. Jackson testified that he learned about Raybo's murder on August 9. The implication is that he learned about this shortly after it happened, since when he was on Cheatham Street talking to Keshawn Johnson about what had happened, the police were still at the scene. Yet the shooting at Real Road and Planz, in which Adrian Bonner was wounded, took place on August 11, after Raybo was killed, not before, as necessarily would have had to be the case in order for Johnson to discuss it with Jackson in late June or early July.

Jackson had a second conversation with Johnson on the subject at a gathering on Anderson Street about a week after Raybo's funeral. Johnson again said he was stressed out, and that if the stuff came back on him, it would link him to the McNew Court shooting, where a female was supposed to have gotten shot. Johnson said he was going over there to get at some Eastsider — Anthony Lyons — but then stuff went "all bad." Johnson related that he and Dixon were the shooters, while Lee was the driver and waited for them to come back.[fn49] Things went haywire. The police came or something, and Johnson accidentally dropped a hoodie and a cell phone and some stuff. Johnson was upset when he told this to Jackson. Johnson also said that while he was attending a funeral for his and Jackson's deceased homie, a police officer named Mario was following him around. Johnson was nervous about that.[fn50]

> **FN49**: On cross-examination, Jackson testified that Johnson did not say anything about Lee being involved in this incident, but only that Johnson and Dixon did the shooting. Jackson told the police that Johnson did not tell him anything

about a car or how they got away.

**FN50**: Raybo's funeral was held at the Church of Higher Ground on August 18. Because of information there was a disturbance brewing between rival gang members at the church, the Bakersfield Police Department's gang unit had officers there, as was common with respect to gang members' funerals. Sergeant Jehle, whose nickname in the gang area was Mario, was present at the funeral and made eye contact with Johnson, whom he then observed for a couple of minutes. When people were dispersing, Jehle may have seen Johnson again. There were tensions at the funeral because factions from both the Eastside Crips and Country Boy Crips were there, as Bowen had friends and family on both sides. Although there were posturing and verbal exchanges, there was no physical altercation.

Johnson related that he had also been involved in another shooting. He said he, Dixon, and Lee were "rolling around" at night when they bumped into some Bloods at a mini market somewhere off of South Real Road and Planz. They saw the Bloods again at the stoplight, and Johnson came out of the window and started shooting at the Bloods. Johnson said he was pretty sure he hit one, and he heard later that the person was paralyzed. Johnson said the shooting was retaliation for Cutty Pete. Cutty Pete was a Country Boy Crip who was shot by the Bloods. Jackson knew about that shooting from his homies and from what Cutty Pete told him.[fn51] In addition to Johnson, Jackson received information about the Real Road and Planz shooting from his brother, who had a relationship with a Blood's sister.

**FN51**: According to Adrian Bonner, Cutty Pete appeared to be in "okay" physical condition at the time of their verbal altercation the morning Bonner was shot. As far as Bonner could tell, Cutty Pete had not been shot.

Jackson was arrested on August 23 as a parole absconder. He told the officer that he could not afford to get locked up because he had a family to take care of, and that he knew some information about some shootings. Jackson decided to talk about what he knew because he was fed up with the Country due to the death of Raybo and the robbery, and he wanted out. He wanted a normal lifestyle. Officer Beasley, who arrested Jackson, put Jackson in touch with Detectives Heredia and Darbee. Jackson spoke with them later that night and told them about the McNew Court and Real Road shootings, but he held back some details because he was not sure how much he could trust them. They were former gang officers who had harassed Jackson a couple of times. In later interviews, he told everything he knew about the shootings.

Following his arrest, Jackson was booked into jail. He was in a holding cell when he saw Dixon, who was in a different holding cell. Later, they were placed in the same cell. Dixon told Jackson he was accused of running from the police out of a car with Lee. Dixon said there was a Tec-9 in the car, and that Maniac was in the car with them but got away. Dixon said he never even got to use the gun. Dixon said he (Dixon) also got away and made it home, but then the police came to his house and arrested him and accused him of running from the car. Dixon was angry at

41

Lee because he thought Lee told on him.

Dixon and Jackson were in the same cell for three or four days.[fn52] During that time, Dixon told Jackson that he was involved in the shootings on McNew Court. Dixon said he and Johnson both were shooting and did not know which one hit the victims. After the shootings, they started going back to the car. Police or someone came, and Johnson dropped a hoodie or cell phone. Lee was waiting in the car, and they went back and got in. Dixon said he got picked up later on and questioned about that case, but he was not arrested for it.[fn53] Dixon said that when he got "out of this gun beef case," he was going to slow down. He just wanted to get out and take care of his son. Dixon also said he thought he killed his own cousin "over there."[fn54] Dixon said he had done things for the hood, but the homies were not showing him recognition and giving him money and things like that.

> **FN52**: Jail records showed Jackson and Dixon were assigned to the same cell from August 24 to August 29.

> **FN53**: On cross-examination, Jackson testified that when he first spoke to Dixon, Dixon said he and Johnson were involved in the McNew Court shooting. He said nothing about Lee. On redirect examination, however, Jackson testified that he remembered telling the grand jury that Dixon said Lee was the driver during the Stroller Boy (McNew Court) shooting, and reiterated that Dixon told him, in jail, that Lee was the driver of the car during the McNew Court incident.

> **FN54**: Dixon did not go into further detail, although Jackson knew Dixon was related to the Wallaces who lived on Watts Street. In one of his interviews with detectives, Jackson related that Dixon said his cousin's name was James Wallace.

Dixon also told Jackson about the shooting on South Real Road. He said he was in the car when Johnson came out of the window on the "red rags," meaning Bloods. Lee was driving, and Dixon was the one who pointed out the Bloods.[fn55]

> **FN55**: On cross-examination, Jackson testified that when he was hearing this story, he was not hearing that Lee was in the car and, in fact, he told detectives that Dixon was the driver. On redirect examination, however, Jackson testified that he had told the grand jury that Dixon said Johnson shot the person on the corner of Real Road and Planz, and Lee was the driver of the car. Jackson reiterated that that was indeed what Dixon told him while in custody on August 24.

On August 29, Darbee and another detective asked Jackson if he would agree to testify if this case went to court. Jackson stated he was willing to do so, despite the fact it would make him a marked man for the rest of his life. Jackson then did his time on his parole violation and was released in January 2008, without any intervention from the Bakersfield Police Department. Upon his release, he went into the Witness Relocation Program. He was in the program for about five months, during which time

his rent was paid and he was given $400 to $500 per month for his other expenses. In June 2008, his parole was violated for being around a gang member.[fn56] It was his understanding that he would be placed back in the Witness Relocation Program after he finished testifying.

> **FN56**: This person had come to Jackson's location. Jackson did not go into the Country; he left the Country Boy Crips when he decided to testify.

Jackson was brought from prison to the county jail on October 31, in preparation for his testimony at trial. Early in November, he was placed in a holding cell next to Lee, who saw him and wanted to know what Lee did to Jackson, and whether this was about Lee having a relationship with the mother of Jackson's baby. When Jackson said it did not have anything to do with her, Lee wanted to know if Jackson was going to get on the stand and testify against them. Jackson said he did not know because he wanted Lee to leave him alone. When Lee kept on pressuring him, Jackson said he would not testify. Lee then told Jackson to sabotage the case by saying it was something about the mother of Jackson's child that made Jackson mad and caused him to lie. Jackson agreed he would do that so Lee would leave him alone. At some point during the conversation, Lee said Rifleman wanted Jackson to say Jackson was having a relationship with Rifleman's girl who drove the Expedition. Jackson knew nothing about whether a girlfriend of Johnson was going to testify, but told Lee that if it would help them, to "lay it out" to him. The last time Jackson saw or talked to Johnson's girlfriend was in 2006, when he first got out of prison.

After this conversation with Lee, Jackson had a conversation with Johnson. Johnson told Jackson the same thing Lee had. Johnson asked if Jackson was being paid for his testimony, having heard Jackson received $10,000. Johnson also said that when he beat up his girl in Las Vegas, he got a ride back to Bakersfield with Chris Haynes. Johnson said he knew where Jackson was staying, and he mentioned a motel.

On another occasion in jail, Jackson was being placed in a holding tank when he saw Johnson in another holding tank. Johnson called Jackson a "bitch ass nigga." In November 2008, Jackson's custody situation was changed, and he was housed in his own isolated cell with his own television, and transported to court by a special team. He was testifying because he believed it was the right thing to do. If he were to serve his parole violation in prison, however, he would not get his own cell or television.

Testimony of Law Enforcement Gang Experts

As of April 19, Kern County Sheriff's Senior Deputy Little was in the gang unit, and responsible for all Black gang activity in Kern County. He was an expert on gangs, and particularly African-American gangs. The first time he learned of Lee was in April, after the McNew Court shootings. However, in April 2007, there were approximately 750 to 1,000 members and affiliates of African-American gangs, and he did not know them all. He had known Johnson since 1998 or 1999 when Johnson's name first came up in a gang context. Little had heard of Dixon in the context of Dixon's manslaughter conviction, but did not know much about him. Little was unaware of any instances in which Johnson was searched and a firearm

was found, or in which his or his family's residence was searched and a gun or ammunition was found.

On July 7, Little conducted a search of a residence in the 2900 block of North Half Moon, where Dixon was residing. Little found one letter from Juaqkeib Oliver and another from Frankie Baker. Both contained gang references. The letter from Oliver was signed "Munchy Locsta" and talked about the author being on an "egg hunt" because of being sentenced to a lengthy prison term. "Egg" is a derogatory term for Eastside Crip gang members.[fn57] Little found no hoodies, black pants, guns, or ammunition.

> **FN57**: "Cornbread" is a derogatory term for Country Boy Crips.

During the course of his investigation, Little searched the Internet site MySpace.com, to see if any defendants had a MySpace page.[fn58] Little was unable to locate a MySpace page for Dixon or Johnson, but found one registered to a David Lee from Bakersfield that displayed photographs of the David Lee who was a defendant in this case. The screen name was "Gunner," and next to it was the acronym "P.E.N.U.T.E." A photograph of Lee and Johnson had been selected as the "this-is-who-I-am" photograph.

> **FN58**: It was Little's experience that gang members are often proud of their membership. They may use a social network, such as MySpace, to advertise their membership, sometimes posting photographs of themselves displaying gang signs, writing about their gang ideology, and the like.

By means of a search warrant, Little obtained public and private information for the page from MySpace in August.[fn59] Public information included a photograph of Lee and Johnson and, under "Gunner's interests," a flashing message "Keepin' it Gangsta." There was also a photograph of Lee and a person known to Little to have Country Boy Crip connections. Private information included a subscriber's birth date, city of residence, and occupation that were consistent with Lee, as well as unread messages that were consistent with the dates Lee was in custody. Some comments contained gang references, such as "Cuz" (which Crip gang members call each other) and "South" (another name for Country Boy Crips, who also go by South Side Crips). A number of messages also contained gang references. Included in these was "900 block," which refers specifically to the Stroller Boy Crip subset of the Eastside Crips and which derives from an address on Feliz Drive that is a famous location for the Stroller Boy Crip subset. One of the messages, which was sent the morning of March 22 by someone accessing Lee's MySpace page, referred to the Tahoe being shot up the previous night on Pacheco Road and the writer "bounc[ing] bacc," and concluded, "it's still ESK till I die. P.E.N.U.T.E. Bitch." This message was consistent with the shooting of Lee's Tahoe on Deanna Way, a location one or two blocks north of Pacheco Road. In Little's opinion, based on his overall experience, the reference to bouncing back was indicative of someone bouncing back and taking retaliation. It was plausible that the retaliation was the McGowan shooting, which fit with the timeline.[fn60]

**FN59**: If a MySpace account has been set to private, only those who request to be and are accepted by the account holder as MySpace friends can access the private portion.

**FN60**: Little testified he could not cite a case in which gang members said something to the effect of, "I bounced back," to refer to a shooting of a rival. Little found no references to the McNew Court shooting or the shooting at Real Road and Planz on the MySpace page.

Ultimately, Little obtained search warrants for various other MySpace sites, including those of Lee's family members. As a result, he learned P.E.N.U.T.E. stood for "Putting Egg Niggas Under the Earth." From interviews with some who used the acronym, Little learned it was a clique of Westside Crips and Country Boy Crips, but did not last long and was not considered to be an active clique anymore.

Based on the Agustin interviews, the materials he reviewed, and particularly the MySpace investigation, Little opined that Lee was the owner of the MySpace account under his name. Little further opined that the Web site was indicative of gang activity on Lee's part.

Senior Officer Sherman of the Bakersfield Police Department testified as the People's primary expert on gangs. He was familiar with the Country Boy Crips, which existed in 2007, from personal contact with Country Boy Crip members, their rival gang members, and investigating gang crimes in which Country Boy Crips were victims and suspects. In his opinion, the Country Boy Crips was a criminal street gang in 2007, as it had three or more people, its members had a common sign or symbol, and its members were involved in an ongoing pattern of criminal activity involving criminal offenses listed in the Penal Code.

Sherman recounted the history and growth of the Crip movement in Bakersfield; the development of the Eastside, Westside, and Country Boy Crip factions; the traditional territories of those factions; and the various subsets of the Country Boy and Eastside Crips. Sherman testified that powder blue is the color associated with the Country Boy Crips, and that the North Carolina college team uses the same color. Sherman also explained the role played by graffiti, to both mark territory and show disrespect to rivals. He also explained the role of tattoos, which, depending on the actual tattoo, show gang membership or allegiance. They may also be indicative of disrespect to rivals, or pay tribute to deceased fellow gang members. Sherman explained that, while there will be members in every gang who have tattoos related to that gang, not every member will have a tattoo. Sherman also explained that clothing can be used to show membership in a gang or to show disrespect to a rival gang. However, not all gang members wear their colors all the time, because they know the consequences of being documented by law enforcement in gang clothing and how it can affect a possible criminal trial. Just because someone does not wear colors does not mean he is not a gang member. In addition, gang members also use hand signs to communicate and show where they are from or that they are a rival.

Sherman explained that respect is a very large part of the gang lifestyle, and in fact a lot of gang members get into the gang because they want that respect. A gang member can get respect by having a lot of

45

money, being a good narcotic dealer, or being willing to go around with a weapon and shoot rival gang members. If a person who belongs to a gang is disrespected, that person has to answer back. If he does not, he ruins not only his own respect, but shows the other gangs that his gang is not very strong. Often, the retaliation must go above and beyond the nature of the disrespect. For instance, disrespect with words will be answered with physical assault. A physical assault might be answered with a shooting. A shooting might be answered with murder. Although the retaliation does not have to be immediate, it has to occur.

In 2007, there were several Country Boy Crip hangouts — places where the gang members would congregate, usually either to conduct their criminal activity or to throw parties. The main ones were the D&A Market on Cottonwood Road, the Hollywood Market on East Planz, the Watts Market at Watts and Lotus, and residences in the 900 block of Bradshaw, the 1100 block of Altus, and the residence on Deanna Way at which Lee's vehicle was shot in March. The Eastside Crips also had particular hangouts, as did the Westside Crips. In 2007, a weak alliance existed between the Country Boy Crips and the Westside Crips. That year, one of the latter's common hangouts was a residence in the 400 block of Eye Street.

In 2007, the Country Boy Crips had over 200 members. Their main rivals were the Eastside Crips and the Bloods. The rivalries were long-standing and ranged from simple assaults and fights to drive-by shootings to homicides. One of the major incidents between Eastside and Country was the Casa Loma shooting in 1999. Several Country Boy Crip and Westside Crip gang members were at a wake at Casa Loma Park when several Eastside Crip gang members came by, fired into the large crowd of people there, and so shot several affiliates and family members of both gangs. Beginning in January 2007, the Eastside-Country rivalry showed itself in a number of shootings going back and forth between the two, where members from each gang were victims of gang violence. Sherman opined that the McNew Court shootings in April were part of this pattern, which continued on into May.

The Eastside Crips' primary activities were narcotics possession for sale, weapons possession, assaults, and homicides. In Sherman's opinion, the Eastside Crips were an active criminal street gang in 2007. Based on his research, he opined that Anthony Lyons, Othelon Lyons, Curtis Miller, and Albert Darrett were all Eastside Crip gang members in 2007. Sherman found no information, however, to indicate James Wallace or Vanessa Alcala were gang members.

In 2007, the Bloods and Country Boy Crips were rivals. The Bloods' primary activities were narcotic possession for sale, weapons possession, assaults, and homicides. The Bloods in Bakersfield did not have a traditional territorial boundary; rather, because they were small in number, they were more migrant and controlled small apartment complexes or a few blocks in an area for a while until they usually were run out. In 2007, their hangouts included Monterey and Inyo Streets and the Grinnage residence on Deborah Street. A lot of rock cocaine sales were conducted at Inyo and Monterey Streets. In 2007, there were tensions between the Bloods and other rival gangs in Bakersfield.

Based on his investigations, Sherman opined that the Bloods were an active criminal street gang in 2007. From his research, he concluded that Adrian Bonner was at least affiliated with the Bloods, and Edwin McGowan was a Blood gang member, in 2007.

In Sherman's opinion, in 2007, the primary activities of the Country Boy Crips were sales and possession for sale of narcotics, including rock cocaine (the primary drug sold), methamphetamine, and heroin; possession of concealed and loaded firearms; threats and intimidation of witnesses and victims; burglaries; shootings; and murders. In Sherman's experience, the sale of narcotics is used to fund the gang, allowing it to buy more narcotics and firearms, and to rent cars and properties and facilitate gang activities. The possession of concealed and loaded firearms assists the gang in that firearms are used to fight against rival gang members, to protect gang members from rival gang members, to protect their narcotic trafficking endeavors, and as a form of respect. A gang member who carries a firearm will be "more macho" than one who does not. Burglaries are committed by gang members to steal items to sell to gain money to further the gang's narcotic activity, and also in an effort to locate firearms. Shootings and murders are used to fight against rival gang members, to show other gangs that they are not a gang to be "messed with," and to get respect.

Based on his investigations and the information he gathered from speaking with other officers and from working in the gang unit, Sherman opined that in 2007, the Country Boy Crip criminal street gang was engaged in a pattern of criminal activity. Based on his training and experience, he further opined that gang members discussed crimes and court cases among themselves (and sometimes with law enforcement officers), and that the pattern of criminal activity by the Country Boy Crips was a matter of common knowledge for gang members.

For purposes of showing predicate offenses and a pattern of criminal activity, Sherman described the following cases:

• Case No. BF95016A, involving Dixon. In that matter, in March 2001, Dixon and another African-American male were walking in Eastside Crip territory when they shot at several teenagers sitting on a porch. A month later, Dixon shot and killed an Eastside Crip member who was in Country Boy Crip territory. On September 11, 2001, Dixon pled to manslaughter and was sentenced to prison. In Sherman's opinion, Dixon was a member of the Country Boy Crip gang when the offense was committed.

• Case No. BF105692, involving Vertis Bayne. In that matter, in August 2003, Bayne shot an Eastside Crip while riding past on a bicycle. He was convicted of attempted murder, assault with a firearm, and ex-felon in possession of a firearm with gang enhancements, and sentenced to prison. In Sherman's opinion, Bayne was a member of the Country Boy Crips when the shooting was committed.

• Case No. BF106522, involving Joseph Ferguson. In that matter, in April 2004, officers investigating a shooting tried to stop a vehicle driven by Ferguson, but a pursuit ensued. During the pursuit, an Uzi-type firearm was thrown from the vehicle. Ferguson was convicted of weapons violations, including gang member in possession of a firearm, and evading

police with a gang enhancement, and sentenced to prison. In Sherman's opinion, Ferguson was a member of the Country Boy Crips at the time of the offenses.

• Case No. BF115529, involving Eddie Peterson, Sr. In that matter, in March 2006, officers conducting a parole search of Peterson's motel room found narcotics and sales indicia. Peterson was convicted of possession of narcotics for sale and sentenced to prison. In Sherman's opinion, Peterson was a member of the Country Boy Crips at the time of the offense.

In connection with the present case, Sherman researched the criminal history of defendants in order to determine if they were active gang members at the time the crimes were committed. He determined that Johnson, whose birthday was April 12, 1986, had the monikers Lil C, Rifle, and Little Rifleman, and that he had gang-related tattoos in several places on his body. He also determined that Johnson had numerous police contacts, dating back to October 2000, in which Johnson variously associated with Country Boy Crip members, was in Country Boy Crip territory although he did not live there, admitted his own Country Boy Crip membership, or was involved in gang-related activity. Two of the contacts involved Johnson being the victim of gang-related shootings, and another resulted in Johnson being convicted of being an accessory to a gang-related murder that took place in Eastside Crip territory. In addition, what was written on the shirt Johnson wore at the picnic in January 2007, showed his Country Boy Crip membership and his disrespect toward Eastside Crips. Also, rap lyrics written by Johnson referred to the gang, gang lifestyle, and violence associated with that lifestyle. Sherman also reviewed Johnson's jail bookings. In the bookings between December 2004 and September 2007, he claimed Crip and requested keep-away from the Bloods.[fn61]

FN61: The jail does not have enough housing to keep apart the various cliques of the gangs.

Based on everything Sherman reviewed and personal contact he had had with Johnson, Sherman opined that between March 1 and August 22, 2007, Johnson was an active member of the Country Boy Crips. Agustin's and Jackson's testimonies reinforced his opinion.

Sherman also researched Lee, whose date of birth was October 17, 1984. Lee had what appeared to be a gang-related tattoo. His moniker was Gunner or Gunman. Lee had several prior contacts with law enforcement dating back to July 30, 2005, at which time he was with known Country Boy Crip gang members and associates. In February 2007, he was stopped in the company of Johnson and other Country Boy Crip members, in Country Boy Crip territory, although he did not live in that area. On March 21, 2007, Lee was the victim of a shooting at a Country Boy Crip hangout on Deanna Way, but did not stay at the crime scene because he did not want to have police contact at the time for "whatever personal reasons." On March 22, he was again the victim of a shooting, this time in the vicinity of a Blood hangout near the Country Boy Crip hangout on Deanna Way. Again, he initially did not want to tell police about being shot, but later provided a statement.[fn62] When contacted by Sherman and another officer the next day, Lee admitted that his friends and family were Country Boy Crips, although he did not admit that he

himself was. In August, Lee was arrested with Dixon after a vehicle pursuit, and a Tec-9 handgun was found in the vehicle.

**FN62**: In Sherman's experience, people who are in gangs are often victims of gang violence because of the lifestyle they are in.

Sherman also reviewed Lee's MySpace page. There were gang references in some of the incoming and outgoing messages, with the writer (who gave Lee's telephone number) identifying himself as a Country Boy Crip, referencing other Country Boy Crip members, and trading threats with an Eastside Crip.[fn63] The page also contained a photograph of Lee making a "W" hand sign for Watts. In addition, letters seized during the search of Lee's residence on Myrtle Street contained gang references and indicia. One of the letters from Robert ("Critter") Lee expressed surprise that Lee was giving up his job "for the hood," and warned that if Lee was going to do that, he could only trust a few people. Another from Robert Lee warned Lee not to tell their parents about what Lee and his brother, a Country Boy Crip, were doing. By contrast, Robert Lee's letters to his father contained no gang references.

**FN63**: Sherman conceded he did not have personal knowledge of the identity of the author of any of the entries, and did not compare the dates and times with records of Lee's work history.

Sherman also reviewed Lee's jail bookings. Lee did not claim a gang or request to be kept away from anyone. Based on everything he reviewed, however, Sherman opined that Lee was an active member of the Country Boy Crips between March 1 and August 22, 2007. Agustin's and Jackson's testimonies reinforced this opinion.

Sherman also researched Dixon, whose date of birth was October 11, 1983. Dixon had the monikers Dodo and Baby Clacc, and he had gang-related tattoos on various parts of his body. Prior police contacts revealed that in May 1998, Dixon was arrested for possession for sale of rock cocaine while in the company of individuals who later became documented Country Boy Crip members. The next month, he was acting as a lookout for narcotics sellers in Country Boy Crip territory. In September 1998, Dixon was arrested for possession of rock cocaine and a firearm. In December 1999, Dixon was arrested in Country Boy Crip territory for possessing a loaded firearm. In November 2000, Dixon was the victim of a drive-by shooting while in Country Boy Crip territory. In March 2001, Dixon was contacted at Watts and Lotus, although he did not live in Country Boy Crip territory. In April 2001 was the gang-related shooting that resulted in Dixon's manslaughter conviction. During a July 2007 parole search of Dixon's residence, officers found letters containing gang references addressed to Dixon. In August 2007, Dixon was with Lee during the vehicle pursuit. Dixon fled, but was later arrested at his apartment. He was seen wearing light powder blue clothing, and a loaded Tec-9 was found in the vehicle.

Sherman also reviewed Dixon's jail bookings. In May and August 2007, Dixon claimed Crip, with Country Boy Crip as the subset, and requested a keep-away from Bloods. Based on everything he reviewed, Sherman opined that Dixon was an active member of the Country Boy

49

Crips between March and August 2007.

Sherman did background checks on persons mentioned by Agustin and Jackson in their testimonies. In addition to determining their true names, he opined that Bus Loc, Fat-Fat, D-Keys, Goo, Big Jim, Raybo, Two C's, Nip, Cutty Pete, Riko, and Big Gage were all Country Boy Crip members, with Gage being an OG. Sherman also researched Agustin's background. He found no gang-related contact with police for her.

Sherman explained that all gang members are expected to "put[] in work" for the gang. "Putting in work" can mean selling narcotics, stealing items, getting guns, or even committing a shooting or assault. The type of work may vary according to the gang member's personality or strengths. A shot-caller is an old gangster who has been around for a while, has put in his work, and is well respected. He may be the one who directs the actions of others. There are shooters within the gang; these are the people who commit the assaults, drive-by shootings, and even homicides. They are the aggressors and enforcers. These persons are respected because they are feared, even by fellow gang members. The status of the victim has an effect on the status of the shooter; if he shoots a rival gang member, he gains status and respect. By contrast, if, in trying to shoot a rival member he misses and kills an innocent party, it will not necessarily create a backlash against him, but he will not get as much respect. It is common for shooters in a gang to brag to fellow gang members about whom they shot. They will not, however, take credit for something someone else did, as that would constitute disrespect toward the actual shooter. The bragging, which is done to get credit for the shooting, does not commonly involve a recitation of intricate details.

Sherman explained that a walk-up shooting involves walking up to the intended target and shooting. If it is done in rival gang territory, the perpetrators usually will have some sort of transportation. They will either drive through the territory to scope out the target or see if it is available, then park somewhere close, physically get out of their vehicle, walk up to the target, shoot, and then return to the vehicle and flee the rival gang territory. Communication with other gang members during walk-up shootings usually is by phone; there needs to be communication between the shooters and the person left in the car in case something goes wrong and plans change. Clothing also plays a part; the shooters commonly wear neutral colors that will not make them stand out to witnesses. On the other hand, it can also be used as a ruse to throw suspicion onto a rival gang. Layers of clothing may be worn so the shooters can change their physical appearance after committing the crime and thus will not fit the descriptions given to police. Sometimes, gang members will stash clothing before the shooting and then change into it later.

Sherman also explained that a drive-by shooting involves driving the car up to the target. Disadvantages are that the shooters' vehicle is seen and a vehicle leaving the scene at a high rate of speed draws the attention of arriving law enforcement officers. Shooters on foot can find somewhere to hide and even wait out the police.

According to Sherman, women play a supportive role in the Country Boy Crips and other gangs. They provide the male gang member with financial support, a place to live, a car to use, or a cell phone or clothing. They also conceal or stash the male gang member's illegal activities, such

as guns or narcotics. Whether gang members discuss gang activities with the women depends on the trust factor between them. If the two are in an ongoing, serious relationship, he may divulge some things to her, but is unlikely to go into depth regarding the inner workings of the gang. The male will instill in the female the idea that she is not to tell; if she does, she risks assault or death.

Gangs have rules about not cooperating with law enforcement. One who cooperates is considered a snitch. Even a gang member who is a victim of gang violence often will not cooperate, because he wants to get his respect back, and allowing the police to take care of it will not achieve that. Similarly, a gang member will not want to come to court and testify, even against a rival gang member for that is considered snitching. A gang member who testifies may face threats, intimidation, and assault, both to him and to his family.

In answer to hypothetical questions based on the prosecution's evidence, Sherman opined that the shooting at Monterey and Inyo, shootings at McNew Court, and shooting at Real Road and Planz were committed for the benefit of the Country Boy Crips, and were done with the intent to promote, further, or assist criminal conduct by the Country Boy Crips. Sherman further opined that if there was an agreement between the involved Country Boy Crips to do the shooting or the killing, plus an act of traveling to the location for that purpose, those acts also were committed for the benefit of the Country Boy Crips. A Country Boy Crip member promotes his gang by shooting at a rival gang.

Sherman further opined that if a Country Boy Crip who was a convicted felon was in possession of a loaded firearm in the vicinity of McNew Court, that act would promote or benefit the Country Boy Crips gang, because that gang member was willing to carry the firearm and commit an act for the benefit of the gang. In addition, Sherman opined that if four Country Boy Crips, each armed and in agreement to locate and kill the person (or a relative of the person) they believed had murdered their fellow gang member, drove to a location near Panorama Drive to carry out their intention, those acts were committed for the benefit of, and with the intent to promote, further, or assist conduct by, the Country Boy Crips. The Country Boy Crip who was killed was thereby disrespected, and the four Country Boy Crips were acting to get the respect back for their gang and their deceased friend. Even the act of getting together with guns and going to the location would earn them respect, as they were willing to take matters into their own hands. If the felon who possessed a firearm helped a second Country Boy Crip sell a firearm so the latter could leave Bakersfield after shooting a rival gang member, his acts would be done with the intent to promote or benefit the Country Boy Crips.

II.    Defense Evidence

Johnson's Case

Jim Dill lived in the Encina Street residence in mid-September 2007. Before he cleaned the fireplace, there was a quarter inch of ash in it, but no burnt clothes or metal zippers.

Theodore Richard was a cement mason at the time of trial, and had been doing that since June 2008. As of the time he testified, he was not

doing anything else for money.

Richard was Jackson's cousin. Jackson was "like a brother" to Richard, who was testifying because of the various things Jackson had told him about this situation. Jackson had been frequently seeking Richard out ever since Richard came home.

Jackson told Richard that Jackson was not going to testify in this case. Jackson related that law enforcement had threatened to charge him with Raybo's murder, and he was afraid of being prosecuted for that offense. During their conversations, Jackson mentioned a girl named Sara that he was dating. Jackson said she was supposed to be the ex-girlfriend of one of the defendants in this case. Jackson told Richard that he was lying about defendants. Richard never told Jackson not to come to court or what to say if he took the witness stand, but he did tell Jackson not to testify to the lies Jackson was telling Richard.

Richard denied ever being told by Johnson (whom he had never met) or anyone else to intimidate Jackson or try to convince him not to come to court. He admitted, however, having been convicted in federal court in February 1999 of conspiracy to distribute and possession for sale of cocaine. While in federal custody in April 2000, he pled no contest in Kern County to felony assault with a firearm.

Kevin Griffith saw the car involved in the shooting of Adrian Bonner. It was like a red Nissan Sentra, and the paint on the back trunk hood was bleached or oxidized by the sun. Later that night or possibly early the next morning, he saw what he was "pretty sure" was the same car again.[fn64] It had been pulled over at Fastrip on Real Road and Ming. Shannon Fowler's car was not the car Griffith saw at the time of the shooting or later. Griffith was not able to clearly identify anyone in the car at the time of the shooting. When he saw the car later, it contained three African-American men. The driver appeared older than defendants. The others in the car were "[m]ostly older" than defendants, perhaps in their late 30's.[fn65]

FN64: In his 911 call, he said he was positive it was the car.

FN65: In the summer of 2007, Aaron Norwood drove a red 1991 or 1992 Ford Tempo. The paint on Norwood's car was pretty faded and dull.

On August 11, Norwood worked the 6:00 p.m. to 10:00 p.m. shift at PetsMart. He took no breaks, although the store's employees may have left around 9:30 that evening at the manager's behest. He drove his car to work that day and parked it in front of the store. He did not drive the car during his shift, no one borrowed it, and when he left to go home, it was in the same place that he had left it. After work, he went to a party, then, around 2:00 a.m., he was pulled over at the Fastrip at Ming and Real Road, which was about a mile from Real Road and Planz. At the time, he was with his cousin and a friend. The police searched the car, and the next day searched Norwood's house. They found a live .38-caliber round of ammunition. It had belonged to Norwood's late brother, and Norwood had kept it. Norwood was interviewed at the police station and, after it had been confirmed with his boss that he and his vehicle had both been present at PetsMart at the time of the Adrian Bonner shooting, released.

Dixon's Case

On August 11, 2007, Pamela Ginn's grandson had a birthday party at Camelot Park, an amusement park on Oak Street. The party began about 2:00 p.m. and lasted until it started to get dark. Ginn, who had known Dixon most of his life, saw him at Camelot Park that day. He was there until the party ended, and helped put the gifts in the car. At no time did she see him leave the party.

Dixon testified that he was born in Bakersfield and raised in the Country. Growing up in that area, Dixon — who acquired the nickname Dodo during childhood — saw drug sales and shootings every day. He grew up with a bunch of kids who got into the gang. They hung out together because they were friends and grew up with each other.

Dixon admitted that in addition to being called Dodo, he was sometimes called Baby Clacc, a name he took for himself because he wanted to be like his cousin, Frankie Baker, who was known as Big Clacc. Dixon knew the Country Boy Crips were a criminal gang, but explained that those in the gang looked on each other as family, as there were several generations of people within the gang. In addition, because Bakersfield was so small, it was not unusual to have family members in the other gangs. For example, Dixon's father used to be an Eastside Crip.

Dixon was 14 years old when he became a Country Boy Crip. The only crimes he ever committed were possessing firearms and selling rock cocaine. He never shot a gun, but simply carried a firearm for protection. He sold drugs for himself. He did this in Country Boy Crip territory. The gang left him alone because his mother lived there and he was raised there.

Dixon denied committing the killing for which he pled no contest to voluntary manslaughter in 2001; he was charged with murder and wanted to go to trial, but his then-attorney told him juries did not like gangs. His attorney told him that he was facing a sentence of 56 years to life in prison versus six years. Dixon, who was only 17 at the time, did not want to do life. Dixon did not have any tattoos until he went to prison. He got almost all of his tattoos when he was 18 and in prison, where tattoos are "just fashion."

Dixon was paroled on March 4, 2007. He moved in with his cousin Keshiea, who lived off of Pacheco Road, but she got evicted. He then moved in with Myeshia Herring on Chandler, then moved to an apartment on North Half Moon with Keanna King. Each time he moved, he notified his parole officer. After he paroled, he did not do anything for the gang, but just socialized with Country Boy Crips because all his friends were from there. As for Johnson, Dixon knew he was a gang member, but did not know what his role was in the gang. The two merely socialized, and Dixon never saw Johnson do any criminal activities. Around March or April, Johnson was cutting hair in different neighborhoods. When he cut hair, he sometimes wore his brown barber's smock.

Dixon had known Lee since elementary school. Lee was only known as Dave. Dixon never saw him sell any drugs; Lee did not grow up like that. When Dixon was in prison, he would hear that Lee's brothers

were "hanging out," but not Lee. Dixon had seen Lee smoke marijuana, but never with a mask. Dixon never saw him with any weapons of any kind. Lee never wore powder blue clothes. How he dressed in court was how he dressed on the street.

Dixon did not have a cell phone when he was first paroled, but Myeshia and the others could not get in contact with him so she said her sister had a phone for him. He let other people use the phone if they needed it. He last saw that phone on April 18, in Agustin's Expedition. Johnson dropped Dixon off, and Dixon forgot the phone. Dixon called Johnson from the house phone at Keanna King's residence and told Johnson he would get it from him the next day.

The next day or shortly after, however, Myeshia contacted him and said Deputy Little wanted to talk to him. Dixon called Little, who asked him to come in for an interview. Dixon went, but denied he was known as Dodo, because that name had been used against him back in 2001. He also denied that the cell phone found at the scene was his, because the officers were telling him they had an eyewitness who had seen him on McNew Court. They asked whether he was Rifleman. That was why Dixon subsequently called Johnson; Dixon asked him why Dixon's phone was at a crime scene. Dixon could not explain to the detectives about forgetting the cell phone in the Expedition, because if someone becomes a snitch, his family will disown him, and Dixon's whole family was from the gang.

After Dixon asked Johnson why Dixon's phone was at a crime scene, Johnson left and went to San Jose. Johnson never explained why the phone was there.

Dixon denied being present at the shootings on McNew Court. James Wallace was his cousin, although they did not grow up together. Dixon denied robbing any drug dealer on Cheatham Street or Reese Street. Robbing one's own homie would bring repercussions and would probably cause one's own gang to turn against the robber.

Dixon was acquainted with Shannon Fowler. Among the people who lived in the apartments in the 200 block of Eye Street during August 2007 were Fowler, who was having a sexual relationship with Lee, and Krystle, who was seeing Johnson. In addition, a girl Dixon was seeing often visited her friends in the complex. Fowler had a red car, but she never let Dixon and the others drive it. Dixon had never been in that car.

Dixon was familiar with the house in the 400 block of Eye Street. The man who lived there sold drugs. Dixon grew up with the daughters of the woman who lived there. Dixon never went to that location to help Johnson try to sell a gun so he could go to Las Vegas. Johnson never took Dixon to the intersection at Real Road and Planz to show him a camera.

Dixon grew up with Raybo. When he learned from his aunt that Raybo had been killed, he borrowed his sister's car and drove over to Reese and Cheatham Streets. He estimated there were about 200 people there when he arrived, including Johnson, Lee, and Raybo's brothers. Everybody was discussing what had happened; everyone knew it was an inside job, meaning it had to be a homie who did it. During this discussion, Jackson arrived. Johnson walked over to him, and Dixon, Lee, Raybo's

brothers, and some other homies followed. They all told Jackson that they had heard he killed Raybo. Jackson denied it and blamed it on Fumes (David Taylor).

While everyone was talking to Jackson, Dixon left to pick up his sisters. He returned later to the area of Reese and Cheatham, but never got into a vehicle with Jackson, Johnson, and Lee to go to the Bakersfield College area to kill Fumes or his father. Jackson was telling everyone that he knew where Fumes or Fumes's father stayed, but to Dixon's knowledge, no one went up there.

Dixon denied knowing Adrian Bonner or being at South Real Road and Planz at the time Bonner was shot. He was at Camelot Park, off California and Oak, at the time of the shooting. Dixon learned of the Bonner shooting shortly after it happened. When he and Ginn's son left Camelot Park, they went to the residence of Columbus Holford. Bonner's sister and Holford were friends, and she had called Holford right after the shooting.

On August 23, the day he was arrested, Dixon was the driver of a car that also contained Lee and someone called "Set Trip," whose real name Dixon did not know. The three were just talking. Dixon did not know there was a Tec-9 in the car until Set Trip told him to drive off because he had the gun in the lunch pail. Set Trip tossed the gun in the back seat, and Dixon let him out. Dixon jumped out of the car and ran because he did not want to go back to prison. After his arrest, he was booked into the Kern County jail and was placed in the same cell as Jackson. He never discussed the shootings with Jackson, however. Although Dixon and Jackson talked while celled, the talk was about them both changing and leaving the gang. Jackson was particularly worried about his parole violation.[fn66]

> **FN66**: According to Dixon, he himself gave up the gang lifestyle when he was arrested for possession of the Tec-9.

Dixon pled guilty to participating in a criminal street gang in the case arising out of the vehicle pursuit, and was sentenced to prison. While housed at Wasco State Prison, Dixon heard that Othelon Lyons was also imprisoned there. They were never on the same yard, however, and never had any contact or conversation.

Emmanuel Burts, Jr., married Agustin in September 2008. At the time he testified, he was in jail as the result of her bringing charges against him.[fn67] When he was arrested, he telephoned and wanted to let the defense attorneys in this case know Agustin had lied on the stand.

> **FN67**: Burts was pending charges of spousal abuse and felony threats. He had suffered a number of prior felony and misdemeanor convictions for various offenses.

Before she had testified, Agustin and Burts lived in Fresno. Agustin had transcripts and went over them. She also went on the Internet and looked at maps. She told Burts she was refreshing her memory of the locations to which she went with her ex-boyfriend.

While Agustin was in Bakersfield testifying in this trial, she

55

telephoned Burts every day to let him know when she was back in her room. She told Burts that she was testifying truthfully, but was leaving out parts. She said she was not being truthful about certain things because she did not want her son involved. Johnson sold a gun to Agustin's son, in Agustin's presence, right before they went to Las Vegas. Agustin said it was the gun used in the homicide. In addition, Agustin told Burts that either Lee or Dixon (Burts could not remember which) had nothing to do with the murder.

In the time he had known Agustin, Burts formed the opinion that she was very deceiving and conniving. Burts was aware Agustin received $750 for rent and $450 for her personal things each month as a witness for the prosecution in this case. In Fresno County, however, she applied for food stamps and welfare, and never reported she was receiving that money.

Lee's Case

According to Marc Taylor, a forensic scientist/criminalist and laboratory director of Technical Associates, Incorporated, in Ventura, California, there are ways to preserve and process items, such as expended shell casings, so that they can be tested for fingerprints and potential DNA without interfering one with the other. Latent fingerprints and DNA both can be recovered from expended shell casings. In his opinion, placing individual shell casings in on cottony cushioning in small white boxes, as was done in this case, could result in ridge lines left by whoever touched the casing being wiped off by the cotton. Similarly, packaging multiple expended shell casings together in an envelope could lead to a transfer taking place or to the ability to detect a fingerprint being affected due to the rubbing together of various pieces of evidence. He could not, however, say whether that happened in this case.

In DNA testing, when there is a good quantity of DNA, the peaks on the electropherogram will be well within the normal analytical range. There are specific procedures to test the analytical thresholds of the instrument to be sure that when there is a peak above a certain height, it represents a reliable result. If low levels of DNA from an individual are present, things may show up in certain areas of the electropherograms but disappear in others. Whether to include or exclude an individual as being in the profile can then become subjective. For example, when an allele is present but in a weaker range, there are limitations on what interpretations can be made of that allele being present. Sometimes, the results are inconclusive. Taylor could not say whether there was a subjectivity to the analysis of the DNA results in this case or whether there were low quantities of DNA.

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838, 9-147 (Sept. 25, 2013).

II.    Discussion

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

1   2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

2   suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

3   conviction challenged arises out of the Kern County Superior Court, which is located

4   within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

5   has jurisdiction over the action.

6   **B.    Legal Standard of Review**

7       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

8   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

9   filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

10  114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

11  the AEDPA; thus, it is governed by its provisions.

12      Under AEDPA, an application for a writ of habeas corpus by a person in custody

13  under a judgment of a state court may be granted only for violations of the Constitution

14  or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

15  7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

16  state court proceedings if the state court's adjudication of the claim:

17      (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established federal law, as
18      determined by the Supreme Court of the United States; or

19      (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the State
20      court proceeding.

21  28 U.S.C. § 2254(d).

22      1.    Contrary to or an Unreasonable Application of Federal Law

23      A state court decision is "contrary to" federal law if it "applies a rule that

24  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

25  that are materially indistinguishable from" a Supreme Court case, yet reaches a different

26  result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.

27  "AEDPA does not require state and federal courts to wait for some nearly identical

28  factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

even a general standard may be applied in an unreasonable manner" <u>Panetti v.</u> <u>Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u> at 75-76, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002). In <u>Harrington v. Richter</u>, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419 (2009), quoted by <u>Richter</u>, 131 S. Ct. at 786.

### 2.    Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption. <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from

the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

<u>Richter</u> instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u> To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Id.</u> at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." <u>Id.</u> (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977).

### 3. Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether

the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin v. Lamarque, 555 F.3d at 834.

**III.    Review of Petition**

    **A.    Claim One: Admission of Prior Gang Related Offenses**

    Petitioner claims that the trial court improperly admitted his prior conviction for voluntary manslaughter.

        **1.    State Court Decision**

    Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. (Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under

1 | 28 U.S.C. § 2254(d)(1)).

2 | In denying Petitioner's claim, the California Court of Appeal explained:

3 | Trial Issues

4 | A.   Evidentiary Rulings and Related Claims

5 | Defendants make numerous claims of error concerning the trial
6 | court's evidentiary rulings and related matters. Because many of the
   | issues involve determinations of relevance and/or probative value versus
7 | prejudicial effect, we first state the general legal principles concerning
   | those subjects before turning to defendants' specific contentions. We also
8 | state the law applicable to ineffective assistance of counsel, since
   | defendants raise such claims in the event we find forfeiture of any
9 | substantive issue.

10 | "'Relevant evidence' means evidence, including evidence relevant
   | to the credibility of a witness or hearsay declarant, having any tendency in
11 | reason to prove or disprove any disputed fact that is of consequence to
   | the determination of the action." (Evid. Code, § 210.) "'While there is no
12 | universal test of relevancy, the general rule in criminal cases might be
   | stated as whether or not the evidence tends logically, naturally, and by
13 | reasonable inference to establish any fact material for the prosecution or
   | to overcome any material matter sought to be proved by the defense.
14 | [Citation.] Evidence is relevant when no matter how weak it may be, it
   | tends to prove the issue before the jury.' [Citation.]" (People v. Freeman
15 | (1994) 8 Cal.4th 450, 491.)

16 | While all relevant evidence is admissible except as otherwise
   | provided by statute (Evid. Code, § 351), "[n]o evidence is admissible
17 | except relevant evidence" (id., § 350). We review for abuse of discretion a
   | trial court's rulings on relevance. (People v. Cole (2004) 33 Cal.4th 1158,
18 | 1195.) That court is vested with wide discretion in determining relevance,
   | but has no discretion to admit irrelevant evidence. (People v. Alexander
19 | (2010) 49 Cal.4th 846, 904.) "[D]iscretion is abused whenever the court
   | exceeds the bounds of reason, all of the circumstances being considered.
20 | [Citations.]" (People v. Giminez (1975) 14 Cal.3d 68, 72.)

21 | "Under Evidence Code section 352, the probative value of the
   | proffered evidence must not be substantially outweighed by the probability
22 | that its admission would create substantial danger of undue prejudice, of
   | confusing the issues, or of misleading the jury. [Citations.]" (People v.
23 | Cole, supra, 33 Cal.4th at p. 1195.) "'The prejudice which exclusion of
   | evidence under Evidence Code section 352 is designed to avoid is not the
24 | prejudice or damage to a defense that naturally flows from relevant, highly
   | probative evidence.' [Citations.] 'Rather, the statute uses the word in its
25 | etymological sense of "prejudging" a person or cause on the basis of
   | extraneous factors.'" (People v. Zapien (1993) 4 Cal.4th 929, 958.)
26 | "Evidence is substantially more prejudicial than probative [citation] if,
   | broadly stated, it poses an intolerable 'risk to the fairness of the
27 | proceedings or the reliability of the outcome' [citation]." (People v. Waidla
   | (2000) 22 Cal.4th 690, 724.)

28 | "[T]he trial court enjoys broad discretion in assessing whether the

61

probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (People v. Rodriguez (1994) 8 Cal.4th 1060, 1124-1125 (Rodriguez).)

Finally, the burden of proving ineffective assistance of counsel is on the defendant. (People v. Pope (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (People v. Cunningham (2001) 25 Cal.4th 926, 1003; see generally Strickland v. Washington (1984) 466 U.S. 668, 687-694.)

1.    Dixon's Prior Bad Acts

Dixon contends the trial court committed federal constitutional error by admitting, for any purpose but especially on the issue of identity, evidence of two shootings in which he allegedly was involved in 2001. Lee joins in the argument. Lee acknowledges the evidence was limited to Dixon, but says the limiting instructions given were not effective. The People respond that the evidence was properly admitted for the purposes specified by the trial court, but assuming otherwise, any error was harmless because Dixon's prior acts were properly before the jury on another issue.

a.    Background

Dixon and the prosecution filed dueling motions in limine with respect to Dixon's prior bad acts. Dixon sought exclusion of any mention of his September 11, 2001, voluntary manslaughter conviction, and to bifurcate trial on the prior conviction enhancement allegations. Johnson and Lee joined in the motion. The People sought admission of Dixon's prior acts — the March 7, 2001, assault by shooting at several individuals; and the April 8, 2001, voluntary manslaughter of Joseph Williams — pursuant to Evidence Code section 1101, subdivision (b). The People maintained these prior acts were relevant to prove motive, intent, common design, scheme, plan, and/or identity, and had substantial probative value for purposes of Evidence Code section 352.

After argument, an Evidence Code section 402 hearing was held at which Senior Officer Sherman testified. Sherman related that he had reviewed the police and probation reports with respect to the March 7 and April 8, 2001, shootings. On March 7, 2001, two African-American males, wearing dark clothing, were walking south on Kincaid Street, which was in Eastside Crip territory. After they passed a specific house, they turned around, walked back toward that address, produced firearms, and shot at

several people in the front yard and porch area of the residence. They then fled. A witness observed that one was limping; from his mannerisms, she recognized him as Dixon, whom she knew to be a Country Boy Crip.

Sherman found it significant, in formulating his expert opinions, particularly on motive and intent, that Dixon was a rival gang member who attempted to shoot other gang members in another gang's territory. In addition, it was a walk-up shooting.

On April 8, 2001, Joseph "Freeway" Williams, an Eastside Crip affiliate, was attending a birthday party in the 1900 block of Lotus. Dixon was also at the party. Williams went to his car to obtain some CD's and take some pictures. Dixon, wearing a powder blue sweatshirt with the hood pulled up and tied around his face to hide his facial features, walked up, produced a firearm from underneath the sweatshirt, and shot Williams multiple times at close range, killing him. Dixon then fled to a nearby residence. When he was contacted there later, he was wearing different clothing. Nine-millimeter shell casings found at the scene matched the shell casings found at the earlier scene on Kincaid. Dixon was arrested, entered into a plea bargain for voluntary manslaughter, was sentenced to 11 years in prison, and served six.[fn88]

**FN88**: The prosecutor represented that charges concerning the March 7, 2001, incident were dropped as part of the plea agreement.

Sherman considered it significant to his opinions that it was a walk-up shooting, and that Dixon concealed his facial features with a sweatshirt, and that he used a firearm. In essence, Sherman found this to be a signature crime. The shooting was motivated by hatred of a rival gang.

With respect to motive, intent, and common scheme or plan, Sherman found the 2001 shootings significant with respect to the opinions he would be giving relative to the gang information and the present charges. He particularly noted the style in which the offenses were committed and the fact rival gang members were targeted. The locations were also significant in terms of whether disrespect was being shown.

Sherman conceded that no one positively identified Dixon, and neither Lee nor Johnson was identified as a suspect, in either shooting. Sherman also testified that walk-up shootings now outweighed drive-up shootings in terms of which was the more commonly seen type of gang-related shooting. Walk-ups were now the method of choice, with gang members being told to do walk-ups so as not to inflame people with innocent bystanders being struck. In Sherman's experience, shootings involving African-American gangs were either walk-ups or drive-bys. Sherman also found it not uncommon, in his evaluation of gang-related shootings, to have identity concealed by means of a hoodie or ball cap or do-rag.

Counsel for Dixon subsequently argued for exclusion on the grounds that Dixon was 17 years old at the time of the 2001 shootings, he was never identified with respect to those shootings although he pled, and approximately six years separated those shootings from the current charges. In addition, counsel claimed trial would be prolonged by several

weeks because, if the 2001 shootings were admitted, he would have to try those cases as well as the current one. Counsel pointed out that, if the evidence were excluded, Sherman could still testify Dixon was a gang member based on his tattoos, and could also testify Dixon had a felony conviction, without mentioning it was for manslaughter.

Counsel for Lee argued that, given Sherman's testimony about the number of walk-up shootings outweighing the number of drive-by shootings, and the fact it was common for people involved in shootings to conceal their identities, the evidence should not be admissible on the issue of identity. Counsel further argued the evidence was unduly prejudicial to Lee, especially in light of the disparity in gang-related evidence among defendants, and that an admonition would not be sufficient to prevent a spillover effect. Counsel also argued that allowing the evidence would create an additional consumption of time. Counsel for Johnson joined in these comments, and argued that introduction of the evidence would affect Johnson's ability to have a fair trial.

The People responded by noting that the court had to separately analyze whether the evidence could come in under Evidence Code section 1101, subdivision (b), and whether Sherman could testify about the 2001 incidents as they related to his gang opinions. The prosecutor argued the 2001 incidents were material, relevant, more probative than prejudicial, and not merely cumulative.

After further argument, the court turned to whether the proffered evidence should be admitted, under Evidence Code section 1101, subdivision (b), as to Dixon. The court found the prior incidents material on the issues of intent, motive, identity, knowledge, common plan, and modus operandi, and relevant to prove motive, intent, common plan, design, or scheme, and identity.

Turning to the Evidence Code section 352 analysis, the court found relevance because the prior walk-up shootings were characteristic for gang purposes, and, the court stated, "also it's relevant because it shows someone who was willing to commit violent crimes or murder because of a dislike of a person from a different gang, or people that occupy residences in the defendant's non gang territory, rival's territory, if you will." The court found the probative value increased because evidence of the prior incidents had a source independent from evidence of the charged offenses, and it further found no remoteness. The court reasoned the jury would learn of Dixon's gang affiliation independent of evidence of the prior shootings, and found the evidence of the uncharged acts no stronger or more inflammatory than the current charges. Accordingly, it found substantial probative value that outweighed any prejudicial effect. The court stated this finding was based, in part, on the fact the limiting instructions could guide the jury concerning against whom they were to consider the evidence.[fn89]

FN89: As a result of the court's ruling, counsel for Dixon withdrew his request for bifurcation of the prior conviction allegations.

During trial, the prosecution called a number of witnesses concerning the 2001 shootings. The first was Otha Ford, who was with Joseph Williams when Williams was shot on April 8, 2001. Partway

through direct examination, counsel for Lee and Johnson both raised relevance objections with respect to their clients. After asking the date of the shooting and being told it occurred in 2001, the trial court overruled the objections. When the prosecutor asked his next question, counsel for Lee again objected on relevance grounds. The court asked the prosecutor to clarify the relevance to the individual defendant, whereupon the prosecutor reminded the court of the earlier motions, and that this evidence concerned Dixon's prior offenses. The court then sustained the objection. When Lee's counsel asked for a limiting instruction or explanation to the jury, the court asked the prosecutor, "This is evidence that you're saying only goes and applies to Mr. Dixon only, correct?" When the prosecutor confirmed that was correct, the court told the jury: "That will be the order of the Court. [¶] My understanding, ladies and gentlemen, is this evidence is only offered, as I understand it, by the prosecution in regard to Defendant Mr. Dixon only."

The next witness concerning the 2001 shootings was Byron Allen. At the outset of his testimony, Lee's attorney asked for, and received, an admonition that jurors could only consider the testimony as to Dixon.

The following day, a stipulation between the People and Dixon was read to the jury. In it, they agreed that on August 13, 2001, Dixon pled no contest to the voluntary manslaughter of Joseph Williams. The parties further stipulated that the no contest plea was properly deemed to be a guilty plea under the law, Dixon was sentenced to prison, his sentence was for six years, and he was discharged from prison on or about March 4, 2007. The court informed the jury that the facts contained in the stipulation must be accepted as conclusively proven, and that the stipulation had to do only with Dixon and not the other two defendants.

The prosecutor then called Bakersfield Police Officer Grove, whose testimony pertained to the Williams shooting. At the outset of his testimony, counsel for Lee objected on relevance grounds, and the court confirmed with the prosecutor that the evidence was being offered only against Dixon.

During a subsequent discussion of whether counsel for Dixon could present evidence that Dixon was not involved in the prior shootings despite the no contest plea, counsel for Lee reiterated his objection to admission of the other crimes evidence. Counsel noted the court itself was momentarily confused concerning what shooting was being discussed, and he expressed concern about spillover prejudice once the People established that Lee had been friends with Dixon for some time. Counsel reiterated that there were insufficient similarities between the prior acts and present offenses so as to prove identity in the present case, and that the People did not need the prior acts evidence to establish motive. Counsel for Johnson joined in the comments. The prosecutor responded in part that the evidence was going to come in anyway, because it went to the gang issue, which in turn related to the entire case. After further argument, the court determined that if another cautionary instruction was given that limited the evidence to Dixon, then the probative value would outweigh any prejudicial impact. Accordingly, the court directed the prosecutor to inform the court, when a witness was called, if the testimony was being offered solely against Dixon, at which point the court would admonish the jury accordingly.

65

The prosecution's next witness concerning the events of 2001 was Officer Carruesco. At the outset of his testimony, the prosecutor informed the court that the testimony was being offered only as to Dixon. The court told the jury: "And ladies and gentlemen, we gave you an earlier instruction that during the trial oftentimes evidence comes in for a limited purpose, and this is one of those occasions, and we ask you to follow that jury instruction that we have read to you and we will read again at the end of the case." The jury was reminded, in conjunction with the testimony of the prosecution's next two witnesses to the 2001 events, that the evidence was limited to Dixon.

The People then called Sergeant Jehle to testify as a gang expert with respect to the 2001 shootings.[fn90] In part, Jehle described police contacts with, arrests of, and incidents involving Dixon that took place between 1998 and April 9, 2001. Midway through Jehle's testimony, counsel for Lee objected to a photograph on relevance and Evidence Code section 352 grounds with respect to Lee. Counsel for Johnson joined. When the court asked the prosecutor whether the evidence was coming in solely in regard to Dixon, the prosecutor responded, "This photograph is, yes, your Honor." The court then admonished the jury accordingly, whereupon counsel for Lee clarified that Jehle's testimony was also for that purpose. The court confirmed that understanding with the prosecutor.

> **FN90**: Much of Jehle's testimony concerning the history of the Eastside and Country Boy Crips and gangs in general was repeated by Senior Officer Sherman when he testified as a gang expert concerning the charged offenses.

Jehle ultimately opined that on April 8, 2001, Williams was an active member of the Eastside Crips criminal street gang, and that in March and April 2001, Dixon was an active member of the Country Boy Crips criminal street gang. By means of hypothetical questions, Jehle further opined that the March and April 2001 shootings were committed for the benefit of, at the direction of, or in association with the Country Boy Crips criminal street gang. At the behest of Lee's attorney, the court clarified that the hypotheticals related solely to Dixon.

The prosecutor called Supervising Criminalist Gregory Laskowski to testify with respect both to evidence collected in conjunction with the current charges, and also with respect to evidence collected in conjunction with the 2001 shootings. The prosecutor clarified which evidence related only to Dixon.

Laskowski was the final witness called by the prosecution with respect to the 2001 shootings. The subject was briefly broached by various parties during the examination of Dupree Jackson. As previously described, Sherman discussed the shootings in conjunction with his gang testimony, and Dixon took the stand and denied involvement in the shootings.

During summation, the prosecutor argued to the jury that the way the Williams killing was committed was very similar to the McNew Court shootings, in that both were gang motivated, both were walk-up shootings, both took place in gang territory, the victims in both were in the front yard, the shooter in both was wearing a hooded sweatshirt, the shooter in both

shot the victims several times at point-blank range, the intended victims in both were Stroller Boy Eastside Crips, the shooter in both ran back the way he had come after the shootings, and there was a clothing change as part of the scheme in both.[fn91] The prosecutor argued the prior acts could be used to determine Dixon's identity, intent, motive, and common plan and scheme with respect to the McNew Court shootings, but warned that the evidence could not be used to show Dixon was a bad person or the type likely to commit crimes. The prosecutor also discussed the relevance of the prior crimes to the gang issues and the prior conviction allegations. Dixon's attorney countered that the shootings were six years apart, there are a lot of walk-up shootings and shootings that involve the wearing of a hoodie, and there were differences between the crimes.

> **FN91**: Insofar as the Williams shooting is concerned, this appears to be a reference to the fact that, when contacted shortly afterward, Dixon was not wearing a hooded sweatshirt.

In pertinent part, the trial court instructed the jury, pursuant to CALCRIM No. 303:

> "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] I instructed you during the trial that certain evidence was admitted only against certain defendants. You must not consider that evidence against any other defendant."

Specifically with respect to the evidence admitted pursuant to Evidence Code section 1101, subdivision (b), jurors were told, pursuant to CALCRIM No. 375:

> "The People presented evidence that the defendant Mr. Joseph Kevin Dixon allegedly committed the offenses of voluntary manslaughter and/or shooting at an inhabited dwelling house, both of which are alleged to have occurred in 2001 that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. Proof by a preponderance of evidence is a different burden of proof than proof beyond a reasonable doubt.

> "A fact is proved by a preponderance of evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely.

> "If you decide that the defendant committed the uncharged offenses you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant was the person who committed the offenses alleged in this case or the defendant acted with the intent to kill or the defendant had a motive to commit the offenses alleged in this case or the defendant had a plan or scheme to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose other than the credibility of defendant Mr. Joseph Dixon. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that said defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged or that the enhancements or allegations have been proved. The People must still prove each charge, enhancement, and allegation beyond a reasonable doubt."

    b.    <u>Analysis</u>

Evidence Code section 1101 provides, in pertinent part:

"(a) Except as provided [in statutes not involved here], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, ... when relevant to prove some fact (such as motive, ... intent, ... plan, ... [or] identity ...) other than his or her disposition to commit such an act."

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.] On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion. [Citations.]" (<u>People v. Kipp</u> (1998) 18 Cal.4th 349, 369.)

"'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' [Citation.]" (<u>People v. Lindberg</u> (2008) 45 Cal.4th 1, 22.) "'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' [Citation.]" (<u>Id.</u> at p. 23.)

"When the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense with evidence he had committed uncharged offenses, the admissibility of evidence of the uncharged offenses turns on proof that the charged and uncharged offenses share sufficient distinctive common features to raise an inference of identity." (<u>People v. Lindberg</u>, *supra*, 45 Cal.4th at p. 23.) "The greatest degree of

similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] *'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.*' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403, italics added.)

The requisite degree of similarity was not established in the present case. The inference of identity "need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. [Citation.]" (<u>People v. Miller</u> (1990) 50 Cal.3d 954, 987.) Nevertheless, "'"[t]he marks common to the charged and uncharged offenses, considered singly or in combination, [must] logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." [Citation.]' [Citation.]" (Ibid.)

A walk-up shooting of a gang member (or someone associated with or believed to be a gang member), perpetrated in gang territory by an African-American male wearing a hooded sweatshirt, may be sufficiently distinctive to identify the shooter as a gang member — perhaps even as a Country Boy Crip — but, especially in light of expert testimony that walk-up shootings are now more common than drive-by shootings, it is not sufficiently distinctive to identify the shooter as a specific gang member. (<u>See</u> <u>People v. Balcom</u> (1994) 7 Cal.4th 414, 424-425 [where uncharged act relevant to show identity, "highly unusual and distinctive nature" of charged and uncharged offenses "virtually eliminates" possibility anyone but defendant committed charged offense].) Accordingly, the trial court erred in admitting evidence of the 2001 shootings on the issue of, and instructing jurors they could consider the evidence for the purpose of determining, whether Dixon perpetrated charged offenses. (<u>See, e.g.</u>, <u>People v. Rivera</u> (1985) 41 Cal.3d 388, 392-393 [similarities that both crimes occurred on Friday night at approximately 11:30 p.m., took place at convenience markets on street corners in Rialto outside of which two or three people were seen standing before the crimes, involved three perpetrators and getaway vehicles, and for which defendant presented alibi defense, not sufficiently unique or distinctive so as to indicate defendant perpetrated both crimes], disapproved on another ground in <u>People v. Lessie</u> (2010) 47 Cal.4th 1152, 1168, fn. 10.)

A lesser degree of similarity is required to prove the existence of a common scheme or plan. (<u>People v. Lindberg</u>, *supra*, 45 Cal.4th at p. 23.) "Evidence of a common design or plan ... is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (<u>People v. Ewoldt</u>, *supra*, 7 Cal.4th at p. 394, fn. omitted.) "[I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]" (<u>Id.</u> at p. 402.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need

not be distinctive or unusual.... [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (Id. at p. 403.)

We have been unable to locate any case in which the inference of a common scheme or plan has been found to be proper based on the presence of so few, and such mundane, common features, especially when those features appear to be common to the type of crime at issue. (Contrast, e.g., People v. Foster (2010) 50 Cal.4th 1301, 1329; People v. Carter (2005) 36 Cal.4th 1114, 1148-1149; People v. Balcom, supra, 7 Cal.4th at p. 424; People v. Ewoldt, supra, 7 Cal.4th at pp. 394-398, 403 & cases cited therein.) In our view, the common features in the case before us are insufficient to indicate the existence of a scheme or plan rather than a series of similar spontaneous acts. Accordingly, the trial court erred in admitting evidence of the 2001 shootings on the issue of, and instructing jurors they could consider the evidence for the purpose of determining, whether Dixon had a plan or scheme to commit the charged offenses.

"The least degree of similarity is required to establish relevance on the issue of intent. [Citation.] For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.' [Citations.]'" [Citation.]" (People v. Kipp, supra, 18 Cal.4th at p. 371.) "'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (People v. Ewoldt, supra, 7 Cal.4th at p. 394, fn. 2.)

We find ample similarity between the charged and uncharged offenses so as to render the 2001 shootings relevant with respect to intent. The same is true with respect to motive. Moreover, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. [Citations.]" (People v. Demetrulias (2006) 39 Cal.4th 1, 15.) Here, the logical nexus is hatred of rival gang members; the motive is, in turn, relevant to show intent to kill and to benefit the perpetrator's gang, as well as premeditation. (See ibid.)

Our inquiry does not end here, however. "Although we have concluded that evidence of [Dixon's] uncharged criminal conduct is relevant to establish [intent and motive], in order to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]' [Citation.] We thus proceed to examine whether the probative value of the evidence of [Dixon's] uncharged offenses is 'substantially outweighed by the probability that its admission [would] ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.]" (People v. Balcom, supra, 7 Cal.4th at pp. 426-427.)

"Evidence of uncharged offenses 'is so prejudicial that its admission

requires extremely careful analysis. [Citations.]' [Citations.]" (<u>People v. Ewoldt</u>, supra, 7 Cal.4th at p. 404.) "'Evidence is prejudicial within the meaning of Evidence Code section 352 if it "'uniquely tends to evoke an emotional bias against a party as an individual'" [citation] or if it would cause the jury to ""'prejudg[e]" a person or cause on the basis of extraneous factors'" [citation].' [Citation.]" (<u>People v. Foster</u>, *supra*, 50 Cal.4th at p. 1331.) "'As Wigmore notes, admission of this evidence produces an "over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts." [Citation.] It breeds a "tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences...." [Citation.] Moreover, "the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor." [Citation.]' [Citation.] Due to these inherent risks, 'uncharged offenses are admissible only if they have substantial probative value.' [Citations.]" (<u>Ibid.</u>)

In light of the risks, "admission of other crimes evidence cannot be justified merely by asserting an admissible purpose. Such evidence may only be admitted if it '(a) "tends logically, naturally and by reasonable inference" to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue.' [Citation.]" (<u>People v. Guerrero</u> (1976) 16 Cal.3d 719, 724.)

Here, Dixon's plea of not guilty and denial of the special allegations put in issue all elements of the charged offenses and alleged enhancements. (<u>People v. Steele</u> (2002) 27 Cal.4th 1230, 1243.) Although he sought to limit the admissibility of the other crimes evidence by stipulating to certain issues, the People were not required to accept the proffered stipulations (<u>People v. Scott</u> (2011) 52 Cal.4th 452, 471), but rather were entitled to prove their case (<u>Steele</u>, *supra*, at p. 1243).

Nevertheless, motive and intent were not seriously contested with respect to the charged offenses themselves. There was no real question but that whoever shot the victims did so with an intent to kill and premeditation, and was motivated by hatred of rival gang members. (See <u>People v. Ewoldt</u>, *supra*, 7 Cal.4th at p. 406; People v. Bigelow (1984) 37 Cal.3d 731, 748.) This being the case, the evidence of the 2001 shootings did not have substantial probative value that outweighed its inherent prejudice. (See <u>People v. Lopez</u> (2011) 198 Cal.App.4th 698, 715.) This is especially so in light of the prejudicial impact of the other-crimes evidence. That evidence consisted not merely of a property crime or even an assault, but a homicide and a shooting that could easily have resulted in a homicide. Only the homicide resulted in a criminal conviction and prison term; although it appears charges arising from the March 2001 shooting were dismissed as part of the plea agreement with respect to the homicide, jurors may well have felt Dixon was not punished for the nonfatal shooting. Moreover, despite the fact Dixon's legal guilt of the homicide had been conclusively determined by his manslaughter conviction, because he never pled to the March 2001 shooting and testified he did not actually commit the homicide, the jury's attention necessarily was diverted to a determination whether Dixon committed the uncharged offenses. (<u>Compare</u> <u>People v. Balcom</u>, *supra*, 7 Cal.4th at p. 427.)

"Simply put, evidence of uncharged acts cannot be used to prove something that other evidence showed was beyond dispute; the prejudicial effect of the evidence of the uncharged acts outweighs its probative value to prove intent [and motive] as it is cumulative regarding [those] issue[s]. [Citations.]" (<u>People v. Lopez</u>, *supra*, 198 Cal.App.4th at p. 715.) Accordingly, we hold that the trial court abused its discretion by admitting evidence of the 2001 shootings, and allowing the jury to consider it, for any purpose with respect to the substantive offenses of the charged murders and attempted murders.

The People say any error was harmless because even if Dixon's prior offenses were inadmissible under Evidence Code section 1101, they nevertheless were admissible with respect to, in part, the gang charge and enhancements. We agree the prior offenses were admissible for those purposes. (<u>See People v. Tran</u> (2011) 51 Cal.4th 1040, 1046-1047, 1048; <u>People v. Williams</u> (2009) 170 Cal.App.4th 587, 612-613.) We disagree, however, that admissibility with respect to one purpose renders harmless an error in allowing evidence to be considered for another, improper purpose. We presume jurors follow limiting instructions (<u>People v. Guerra</u> (2006) 37 Cal.4th 1067, 1115, disapproved on another ground in <u>People v. Rundle</u> (2008) 43 Cal.4th 76, 151; <u>but see People v. Gibson</u> (1976) 56 Cal.App.3d 119, 130), and so would not have considered the uncharged offenses in determining, for example, Dixon's identity as one of the perpetrators of the McNew Court shootings had a proper limiting instruction been given.

We caution prosecutors against over proving their cases and urge trial courts carefully to assess especially inflammatory evidence to determine whether it is unnecessarily cumulative. (<u>See People v. Tran</u>, *supra*, 51 Cal.4th at p. 1049; <u>People v. Williams</u>, *supra*, 170 Cal.App.4th at pp. 610-611.) Nevertheless, we do not believe admission of the other-crimes evidence, standing alone, gave rise to a deprivation of Dixon's right to a fair trial such that the error must be assessed under the harmless-beyond-a-reasonable-doubt standard of <u>Chapman v. California</u> (1967) 386 U.S. 18, 24 (<u>Chapman</u>). (<u>Compare People v. Foster</u>, *supra*, 50 Cal.4th at p. 1335 & <u>People v. Williams</u>, *supra*, 170 Cal.App.4th at pp. 612-613 with <u>People v. Albarran</u> (2007) 149 Cal.App.4th 214, 227-232.) Assessing such errors under the standard of <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836 (<u>Watson</u>), as is appropriate (<u>People v. Malone</u> (1988) 47 Cal.3d 1, 22), we find no cause for reversal: It is not reasonably probable a result more favorable to Dixon would have resulted absent the errors.

In reaching this conclusion, we reject the notion that CALCRIM No. 375, as given by the trial court, was constitutionally defective because it permitted jurors to draw irrational inferences from the other-crimes evidence. (<u>See Yates v. Evatt</u> (1991) 500 U.S. 391, 402, fn. 7, disapproved on another ground in <u>Estelle v. McGuire</u> (1991) 502 U.S. 62, 72, fn. 4; <u>Francis v. Franklin</u> (1985) 471 U.S. 307, 314-315; <u>People v. Castro</u> (1985) 38 Cal.3d 301, 313.) The court instructed the jury in accordance with its evidentiary rulings. That its rulings were erroneous under state law does not somehow transform the resulting instructional error into error under the federal Constitution. Although the jury should not have been permitted to consider the other-crimes evidence for nongang-related purposes, the inferences permitted by the instruction were not irrational. Accordingly, the instruction was not constitutionally deficient.

(See <u>People v. Moore</u> (2011) 51 Cal.4th 1104, 1130-1133.)

> We further conclude the trial court's instructions and the prosecutor's statements made it clear to jurors that they could not use the evidence of the 2001 shootings against anyone but Dixon with respect to the substantive charges. Lee has no cause to complain about Sherman's consideration of the prior crimes in forming his opinions concerning the charged offenses.

<u>People v. Johnson</u>, 2013 Cal. App. Unpub. LEXIS 6838 at 219-252.

## 2. Analysis

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. <u>See</u> <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1077 (9th Cir. 2009) citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>See</u> <u>Estelle</u> at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. <u>Id.</u> The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the admissibility of evidence. <u>Id.</u> at 72.

The United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process. <u>See</u> <u>Estelle</u>, 502 U.S. at 75, n.5. In <u>Estelle</u>, the Supreme Court expressly refused to determine whether the introduction of prior crimes evidence to show propensity to commit a crime would violate the Due Process Clause. <u>Id.</u> ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); <u>see also</u> <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866 (9th Cir. 2006) ("<u>Estelle</u> expressly left this issue an 'open question'"); <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066 (9th Cir. 2008). Because the Supreme Court has specifically declined to address whether the introduction of propensity evidence violates due process, Petitioner lacks the clearly established federal law necessary to support his claims. <u>Id.</u>; <u>see also</u> <u>Mejia v. Garcia</u>, 534 F.3d 1036, 1046-

47 (9th Cir. 2008) (relying on _Estelle_ and _Alberni_ and concluding that the introduction of propensity evidence under California Evidence Code § 1108 does not provide a basis for federal habeas relief, even where the propensity evidence relates to an uncharged crime); _Holley v. Yarborough_, 568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Accordingly, the state courts' rejection of Petitioner's claim could not have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists. 28 U.S.C. § 2254(d)(1).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. _Estelle_, 502 U.S. at 72; _Walters v. Maass_, 45 F.3d 1355, 1357 (9th Cir. 1995); _Jeffries v. Blodgett_, 5 F.3d 1180, 1192 (9th Cir. 1993); _Gordon v. Duran_, 895 F.2d 610, 613 (9th Cir.1990). Constitutional due process is violated if there are no permissible inferences that may be drawn from the challenged evidence. _Jammal v. Van de Kamp_, 926 F.2d 918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." _Id._ at 920. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." _Boyde v. Brown_, 404 F.3d 1159, 1172 (9th Cir. 2005).

Here, the California Court of Appeal found that the evidence was properly admitted to prove Petitioner's intent in committing the charged crimes and to allow the gang expert to determine whether Petitioner was a member of a street gang at the time of the offense. Federal law holds that evidence of gang affiliation is admissible when it is relevant to a material issue in the case. _United States v. Easter_, 66 F.3d 1018, 1021 (9th Cir. 1995) (citing United _States v. Abel_, 469 U.S. 45, 49 (1984) (finding gang evidence admissible to show bias)). The gang evidence was introduced to establish permissible inferences that were essential to the prosecution's theory. See _Jammal_, 926 F.2d at 919.

| 1 | Even though the propensity evidence was found inadmissible to prove identity or intent,

2   the jury still would have heard the evidence that Petitioner had fired at an occupied

3   building located in a rival gang territory in March 2001, and had fatally shot a rival gang

4   member in his gang's territory in April 2001, for the limited purpose of proving "the gang

5   charge and enhancements." People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at

6   249.

7          Even if the evidence was admitted in error (as assumed by the California Court of

8   Appeal), Petitioner is only entitled to relief if the error had "a substantial and injurious

9   effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623; Fry v.

10   Pliler, 551 U.S. at 121-22. The state appellate court concluded that the "properly

11   admitted evidence, while primarily circumstantial, was overwhelming as to each of the

12   three defendants." People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 546.

13   Particular facts supporting Petitioner's guilt include: Petitioner's cell phone was left at the

14   McNew Court crime scene; cell phone tower records placed that phone, along with fellow

15   gang member Lee's phone, in the McNew Court area for a half hour before the shooting;

16   the timing of calls between Petitioner and Lee's phone was consistent with Petitioner

17   being the shooter and Lee the getaway driver; Petitioner confessed his involvement with

18   the McNew Court murders to fellow gang member "Tank" Jackson; and Petitioner

19   implicitly admitted his involvement in the McNew Court shooting when apologizing to

20   Eastside Crip member Othelon explaining that he did not know the shooting occurred at

21   Othelon's aunt's house.

22          Similarly, Petitioner, along with fellow gang members Lee and Johnson, generally

23   matched the description of the assailants on Planz Road, and Dixon admitted his

24   involvement in the shooting to Johnson's girlfriend Agustin. Also, "Tank" Jackson gave

25   an eyewitness account of the conspiracy among Petitioner, Johnson, and Lee, to murder

26   "Fume" Taylor, which was further corroborated by records from Lee's cell phone. Thus,

27   there was significant evidence indicating Petitioner was involved in the crimes. The state

28   court's erroneous admission of  prior acts for certain purposes did not render Petitioner's

trial fundamentally unfair or violate his due process rights. Even if much of the evidence was circumstantial, such as cell phone records placing Petitioner in the vicinity of the shootings at the time they occurred, or Agustin's detailed testimony regarding the activity and statements of Petitioner and his co-defendants, the evidence, when viewed in its entirety, created a strong case against Petitioner. It is unlikely that the admission of Petitioner's prior convictions had a substantial and injurious effect or influence in determining the jury's verdict.

Accordingly, the Court cannot find the rejection of Petitioner's claim regarding the admission of his prior criminal acts to be unreasonable. See 28 U.S.C. § 2254(d). The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent and Petitioner is not entitled to habeas relief.

**B.     Claim Two – Admission of Agustin's Hearsay Testimony**

Petitioner contends the trial court erred in allowing Agustin's testimony relaying co-defendant's Johnson's out-of-court statements.

**1.     State Court Decision**

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

3.     Sara Agustin's Testimony

Lee and Dixon raise claims of error with respect to admission of certain portions of Sara Agustin's testimony. Dixon, joined by Lee, says the trial court's erroneous admission of Agustin's testimony concerning Johnson's statements inculpating his codefendants, violated their rights to due process and a fundamentally fair trial. The People say the testimony was properly admitted against all three defendants and, assuming some error under state law, there was no due process violation. Lee, joined by

Dixon, faults the trial court for permitting Agustin to testify that she had discussed Lee's gang role and activities with Lee's girlfriend. The People say this evidence was properly admitted solely against Johnson. We address each claim in turn.

a.    Johnson's statements inculpating codefendants

1.    Background

The People moved, in limine, to admit statements of Johnson and Dixon against all three defendants as declarations against penal interest pursuant to Evidence Code section 1230. In pertinent part, the People pointed to statements made by Johnson to Agustin concerning the incidents in which Lee's car and Lee were shot, and the charged shootings. Dixon and Lee moved to exclude anything Johnson allegedly told Agustin relating to either of them, asserting declarations against penal interest could be admitted only against the declarant, and that the proffered evidence was inadmissible under the federal Constitution.

The prosecutor excerpted, from Agustin's grand jury testimony and law enforcement interviews, each statement proposed for use at trial. Following a lengthy argument, the court made rulings concerning the various categories of statements. Agustin's testimony is set out in the statement of facts, *ante*. We recount here the main statements to which Dixon and Lee now object, and the trial court's related rulings.[fn94]

> **FN94**: Because the People appropriately do not claim forfeiture based on lack of or insufficient objection, for the most part we do not include any objections and rulings made when Agustin actually testified to the statements. Counsel for Lee and Dixon unsuccessfully renewed their objections and motions to exclude midway through Agustin's direct examination. They were granted a continuing objection to the evidence.

Our analysis with respect to any other statements made by Johnson to Agustin implicating Lee and/or Dixon is the same as with respect to the statements we identify here.

• Johnson told Agustin that Dixon and Lee were Country Boy Crips. (This was admitted against Johnson as an admission, and against Dixon and Lee under the coconspirator exception to the hearsay rule.)

• Lee discussed with Johnson, in Agustin's presence, Lee's car getting shot. Lee said he and Johnson went to a location on Pacheco Road to buy some marijuana, and they were shot at by some individuals. Lee's black vehicle was shot many times. He and Johnson were both angry, and Johnson said they needed to go back and retaliate. Johnson and Lee discussed how they needed to retaliate. Lee said he submitted a damage claim to his insurance company, but regretted doing so because the insurance company required a police report, and that was how the police department found out about the shooting. (These statements were admitted, during in limine motions, against Johnson and Lee as declarations against interest. At the time Agustin testified, they were also admitted against Dixon with respect to counts nine (conspiracy) and eleven (active participation in a criminal street gang).)

77

• Lee came to Agustin's house with his arm bandaged. Speaking to Agustin and Johnson, he said he and Johnson went back to retaliate for the initial shooting, and parked off Pacheco Road so their vehicle would not be spotted. Johnson said they then started walking toward the location where they thought the individuals lived. Lee said as they were walking, they spotted a vehicle driving toward them. In it were the individuals who had shot Lee's vehicle. These people now began to shoot toward Lee and Johnson. Johnson said that he pulled out his gun and went to fire, but it jammed. He and Lee then ran in different directions. Lee said he jumped over a fence and it broke. Agustin already knew Lee had been shot, because Johnson had told her the same story about what had happened when he said he wanted to go with Agustin to visit Lee at the hospital. (These statements were admitted, during in limine motions, against Johnson and Lee as declarations against interest. At the time Agustin testified, they were also admitted against Dixon with respect to counts nine and eleven.)

• Johnson gave Agustin some clothes to destroy. He said that a couple of days earlier, he and Lee had driven to a location off of Monterey Street, by the canal. Lee was driving and parked in an alley. Johnson got out of the vehicle, put on a mask, walked to the front of a residence where a couple of individuals were sitting, walked up to one of them, and began shooting. Johnson said that Lee wanted to go and retaliate for the shooting on Pacheco Road, but he could not shoot the gun himself because of his injuries, so Johnson had to shoot on his behalf. (These statements were admitted against Johnson and Lee as declarations against interest.)

• Johnson and Agustin were lying in bed. Johnson told her that he, Dixon, and Lee had driven to a certain location. They had parked the car where they could watch a particular vehicle. Dixon and Lee stayed in the car, while Johnson got out, approached, and started shooting inside the vehicle. He could not see inside, but thought someone was there. (These statements were admitted against all three defendants as declarations against interest.)

• Agustin overheard a phone call Johnson got from Dixon. Johnson said Dixon was very upset at him because he had left the clothing that he was wearing at the shooting, and inside the coat pocket was Dixon's cell phone. The police had found the items and were harassing Dixon. (These statements were admitted against all three defendants as declarations against interest.)

• Agustin saw Johnson, Dixon, Lee, and Goo sitting on the floor at Dreenie's house, with a bunch of money and some marijuana. All four were talking about how they had robbed Reese; they were splitting the money among themselves. (These statements were variously admitted against all three defendants as admissions, declarations against interest, adoptive admissions, and coconspirator statements.)

• Johnson told Agustin that he and Dixon found out where the father of the person who shot Johnson's friend lived. Johnson and Dixon drove to the location, which was up in the bluffs, got out of the car, and started walking toward the house. When a vehicle approached and the individuals inside made eye contact with them, Johnson and Dixon got scared and pretended they were tying their shoes. (These statements were admitted

against all three defendants as declarations against interest.)[fn95]

> **FN95**: Although Agustin testified at trial that she did not recall Johnson saying Lee was with Dixon and him, the assumption during the in limine hearing was that she would include Lee, based on her grand jury testimony.

• Johnson drove Agustin to an intersection on Real Road and showed her a camera on the signal light. He said he had done a drive-by shooting at that intersection the previous Saturday. He said Lee was driving, Dixon was in the passenger seat, and Johnson was in the back seat. Johnson said he saw an individual walking on the sidewalk, and he stuck his head out of the car and fired. He was concerned that the camera may have recorded the incident. (These statements were admitted against all three defendants as declarations against interest.)

• Johnson took Lee and Dixon to see the camera on the light post. Agustin was with them. Johnson said that if the camera was actually recording, it would be bad because it would show that Lee was driving, the vehicle and the license plate, and that Dixon was in the front seat. Dixon responded that if it was going to show that, it was also going to show when Johnson put his head out of the window and started firing. (These statements were variously admitted against all three defendants as declarations against interest, admissions, and adoptive admissions.)

Agustin testified under a grant of immunity. During her 11-month relationship with Johnson, she smoked marijuana just about every day, but to her knowledge suffered no memory loss as a result. Senior Officer Sherman testified that it is not uncommon, within the gang culture, for a shooter to brag about shooting, though he likely would not brag about shooting an innocent victim. A shooter would not brag about doing a shooting he did not actually do; to take credit for something someone else did would be perceived as disrespect.

The trial court instructed the jury that Agustin was a potential accomplice to conspiracy to violate section 186.22, subdivision (a), as charged in count nine, and section 186.22, subdivision (a)(1), as charged in count eleven.

2.    Analysis

At trial, Lee and Dixon asserted in part that admission of the challenged evidence violated their confrontation rights under the Sixth Amendment to the United States Constitution, because they were unable to cross-examine the declarant, Johnson. They now acknowledge that the statements at issue were not testimonial. (Davis v. Washington (2006) 547 U.S. 813, 822, 826-827 (Davis); Crawford v. Washington (2004) 541 U.S. 36, 51-54 (Crawford).) "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (Davis, at p. 821.) "Accordingly, after Davis, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial. If the statement is testimonial, it must be excluded unless the declarant is unavailable as a

witness and the defendant had a prior opportunity to cross-examine the declarant. If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (<u>People v. Garcia</u> (2008) 168 Cal.App.4th 261, 291; <u>see People v. Cage</u> (2007) 40 Cal.4th 965, 981 & fn. 10, 984.)

In light of the foregoing, on appeal Lee and Dixon abandon their Sixth Amendment argument. Instead, they focus on their claims the evidence was (1) not admissible under the Evidence Code, and (2) so grossly unreliable that its admission denied them their rights to due process and a fair trial.

The statements Johnson made to Agustin outside the presence of Lee and/or Dixon primarily were admitted as declarations against interest. Pursuant to Evidence Code section 1230, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability, ... that a reasonable man in his position would not have made the statement unless he believed it to be true."

The first requirement — unavailability of the declarant — was clearly satisfied. Having chosen to exercise his Fifth Amendment privilege not to testify, Johnson was unavailable. (<u>People v. Cudjo</u> (1993) 6 Cal.4th 585, 607; <u>People v. Fuentes</u> (1998) 61 Cal.App.4th 956, 961-962.)

The second and third requirements — that the statement must have been against the declarant's penal interest and must have been sufficiently reliable to warrant admission despite its hearsay character (<u>People v. Cudjo</u>, <u>supra</u>, 6 Cal.4th at p. 607) — are interrelated. If a statement "'is truly against interest within the meaning of Evidence Code section 1230,'" it "'is sufficiently trustworthy to be admissible ....'" (<u>People v. Geier</u> (2007) 41 Cal.4th 555, 584; <u>see People v. Fuentes</u>, <u>supra</u>, 61 Cal.App.4th at pp. 966-967.) Because declarations against penal interest sometimes contain self-serving and unreliable information (<u>People v. Duarte</u> (2000) 24 Cal.4th 603, 611), Evidence Code section 1230 does not apply "to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (<u>People v. Leach</u> (1975) 15 Cal.3d 419, 441, fn. omitted.) Thus, the statute does not apply to "'collateral assertions'" within a declaration against penal interest (<u>Duarte</u>, <u>supra</u>, at p. 612); moreover, "a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (<u>Ibid.</u>)

To determine whether a particular statement is trustworthy, "a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (<u>People v. Cudjo</u>, <u>supra</u>, 6 Cal.4th at p. 607.) This is because "even when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. [Citations.]" (<u>People v. Duarte</u>, <u>supra</u>, 24 Cal.4th at p. 614.) Accordingly, "assessing trustworthiness '"requires the court to apply to the

peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception."' [Citation.]" (Ibid.)

The test of whether a statement is one against penal interest "is an objective one — would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true. [Citations.]" (People v. Jackson (1991) 235 Cal.App.3d 1670, 1678, fn. omitted.) We review a trial court's determinations whether a statement was against the declarant's penal interest and whether it was trustworthy for abuse of discretion. (People v. Lawley (2002) 27 Cal.4th 102, 153; People v. Gordon (1990) 50 Cal.3d 1223, 1250-1253, overruled on another ground in People v. Edwards, supra, 54 Cal.3d at p. 835; People v. Greenberger (1997) 58 Cal.App.4th 298, 335 (Greenberger).)[fn96]

> **FN96**: There is some disagreement concerning the appropriate standard of review of a trial court's ruling on the trustworthiness issue. Citing Lilly v. Virginia (1999) 527 U.S. 116 (plur. opn. of Stevens , J.) (Lilly), some courts have conducted de novo review. (See, e.g., People v. Cervantes (2004) 118 Cal.App.4th 162, 174-175 & cases cited therein.) However, the Lilly court expressly stated it accepted the state court's determination that the declarant's statements were reliable for purposes of state hearsay law. (Lilly, supra, at p. 136 (plur. opn. of Stevens , J.).) It applied the standard of independent review with respect to whether the government's proffered guarantees of trustworthiness satisfied the demands of the confrontation clause. (Id. at p. 137.) In so doing, Lilly undertook the pre-Crawford confrontation clause analysis required by Ohio v. Roberts (1980) 448 U.S. 56, 66 (Roberts), viz., "that the veracity of hearsay statements is sufficiently dependable to allow the untested [by cross-examination] admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability. [Citation.]" (Lilly, supra, at pp. 124-125 (plur. opn. of Stevens , J.).) With Crawford and Davis, however, Roberts has been overruled for all purposes. (People v. Cage, supra, 40 Cal.4th at p. 981, fn. 10.) We thus adhere to the abuse-of-discretion standard, although our conclusion regarding admissibility would be the same in the present case under de novo review.

Johnson's statements implicated him in murder and attempted murder. Clearly, on their face they were against his penal interest. (People v. Cudjo, supra, 6 Cal.4th at p. 607.) This is true even of those portions that inculpated Dixon and Lee. Under the circumstances related by the statements, inclusion of their participation was specifically disserving to Johnson's interest by implicating him in a conspiracy, and in retaliatory shootings that were premeditated and inferentially gang related; and it was not exculpatory, self-serving, or collateral. (Compare People v. Samuels (2005) 36 Cal.4th 96, 120-121 with People v. Lawley, supra, 27 Cal.4th at

pp. 152-154.)

The statements also met the trustworthiness requirement. "In addition to the 'reasonable assurance' of the veracity that ordinarily flows from a person's interest in not being criminally implicated [citation], the circumstances surrounding [Johnson's] statements confirm their reliability." (People v. Arceo (2011) 195 Cal.App.4th 556, 577.) "[T]he least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others.... However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (Greenberger, *supra*, 58 Cal.App.4th at p. 335.) Here, the statements were made by Johnson to his lover, on one occasion while the two lay in bed.

It is true that Agustin's recitation of what she recalled Johnson telling her was, in certain respects, at odds with other evidence presented at trial. This was not fatal to admission of the challenged evidence, however. When evidence is offered under a hearsay exception, the trial court must determine, as a preliminary fact, that the declarant made the statement as represented. (People v. Cudjo, *supra*, 6 Cal.4th at p. 608.) This determination "is governed by the substantial evidence rule. The trial court is to determine only whether there is evidence sufficient to sustain a finding that the statement was made. [Citation.] As with other facts, the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.][fn97] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest. [Citations.]" (Id. at pp. 608-609.)

**FN97**: The trial court ruled Agustin was a potential accomplice only with respect to the counts that charged active participation in, or conspiracy to actively participate in, a gang. Defendants do not now challenge this ruling. As a result, her testimony did not potentially require corroboration with respect to the counts that charged the various shootings.

The discrepancies here are such only when Johnson's reported statements are compared with other evidence presented at trial. Even under pre-Crawford analysis, however, the question is whether hearsay evidence "'possess[es] indicia of reliability by virtue of its inherent trustworthiness, *not by reference to other evidence at trial*.' [Citation.]" (Lilly, *supra*, 527 U.S. at p. 138 (plur. opn. of Stevens , J.), italics added.) Here, the discrepancies did not negate all possibility that, if Johnson claimed to be involved in the various shootings, he was telling the truth. (See People v. Cudjo, *supra*, 6 Cal.4th at pp. 607-608.) Rather, the trial court (and, ultimately, the jury) reasonably could have concluded Johnson did indeed tell Agustin what happened, but she misunderstood or misrecollected some of the details. (See id. at p. 607.)

Because Johnson's statements qualified as declarations against interest and satisfied the trustworthiness requirement, they were properly

admitted against Dixon and Lee. This is so regardless of whether Dixon and Lee were present when the statements were made. (See, e.g., People v. Samuels, supra, 36 Cal.4th at pp. 120-121; People v. Arceo, supra, 195 Cal.App.4th at pp. 563, 576-578; People v. Cervantes, supra, 118 Cal.App.4th at pp. 166-167, 174-177; Greenberger, supra, 58 Cal.App.4th at pp. 326, 336-337.) The trial court did not err in admitting the evidence.

The trial court similarly did not err in concluding that certain of the statements made by Johnson to Lee and/or Dixon in Agustin's presence were admissible as adoptive admissions.[fn98] Pursuant to Evidence Code section 1221, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

> **FN98**: Dixon suggests he did not receive constitutionally required notice to litigate adoptive admissions as a theory of admissibility, but we disagree. The record clearly shows this theory of admissibility was addressed by the court and counsel at trial. We do not hold evidence was admissible as an adoptive admission if the trial court did not so find (see, e.g., People v. Lucas (1995) 12 Cal.4th 415, 462; People v. Alcala (1992) 4 Cal.4th 742, 795-796; but see People v. Brown (2004) 33 Cal.4th 892, 901), but rather conclude the trial court properly determined that some of the challenged evidence was admissible under this exception to the hearsay rule.

"There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his adoption of, or his belief in, the truth of such hearsay statement.' [Citation.] '[A] typical example ... is the accusatory statement to a criminal defendant made by a person other than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true.' [Citation.]" (People v. Silva (1988) 45 Cal.3d 604, 623-624, italics omitted.) "For the adoptive admission exception to the hearsay rule to apply, no 'direct accusation in so many words' is necessary. [Citation.] Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so. [Citation.]" (People v. Davis (2005) 36 Cal.4th 510, 539.)

There can be little doubt that Johnson's conversations with Lee, Dixon, or both, as recounted by Agustin, resulted in adoptive admissions on the part of the nondeclarant defendant(s). (See People v. Fauber, supra, 2 Cal.4th at pp. 851-853.)[fn99] To the extent indicia of reliability were required even though the statements were not testimonial (see People v. Sully (1991) 53 Cal.3d 1195, 1232-1233 [pre-Davis confrontation clause analysis]), they were sufficient for the reasons

discussed with respect to the declarations against penal interest, *ante*.

> **FN99**: Defendants implicitly concede their own statements, if found by the jury to have been made as testified to by Agustin, constituted admissions under Evidence Code section 1220.

> Admission of the various statements as declarations against penal interest and/or adoptive admissions was not an abuse of discretion under state law, whether as hearsay exceptions or under Evidence Code section 352. (See People v. Geier, *supra*, 41 Cal.4th at p. 585.) As the statements were nontestimonial, their admission did not violate the confrontation clause. Moreover, their admission did not violate due process or render the trial fundamentally unfair. Any unreliability in Agustin's recollection and recitation of the statements was amply brought to the jury's attention through cross-examination. (See People v. Gutierrez (2009) 45 Cal.4th 789, 813.)

> In light of the foregoing, we need not determine whether any of the statements were also properly admitted under the exception to the hearsay rule for coconspirator statements. (Evid. Code, § 1223.) Assuming evidence was erroneously admitted under that exception (for instance, in the case of statements concerning the Reese robbery, because the conspiracy had ended), the error was harmless under any standard. There was ample evidence, aside from Johnson's identification of Lee and Dixon as Country Boy Crips, that the pair were gang members; the Pacheco Road shootings were not charged against any defendant, and Dixon was not charged with the shooting at Monterey and Inyo; and evidence of what was said concerning the Reese robbery was properly admitted under other hearsay exceptions.

b.      Discussions with Lee's girlfriend

1.      Background

Agustin testified about Johnson's gang activities and what he told her about his position in the Country Boy Crips. She testified that Lee was his best friend, and described where Lee lived and meeting his family at Lee's home. Asked if she had ever met any of Lee's girlfriends, Agustin said she had met one. This ensued:

> "Q. [by the prosecutor] And did [Lee] refer to her in any certain way?

> "A. He never called — said — he said it wasn't his girlfriend. He hadn't given her that title yet.

> "Q. So you saw him with a woman that he was involved in like a dating relationship with. Is that correct?

> "A. Correct.

> "Q. But he told you that he hadn't given her the title of girlfriend.

> "A. That is correct. [¶] And his girlfriend — and that girl also

84

told me the same thing, that she had not earned that title yet. [¶] ... [¶]

"Q. She was pregnant with his child, correct?

"A. Yes, that is correct.

"[COUNSEL FOR LEE]: Objection; relevance.

"THE COURT: Response?

"[PROSECUTOR]: This woman has significant relevance in this case. I'll make an offer of proof that it's —

"THE COURT: I'm going to overrule the objection."

Agustin then testified she did not remember this woman's name. She also testified Lee had a son whose mother she had never met.

Agustin subsequently testified that Lee was not as open with her about his gang activities as Johnson was; however, Lee would talk about his gang activities with Johnson in the house on Encina Street within earshot of Agustin. Asked if she ever discussed Lee's gang activities with the girl to whom Lee had not given the title of girlfriend, Agustin replied affirmatively. When the prosecutor asked when, counsel for Johnson objected "as to hearsay as to a conversation with some third party that's not identified for any relevant purposes." Counsel for Dixon and Lee both joined. The prosecutor asserted it was relevant because it went "to the fact that she was told that she better not talk to his girlfriend by Corey Johnson about gang activities." The trial court overruled the objection.

Lee's attorney immediately objected on grounds of unreliable and untrustworthy hearsay, improper declaration against penal interest, improper use of a coconspirator's statement, no proper and lawful exception to the hearsay rule, and as denying Lee's rights under the Sixth and Fourteenth Amendments. Dixon joined. The prosecutor represented that she was not offering this particular statement for the truth of the matter, just that there was a discussion about gang activities and for what happened after. The court overruled the objection and admitted the evidence "for the limited purpose to explain what may have transpired after this discussion."

Agustin then testified that she had the discussion with the person she considered Lee's girlfriend, although he never claimed her to be a girlfriend. The court clarified that the woman was carrying Lee's child. The prosecutor then elicited that Agustin had a discussion with this woman about Lee's role and activities in the gang, and that shortly after that discussion, Agustin heard from Johnson about it. Johnson told Agustin that she talked too much.

Counsel for Lee renewed his objection, this time with respect to Johnson's statements. Counsel for Dixon joined. The prosecutor represented that the evidence was coming in for a limited purpose. She further asserted it was not offered for the truth of the matter and was an admission by Johnson. The court admitted it for that purpose, but limited it to Johnson. Agustin then testified that Johnson told her she talked too

much and that Lee did not let his girlfriend know anything, so Agustin should not say anything.

During her argument to the jury, the prosecutor discussed the evidence showing Lee to be a member of the Country Boy Crips. Included were four individuals the prosecutor termed Lee's women, whom, she said, played an important role in this case in one way or the other. In pertinent part, the prosecutor stated:

"Saleta Roseburr was *the one that hadn't earned the title of girlfriend yet even though she was pregnant with his child.* She was also — that's Saleta Roseburr, the hostess at Denny's, and Adrian Bonner's friend." (Italics added.)

2. <u>Analysis</u>

Saleta Roseburr's relationship with Lee was relevant because of her connection, however inadvertent, to what happened to Adrian Bonner. It thus was proper for the prosecutor to seek to show the nature of that relationship. Since Lee told Agustin that Roseburr was not his girlfriend, the fact Roseburr was pregnant with Lee's child was relevant to explain Agustin's belief Roseburr was his girlfriend.[fn100]

> **FN100**: Lee asserts his trial attorney objected to Agustin's testimony about Roseburr not having earned the title of girlfriend. He is incorrect. Counsel objected to the additional testimony about her being pregnant with Lee's child.

There is also some relevance to Johnson's reaction to Agustin's discussion of Lee's gang activities with Roseburr. Johnson's active participation in a criminal street gang was clearly an issue in dispute. Johnson's actions prohibiting Agustin from discussing Lee's gang activities with Lee's girlfriend demonstrates Johnson's participation and active involvement in the gang in that it shows him trying to maintain the clandestine nature of the gang's activities.

Lee and Dixon do not claim the evidence was prejudicial of itself, and we concur. Lee's treatment of Roseburr paled in comparison to other evidence that was admitted, and the testimony about Agustin's conversation with Roseburr was, at most, merely cumulative of the gang evidence. (See <u>People v. Mayfield</u> (1997) 14 Cal.4th 668, 751.)

<u>People v. Johnson</u>, 2013 Cal. App. Unpub. LEXIS 6838 at 276-311.

**2. Analysis**

Respondent reminds the Court that Petitioner withdrew, and the California Courts did not address, argument that Agustin's testimony violated his Sixth Amendment right to Confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). A review of Petitioner's state appellate records confirms that he did not present a Confrontation Clause argument to the state courts on direct review. (<u>See</u> Lodged Doc. 1 at 64, Lodged

Doc. 6 at 9-10.) As Petitioner neither exhausted his Confrontation Clause claim in state court, nor presented it in the present petition, the Confrontation Clause claim is not before the Court for review.

Instead, Petitioner only seeks federal habeas review of his claim that Agustin's statements were so unreliable as to violate Petitioner's right to a fundamentally fair trial under the Due Process Clause. (Pet. at 30-31.) Admission of evidence may amount to a due process violation if it is clearly prejudicial and rendered a trial fundamentally unfair. Michigan v. Bryant, 562 U.S. 344, 371 n. 13 (2011), ("Of course the Confrontation Clause is not the only bar to admissibility of hearsay statements at trial. State and federal rules of evidence prohibit the introduction of hearsay, subject to exceptions. Consistent with those rules, the Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence.") (citing Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (plurality opinion) ("[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation") and Dutton v. Evans, 400 U.S. 74, 96-97 (1970) (Harlan, J., concurring in result) ("[T]he Fifth and Fourteenth Amendments' commands that federal and state trials, respectively, must be conducted in accordance with due process of law" is the "standard" by which to "test federal and state rules of evidence")); see also Valerio v. Crawford, 306 F.3d 742, 775 (9th Cir. 2002).

Admission of evidence only violates due process when two circumstances are met: (1) there are no permissible inferences the jury may draw from the evidence, and (2) the evidence is of such quality as necessarily prevents a fair trial. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

The United States Supreme Court has stated that Due Process might bar unreliable hearsay. Bryant, 131 S.Ct. at 1162 n. 13. However, some case law suggests that no clearly established Supreme Court law precludes the admission of such evidence so long as it does not violate the Confrontation Clause. See, e.g., Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court "has not yet made a

clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ"); Moses v. Payne, 555 F.3d 742, 761-62 (9th Cir. 2009) (rejecting claim because the Supreme Court has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause); Alberni v. McDaniel, 458 F.3d 860, 863-867 (9th Cir. 2006) (stating that the Supreme Court has not yet ruled on the specific question of whether the admission of propensity evidence violates the Due Process Clause (and, on the contrary, has expressly refrained from deciding this question).

Rather than assume that the claim is without merits because there is no clearly established Supreme Court law addressing the issue, the Court will review Petitioner's claim under the more expansive test regarding whether his due process was violated based upon the improper admission of evidence.

As stated in claim one, habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). Constitutional due process is violated if there are no permissible inferences that may be drawn from the challenged evidence. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." Id. at 920. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

The California Court of Appeal appropriately found that Agustin's testimony was properly admitted as statements against Petitioner and his co-defendant's penal interests or adoptive admissions of such statements by the other co-defendants. In reviewing the admission of the hearsay evidence, the California Court adopted and applied state standards that incorporated the federal standards regarding the admission of hearsay evidence. See e.g., People v. Greenberger, 58 Cal. App. 4th 298, 334-335

1   (1997) (relying on <u>Dutton v. Evans</u>, 400 U.S. 74, 88 (1970); <u>Idaho v. Wright</u>, 497 U.S.

2   805, 819 (1990); <u>Williamson v. United States</u>, 512 U.S. 594, 601 (1994)).

3          The Sixth Amendment's Confrontation Clause, which is binding on the States

4   through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused

5   shall enjoy the right . . . to be confronted with the witnesses against him." <u>Ohio v. Clark</u>,

6   135 S. Ct. 2173, 2179 (2015) The Supreme Court, in <u>Ohio v. Roberts</u>, 448 U.S. 56, 66

7   (1980), interpreted the Clause to permit the admission of out-of-court statements by an

8   unavailable witness, so long as the statements bore "adequate indicia of reliability." Such

9   indicia are present if "the evidence falls within a firmly rooted hearsay exception" or

10  bears "particularized guarantees of trustworthiness." <u>Id.</u>

11         The state court's determination that Petitioner or his co-defendant's statements to

12  Agustin were trustworthy was not unreasonable. The state court explained that Agustin

13  was in a serious relationship with co-defendant Johnson, and the statements made

14  regarding the criminal activities were against interest, as they implicated Petitioner and

15  his co-defendants in multiple shootings resulting in several counts of murder and

16  attempted murder. The statements also implicated that Petitioner and his co-defendants

17  were active criminal street gang members and that the crimes were committed for the

18  benefit of the gang. Finally, rather than attempt to deflect and place blame on other co-

19  defendants, the statements implicated Petitioner and his co-defendants as co-

20  conspirators, thereby implicating all three in the crimes, rather than attempting to divert

21  and place the criminal activity on one of the criminal co-conspirators.

22         Further, the state court was not unreasonable in determining the statements were

23  adoptive admissions as to Petitioner. Petitioner has presented no evidence that he

24  attempted to deny responsibility or otherwise dissociate himself from statements of his

25  co-defendants made in front of Agustin implicating him the various crimes. Based on the

26  totality of the circumstances surrounding the statements against interest, the state

27  court's determination that the hearsay statements were admissible as statements

28  against interest or adoptive statements against interest was reasonable.

Even if the statements were admitted in error, Petitioner is only entitled to relief if the error had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623; <u>Fry v. Pliler</u>, 551 U.S. at 121-22. As the Court explained in further detail with regard to claim one, Petitioner has failed to show any reasonable probability that the result would have been different had Agustin's statements not been admitted. There was significant physical evidence left implicating Petitioner and his co-defendants were involved in the McNew Court shooting, and phone records implicated that Petitioner and his co-defendants were in the vicinity of the crime scene at the time of the shooting. Further Petitioner made statements against interest to Jackson while custody regarding the both the McNew Court and Planz road shootings.

Accordingly, the Court cannot find the rejection of Petitioner's claim regarding the admission of Agustin's testimony to be unreasonable. <u>See</u> 28 U.S.C. § 2254(d). The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent and Petitioner is not entitled to habeas relief.

### C.  Claim Three – <u>Massiah</u> Violation

Petitioner, in his third claim, asserts that his Fifth, Sixth and Fourteenth Amendment rights were violated by the admission of statements made during a conversation between Petitioner and Dupree Jackson after they had been arrested. (ECF No. 1 at 32.) Petitioner contends that the attempt by law enforcement to elicit incriminating statements from him violated his rights under <u>Massiah v. United States</u>, 377 U.S. 201 (1964). (<u>Id.</u>)

#### 1.  State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have

issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

### 5.  Dupree Jackson's Testimony

Defendants claim the trial court committed prejudicial error with respect to the admission of Dupree Jackson's testimony. First, Dixon says the court erred by denying him a hearing on the issue of intentional charging delay in conjunction with his motion to exclude Jackson's testimony on the ground he was acting as a police agent. Johnson and Lee join. The People say the trial court properly rejected the substantive claim as a matter of law; hence, no additional hearing was constitutionally required. Second, Lee says the trial court erred by permitting Jackson to testify, without sufficient foundation, regarding cell phone practices of gang members in walk-up shootings. Johnson and Dixon join. The People say ample foundation was laid, but, if error occurred, it was harmless in light of the gang expert's duplicative opinion testimony.

Jackson's testimony is set out at length in the statement of facts, *ante*. We address defendants' claims in turn.

a.    Massiah[fn106]

**FN106**: Massiah v. United States (1964) 377 U.S. 201.

1.    Background

Prior to trial, Dixon moved to exclude testimony by Jackson about what Dixon told him while they were in jail together, on the ground Jackson was an agent of the government at the time. In their response, the People represented that Dixon and Lee were celled together from August 25 to August 29, 2007, but that no one intentionally placed them together in connection with this case, and Jackson was under no directive to speak to Dixon about this case. Because Dixon was not in custody on this case, as he was not arrested in connection with it until October 1, 2007, the People argued, there was no Sixth Amendment violation.

At the hearing on the motion, the prosecutor presented a certified copy of the felony complaint in this case, showing it was not filed until October 2, 2007. She related that on August 24, 2007, Dixon and Lee were arrested on charges of vehicle pursuit and possession of an assault rifle. The next day, Jackson was arrested on a parole violation. Before he was taken to the jail, he had an interview with the Bakersfield Police Department in which he implicated Johnson in the McNew Court, and Real Road and Planz, shootings. Detective Darbee told Jackson to think about whether he would be willing to testify in this case and, when Jackson expressed some concerns, Darbee told Jackson he would talk to him about it in a few days. Four days later, on August 29, Darbee brought Jackson to the police department again. In the meantime, however, unbeknown to the police department or the detectives involved from the sheriff's department, Dixon and Jackson were placed in the same cell, and Dixon spoke to Jackson about this case. On August 29, Jackson was again interviewed by the police department and asked if he would be willing to testify. During this interview, he revealed what Dixon had told

him while they were celled together. That same day, Dixon was moved out of the cell.

The prosecutor asserted that no one involved with this case asked for Dixon and Jackson to be celled together, and she offered to present testimony on that point. Moreover, she argued, even if they were intentionally housed together, that fact would be irrelevant under the law, because Dixon was not in custody on this case.

Counsel for Dixon represented that Jackson would be brought out to see his parole officer and talk to a police officer, then would be sent back in to get more information, and brought out again. Counsel argued he was an informant, and an agent of the police department. Counsel acknowledged that Dixon was in custody on another charge, but pointed out he was a suspect in this case because law enforcement had already interviewed him in April about the McNew Court shootings, plus officers had already interviewed Agustin. Counsel asked the court to assume a scenario in which a suspect was charged with something else, and then the authorities decided to hold off filing the indictment or complaint in order to send in agents to elicit information. Counsel asserted that just because the authorities were holding off filing should not deprive his client of his Fifth or Sixth Amendment rights.

The court found no Sixth Amendment violation. Accordingly, it ruled the statements were admissible.[fn107] Jackson subsequently testified concerning the circumstances under which he and Dixon were celled together, and statements Dixon made to him about some of the offenses charged in this case.

FN107: Lee challenged admission of Jackson's testimony on statutory grounds, because of money and assistance Jackson had been given. That issue is not raised on appeal.

2.  Analysis

The California Supreme Court has stated:

"The Sixth Amendment [to the United States Constitution] provides that 'in all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense.'

"In Massiah[, supra,] 377 U.S. 201, and its progeny, the United States Supreme Court held that 'the government' — whether federal or state — 'may not use an undercover agent to circumvent the Sixth Amendment right to counsel once' that right has attached. [Citation.] After attachment, 'the Sixth Amendment prevents the government from interfering with the accused's right to counsel.' [Citation.] Before attachment, by contrast, the constitutional provision is not implicated. [Citation.]

"The Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, "'at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment,

information, or arraignment.'"" [Citations.] It is not enough, for example, that the defendant has become the focus of the underlying criminal investigation. [Citations.]

"The Sixth Amendment right to counsel, the United States Supreme Court has ... declared, is 'offense specific.' [Citation.] That is to say, it attaches to offenses as to which adversary judicial criminal proceedings have been initiated — and to such offenses alone. [Citation.]" (People v. Clair (1992) 2 Cal.4th 629, 657; see also McNeil v. Wisconsin (1991) 501 U.S. 171, 175; Illinois v. Perkins (1990) 496 U.S. 292, 299-300; United States v. Gouveia (1984) 467 U.S. 180, 187-188; United States v. Henry (1980) 447 U.S. 264, 270.)

The trial court here implicitly found Dixon's Sixth Amendment right to counsel had not attached as to the offenses charged in this case. We examine this conclusion independently, while scrutinizing underlying findings for substantial evidence. (People v. Clair, supra, 2 Cal.4th at p. 657.) So reviewed, the trial court's determination is correct. Indeed, no other conclusion can be drawn from the record.

Dixon says, however, that the trial court erred in accepting the prosecutor's view that no hearing on intentional charging delay was required. In reality, the record shows the prosecutor never expressed such a view. Rather, her argument was that because Dixon's Sixth Amendment right to counsel had not attached, whether Jackson was merely listening to Dixon or actively eliciting information from him was irrelevant, and so no hearing needed to be held to make that determination. (See United States v. Henry, supra, 447 U.S. at pp. 271-272 & fn. 9 [distinguishing, in case involving postindictment communications, between informant who is passive listener and one who deliberately elicits information].)

We assume, for purposes of our analysis, that intentional and unnecessary delay by the government in bringing charges can implicate a defendant's Sixth Amendment right to counsel. (See Flittie v. Solem (8th Cir. 1985) 775 F.2d 933, 943; State v. McNeil (Wis. 1990) 454 N.W.2d 742, 749-750; but see People v. Webb, supra, 6 Cal.4th at pp. 527-528.) In the present case, however, counsel for Dixon merely asked the court to assume a scenario in which there was such delay. Defense counsel neither asserted that intentional delay occurred (or even may have occurred) in the present case, nor asked for a hearing on that issue. On the record before us, the court was under no duty to hold such a hearing absent a request. Accordingly, although defendants clearly raised a substantive Massiah claim, they cannot predicate error on the trial court's denial of the motion without holding a hearing. (See People v. Wilson (2005) 36 Cal.4th 309, 347-348; cf. People v. Hoyos (2007) 41 Cal.4th 872, 897-898, overruled on another ground in People v. McKinnon, supra, 52 Cal.4th at pp. 637-643; People v. Hughes (2002) 27 Cal.4th 287, 325-326.) The court did not err by finding no Sixth Amendment violation, and defendants are entitled to neither reversal nor remand for a hearing on delay.[fn108]

FN108: Because the record is insufficient to allow us to determine whether unnecessary and intentional delay could have been established such that Jackson's testimony should

have been excluded, we cannot assess whether defense counsel were ineffective in failing to request a hearing or whether defendants were prejudiced thereby. Accordingly, we reject defendants' alternative claims of ineffective assistance of counsel.

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 312-319.

**2.     Analysis**

The Supreme Court has held that the right to counsel under <u>Massiah</u> "guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." <u>Maine v. Moulton</u>, 474 U.S. 159, 176 (1985). Although "the Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached," the state may not knowingly exploit an opportunity to confront an accused in the absence of counsel or intentionally create a situation "likely to induce [him] to make incriminating statements without the assistance of counsel." <u>Id.</u>; <u>United States v. Henry</u>, 447 U.S. 264, 274 (1980).

To prove a Sixth Amendment <u>Massiah</u> violation based on the government's use of an informant, a petitioner must show that the informant was acting as a government agent and that he or she "deliberately elicited" incriminating statements from the petitioner. <u>Massiah</u>, 377 U.S. at 206; <u>Henry</u>, 447 U.S. at 269-70. In <u>Henry</u>, the Supreme Court found a Sixth Amendment violation where a paid government informant, Nichols, had engaged the accused, Henry, in conversations regarding the charged bank robbery. 447 U.S. at 266, 270-71. The Supreme Court found that although Nichols was instructed not to initiate any conversations with Henry, the government's awareness that Nichols "had developed a relationship of trust and confidence with Henry" and would therefore "be able to engage him in conversations without arousing Henry's suspicion" was sufficient to find a violation. <u>Id.</u> at 269, 271. The Court emphasized that although Nichols had not affirmatively questioned Henry, he had "stimulated" conversations in which he was able to "elicit[] the statements in myriad less direct ways." <u>Id.</u> at 271 n.8, 273.

In <u>Kuhlmann v. Wilson</u>, 477 U.S. 436 (1986), the Supreme Court addressed a

94

1    question left open in Henry: whether a <u>Massiah</u> violation may occur "where an informant

2    is placed in close proximity but makes no effort to stimulate conversations about the

3    crime charged." <u>Henry</u>, 447 U.S. at 271 n.9. The <u>Kuhlmann</u> Court answered this

4    question in the negative, holding that an informant placed in the accused's cell for the

5    sole purpose of listening to find out the names of accused co-conspirators did not

6    "deliberately elicit" information within the meaning of <u>Massiah</u>. <u>Kuhlmann</u>, 477 U.S. at

7    460. The Court noted that because "the primary concern of the <u>Massiah</u> line of decisions

8    is secret interrogation by investigatory techniques that are the equivalent of direct police

9    interrogation," a petitioner seeking to make out a <u>Massiah</u> claim "must demonstrate that

10    the police and their informant took some action, beyond merely listening, that was

11    designed deliberately to elicit incriminating remarks." <u>Id.</u> at 459.

12        However, "[r]ight to counsel cases in general, and the <u>Massiah</u> line of cases in

13    particular, involve incidents that occurred after the initiation of adversary criminal

14    proceedings and that arose during a critical, post-indictment proceeding. <u>United States v.</u>

15    <u>Hayes</u>, 231 F.3d 663 (9th Cir. 2000). The Sixth Amendment right to counsel does not

16    attach until a prosecution is commenced. <u>United States v. Charley</u>, 396 F.3d 1074, 1082

17    (9th Cir. 2005) (citing <u>McNeil v. Wis.</u>, 501 U.S. 171, 175 (1991). In other words, it

18    attaches "at or after the initiation of adversary judicial criminal proceedings -- whether by

19    way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>Id.</u>

20    "[T]he right to counsel guaranteed by the Sixth Amendment applies at the first

21    appearance before a judicial officer at which a defendant is told of the formal accusation

22    against him and restrictions are imposed on his liberty." <u>Rothgery v. Gillespie County</u>,

23    554 U.S. 191, 194 (2008).

24        As explained by the California Court of Appeal, on the night of August 23, 2007,

25    Petitioner was spotted by two Bakersfield Police Officers who knew Petitioner was on

26    parole. Petitioner fled in his vehicle when asked by the officers to perform a parole

27    search. Petitioner was driving the vehicle, and during the chase, jumped out of the

28    vehicle while it was still moving. When the car came to a stop, police found co-defendant

Lee in the rear seat and a loaded Tec-9 pistol in the car. Petitioner fled, but was arrested after midnight at his residence. Accordingly, Petitioner was placed under arrest for the criminal acts occurring on the night of August 23, 2007. Petitioner was not arrested for, nor formally charged, with the counts of murder and attempted murder for which he was later convicted when placed in a holding cell with Jackson. Even if Petitioner had been formally charged for the offenses relating to his actions evading the police on the night of his arrest, Massiah is offense specific, and his charging would not provide protection regarding the uncharged offenses to which he made statement against his penal interest to Jackson while being held.

As the California Court of Appeal correctly found, Petitioner had yet to be formally charged when he was placed in a holding cell with Jackson. Further, the events occurred the day after his arrest, and Petitioner presented no facts supporting an intentional delay in charging Petitioner. Because no formal charges were pending against Petitioner at the time he made his incriminating statements to Jackson, Massiah is not implicated and Petitioner's Sixth Amendment rights were not violated. The state court's denial of the claim was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to federal habeas relief on his claim based on his Sixth Amendment right to counsel.

Alternatively, Petitioner argues that trial counsel was ineffective for failing to exclude Petitioner's statements to Jackson. The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must

1   show that counsel's representation fell below an objective standard of reasonableness,
2   and must identify counsel's alleged acts or omissions that were not the result of
3   reasonable professional judgment considering the circumstances. Id. at 688; United
4   States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of
5   counsel's performance is highly deferential. A court indulges a strong presumption that
6   counsel's conduct falls within the wide range of reasonable professional assistance.
7   Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed.
8   2d 624 (2011).

9       Second, the petitioner must demonstrate that "there is a reasonable probability
10  that, but for counsel's unprofessional errors, the result ... would have been different,"
11  Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so
12  egregious as to deprive defendant of a fair trial, one whose result is reliable. Id. at 687.
13  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable
14  because of counsel's ineffectiveness. Id.

15      However, a court need not determine whether counsel's performance was
16  deficient before examining the prejudice suffered by the petitioner as a result of the
17  alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively
18  prove prejudice, any deficiency that does not result in prejudice must necessarily fail. As
19  the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the standard for
20  ineffective assistance of counsel in federal habeas is difficult based on the deference
21  afforded under Strickland and  AEDPA. Harrington v. Richter, 131 S. Ct. at 785-86. "As
22  amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court
23  relitigation of claims already rejected in state proceedings." Id. "As a condition for
24  obtaining habeas corpus from a federal court, a state prisoner must show that the state
25  court's ruling on the claim being presented in federal court was so lacking in justification
26  that there was an error well understood and comprehended in existing law beyond any
27  possibility for fairminded disagreement." Id. at 786-87.

28      Accordingly, even if Petitioner presents a strong case of ineffective assistance of

counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

Petitioner has not presented a persuasive case of ineffective assistance of counsel, as there was no reasonable probability that the result would have been different had trial counsel properly raised the issue. As noted above, Petitioner had not been charged for the crimes at issue nor had Petitioner made a strong showing that there was intentional delay with regard to being charged as the incriminating statements were made the day after Petitioner was arrested. As there was little chance that Petitioner was entitled to relief under Massiah, counsel was neither ineffective, nor was Petitioner prejudiced by his failure to present the claim at trial.

Petitioner has failed to meet his burden of showing that he was prejudiced as required under Strickland. The state court decision that Petitioner was not prejudiced by counsel's conduct was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was its decision based on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief.

### D.     Claim Four – Gang Expert Testimony

Petitioner claims that the criminal street gang expert's testimony violated his Due Process, his right to a fair trial, and right to a jury trial by presenting unfounded and prejudicial statements regarding Petitioner's actions. (Pet. at 23-29.)

#### 1.     State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

c.    Mental States and Ultimate Issues of Fact

Johnson contends the trial court erred in permitting Sherman to testify to defendants' intent and motive, which were ultimate issues to be decided by the jury. He says the court initially ruled evidence of defendants' gang involvement was admissible to prove identity, motive, and intent as to all counts, but later ruled the officer was not testifying to intent or motive even though the officer did so testify. Johnson says this allowed the prosecution to present speculative and unfounded expert testimony on ultimate issues of law and fact. Because the expert's opinions were improper, he concludes, they did not constitute sufficient evidence to support the gang benefit enhancements, gang special circumstances, and active gang participation charge.[fn120] Moreover, the argument runs, because the evidence spilled over into the mental state requirements for murder and conspiracy, reversal is required on all counts. Dixon and Lee join.

> FN120: In contravention of California Rules of Court, rule 8.204(a)(1)(B), Johnson has not placed his sufficiency of the evidence argument under a separate heading or subheading.

Dixon adds that the trial court erred by admitting Sherman's testimony that Dixon was an active gang member in 2007, the Country Boy Crips' pattern of criminal activity is common knowledge for other gang members, "mirroring" hypothetical shootings were done with the intent to aid the gang, and it is not common for gang members bragging about crimes to go into much detail. He says the hypotheticals usurped the jury's fact-finding responsibilities on ultimate issues; under section 29, an expert cannot give an opinion as to the ultimate question of a person's intent, knowledge, or mental state, or the reasonableness of a person's actions; Sherman's testimony that gang members do not divulge details when admitting crimes lacked foundation in the qualifications of the officer to offer the opinions; the testimony was not helpful or necessary to the jury to understand questions of intent, motive, and conduct; and the testimony invaded the fact-finding province of the jury. Johnson and Lee join.

The People say Sherman's testimony was proper, and that he did not express any opinion concerning the actual, subjective motivation of defendants. They further say the trial court properly relegated to cross-examination challenges to Sherman's qualifications to offer opinions on subjects such as whether gang members divulge details when admitting crimes. The People conclude that Sherman's testimony, combined with additional evidence, provided sufficient evidence to uphold the various charges, enhancements, and special circumstances.

1.    Background

At the outset of the Evidence Code section 402 hearing, Sherman testified that he had been employed as a senior police officer for over 12 years, before which he was a Kern County detentions officer for 10 years.[fn121] At the time of trial, he had been assigned to the Kern County Violent Crimes Gang Task Force for about two months, before which he was a field training officer on patrol for about a year. Before that, he was a gang officer for the SEU for two years. The SEU monitors gang activity,

conducts gang investigations and arrests, has daily contacts with gang members, and gathers intelligence. During his time with the unit, Sherman went out on a daily basis and patrolled high-activity gang areas, contacted gang members and arrested them if appropriate, conducted investigations of gang members, assisted in investigations in which gang members were suspects, and testified in court on those cases as a gang expert.

> **FN121**: Much of the procedural history concerning, and content of, Sherman's testimony has already been stated. We do not repeat everything here.

Sherman had over 200 hours of formalized training with respect to gangs. Subjects addressed in his classes included why people become gang members, why they stay in the gang life, the primary activities of the gang, why they possess weapons, why they sell drugs, and why they commit assaults. Through local training, he learned the gang territories, the primary activities of the local gangs, and who the local gangs are, their associates, and their rivals. Sherman also had expertise gained from conducting gang investigations and personally contacting gang members. He had investigated numerous gang cases within Bakersfield, involving Black gangs, Hispanic gangs, and White gangs; and had contacted gang members of pretty much each set and gang within Bakersfield. He previously testified in court as a gang expert, including about the Westside Crips, Eastside Crips, and Country Boy Crips. He stayed current on gang trends by reading reports of the police department and sheriff's office; speaking with officers, including probation and parole; and talking to gang members.

Sherman also had experience with gang members as a detentions officer for the sheriff's department. He was in contact with inmates on a daily basis, and conducted disciplinary hearings and housing changes, and had general conversations with, gang members.

Not all of Sherman's contacts with gang members were adversarial. Some gang members will show respect if shown respect; once that respect is established, they are willing to have candid conversations about their lifestyles and traditions. Sherman had also sat in on the interviews of arrested gang members. Sometimes gang members talked to him about gang customs. In addition, he shared intelligence regarding gang crimes with other officers.

Specifically with respect to the Country Boy Crips, Sherman had training and experience in contacting members of that gang and talking to them about it. He had also talked to other officers who had talked to Country Boy Crips, and had read police reports about Country Boy Crips and the crimes they commit. He had previously testified in court as an expert on that gang.

At the conclusion of the Evidence Code section 402 hearing, the trial court found Sherman to be qualified to testify as an expert in gang recognition and detection. It proposed to give a limiting instruction telling jurors they could consider evidence of gang activity only for the purpose of deciding whether a defendant acted with the intent, purpose, and knowledge required to prove gang-related crimes, enhancements, and special-circumstance allegations, or that a defendant had a motive to commit the crimes charged, as well as in evaluating the credibility of a

witness when considering the facts and information relied on by an expert witness. The court also proposed to admonish jurors that hearsay matters relied on by Sherman could only be considered in evaluating the basis for his opinion, and not for their truth. The court invited counsel to prepare a proposed limiting instruction covering those areas of concern.

During the course of Sherman's testimony before the jury, the prosecutor elicited that in 2007, the Country Boy Crip criminal street gang engaged in a pattern of criminal activity. She then asked if that pattern of criminal activity was a matter of common knowledge among other gang members. When Sherman answered yes, the prosecutor asked why he said that. Sherman answered, "Gang members know what other gang members do." Counsel for Lee objected to the testimony as speculation. The other defense attorneys joined. The trial court sustained the objection, but told the prosecutor she could lay a foundation. The prosecutor then elicited from Sherman that gang members will talk about who got convicted of what, who was testifying, who was the witness, and the facts of the case, and that they will discuss it among themselves and with their friends and relatives. When she asked whether gang members discuss crimes among themselves that are occurring out in the neighborhoods, counsel for Lee objected that the question called for speculation and lacked foundation. Counsel for Johnson joined. The court permitted Sherman to answer based on his education, training, and experience. Sherman answered that gang members did discuss it among themselves, and also discussed it with officers. When the prosecutor asked how he knew this, defense counsel asked for and were granted a continuing objection. Sherman then answered that he had talked to gang members who told him about crimes in which they were not involved, and said they obtained the information from other gang members. They also talked to him about crimes of which they knew. Sherman further testified this was true for the Country Boy Crips.

The prosecutor asked again whether, in Sherman's opinion, the pattern of criminal activity was a matter of common knowledge for gang members within the Country Boy Crips. Counsel for Lee objected that it went to the ultimate issue for the jury. Counsel for Johnson joined. The matter was then taken up outside the jury's presence. Counsel for Lee argued that testimony a gang member knew about what other gang members were doing was speculative, without foundation, and removed the issue from of the province of the jury. Ultimately, he objected under Evidence Code section 352, on relevance grounds, and that it went to the ultimate issue. Counsel for Johnson and Dixon joined. After further argument that expanded to include the prosecutor's proffer of expert testimony to show motivation for particular crimes, and whether and how a crime was committed to benefit or promote a gang, the court ruled that as long as the questions were based on the gang in general and not any of these particular defendants unless Sherman had specific knowledge otherwise, and were founded on Sherman's observations, interviews, and intelligence received from active gang members, confidential informants, and other officers, the probative value outweighed any prejudicial impact and the evidence was admissible.

Counsel for Lee then asked for a continuing objection on the ground that Sherman's opinions were based on unreliable hearsay, and on protected speech and freedom of association. Counsel for Johnson and Dixon joined. The court granted defendants continuing objections but

overruled them, and rejected the claim Sherman's opinions would deny defendants the right to confront and cross-examine the witnesses who formed the basis of those opinions.

In the jury's presence, the prosecutor asked Sherman, separately as to each defendant, if he had formed an opinion as to whether that defendant was an active member of the Country Boy Crips between March 1 and August 22, 2007, and what that opinion was.[fn122] The prosecutor subsequently asked Sherman a series of hypothetical questions that mirrored the prosecution's evidence of how the various charged offenses occurred, but did not specifically refer to any defendant. Defendants were granted continuing objections based on their previous arguments, but, in light of its previous rulings, the trial court overruled the objections. Sherman then testified to his opinions that the offenses were committed for the benefit of the Country Boy Crips, and with the intent to promote, further, or assist criminal conduct by the Country Boy Crips. He also explained the basis of those opinions.

> **FN122**: Counsel for Johnson objected that the question went to the ultimate conclusion of law and fact, and was a matter for the jury to decide. The court responded, "Talking about membership, not intent or motive, so I'm going to overrule the objection."

This is the basis for Johnson's claim the trial court ruled Sherman was not testifying to intent or motive even though Sherman did so testify. When read in context, the ruling is not the contradiction Johnson would lead us to believe. Rather, it is apparent the court was harkening back to its lengthy discussion with counsel, outside the jury's presence, concerning this court's opinion in People v. Killebrew (2002) 103 Cal.App.4th 644 (Killebrew), and what questions, under that opinion, could properly be asked with respect to these specific defendants as opposed to unspecified individuals or gang members in general.

The California Supreme Court recently disapproved any interpretation of Killebrew barring or limiting the use of hypothetical questions. (People v. Vang (2011) 52 Cal.4th 1038, 1047, fn. 3 (Vang).)

2.    Analysis

Section 186.22, subdivision (a) defines a substantive offense with three elements. "Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element .... The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (People v. Lamas (2007) 42 Cal.4th 516, 523.) There is no requirement that the felonious criminal conduct that is promoted, furthered, or assisted be gang related. (People v. Albillar (2010) 51 Cal.4th 47, 51, 59 (Albillar).)

To establish the enhancement defined by subdivision (b) of section 186.22, "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, [and that it was committed] with the specific intent to promote, further, or assist in any

criminal conduct by gang members.' [Citations.]" (<u>Gardeley</u>, *supra*, 14 Cal.4th at pp. 616-617.) There need not be an intent to promote, further, or assist either gang-related conduct apart from the charged offenses, or a gang. (<u>Albillar</u>, *supra*, 51 Cal.4th at pp. 51, 66-67.)[fn123]

> **FN123**: After <u>Albillar</u>, cases such as <u>Garcia v. Carey</u> (9th Cir. 2005) 395 F.3d 1099, 1102-1104 and <u>Briceno v. Scribner</u> (9th Cir. 2009) 555 F.3d 1069, 1078-1083 are no longer the law to the extent they interpret section 186.22, subdivision (b) as requiring proof the defendant had the specific intent to facilitate gang members' criminal activities other than the charged crime(s). (<u>Emery v. Clark</u> (9th Cir. 2011) 643 F.3d 1210, 1215.)

The special circumstance defined in section 190.2, subdivision (a)(22) mandates a sentence of death or life in prison without the possibility of parole where "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, ... and the murder was carried out to further the activities of the criminal street gang." Before a defendant can be penalized under this statute for being an active participant in a criminal organization, he or she must be shown to have had knowledge of the gang's criminal purposes. (<u>People v. Carr</u> (2010) 190 Cal.App.4th 475, 487.) The requirement that the People prove "'the murder was carried out to further the activities of the criminal street gang'" "substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members....'" (<u>Id.</u> at p. 488.)[fn124]

> **FN124**: The statutes all require proof of the existence of a criminal street gang. Accordingly, the prosecution is required to prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. [Citations.]" (<u>Gardeley</u>, *supra*, 14 Cal.4th at p. 617, italics omitted.) As defendants implicitly concede the evidence concerning the Country Boy Crips was sufficient to establish these requirements, we do not discuss them further.

Evidence of gang affiliation and activity, though potentially prejudicial, is relevant and admissible when the reason for the underlying crime is gang related. (<u>People v. Samaniego</u> (2009) 172 Cal.App.4th 1148, 1167; <u>People v. Gonzalez</u> (2005) 126 Cal.App.4th 1539, 1550.) "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (<u>Gonzalez</u>, at p. 1550.)

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation]. Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] The subject matter of the culture and habits of criminal street gangs ... meets this criterion. [Citations.]" (<u>Gardeley</u>, *supra*, 14 Cal.4th at p. 617.) Included within "'culture and habits'" is "testimony about the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (<u>Killebrew</u>, *supra*, 103 Cal.App.4th at pp. 656-657, fns. omitted.)

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.]" (<u>People v. McAlpin</u>, *supra*, 53 Cal.3d at p. 1299.) "'[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information ....' [Citation.]" (<u>Id.</u> at pp. 1299-1300.)

"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (<u>Gardeley</u>, *supra*, 14 Cal.4th at p. 618.) Although a trial court "should prevent the use of misleading or unfair hypothetical questions." (<u>People v. Wilson</u> (1944) 25 Cal.2d 341, 348), the questioner is not required to disguise the fact that the questions are based on the evidence adduced at trial (<u>Vang</u>, *supra*, 52 Cal.4th at p. 1041). Because a hypothetical question not based on the evidence is irrelevant, and expert testimony not based on the evidence will not assist the trier of fact, "the prosecutor's hypothetical questions [must] be based on what the evidence showed these defendants did, not what someone else might have done." (<u>Id.</u> at p. 1046.)

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) Nevertheless, an expert's opinion "is not admissible if it invades the province of the jury to decide a case. 'Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided ....' [Citation.] Notwithstanding Evidence Code section 805, an 'expert must not usurp the function of the jury ....' [Citations.] [¶] Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). '[T]he rationale for admitting opinion testimony is

that it will assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." [Citation.]' [Citations.] In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not aid the jurors, it supplants them." (<u>Summers v. A. L. Gilbert Co.</u> (1999) 69 Cal.App.4th 1155, 1182-1183.)

There is no hard-and-fast rule concerning when an expert's opinion goes beyond embracing the ultimate issue and improperly invades the province of the jury. As the California Supreme Court has said, "'We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved.... Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' [Citations.]" (<u>People v. Wilson</u>, *supra*, 25 Cal.2d at p. 349.)

In keeping with the foregoing, a witness may not express an opinion as to a defendant's guilt or innocence, or with respect to whether a crime has been committed. (<u>People v. Torres</u>, *supra*, 33 Cal.App.4th at pp. 46-47.) Nonetheless, "[t]here are some crimes a jury could not determine had occurred without the assistance of expert opinion as to an element of the crime." (<u>Id.</u> at p. 47, fn. omitted.) Thus, for example, it has been held proper for a trial court to permit an expert in the illegal distribution of pharmaceutical drugs to opine that, under the facts of the hypothetical question posed to him, the drugs were possessed for the purpose of illegal street sales. (<u>People v. Doss</u> (1992) 4 Cal.App.4th 1585, 1596.) "Rarely, if ever, does an expression of opinion by a so-called expert not amount to that which either the court or jury might adopt as a basis for the ultimate decision in the case. However, that does not mean that the witness is deciding the case or that in so testifying he is usurping the functions of the jury. He is merely giving an opinion, based upon his technical training, which the court may or may not accept as testimony that is proper and necessary to an enlightened consideration and a correct disposition of the ultimate issue. [Citation.]" (<u>Wells Truckways, Ltd. v. Cebrian</u> (1954) 122 Cal.App.2d 666, 674.)

Considering Sherman's testimony and the trial court's rulings in light of the foregoing principles, we find no abuse of discretion. Sherman properly was allowed to state his opinions that defendants were active members of the Country Boy Crip criminal street gang at the time of the charged offenses, and that the offenses were committed for the benefit of a criminal street gang. (<u>People v. Garcia</u> (2007) 153 Cal.App.4th 1499, 1512-1514; <u>see</u> <u>People v. Lindberg</u>, *supra*, 45 Cal.4th at pp. 48-50; <u>People v. Gonzalez</u>, *supra*, 126 Cal.App.4th at pp. 1550-1551; <u>People v. Valdez</u> (1997) 58 Cal.App.4th 494, 507-509.) He was also properly permitted to express an opinion concerning intent. Significantly, he did not give an opinion concerning the subjective intent of defendants on trial, but rather answered hypothetical questions that paralleled the evidence presented by the prosecution. (<u>Compare</u> <u>Gonzalez</u>, *supra*, 38 Cal.4th at p. 946 with <u>In re Frank S.</u> (2006) 141 Cal.App.4th 1192, 1195-1196, 1197-1198; <u>see</u> <u>People v. Ferraez</u> (2003) 112 Cal.App.4th 925, 928, 930-931

[gang expert properly allowed to opine, based on hypothetical facts paralleling evidence, that drugs in defendant's possession were intended to be sold for benefit of or in association with gang, and that proceeds would be used to benefit gang].)

Vang, *supra*, 52 Cal.4th 1038 is instructive. There, the challenged hypothetical questions were designed to elicit the expert's opinions on whether the crime was committed for the benefit of and in association with or at the direction of a particular gang, and whether the charged assault was gang motivated. (Id. at p. 1043.) The court stated, in part:

"To the extent Killebrew, *supra*, 103 Cal.App.4th 644, purported to condemn the use of hypothetical questions, it overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves. Killebrew stated that the expert in that case 'simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact.' [Citation.] But, to the extent the testimony responds to hypothetical questions, as in this case ..., such testimony does no such thing. Here, the expert gave the opinion that an assault committed in the manner described in the hypothetical question would be gang related. The expert did not give an opinion on whether defendants did commit an assault in that way, and thus did not give an opinion on how the jury should decide the case.

"The trial court understood precisely the distinction between (1) not permitting the expert to opine that the particular defendants committed a crime for a gang purpose, and (2) permitting the expert to express his opinion in response to hypothetical questions....

"[There may be concern] that permitting these hypothetical questions invades the province of the jury. However, as noted, expert testimony is permitted even if it embraces the ultimate issue to be decided. [Citation.] The jury still plays a critical role in two respects. First, it must decide whether to credit the expert's opinion at all. Second, it must determine whether the facts stated in the hypothetical questions are the actual facts, and the significance of any difference between the actual facts and the facts stated in the questions. The trial court instructed the jury on both of these roles....[fn125]" (Vang, *supra*, 52 Cal.4th at pp. 1049-1050, fn. omitted.)

**FN125**: The trial court in the present case so instructed the jury, as well.

The court further stated: "Whether to accept the expert's opinion and, if so, how to apply it to the actual case was for the jury to determine. But the trial court properly permitted the questions and answers." (Vang, *supra*, 52 Cal.4th at p. 1050, fn. 5.)

Defendants say, however, that the testimony ran afoul of section

29. That statute provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Assuming the issue was preserved despite the lack of specific objection based on the statute (see People v. Zepeda (2001) 87 Cal.App.4th 1183, 1208), we do not believe section 29 is applicable. There was no testimony concerning any defendant's mental illness, mental disorder, or mental defect. (See People v. Adan (2000) 77 Cal.App.4th 390, 393, fn. 3.) In our opinion, the last sentence of the statute cannot be divorced from the first sentence, and, insofar as we can tell, the statute is most usually invoked with respect to expert psychiatric or psychological testimony. (See, e.g., People v. Coddington (2000) 23 Cal.4th 529, 582-583, overruled on another ground in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13; People v. Bordelon (2008) 162 Cal.App.4th 1311, 1315, 1326-1328; People v. Nunn (1996) 50 Cal.App.4th 1357, 1363-1365 & cases cited therein.)

We also conclude the trial court did not abuse its discretion by permitting Sherman to testify concerning such matters as whether the pattern of criminal activity was common knowledge and whether it was uncommon for gang members to go into detail when bragging about their crimes. We recognize that a person may be qualified as an expert on one subject, yet not be qualified as an expert on matters beyond the scope of that subject. (People v. Hill, supra, 191 Cal.App.4th at p. 1120.) Given Sherman's extensive training and experience, however, the trial court did not err by concluding he was adequately qualified to testify on the topics. Moreover, in light of his frequent conversations with gang members, an adequate foundation was laid. (See, e.g., Gardeley, supra, 14 Cal.4th at p. 620; People v. Hill, supra, 191 Cal.App.4th at pp. 1124-1125.)

Lastly, the test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crimes, enhancements, and special circumstances beyond a reasonable doubt. (People v. Alvarez, supra, 14 Cal.4th at p. 225; People v. Johnson (1980) 26 Cal.3d 557, 578; People v. Augborne (2002) 104 Cal.App.4th 362, 371; accord, Jackson v. Virginia (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (People v. Johnson, supra, 26 Cal.3d at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (People v. Reilly (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (People v. Culver (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (In re Frederick G. (1979) 96 Cal.App.3d 353, 367). This standard of review applies regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (People v. Lenart (2004) 32 Cal.4th 1107, 1125.)

Having concluded Sherman's opinions were properly admitted, we

further conclude his testimony, coupled with the other evidence presented at trial, is sufficient to uphold the jury's verdicts and special findings on the charges and allegations under section 186.22, subdivisions (a) and (b) and section 190.2, subdivision (a)(22). (See People v. Ferraez, *supra*, 112 Cal.App.4th at p. 931.)[fn126]

> FN126: We would reach this conclusion even if Sherman should not have been permitted to offer his opinions on intent. The erroneous admission of expert testimony is assessed under the Watson standard (People v. Prieto, *supra*, 30 Cal.4th at p. 247), and the evidence on the point was overwhelming even without those pieces of opinion testimony.

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 376-403.

## 2.    Analysis

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. See Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." See Estelle at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the admissibility of evidence. Id. at 72.

The United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process. See Estelle, 502 U.S. at 75, n.5; Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001). In Estelle, the Supreme Court expressly refused to determine whether the introduction of prior crimes evidence to show propensity to commit a crime would violate the Due Process Clause. Id. ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); see also Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) ("Estelle expressly left this issue an 'open question'"). Because

the Supreme Court has specifically declined to address whether the introduction of propensity evidence violates due process, Petitioner lacks the clearly established federal law necessary to support his claims. Id.; see also Mejia v. Garcia, 534 F.3d 1036, 1046-47 (9th Cir. 2008) (relying on Estelle and Alberni and concluding that the introduction of propensity evidence under California Evidence Code § 1108 does not provide a basis for federal habeas relief, even where the propensity evidence relates to an uncharged crime); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Accordingly, the state courts' rejection of Petitioner's claim could not have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists. 28 U.S.C. § 2254(d)(1).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). Constitutional due process is violated if there are no permissible inferences that may be drawn from the challenged evidence. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." Id. at 920. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

Here, the California Court of Appeal appropriately found that the evidence was properly admitted to allow the gang expert to determine whether Petitioner was a member of a street gang or acted in furtherance of the street gang at the time of the offense. On appeal, the court found that it was proper to allow the gang expert to "state his opinions that defendants were active members of the Country Boy Crip criminal

street gang at the time of the charged offenses, and that the offenses were committed for the benefit of a criminal street gang." Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 376-403 (citing People v. Garcia 153 Cal.App.4th 1499, 1512-1514 (2007)). The state The state standard applied in this case parallels federal law which holds that evidence of gang affiliation is admissible when it is relevant to a material issue in the case. United States v. Easter, 66 F.3d 1018, 1021 (9th Cir. 1995) (citing United States v. Abel, 469 U.S. 45, 49 (1984) (finding gang evidence admissible to show bias)). The testimony of the gang expert was introduced to establish permissible inferences that were essential to the prosecution's theory. See Jammal, 926 F.2d at 919. These inferences include that Petitioner was part of a criminal street gang and Petitioner's intent. See Abel, 469 U.S. at 49. The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

E.     Claim Five – **Wheeler/Batson** Challenge

Petitioner presents two separate Wheeler/Batson claims. First he claims that his right to a fair and impartial jury under the Sixth Amendment was denied based on removal of jurors who had visual and hearing impairments. Next, he claims his Sixth Amendment rights were violated by the removal of African American jurors. (Pet. at 34-35.)

1.     **State Court Decision**

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

C.    Batson-Wheeler

Defendants challenge the trial court's denial of their Batson-Wheeler[fn75] motions, which were predicated on the prosecution's peremptory excusals of physically disabled and African-American prospective jurors.[fn76] The People say the challenged peremptory strikes were constitutionally permissible.

> **FN75**: Batson v. Kentucky (1986) 476 U.S. 79 (Batson); People v. Wheeler (1978) 22 Cal.3d 258 (Wheeler). Wheeler has been overruled in part by Johnson v. California (2005) 545 U.S. 162 (Johnson).

> **FN76**: Defendants are African-American. Although there is no indication any is hearing impaired or otherwise physically disabled, a defendant and prospective juror(s) alleged to have been wrongly excused need not be members of the same group in order for the defendant to complain. (Powers v. Ohio (1991) 499 U.S. 400, 416.)

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (People v. Jackson (1992) 10 Cal.App.4th 13, 17.) "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.]" (People v. Bonilla (2007) 41 Cal.4th 313, 341.)

Peremptory challenges may properly be used to remove prospective jurors believed to entertain specific bias, i.e., bias regarding the particular case being tried or the parties or witnesses thereto. (Wheeler, supra, 22 Cal.3d at p. 274.) However, "'[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias — that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" — violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (People v. Bell (2007) 40 Cal.4th 582, 596; see Batson, supra, 476 U.S. at pp. 88-89; Wheeler, supra, 22 Cal.3d at pp. 276-277.)[fn77]

> **FN77**: Defendants raise a separate equal protection claim under the state Constitution. "Our state constitutional guarantee of equal protection (Cal. Const., art. I, § 7) is substantially equivalent to that contained in the United States Constitution (U.S. Const., 14th Amend.), and our analysis of state and federal equal protection claims is substantially the same. [Citations.]" (People v. Hofsheier (2006) 37 Cal.4th 1185, 1211; accord, People v. Leng (1999) 71 Cal.App.4th 1, 11; see People v. Taylor (2001) 93 Cal.App.4th 318, 322; In re Evans (1996) 49 Cal.App.4th 1263, 1270.) Accordingly, defendants' contention is subsumed within our existing discussion, and we do not

separately address it.

"The United States Supreme Court has ... reaffirmed that <u>Batson</u> states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (<u>People v. Avila</u>, *supra*, 38 Cal.4th at p. 541, <u>quoting</u> <u>Johnson</u>, *supra*, 545 U.S. at p. 168.) The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (<u>People v. Bell</u>, *supra*, 40 Cal.4th at p. 596; <u>see</u> <u>Wheeler</u>, *supra*, 22 Cal.3d at pp. 280-282.)

With these principles in mind, we turn to the case before us.

1.    <u>Physical Disabilities</u>

a.    <u>Background</u>

1.    <u>H.D.</u>

Prospective Juror H.D. was employed as a caterer. She was also a student at Bakersfield Adult School, where she was halfway to getting her high school diploma and was taking regular high school classes. In addition, she taught a parenting class at a counseling center. She helped the director with parents who had lost their children, especially through adoption. Her son was being raised by her sister. She had two brothers in gangs, but had no contact with them. She had no prior jury service, no close friends or relatives in law enforcement, and did not know anyone involved in the trial. She did not believe there was anything about the nature of the case or charges that would affect her ability to be fair and impartial. Her home had been burglarized about eight months earlier, and she had pled no contest to misdemeanor disturbing the peace about 15 years earlier. She had never had an unpleasant experience with law enforcement. She promised she could and would be fair to both sides in this case.

Because of her eyesight and hearing, H.D. did not watch much television or read much of the paper, and so had not heard anything about this case other than what she had heard in court. She had heard all the questions asked by the attorneys of, and answers given by, her fellow prospective jurors.

H.D. initially could not hear the prosecutor, whose microphone may not have been on at the start of the prosecution's voir dire. When H.D. erroneously called the prosecutor "sir" and then apologized, the prosecutor said, "There are a lot of them here."[fn78] H.D. responded, "They're handsome too."

> **FN78**: All three defense attorneys, and one of the two prosecutors, were male. The lead prosecutor was female.

(For the most part, we refer to "the prosecutor" as a single entity.)

H.D. was using a device to help her hear better, and she confirmed she had been able to hear the proceedings.[fn79] She was partially sighted, but could see the attorneys and the wall behind them. She had trouble with small things and used a magnifier to read small print. If she brought her magnifier, she would be able to read something like a typewritten document. It would not be too difficult for her to read things in this case; she was the kind of person, she told the prosecutor, who, whatever was given, would do her work. She was very independent, too.

**FN79**: For best reception, the device had to be kept zeroed in on the other half of the court's apparatus for hearing-impaired jurors, which was situated above the judge's head.

Outside the presence of the prospective jurors, the prosecutor related that she had "some concerns" about H.D.'s mental abilities. The prosecutor felt some of H.D.'s answers were somewhat appropriate, but that a lot were inappropriate. The prosecutor wanted to ask additional questions, and it was agreed H.D. would be questioned in chambers. During this further questioning, H.D. related that she had never been under a conservatorship and did not have a payee for the SSI benefits she received due to her eyesight. She was prohibited from having a driver's license due to her eyesight, but could get a ride or take the bus to court.

On a couple of occasions during this questioning, H.D. had to ask the prosecutor to repeat a question. At one point, the prosecutor asked if H.D. remembered the previous discussion of the People's burden of proof in the case. H.D. answered affirmatively; when asked what that burden was, H.D. answered, "I'm okay with that." She then asked the prosecutor to repeat the question, and this time responded, "I have no burden of proof." Once reminded of the People's burden, H.D. said she had no problem with it. The prosecutor then asked if H.D. remembered the discussion about past misconduct of defendants, and that it could be used for specific purposes. When H.D. said yes, the prosecutor asked if she remembered what those purposes were. H.D. responded, "Only on something that's related to that and no other."

The prosecutor then questioned H.D. about her comment that the defense attorneys or the gentlemen at the table were handsome. Asked which ones she thought were good looking, H.D. responded that they were all good looking. She also told Lee's attorney he had a good smile. When the lead prosecutor asked what about the male prosecutor, H.D. stated that he had a beard. Asked who did, H.D. referred to Lee's counsel and said it was white. She thought about Christmastime when she saw it, because she thought he looked like Santa Claus. Asked if that would cause her to favor his side, she said no. It was just something nice on her part. It was a joke, and she did not feel she was rooting for either side.

Questioning then passed to the defense. H.D. apparently could not hear counsel for Dixon until he turned on his microphone. H.D. related that she had no problem seeing him at counsel table, that she was born completely blind and partially deaf, and that she had undergone many surgeries in her eyes and ears. When she went to school, she had trouble

113

learning because of her hearing and eyesight. She did not get hearing aids until she was 19. They worked well, but it was difficult for her to hear in court with just her hearing aid because of interference from the background sound. She could hear everything with the court's device, however. H.D. felt that in the jury room, she would have no problem talking to the other jurors or listening to them. She felt she was on an equal basis with them and wanted to be treated that way.

Defense counsel all expressly passed for cause, and the prosecutor did not challenge for cause. The court found H.D. qualified to serve as a juror, stating: "I listened to her. I watched her body language. And sure, she has some challenges, but she's been able to overcome those handicaps. I don't know if I could have done as well as she's done." It also observed that the judicial branch's goals included fairness, diversity, and access.

The next peremptory challenge belonged to the People, and the prosecutor excused H.D. Told by the court that she was excused, H.D. responded, "Who, me?" Counsel for Johnson then asked to take up a matter at sidebar. When he asked if H.D. could stay for a moment, a prospective juror said, "She can't hear you." The clerk said she would take care of H.D.

After a brief conference, the court asked the prospective jurors, including H.D., to leave the courtroom while it heard a motion. Outside their presence, it asked if counsel for Johnson had any support for the notion that persons with visual and hearing impairments were cognizable groups for purposes of the Batson-Wheeler motion he had made at sidebar. Counsel responded that it was his understanding being blind or hearing impaired were not appropriate grounds upon which to challenge a prospective juror, that H.D. could overcome her impairments with certain aids, and that she could keep an open mind.

The court expressed its feeling that H.D. was not a member of a cognizable group for Batson-Wheeler purposes. The prosecutor stated that assuming a cognizable class existed, no prima facie showing had been made that H.D. was excused because of her physical disabilities. The prosecutor declined to offer reasons for excusing H.D. absent a request by the court because she did not think a prima facie case had been shown, but she stated for the record that after the sidebar was requested, H.D. was wandering around the courtroom and tried to go in the back with the court and counsel. The court noted that she did not have her hearing-impaired device with her. The prosecutor agreed, and pointed out that she tried to go behind defendants, then toward an exit door, and another juror had to catch her and bring her back in. The prosecutor asserted her confusion was obvious, and that if someone merely does not know what is happening, that person does not try to go back into the judge's chambers.

The court invited counsel to address whether a prima facie case of systematic exclusion had been shown. Counsel for Johnson argued that he saw no reason for excusing H.D. other than her special needs, as she did not show a preference for either side. The court stated: "I don't feel that she's part of a cognizable group, but I can see good arguments for why she should be in a cognizable group. [¶] But based on what I've seen here, I don't feel that a prima facie case of group bias has been

established in this case or evidence sufficient to permit me to draw an inference that discrimination has occurred in this case." Asked about the possibility counsel might find case law showing she was part of a cognizable group, the court stated it was assuming she was a member of a cognizable group, and was making that finding. Accordingly, it denied the <u>Batson</u>-<u>Wheeler</u> motion for failure to show a prima facie case.

2.     M.R.

Prospective Juror M.R., a former school teacher, had been retired for about 15 years. She had prior jury service in both criminal and civil cases. She knew of no close friends or relatives in law enforcement, did not know anyone involved in the case, and saw nothing about the nature of the case or charges that would affect her ability to be fair and impartial. She had no knowledge of any pretrial publicity or the facts of this case. She heard all the questions asked of her fellow prospective jurors and the answers given; they brought nothing to mind that she wanted to discuss.

When the prosecutor asked in what county M.R. had taught, M.R. responded it was in Los Angeles County. When the prosecutor asked if she was "from L.A.," M.R. responded, "Am I married?" When the question was repeated, M.R. began her answer by calling the prosecutor "Dear." A short time later, the prosecutor asked what brought M.R. and her husband to Kern County. M.R. answered, "Fourteen years." She subsequently echoed several of the prosecutor's questions, suggesting she did not hear them well.[fn80] Asked if she knew anything about gangs in Kern County or elsewhere, M.R. related that she had read a little bit about them in the paper, but not so much that she knew about them. She did not think she had developed an opinion about them. When the prosecutor then said jurors could not consider penalty or punishment when deliberating, M.R. responded that she could not hear the prosecutor. A short time later, she said she was having "a terrible time" hearing the prosecutor. She found it "a little better" when the prosecutor spoke in the microphone "up close."

**FN80**: For example, when the prosecutor asked, "What does he [M.R.'s son] do for a living?" M.R. answered, "What does he do?"

The prosecutor and counsel for Johnson passed for cause, as did counsel for Dixon after further questioning. Counsel for Lee moved around to ascertain where M.R. could best hear him. M.R. said she did not think it would interfere with her ability to hear everything if an attorney were to walk from the witness box to the projector and point to something being projected without wearing a microphone. M.R. promised that she would raise her hand every time she did not hear a question or answer. She also related that she had a hearing device, but did not have the batteries needed for it at that time. She promised to get them over the weekend. Offered use of the court's hearing-impaired device or to have the court bring batteries, M.R. declined, stating she would bring her own hearing aid.

Counsel for Lee passed for cause. The next challenge was with the People; the prosecutor excused M.R. No objection was raised, nor was the <u>Batson</u>-<u>Wheeler</u> motion renewed.

b.     <u>Analysis</u>

"In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.'[fn81] [Citation.] The high court [has] explained that 'a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] 'An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them."' [Citation.]" (People v. Gray (2005) 37 Cal.4th 168, 186; Johnson, supra, 545 U.S. at pp. 168-170 & fn. 4; Batson, supra, 476 U.S. at p. 96.)

FN81: We have been unable to find any case directly holding that the physically disabled are a cognizable class for Batson and/or Wheeler purposes. In United States v. Watson (D.C. Cir. 2007) 483 F.3d 828, 829-835, a case dealing with visually impaired prospective jurors, the federal court determined that disability was not to be accorded heightened scrutiny for equal protection analysis. In People v. Green (Cty. Ct. 1990) 561 N.Y.S.2d 130, 131, 132-133, a lower court found a peremptory challenge intended to eliminate a prospective juror solely because she could not hear, to violate New York's state constitution. The soundness of Green's analysis was questioned in Lawler v. MacDuff (Ill.Ct.App. 2002) 779 N.E.2d 311, 320. We assume, for purposes of our analysis, that the physically disabled are a cognizable class.

"Though proof of a prima facie case may be made from any information in the record available to the trial court, [the California Supreme Court has] mentioned 'certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic — their membership in the group — and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, ... the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' [Citations.]" (People v. Bell, supra, 40 Cal.4th at p. 597.)

"When the trial court concludes that a defendant has failed to make a prima facie case, we review the voir dire of the challenged jurors to determine whether the totality of the relevant facts supports an inference of discrimination. [Citations.]" (People v. Lancaster (2007) 41 Cal.4th 50, 74.) We find no such inference here.

The information elicited during voir dire established ample disability-neutral reasons for excusing H.D. (See People v. Bonilla, supra,

41 Cal.4th at p. 343.) For instance, her lack of education made her a less-than-desirable juror for a complex case such as this. She had brothers who were gang members and had been in and out of prison, and she herself had a prior misdemeanor conviction. (See People v. Davis, *supra*, 46 Cal.4th at p. 584.) More importantly, a number of her answers were inappropriate, and the prosecutor was not required to accept the explanation that H.D. was joking with regard to her statements about defense counsel. In addition, the record supports the prosecutor's claim that H.D. was confused for reasons beyond her hearing impairment when the sidebar conference was called, a claim the trial court was in the best position to evaluate.[fn82] In light of H.D.'s answers and behavior, we decline to equate the prosecutor's questioning her mental abilities, or peremptorily excusing her, with bias or the stereotyping of people with disabilities.

> **FN82**: In order to make as full a record as possible in Batson-Wheeler proceedings, the California Supreme Court has encouraged trial courts to solicit explanations for contested peremptory challenges from prosecutors, even in the absence of a prima facie showing. Although the prosecutor here was within her rights to decline to state her reasons unless and until the court found a prima facie case, her voluntary decision to do so would not have constituted an admission or concession that a prima facie case existed, and so would not have converted a first-stage Batson-Wheeler case into a third-stage one. (People v. Howard (2008) 42 Cal.4th 1000, 1020; People v. Zambrano (2007) 41 Cal.4th 1082, 1105, fn. 3, disapproved on another ground in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendants say we should consider the prosecutor's excusal of M.R. in determining whether there was sufficient evidence to support an inference of discriminatory intent. We decline to do so, because defendants did not renew their motion following her excusal and so failed to preserve the issue for appeal. "[T]he trial court's finding is reviewed on the record as it stands at the time the Wheeler/Batson ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (People v. Lenix (2008) 44 Cal.4th 602, 624; see also People v. Hartsch (2010) 49 Cal.4th 472, 490, fn. 18; People v. Irvin (1996) 46 Cal.App.4th 1340, 1352.) Defendants claim any further objection would have been futile because it would not have changed the trial court's finding that people with disabilities are not a cognizable group for Batson-Wheeler purposes. This assertion ignores the fact the trial court, while expressing doubt that persons with physical disabilities constituted a cognizable group, made an express finding that H.D. was indeed part of a cognizable group but that no prima facie case had been shown. Under these circumstances, it would hardly have been futile to renew a motion following the presentation of circumstances defendants could have used as additional evidence in support of a prima facie showing.[fn83]

> **FN83**: We do not find counsel ineffective for failing to renew the motion, because the record does not affirmatively show counsel had no rational tactical purpose for the omission. (People v. Jackson (1989) 49 Cal.3d 1170, 1202; see

People v. Holt (1997) 15 Cal.4th 619, 657.)

Were we to consider the prosecutor's excusal of M.R., we would still find no inference of discriminatory intent. "'[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.'" (People v. Bell, supra, 40 Cal.4th at p. 598.) Defendants say H.D. and M.R. were the only remaining potential jurors with disabilities, but we do not know this to be true. Moreover, we decline to take into account challenges for cause in determining whether the prosecution removed all prospective jurors with disabilities from the panel, thereby evidencing discriminatory intent, as defendants apparently would have us do: The excusal of a prospective juror whose physical disabilities would interfere with jury service simply does not raise an inference of discrimination, alone or in combination with other circumstances. Similarly, the fact that a prospective juror was not subject to exclusion for cause does not support an inference that the exercise of a peremptory challenge against him or her was motivated by group bias. (People v. Cornwell (2005) 37 Cal.4th 50, 70, disapproved on another ground in People v. Doolin, supra, 45 Cal.4th at p. 421, fn. 22.)

Additionally, voir dire elicited disability-neutral reasons for excusing M.R. For instance, any prosecutor might have been concerned about her not having developed any opinion about gangs despite having lived in Los Angeles and Kern Counties. In addition, questions remained about the extent of her hearing problem and its potential impact on her abilities as a juror, since she neither got batteries for her own hearing aid despite necessarily knowing she was coming to court for jury service, nor accepted the court's offer of the use of its device. Under the circumstances, the prosecutor was not required to assume M.R. would be able adequately to hear everything, or that she would carry through on her promise to raise her hand every time she could not.

The trial court did not err by finding no prima facie case of discrimination was shown. Accordingly, having assumed for purposes of our analysis that the physically disabled constitute a cognizable group for Batson-Wheeler purposes, we need not determine whether that is indeed so.

2. Race

a. Background

Prospective Juror E.B. had been employed as a derrick hand on a drilling rig in the oil fields for approximately three years. E.B. was single, had no prior jury service, and had no close friends or relatives in law enforcement. Asked if there was any reason he could not be fair and impartial, E.B. answered no, but, when the court noted he had paused, stated, "I just want to go back to work, pretty much." E.B. explained that he normally worked, and was paid for, a 12-hour tour, but this was decreased to eight hours when he was on jury duty. Asked if he would be able to get by financially if he served on the jury, he responded, "I don't know. I got a lot of bills."

The prosecutor questioned E.B. further about his financial situation and ascertained that E.B. would be losing substantially more than a third

of his paycheck if he did not receive overtime pay for the extra four hours per tour. Asked if he could weather that kind of pay cut if the trial went into January, E.B. answered, "I don't know. I have to see what my check is like Friday." E.B. did not think he would be worrying about his finances rather than giving his full attention to the case. He acknowledged, however, that because his shift was four days on, four days off, there might be times when he would be working two 12-hour days on the weekend.

E.B. was not familiar with MySpace or Facebook. He liked to watch sports on television, and sometimes a show called "Wife Swap." He did not really like to read, as he read enough at work. Noting that E.B. appeared to be similar in age to defendants, the prosecutor asked if he was concerned about any kind of sympathy he might have toward them. E.B. responded that he did not have any sympathy. Asked about victims who might be around his age, he said, "I don't know them."

The prosecutor then called E.B.'s attention to the prior discussion about the standards used for evaluating witnesses, and asked if he had ever been in a situation at work where he had to evaluate whether someone was telling him the truth. When E.B. answered affirmatively, the prosecutor asked what sorts of situations. E.B. answered, "Just make sure they did their job, because most of the time they lie to you trying to just — you have to go and check it." E.B. explained that he was in charge of two other people on the job. Asked what kind of responsibilities he would have in a situation in which, for example, one of his employees was a couple of hours late and had obviously been drinking, E.B. said he would have no responsibilities, as he was just supposed to make sure they did their job and to keep them busy.

The prosecutor then asked what type of responsibilities E.B. had if there were problems with the people he supervised. This ensued:

"Q. Well, do you have any responsibilities for discipline, for instance?

"A. If they talk too crazy or something to you crazy, just tell them to meet you after work. [¶] ... [¶]

"Q. Like to settle it in the parking lot kind of thing?

"A. Yeah. [¶] ... [¶]

"Q. And what if someone that you're supposed to tell them what to do, what if they don't do what they're supposed to, what are you supposed to do?

"A. Just cuss them out. Just let them know what's up. They gotta respect what your position is. If not, you just try to send them home.

"Q. Does that involve any paperwork? Do you have to fill out a — you know, write some paper on them about some problem you have with them?

"A. No, I don't have to. Just keep yelling at them all day until you make them quit.

"Q. Do you like that part of your job?

"A. Not really."

E.B. subsequently confirmed that he believed he would be able to judge which witnesses were telling the truth and which were lying. He was not familiar with the state's gang laws, did not pay attention to them, and did not watch or follow the news. It did not cause him any concern when he heard there would be evidence in this case about previous convictions; he did not think anything when he heard that. It did not bother him at all. The judge's explanation of how that evidence would be evaluated and used seemed fair.

When counsel for Dixon noted that E.B. spoke softly, E.B. responded that he was nervous. He felt, however, that he would be able to express his opinions to the other jurors during deliberations, as well as to listen to their opinions and change his if he found they were right. He would also be able to hold on to his opinion if he felt he was right.

Counsel for Lee questioned E.B. further about how he handled those he supervised. This ensued:

"Q. And taking them down to the parking lot is a way to take them apart and tell them what's up. If they want to keep making that kind of money they don't really have a choice. They have to do what you want them to do. Right?

"A. Yes.

"Q. Kind of like kicking them in the butt, so to speak. Kind of like riding them during the day, like you said, right?

"A. Yes.

"Q. If you don't want to do the job that's up here, then maybe we can find you some really dirty job and change your mind about being some part of the team, that kind of thing?

"A. Yeah.

"Q. You didn't mean you'd ask somebody to come out in the parking lot so you could whoop them, right?

"A. Sometimes you have to do that. [¶] ... [¶]

"Q. Who wins those things?

"A. You just don't tell nobody."

All counsel passed for cause. Later, however, the People peremptorily excused E.B., prompting defendants to object to what they asserted was the systematic exclusion of African-Americans and minorities. Counsel for Johnson pointed to the excusal of J.C., an African-American male; C.A., a Hispanic-surnamed female; J.H., an African-

American male; and E.B., an African-American male. Counsel for Lee added that the challenge to E.B. was the prosecutor's 10th, and of the 10 challenged, three were African-American. The court estimated that there were seven or eight African-American prospective jurors, including one currently in the box (Juror No. 1336880). Counsel for Lee argued that a comparison of the percentage of African-Americans in the venire with the percentage of African-Americans stricken by the prosecution alone gave rise to at least the inference required to show a prima facie case.

The prosecutor argued that no prima facie case had been shown, as the defense had not met its burden of showing there was a discriminatory purpose in the excusing of E.B. She noted that the People had excused people of all races from the jury, as had the defense. Counsel for Johnson responded that of the prosecution's 10 challenges, seven had been exercised against minorities.

The court found the defense had established an inference that the persons named by counsel for Johnson were challenged because of their group association of being Hispanic or African-American, and it asked the prosecutor to explain the challenges. When the prosecutor asked if she was to explain only with respect to E.B., the court answered affirmatively, saying that was the challenge. The prosecutor then stated E.B. was excused because the prosecution believed he was very young, had limited life experience, was single, had no children, had no post-high school education, did not look at the news and was unaware of the circumstances in the news with respect to the current world, was uncomfortable and fidgeting while being questioned, mumbled, was very nervous, was very immature in failing to check out the financial consequences to him of jury duty, and most of all, solved workplace disputes in a completely inappropriate manner. The prosecutor argued that violence in the workplace was inappropriate even in the oil fields, and that E.B. was not ashamed of resorting to violence to resolve his disputes. The prosecutor also asserted that she felt E.B. was cavalier in some of his answers about Dixon's prior conviction, and she thought his style of dress — wearing a black T-shirt with a large skull on the front in a murder case, and sagging pants — was inappropriate and immature and showed a lack of respect for the system. The prosecutor reiterated that this was a case involving people taking their disputes to the street in retaliation, and E.B.'s manner of dealing with people at work showed him to have no place on the jury. The prosecutor felt him to be a "very immature and mean" person.

Counsel for Lee argued that law enforcement and military academies used tactics such as cursing and beating to instill discipline and prepare students for the dangers of the job. He also argued that people dressed differently, and that clothing should not be the hallmark of showing respect in the courtroom. Counsel also asked if the court saw fidgeting. Counsel for Dixon argued that E.B. said he could sit on the jury financially, and that this should be taken at face value. When counsel started to discuss the T-shirt, the court stated it had not seen the garment and so would not rely on it. As for fidgeting, counsel pointed out E.B. said he was nervous, and that other potential jurors were nervous. Counsel also argued that E.B. was not as young as the prosecutors believed, but rather was in his mid-20's. Counsel further argued that just because E.B. could not always be heard did not make him different from a number of other people. Counsel for Johnson joined in the other defense comments, and argued E.B.'s body language did not reflect an aggressive demeanor,

and that E.B. was polite, attentive, and answered appropriately. He further did not show aggression when interacting with other prospective jurors.

The prosecutor responded that while he was talking to E.B., E.B. never stopped moving from side to side in his seat. As for his financial situation, E.B. would not know if there was a problem until he received his paycheck on Friday.[fn84] The prosecutor argued that E.B. had bills to pay and responsibilities, yet had not taken the step of calling his employer to find out what his paycheck would be, and that this was indicative of immaturity. The prosecutor further pointed to E.B.'s manner of exercising his workplace authority, specifically in terms of committing a crime and then covering it up.

**FN84**: The motion was heard on Wednesday, December 3, 2008.

After counsel for Lee responded, the court ruled:

"Find that the reasons given for the challenge exercised on [E.B.] are group neutral. I find specifically that the prosecution was sincere in offering their challenges based on demeanor of [E.B.] based upon his young age, his immaturity, and indication of the type of way in which he settles disputes or exercises control by the exercise of self-help mechanisms in regards to co-employees on the drilling rig, his body language, his movement in his seat in shifting of position. All I think are indicative, especially the way in which he indicates he would discipline or handle employees in the workplace.

"Maybe if this was in a restaurant or a bar setting or in a party setting or in some social gathering, but the way in which he would handle employees who were either under the influence or not performing to his expectation indicate to me how a sincere ... party such as the prosecution could conclude that he is immature in the way in which he would exercise discipline and control other co-employees. So the challenge is denied."

b.    Analysis

The trial court ruled for the defense in step one of the Batson-Wheeler analysis by finding a prima facie case of discrimination with respect to African-Americans and Hispanics.[fn85] African-Americans are a cognizable group (People v. Alvarez, *supra*, 14 Cal.4th at p. 193), and we assume substantial evidence supports the court's determination (see People v. Silva (2001) 25 Cal.4th 345, 384; Alvarez, *supra*, at p. 197). Accordingly, we move to step two.

**FN85**: Defendants do not claim the trial court erred by limiting the hearing to the peremptory excusal of E.B. despite the broader finding with respect to a prima facie showing. Accordingly, our analysis concerns only E.B.

At step two, the prosecutor must come forward with a race-neutral explanation for the challenged excusal. (People v. Silva, *supra*, 25 Cal.4th at p. 384.) "A neutral explanation ... means an explanation based on

something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (Hernandez v. New York (1991) 500 U.S. 352, 360 (plur. opn. of Kennedy , J.).) At this stage, the explanation need not be persuasive, or even plausible. (Purkett v. Elem (1995) 514 U.S. 765, 767-768.) "'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.]" (People v. Lenix, supra, 44 Cal.4th at p. 613, italics omitted.)

Whether the prosecutor has offered a race-neutral reason for his or her challenges is a question of law subject to our independent review. (People v. Álvarez, supra, 14 Cal.4th at p. 198, fn. 9; Paulino v. Harrison (9th Cir. 2008) 542 F.3d 692, 699.) As no discriminatory intent was inherent in any of the prosecutor's reasons, we conclude those reasons were race neutral. (Hernandez v. New York, supra, 500 U.S. at p. 360 (plur. opn. of Kennedy , J.).) Hence, the prosecution met its burden with respect to step two of the Batson-Wheeler analysis.

Accordingly, we move to step three. At this stage of the analysis, the trial court must decide whether the opponent of the peremptory strikes has proved purposeful racial discrimination by a preponderance of the evidence. (Purkett v. Elem, supra, 514 U.S. at p. 767; People v. Hutchins (2007) 147 Cal.App.4th 992, 997-998.) The persuasiveness of the proffered justification now becomes relevant (Johnson, supra, 545 U.S. at p. 171), as implausible or fantastic justifications will be found to be pretexts for purposeful discrimination (Purkett v. Elem, supra, 514 U.S. at p. 768). "What is required are reasonably specific and neutral explanations that are related to the particular case being tried." (People v. Johnson (1989) 47 Cal.3d 1194, 1218.)

Once the prosecutor comes forward with such an explanation, the trial court must then satisfy itself that the explanation is genuine. (People v. Hall (1983) 35 Cal.3d 161, 167.) "In [this] process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (People v. Fuentes (1991) 54 Cal.3d 707, 720.) "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (People v. Hall, supra, 35 Cal.3d at pp. 167-168; see also People v. Lomax (2010) 49 Cal.4th 530, 570-571.) In undertaking this evaluation, the trial court need not make affirmative inquiries, but must find the race-neutral explanations to be credible. (People v. Hamilton (2009) 45 Cal.4th 863, 907.)

"When a trial court has made a sincere and reasoned effort to

evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (<u>People v. Jurado</u> (2006) 38 Cal.4th 72, 104-105; <u>accord</u>, <u>People v. Lenix</u>, <u>supra</u>, 44 Cal.4th at p. 627; <u>see</u> <u>Batson</u>, <u>supra</u>, 476 U.S. at p. 98, fn. 21; <u>Paulino v. Harrison</u>, <u>supra</u>, 542 F.3d at p. 699.) Deference does not, of course, "imply abandonment or abdication of judicial review." (<u>Miller-El v. Cockrell</u> (2003) 537 U.S. 322, 340.)

The record before us clearly establishes the trial court made a sincere and reasoned effort to evaluate each of the prosecutors' stated reasons for their peremptory challenge of E.B. Accordingly, application of the substantial evidence standard is appropriate. Such evidence supports the trial court's ruling; the court neither erred by accepting the prosecutors' explanations nor failed in its duty to examine those reasons for racial discrimination.

The prosecutors' nondemeanor-based reasons for excusing E.B. were both inherently plausible and supported by the record. (See <u>People v. Silva</u>, <u>supra</u>, 25 Cal.4th at p. 386.) Youth and a concomitant limited life experience are valid bases for excusal. (<u>People v. Gonzales</u> (2008) 165 Cal.App.4th 620, 631; <u>People v. Perez</u> (1994) 29 Cal.App.4th 1313, 1328.) By parity of reasoning, so is immaturity. The prosecutors were reasonably specific with respect to their concerns about E.B.'s workplace conduct, and the willingness to engage in violence to enforce one's authority on the job is something that, in a prosecutor's subjective and sincere estimation, may render the prospective juror not the best type of individual to sit on the case being tried. (See <u>People v. Reynoso</u> (2003) 31 Cal.4th 903, 924-925.)[fn86]

> **FN86**: Defendants say that even if not pretextual, E.B.'s conduct in resolving workplace disputes was not rationally related to his ability to serve as a juror in this case, especially where his conduct during voir dire was polite and appropriate, and he was unbiased and stated he could listen to others during jury deliberations. We disagree. In our view, there is a clear and rational relationship between the use of violence to resolve workplace disputes or impose one's authority and will in the workplace, and how one may act to resolve disputes or impose one's opinions in the jury room. Even if there need be no fear the prospective juror would actually use violence in deliberations, the apparent inability to use reasoning and persuasion to resolve disputes demonstrates an immaturity that is rationally connected to his or her ability to serve. In addition, the present case involved a form of "self-help" — gang members taking their disputes to the streets instead of attempting to resolve them by other means.

As for the demeanor-based explanations, particularly E.B.'s constant movement, they are neither affirmatively contradicted by the record nor inherently improbable. (See <u>People v. Reynoso</u>, <u>supra</u>, 31 Cal.4th at pp. 925-926; <u>People v. Jordan</u> (2006) 146 Cal.App.4th 232, 256.) In fact, E.B.'s movement was implicitly confirmed by the trial court. (<u>Contrast</u> <u>Snyder v. Louisiana</u> (2008) 552 U.S. 472, 479.) Generally speaking, a prospective juror's demeanor may properly be considered by a prosecutor in deciding whether to exercise a peremptory challenge.

(See, e.g., People v. Ward (2005) 36 Cal.4th 186, 202; People v. Turner (1994) 8 Cal.4th 137, 170-171, disapproved on another ground in People v. Griffin (2004) 33 Cal.4th 536, 555, fn. 5; People v. Cummings (1993) 4 Cal.4th 1233, 1282.) The trial court here was in the best position to observe E.B., and its acceptance of the prosecutors' reasons is entitled to great deference. (People v. Stanley (2006) 39 Cal.4th 913, 939.) Under the circumstances, the fact defense counsel did not observe something, or interpreted it differently than the prosecutors, does not call into question the credibility of the prosecutors' stated reason. (People v. Jordan, *supra*, 146 Cal.App.4th at p. 255.) Moreover, the trial court was in the best position to observe the prosecutors' demeanors, and the manner in which they exercised their peremptory challenges, in assessing the prosecutors' credibility. (People v. Stanley, *supra*, 39 Cal.4th at p. 939; see People v. Lomax, *supra*, 49 Cal.4th at pp. 570-571.)

Relying on Miller-El v. Dretke (2005) 545 U.S. 231, defendants put forth several arguments in support of their assertion the prosecutors' reasons for excusing E.B. were pretexts for excusing him because he was African-American. First, defendants point out that seven of the prosecution's first 10 challenges were used against minorities, three of whom were African-Americans. Three out of four African-Americans in the jury box were excused peremptorily by the prosecution. Thus, defendants say, a great percentage of African-Americans were removed by the prosecution, a fact that supports a strong inference of purposeful discrimination on the basis of race. (See id. at pp. 240-241.)

Statistics cannot be considered in a vacuum. Here, although defendants were themselves African-American, so too were most of their victims. Thus, this is not a case in which the defendants were members of the excluded group, while their alleged victims were members of the group to which the majority of the jurors belonged. (See People v. Cleveland, *supra*, 32 Cal.4th at pp. 733-734.) In addition, at least one trial juror, Juror No. 1336880, was African-American. "'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a Wheeler objection.' [Citation.]" (People v. Ward, *supra*, 36 Cal.4th at p. 203; *accord*, People v. Lewis, *supra*, 43 Cal.4th at p. 480.)

In addition, the circumstances surrounding the excusals of the other two African-American prospective jurors cannot be ignored. J.H. had a son serving life in prison for what J.H. believed was a gang-related murder. He had served on two juries before and felt he never knew when a lawyer was giving him all the facts or telling the truth. Asked by the prosecutor if, were he in her position, he would think it good to have 12 jurors with his state of mind, J.H. stated he could not be in her position and could not put himself in her position. When the prosecutor questioned J.H. further about his prior jury experience, this ensued:

"Q. Now, is there anything about that experience that would cause you to —

"A. Absolutely not.

"Q. Are you feeling irritated with me right now?

"A. Absolutely not.

"Q. Are you sure? Because it's time to be honest.

"A. Why do you ask me the same question over and over? If I lied the first time, I'm going to lie the second time. I told you the truth the first time. I'm going to do it again.

"[PROSECUTOR]: Your Honor, at this time I think I need to challenge for cause.

"[J.H.]: Good."

Following voir dire by defense counsel, the trial court denied the prosecutors' challenge for cause. The next peremptory challenge was the People's, and the prosecutor used it to excuse J.H. During the hearing on the Batson-Wheeler motion, the trial court observed that J.H. and been "a little short" with the prosecutor.

The other African-American prospective juror who was peremptorily excused by the People was J.C. In pertinent part, J.C. stated that, although he knew jurors were not supposed to consider penalty or punishment, if he were a juror and were to return a guilty verdict, it would be "kind of like morally hard" on him. He noted that defendants looked to be about his age, and the jury's decision "could potentially determine the rest of their lives ...." Although J.C. felt he could listen to the evidence, keep an open mind, and reach a fair and just verdict based on the evidence and the law, he admitted he was having a hard time not putting himself in defendants' position. Although he would try putting it out of his mind, he felt it would be hard to not think, during deliberations, about what would happen to defendants if convicted.

The prosecutor challenged for cause, but, as J.C. said he believed he could find defendants guilty if the prosecution met its burden of proof and that he would follow the law as the court instructed, the trial court denied the challenge. The prosecution then accepted the panel containing J.C. (and Juror No. 1336880) four times. Only after using its next two peremptory challenges against other prospective jurors, and having defendants exercise various peremptory challenges, did the People excuse J.C. During the hearing on the Batson-Wheeler motion, counsel for Lee represented that the defense did not make such a motion with respect to J.C. because J.C. indicated he felt sympathy toward defendants based on their ages.

In light of the foregoing, the bare statistics are misleading in this case, and do not support an inference of purposeful discrimination based on race. Defendants say, however, that the prosecution used a different script for questioning E.B. than it did for other prospective jurors and included a trick question designed to elicit cause to strike an African-American male and not discover how he would function as a juror, and that these circumstances were a strong indication of racial bias in questioning. (See Miller-El v. Dretke, supra, 545 U.S. at pp. 255-262.)

Defendants point to the prosecutor asking E.B. if he had ever had to evaluate someone's credibility at work and then, rather than questioning E.B. about the process he might use in that regard, instead asking how

E.B. would handle a hypothetical situation. When an objection to the question was sustained, the prosecutor asked what type of responsibilities E.B. had if there were problems with the people he was responsible for supervising, and if he was responsible for discipline. In light of E.B.'s previous answers concerning such things as his finances, youth, and lack of education beyond high school, and his demeanor, we find no trickery. Rather, the question was designed to probe E.B.'s maturity and ability to work with other people, both of which were related to how he would function as a juror. The record does not support an inference the prosecutor anticipated E.B. would answer by admitting to the use of violence or in a way that would generate cause to strike a young African-American male. (Compare Miller-El v. Dretke, *supra*, 545 U.S. at pp. 261-262.)

As for allegedly disparate questioning, defendants point to the questions asked a number of non-African-American jurors and prospective jurors. However, the majority of these jurors were examined after denial of the Batson-Wheeler motion. Since we review the trial court's finding on the record as it stood at the time the Batson-Wheeler ruling was made (People v. Lenix, *supra*, 44 Cal.4th at p. 624), we question defendants' inclusion of jurors and prospective jurors who had not been the subject of voir dire at the time the trial court denied the Batson-Wheeler motion. Nevertheless, we include them in our analysis and accept defendants' representation that those jurors and nonjurors were in fact not African-American.

Defendants first point to Juror No. 1314332, who worked in the oil fields as a compressor operator for a major oil company. When the prosecutor ascertained the juror was the only one at the plant, this took place:

"Q. You would not advocate violence out there in the oil fields, would you?

"A. No.

"Q. You would agree that that's not the right thing to do.

"A. No, it's not."

Defendants say this was clearly a reference to E.B. and not a sincere question going to Juror No. 1314332's suitability as a juror. While clearly engendered by E.B.'s responses, we find the questions proper, especially in light of the argument of Lee's attorney at the time of the Batson-Wheeler motion concerning the training techniques used by law enforcement and military academies.

The prosecutor asked prospective alternate juror B.R., a supervisor for an oil company, if he had a "basic management philosophy" for dealing with problems with employees. B.R. replied, "Get rid of them." Asked if he considered himself a tough boss, B.R. stated, "Well, I think that we are only accountable to each other for ourselves." Defendants say this answer puts E.B.'s response into perspective. Indeed: It demonstrates that, while the oil fields may not be a workplace environment for sensitive people, neither is it necessary or common to resort to violence in order to deal with problem employees.

Defendants say the prosecution did not ask similar questions about workplace conflict or discipline of G.H., Juror No. 1222064, B.M., Juror No. 1355968, M.B., or G.F., all of whom were non-African-Americans with similar jobs. However, the record supports the People's response on appeal, namely that the prosecution's questions were tailored to address potential concerns for each prospective juror in light of that individual's previous answers. For instance, the prosecutor questioned G.H. at length about how he would determine credibility, especially since he was a friend of one of the law enforcement witnesses in this case. G.H. ultimately was excused pursuant to a defense challenge for cause. The record also shows striking dissimilarities between E.B. and the individuals identified by defendants. For example, Juror No. 1222064 had not worked in the oil fields in at least 12 years and, being retired, was clearly considerably older than E.B. Similarly, B.M. had not worked in the oil business for 16 years. Juror No. 1355968 was several jobs removed from contact with the oil fields, and even then sold oil field equipment as opposed to working in the oil fields per se. M.B. was not a supervisor, but rather worked in a job in which he had someone telling him what to do. Prospective alternate juror G.F. was a lease operator who helped maintain production for several hundred oil wells. Having lived in Kern County for 55 years, he was considerably older than E.B., and the prosecutor ascertained that he did not supervise people, but rather worked together with three other people, with G.F. usually being in the office and the other three being out in the field. In light of the foregoing, the record does not support defendants' claim that the disparate questioning was a strong indication of racial bias.

Defendants also say the prosecution did not ask questions about employee conflict resolution or discipline during voir dire of similarly situated non-African-American prospective jurors S.F., K.M., L.D., and T.C. However, S.F.'s employees were in sales and marketing. K.M. had been employed for at least 31 years and had adult children. He was clearly significantly older than E.B. L.D. did not work in the oil fields, was significantly older than E.B., and was questioned by counsel for Johnson about making credibility determinations. Similarly, T.C. did not work in the oil fields and, with a 16-year-old son, was at least somewhat older than E.B. Given these differences, we again find no indication of racial bias in questioning.

Last, defendants say the record reflects some sworn jurors shared characteristics with E.B. that the prosecution listed as reasons for dismissing him. (See Miller-El v. Dretke, supra, 545 U.S. at pp. 241-248.) We recognize that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step. [Citation.]" (Id. at p. 241, italics added.) Accordingly, we have undertaken the requisite comparative analysis (see People v. Lenix, supra, 44 Cal.4th at pp. 607, 621-622), keeping in mind that "[t]wo panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (Id. at p. 624.)

"Viewing such comparative evidence in light of the totality of evidence relevant on the claim, we conclude it does not demonstrate purposeful discrimination." (People v. Cruz (2008) 44 Cal.4th 636, 659.) Like E.B., Juror Nos. 1181469, 1227832, 1228043, and 1355968 were single and/or had no children. However, Juror No. 1181469 was an accountant who was older than E.B., having lived in Kern County for 35 years. The juror had prior jury experience and read books or magazines that helped him with his job. Juror No. 1227832 was considerably older than E.B., having retired in 1989 after 27 years in the Air Force. During that career, he was stationed all over the United States, Europe, and Asia. He supervised numerous people during his career, and part of his duties involved disciplinary actions. When he had to deal with someone he perceived had a problem, the commander, not the juror, usually had the last word concerning what would happen. Most of the time, the commander accepted the juror's recommendation. The juror had a lot of responsibility in evaluating the soldiers and figuring out the appropriate thing to do, based on talking to them and other witnesses. Juror No. 1228043 was a public health nurse with prior jury experience. She sat on various boards. An inference can be drawn that she was considerably older than E.B., since she had nieces in their 30's and had been a nurse for about 30 years. She tried to follow the news. Juror No. 1355968 had prior jury experience. Given her lengthy employment history and the fact she had a 36-year-old child, it is apparent she was significantly older than E.B.

Juror Nos. 1286800, 1343211, 1477749, and 1336880 all stated that a prior conviction would not have an impact on how they viewed the murder case, though they do not appear to have said so in the same manner as E.B. That there may have been "'isolated and discrete similarities'" between their views on the subject and that of E.B. does not, however, make them similarly situated for purposes of comparative analysis. (People v. Lewis and Oliver (2006) 39 Cal.4th 970, 1019, fn. 15.) Defendants fail to point to any other similarity between these jurors and E.B. in any respect contributing to the prosecutors' challenge. "The circumstance that the ... jurors made a single comment having similarity does not establish that the prosecutor[s'] reasons were pretextual or that defendant[s] established purposeful discrimination under the facts of the present case." (People v. Schmeck (2005) 37 Cal.4th 240, 271, disapproved on another ground in People v. McKinnon (2011) 52 Cal.4th 610, 637-638.)

"Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (People v. Lenix, supra, 44 Cal.4th at p. 631, fn. omitted.) The seated jurors identified by defendants simply do not "demonstrate such a striking similarity" to E.B. in any meaningful way that a finding of pretext is warranted. (People v. Stevens (2007) 41 Cal.4th 182, 196.)

Our review of the record as a whole demonstrates that substantial evidence supports the trial court's conclusion the prosecutors' peremptory excusal of E.B. was not motivated by discriminatory intent. (See People v. Cruz, supra, 44 Cal.4th at p. 661.) The Batson-Wheeler motion was properly denied.[fn87]

FN87: Even if we were to find that some part of the prosecutors' assessment was not well supported by the

129

1
2
3

record, we would not conclude the trial court erred by not finding the excusal was motivated by E.B.'s race. The primary reason the trial court accepted for E.B.'s excusal — his manner of handling employees in the workplace — was amply supported by the record. (See People v. Taylor (2009) 47 Cal.4th 850, 896.)

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 168-219.

### 2. Legal Standard

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., quoting Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, n.21.

The Court will review each Batson challenge, the challenge as to disabled jurors, and the challenge as to African American jurors, in turn.

### 3. Dismissal of Hearing and Vision Impaired Jurors

Petitioner first claims that two jurors were removed based on disabilities, most

notably hearing or vision impairments. In order to succeed with this claim Petitioner must show that the physical disabilities reflect a class that is eligible for Sixth Amendment protection under Batson. In Batson, the Supreme Court held that the privilege of peremptory strikes in selecting a jury is subject to the guarantees of the Equal Protection Clause. SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 479-480 (9th Cir. 2014) (citing Batson, 476 U.S. at 89). The Supreme Court, in Batson, exclusively considered peremptory strikes based on race. Id. Eight years later, the Supreme Court extended Batson to peremptory strikes made on the basis of gender. J.E.B. v. Alabama, 511 U.S. 127, 129 (1994). However, the Supreme Court has not held that heightened scrutiny should apply to preemptory challenges based on any other protected class.

While the Ninth Circuit has expanded Batson to include challenges based on sexual orientation, it has not found that disability is subject to heightened scrutiny and therefore subject to preemptory challenges under Batson. In SmithKline Beecham Corp. v. Abbott Labs, the Ninth Circuit found that Batson applies to peremptory strikes based on sexual orientation based on the history of exclusion of gays and lesbians from democratic institutions and the pervasiveness of stereotypes about the group. 740 F.3d 471, 486 (9th Cir. 2014). Alternatively, the Ninth Circuit has not extended protection to disabled individuals under Batson. United States v. Santiago-Martinez, 58 F.3d 422, 422-423 (9th Cir. 1995). In Santiago-Martinez, the Ninth Circuit found that obesity, even if recognized under the Americans with Disabilities Act, did not subject the class to heightened scrutiny under the Equal Protection Clause nor entitle the class to protection under Batson. Id.

In addressing the same issue, the Court of Appeals for the District of Columbia Circuit reached the same conclusion regarding disabled jurors. United States v. Watson, 483 F.3d 828, 831-832 (D.C. Cir. 2007). In that the Supreme Court had held that classifications based on disability are subject only to rational basis review, the Court held that there no basis for applying heightened scrutiny to peremptory challenges of blind jurors. Id. at 832-33.

1      Petitioner has not provided any case law to support the claim that disabled jurors
2    should be subject to a <u>Batson</u> challenge. Under Ninth Circuit law, Petitioner's claim fails.
3    But more importantly, under ADEPA review, Petitioner is only entitled to relief for
4    violations of clearly established Federal law, as determined by the Supreme Court of the
5    United States. 28 U.S.C. § 2254(d). "It is not an unreasonable application of clearly
6    established Federal law for a state court to decline to apply a specific legal rule that has
7    not been squarely established" by the Supreme Court. <u>Knowles v. Mirzayance</u>, 129 S.
8    Ct. 1411, 1419 (2009). The striking of the disabled jurors did not violate clearly
9    established Federal law.  Petitioner is not entitled to relief on his first <u>Batson</u> challenge.

10                    **4.      Dismissal of African American Jurors**

11      Petitioner next claims that his Equal Protection rights were violated by the
12    prosecution's use of a preemptory against juror E.B., an African American male. Here,
13    the trial court found that the first step, a prima facie finding that the juror was struck
14    based on race occurred, and proceeded to analyze the second and third steps of the
15    <u>Batson</u> analysis.

16      Because the matter proceeded to the second and third step at the state trial court,
17    this Court need not review the first step of the <u>Batson</u> analysis. <u>Hernandez v. New York</u>,
18    500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for
19    the peremptory challenges and the trial court has ruled on the ultimate question of
20    intentional discrimination, the preliminary issue of whether the defendant had made a
21    prima facie showing becomes moot.").

22      In evaluating the race-neutral explanation, the Court must keep in mind that proof
23    of discriminatory intent or purpose is required to show a violation of the Equal Protection
24    Clause. <u>See</u> <u>Hernandez</u>, 500 U.S. at 360 (no discriminatory intent where Latino jurors
25    dismissed because of possible difficulty in accepting translator's rendition of Spanish
26    language testimony). It should also keep in mind that a finding of discriminatory intent
27    turns largely on the trial court's evaluation of the prosecutor's credibility. <u>See</u> <u>Rice v.</u>
28    <u>Collins</u>, 546 U.S. 333, 340-41 (2006); <u>Lewis v. Lewis</u>, 321 F.3d 824, 830 (9th Cir. 2003).

"[T]he court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing Lewis, 321 F.3d at 831). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." Purkett v. Elem, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially neutral explanation, not "the reasonableness of the asserted nonracial motive." Id. "To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but 'whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006) (citing Hernandez, 500 U.S. at 365).

When determining whether a prosecutor's professed race-neutral reasons for striking a juror were pretextual, Batson requires an inquiry into "the totality of the relevant facts about a prosecutor's conduct." Currie v. McDowell, 825 F.3d 603, 610 (9th Cir. 2016); Kesser, 465 F.3d at 359. However, AEDPA "'imposes a highly deferential standard for evaluating state-court rulings'" and "'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 562 U.S. 594, 598 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Purkett, 514 U.S. at 769, as are the findings of the state appellate court, see Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means a state court's findings with respect to discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240, (2005). "[The federal court] must defer to the [state court's] conclusion that there was no discrimination unless that finding 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Cook v.

1 | LaMarque, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)). A federal
2 | habeas court may grant relief only "if it was unreasonable to credit the prosecutor's race-
3 | neutral explanations for the Batson challenge." Rice, 546 U.S. at 338.

In reviewing the claim, Petitioner provides no factual support for his argument and only states that the state court "erred in determining the reasons offered by the prosecutor rebutted the inference of group bias and stereotyping based on race." (Pet. at 34-35.) The state court, in reviewing the Batson claim, provided significant detail and explanation as to why it found that the peremptory challenge as to E.B. was not racially motivated.

The prosecutor provided several explanations why he moved to excuse E.B. from the jury. The prosecution believed E.B "was very young, had limited life experience, was single, had no children, had no post-high school education, did not look at the news and was unaware of the circumstances in the news with respect to the current world, was uncomfortable and fidgeting while being questioned, mumbled, was very nervous, was very immature in failing to check out the financial consequences to him of jury duty, and most of all, solved workplace disputes in a completely inappropriate manner." Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 195-96. The prosecutor focused on the juror's unabashed comments regarding workplace violence, and found the juror's actions to be "inappropriate even in the oil fields." Id. In addition, the prosecutor noted that E.B. was inappropriately dressed - wearing a black t-shirt with picture of a skull - and that based on the totality of the factors felt the juror to be a "very immature and mean" person. Id. Based on the reasons provided, the trial court found the prosecution's concerns were sincere and would lead the prosecution to "conclude that [E.B.] is immature in the way in which he would exercise discipline and control other co-employees," and denied the Baston challenge. Id. at 198-99.

Upon reviewing the record, the state court found that evidence "clearly establishe[d] the trial court made a sincere and reasoned effort to evaluate each of the prosecutors' stated reasons for their peremptory challenge of E.B." People v. Johnson,

2013 Cal. App. Unpub. LEXIS 6838 at 203. The state court held that the prosecutors' nondemeanor-based reasons for excusing EB, including youth, limited life experience, and immaturity, were inherently plausible and supported by the record. Id. The state court focused on E.B.'s workplace conduct and his willingness to engage in violence, there   as factors which could influence the prosecutor's subjective and sincere estimation that he was not a suitable juror.

The state court also found that that the prosecution's demeanor-based explanations were properly considered. While the actions were not fully confirmed by the record, the state court deferred to trial court which was in the best position to observe the juror and his behavior.

The state court also addressed Petitioner's arguments as to why the dismissal of E.B. was pre-textual and actually based on race. Petitioner noted that seven of the prosecution's first 10 challenges were used against minorities including three of the four African-Americans in the jury box. Despite the fact that only one African American juror remained on the jury, the state court noted that the defendants and most of the victims were themselves African American, so the removal of the jurors did not create a situation where defendants were members of the excluded group while the jury was populated by members of the victim's group.

The state court also looked at the reasons for dismissing the other African American jurors. One had a son serving life in prison for a gang-related murder and had a general distrust of attorneys. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 207-09; see also Aug. Rep. Tr. at 442; 7 RT 1351-1353. The other dismissed African American juror repeatedly responded to questions that he would not be able to set aside the fact that if he were on a jury that reached a guilty verdict, it would be "morally hard" on him and to know that he played a role in placing the defendants that were similar in age to him in prison.  (Aug. Rep. Tr. at  1418-1423, 1430.)

Further, the defense declined to raise any Batson objections to either of these peremptory challenges likely because the race-neutral basis was obvious. By

comparison, the prosecution retained African-American Juror 136880, who was older, married with children, steadily employed in the education field, with prior jury service. (Id. at 257, 598, 660, 678, 844.) Based on the reasons why the prosecution had to dismiss the two other African American jurors, and the fact that at least one other African American juror remained, the state court found "the bare statistics" to be "misleading in this case," and did not support an inference of purposeful discrimination based on race. People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 210.

Nor did the state court find that the prosecution's asking E.B. how he would deal with such a workplace situation while not asking the same or similar questions to other jurors was an attempt to trick the juror into a response that would provide cause to be stricken. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 212-15. The state court found the question was designed to probe E.B.'s maturity and ability to work with other people, a relevant skill to properly function as a juror. Id. More importantly, the prosecutor could not have anticipated E.B. would answer by admitting to the use of violence or in some other way that would generate cause to strike a young African-American male. Id.

Finally, the state court performed a comparative analysis of the responses of the other jurors to determine whether the reason for dismissal of E.B. would have equally applied to the other jurors. Upon such review, the state court found that most of the other single jurors were older and had significantly more professional and life experiences than E.B. The state court concluded that "[t]he seated jurors identified by defendants simply do not demonstrate such a striking similarity to E.B. in any meaningful way that a finding of pretext is warranted. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 218. Accordingly, the state court denied the Batson challenge, finding that the excusal of E.B. was not motivated by discriminatory intent especially since the primary reason the trial court accepted E.B.'s excusal — his manner of handling employees in the workplace — was amply supported by the record.

Providing the trial court's credibility determination of the prosecution's nondiscriminatory subjective intent great deference, the Court is unable to find that the

ruling was an unreasonable application of federal law. Cook v. LaMarque, 593 F.3d at 816. A federal habeas court may grant relief only if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge. Rice, 546 U.S. at 338. That is not the case with regard to the reasons proffered by the prosecution as to E.B. E.B.'s comments that he approved of the use of violence in the workplace should and did create concern by the prosecutor that E.B. may condone criminal behavior, and although not mentioned by the prosecutor, raised a legitimate concern that E.B. might not conduct himself in an appropriate manner if he were to remain on the jury.

Even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," that disagreement "does not suffice to supersede the trial court's credibility determination." Rice, 546 U.S. at 341-42. Petitioner has not shown that "it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge," and therefore is not entitled to relief. Id. at 338.

In sum, the state appellate court's finding that there was no discriminatory intent was not based on an unreasonable determination of the facts in light of the evidence presented in the trial court. Nor has Petitioner come forward with clear and convincing evidence to rebut the presumption that the state court's conclusion was a reasonable one, nor has he otherwise shown why this Court should accept his interpretation of the record over the trial court's credibility determination. See 28 U.S.C. § 2254(e)(1); Miller-El, 545 U.S. at 240. Accordingly, the Court defers to the state court's conclusion that there was no discriminatory intent. See Cook, 593 F.3d at 816. The state courts' rejection of Petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on this claim.

### F.    Claim Six – Change of Venue

Petitioner claims that his federal Due Process rights, right to a fair trial, and right to an impartial jury were violated by the state court's denial of  a change of venue.

**1.     State Court Decision**

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

A.     Change of Venue

Dixon and Johnson contend the trial court erroneously denied a defense motion for change of venue, thereby denying them due process, a fair trial, and trial by an impartial jury, as guaranteed by the state and federal Constitutions. The People say the motion was properly denied.

1.     Background

Johnson moved, in limine, for a change of venue based on pretrial publicity. Johnson pointed to a June 10, 2008, article in the Bakersfield newspaper in which he was called one of the top gang members in Kern County; a September 3, 2008, local television news story in which a liquor store surveillance video was played that depicted an unknown African-American male shooting a clerk in a February 2006 robbery,[fn69] and which reported that Johnson had now been named as the suspect in the shooting; and an October 21, 2008, article in the Bakersfield newspaper titled "Shot-callers, the 66," in which the district attorney's office included defendants among the 66 most dangerous or significant gang members in Bakersfield. Dixon joined in the motion and noted that the information was also on the Internet.[fn70]

> **FN69**: According to Johnson, the video was also featured on America's Most Wanted and the national news.

> **FN70**: Lee expressly declined to join in the motion.

The People opposed the motion, claiming Johnson and Dixon had failed to meet their burden of showing they could not receive a fair trial in Kern County. Attached to the People's opposition were copies of the newspaper articles the People were aware of regarding the case and defendants. There were three blurbs in the "[p]ublic safety" section the day after each of the three shootings; a larger story, dated December 31, 2007, and titled "Homicides drop in 2007," that briefly described the year's homicides, including the McNew Court shootings; an article dated May 7, 2008, and titled "MySpace pages help lead deputies to 2007 murder suspects," that discussed defendants' arrests and charges; an article

138

dated May 10, 2008, titled "Search warrants reveal how murder suspects were tracked down," that discussed the case and contained a photograph of Vanessa Alcala and her child; and an article dated June 10, 2008, titled "New D.A. gang unit to target top offenders," that contained a list of 27 gang members called "shot-callers" by the Kern County District Attorney and who had cases pending against them. Defendants were included on the list and named as Country Boy Crips, and the article was accompanied by a photograph of the district attorney at a news conference, standing next to a poster that included Johnson's and Lee's pictures, monikers, and charges.

After hearing argument and viewing the poster, the trial court addressed the relevant considerations (discussed *post*) and denied the motion. It deferred to *voir dire* a determination whether the article had prejudiced the panel and an evaluation of whether a renewal of the motion would be justified.

Jury selection began on November 17, 2008. Prospective jurors were questioned, *inter alia*, about any media exposure they had had to defendants or the case, as well as any exposure to or personal knowledge of gangs. Those whose answers suggested a fixed prejudgment of the case, either because defendants purportedly were gang members or because of what was known about the case through media exposure, were excused for cause. At the time all sides accepted the panel as constituted, the defense had not exhausted all of its peremptory challenges. At the time the alternates were accepted, only Dixon had exercised all of his peremptory challenges. At no time did any defendant request that the change of venue motion be renewed.

2.   Analysis

"'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.'" (People v. Panah (2005) 35 Cal.4th 395, 447; § 1033, subd. (a).) "'[R]easonable likelihood'" means something less than "'more probable than not,'" but something more than "merely 'possible.'" (People v. Bonin (1988) 46 Cal.3d 659, 673, overruled on another ground in People v. Hill (1998) 17 Cal.4th 800, 823, fn. 1.) Each case is resolved on its own facts, and the moving party bears the burden of proof. (People v. Sanders (1995) 11 Cal.4th 475, 505.)

"In contrast to pretrial appellate review by way of a petition for a writ of mandate, review on appeal is retrospective. Thus, 'any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial.' [Citation.]" (People v. Jennings (1991) 53 Cal.3d 334, 360.) "On appeal, '"the defendant must show both that the [trial] court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not in fact had."' [Citation.]" (People v. Jenkins (2000) 22 Cal.4th 900, 943.)

On appeal, we review the trial court's resolution of factual questions

for substantial evidence, but we independently determine the ultimate question of whether a fair trial was obtainable. (<u>People v. Sanders</u>, <i>supra</i>, 11 Cal.4th at pp. 505-506; <u>People v. Jennings</u>, <i>supra</i>, 53 Cal.3d at pp. 359-360.) This <i>de novo</i> standard of review applies to our consideration of the five factors we must examine in making that determination: (1) the nature and gravity of the offenses; (2) the nature and extent of the media coverage; (3) the size of the community; (4) the status of the defendants in the community; and (5) the popularity and prominence of the victims. (<u>People v. Panah</u>, <i>supra</i>, 35 Cal.4th at p. 447; <u>People v. Jennings</u>, <i>supra</i>, 53 Cal.3d at p. 360; <u>People v. Harris</u> (1981) 28 Cal.3d 935, 948.)

With regard to the first factor, "[t]he peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (<u>Martinez v. Superior Court</u> (1981) 29 Cal.3d 574, 582.) Special-circumstance murder is an offense of "utmost gravity," even when the death penalty is not sought. (<u>Williams v. Superior Court</u> (1983) 34 Cal.3d 584, 593.) The multiple murders and attempted murders involved here are extremely serious offenses; thus, this factor favors granting a change of venue, but it is not dispositive. (<u>People v. Davis</u> (2009) 46 Cal.4th 539, 578; <u>People v. Weaver</u> (2001) 26 Cal.4th 876, 905.) Although the fact a pregnant woman and her unborn child were among the victims impacts the nature of this case, this is something that "will not change with a change of venue." (<u>People v. Edwards</u> (1991) 54 Cal.3d 787, 808.) "'Prospective jurors would sympathize with the [victims'] fate' no matter where the trial was held, and this sympathy stems from the nature of the crime, 'not the locale of trial.' [Citation.]" (<u>People v. Davis</u>, <i>supra</i>, 46 Cal.4th at p. 578.)

The second factor, the nature and extent of the media coverage weighs against a change of venue. It simply cannot be deemed "persistent and pervasive." (<u>Martinez v. Superior Court</u>, <i>supra</i>, 29 Cal.3d at p. 585; <u>see, e.g.</u>, <u>People v. Lewis</u> (2008) 43 Cal.4th 415, 448-449 [39 newspaper articles, and 95 minutes of videotaped television coverage, spanning period of 13 months, "considerably less extensive" than in other cases in which California Supreme Court affirmed denials of motions to change venue]; <u>People v. Panah</u>, <i>supra</i>, 35 Cal.4th at p. 448 [18 articles over 12-month period "can hardly be characterized as 'extensive'"].) The coverage was largely factual and noninflammatory; although naming defendants as gang "shot-callers" was potentially prejudicial, evidence of defendants' gang affiliation and level of involvement was admitted at trial, so no prejudice resulted. (See <u>People v. Lewis</u>, <i>supra</i>, 43 Cal.4th at pp. 449-450.)

"[T]he fact that prospective jurors may have been exposed to pretrial publicity about the case does not necessarily require a change of venue. [Citation.] '"It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."' [Citations.]" (<u>People v. Panah</u>, <i>supra</i>, 35 Cal.4th at p. 448.) Here, the prospective jurors had, at most, vague recollections of past news coverage, and any who appeared to have prejudged defendants' guilt were excused. Defendants' failure to exhaust their peremptory challenges strongly suggests they themselves concluded the jurors were fair. (<u>Ibid.</u>)

Also weighing against a change of venue is the size of the

community, the third factor. "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness. [Citation.]" ((1985) 41 Cal.3d 144, 178.) During the hearing on defendants' motion, the prosecutor represented, without contradiction, that Kern County had a population of almost 800,000 people. According to California Department of Finance figures for 2007, the latest year available, Kern County had a population of just under 810,000, making it the 13th most populous of California's 58 counties. (Cal. Statistical Abstract (48th ed. 2009) Dept. of Finance, table B-3, at <http://www.dof.ca.gov/html/fs_data/stat-abs/ Statistical_Abstract.php> [as of Nov. 15, 2009].) Venue changes have, almost without fail, not been granted or ordered on review in cases involving counties with such large populations. (See, e.g., People v. Weaver, supra, 26 Cal.4th at p. 905 [where adverse publicity "neither relentless nor virulent," Kern County's "moderate size" (then exceeding 450,000) did not undermine trial court's decision to deny change of venue motion]; People v. Webb (1993) 6 Cal.4th 494, 514 [motions to change venue granted where county relatively isolated and small, in contrast to San Luis Obispo County (population then almost 200,000)]; People v. Fauber (1992) 2 Cal.4th 792, 818 [size and nature of Ventura County (population then of 619,300) did not support venue change; "[v]enue changes are seldom granted from counties of such a large size"]; People v. Daniels (1991) 52 Cal.3d 815, 852 [no change of venue; murder of two police officers garnered extensive media coverage, but community (Riverside County) had population exceeding 600,000]; People v. Hamilton (1989) 48 Cal.3d 1142, 1158 [most recent successful venue cases involved nonurban counties with substantially smaller populations than Tulare County (population then approximately 250,000, ranking it 20th among California counties in population size)]; People v. Balderas, supra, 41 Cal.3d at pp. 178-179 [cases in which venue changes granted or ordered on review generally involved counties with much smaller populations than Kern (population then 405,600, ranking it 14th among California counties in that respect)].) We have no doubt Kern County's population was of such a size that it neutralized or diluted the impact of what scant media coverage there was. (See People v. Weaver, supra, 26 Cal.4th at p. 905.)

Turning to the final factors — the status of the defendants, and prominence and popularity of the victims — we conclude they too weigh against a change of venue. Neither defendants nor the victims were outsiders to the community, nor were they prominent personages. (See People v. Alfaro (2007) 41 Cal.4th 1277, 1323; People v. Daniels, supra, 52 Cal.3d at p. 852.) Any prominence achieved by the victims through news accounts of the shootings did not favor a change of venue; since all led relatively obscure lives, "the community was not likely to have experienced a uniquely heightened sense of loss or anger which would presumably be alleviated by trial in another county. Any sympathetic features of the case would be apparent wherever it was tried." (People v. Webb, supra, 6 Cal.4th at pp. 514-515.) Likewise, any unsympathetic features of the case — the gang allegations and evidence — would also be apparent wherever the case was tried.

In sum, the gravity and nature of the crimes supported a change of venue. The other relevant factors did not. Accordingly, we conclude the trial court did not err in denying the motion made prior to jury selection.

"'[W]hen a trial court initially denies a change of venue motion

without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal.'" (People v. Maury (2003) 30 Cal.4th 342, 388-389.) Here, as we have noted, defendants did not renew the motion after voir dire. Even if we found no forfeiture, however (see People v. Prince (2007) 40 Cal.4th 1179, 1215-1216), we would conclude defendants' failure to renew the motion and to exhaust their peremptory challenges signified their apt recognition that the jury, as selected, was fair and impartial. (People v. Beames (2007) 40 Cal.4th 907, 922.)[fn71]

> FN71: Accordingly, we do not address defendants' alternative claim of ineffective assistance of counsel.

> As the California Supreme Court stated in People v. Lewis, *supra*, 43 Cal.4th at page 450: "We ... conclude that on appeal defendant[s have] not shown a reasonable likelihood that [they] did not receive a fair trial before an impartial jury. The jury voir dire bore out the trial court's conclusion that a fair jury could be chosen. Each juror assured the trial court that he or she could be unbiased notwithstanding exposure to media reports about the case. Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations]. [Courts] have in the past relied on jurors' assurances that they could be impartial. [Citations.] Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice [citations], we do the same here. Considering all the circumstances, defendant[s have] not established a reasonable likelihood, as opposed to a mere possibility, that [they] did not in fact receive a fair trial before impartial jurors. [Citation.]"

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 147-160.

## 2. Legal Standards

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also Green v. White, 232 F.3d 671, 676 (9th Cir. 2000). "[I]f prejudicial pretrial publicity makes it impossible to obtain an impartial jury," then the trial judge must grant the defendant's motion for a change of venue. Daniels v. Woodford, 428 F.3d 1181, 1210 (9th Cir. 2005); Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997); Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988). However, jurors are not required to be totally ignorant of the facts and issues involved in a case. Irvin, 366 U.S. at 722; see also Murphy v. Florida, 421 U.S. 794, 800 (1975); United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).

Thus, pretrial publicity is so prejudicial that it requires a change of venue where "the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime" or "voir dire reveals that the jury pool harbors 'actual

1  partiality or hostility [against the defendant] that [cannot] be laid aside.'" <u>Hayes v. Ayers</u>,

2  632 F.3d 500, 508 (9th Cir. 2011) (quoting <u>Harris</u>, 885 F.2d at 1361, 1363).

3        Prejudice from pretrial publicity may be presumed where the size of the

4  community suggests that impartial jurors may be hard to find, where the information is so

5  "blatantly prejudicial" that those exposed to it "could not reasonably be expected to shut

6  [it] from sight," and where the publicity occurs shortly before trial. <u>Skilling v. United</u>

7  <u>States</u>, 561 U.S. 358, 382-84 (2010). Where circumstances are not so extreme as to

8  warrant a presumption of prejudice, the Court must still consider whether publicity and

9  community outrage resulted in a jury that was actually prejudiced against the defendant.

10  This inquiry focuses on the nature and extent of the voir dire examination and

11  prospective jurors' responses to it. <u>See</u> <u>Skilling</u>, 130 S. Ct. at 2917-23. Our task is to

12  "determine if the jurors demonstrated actual partiality or hostility [toward the defendant]

13  that could not be laid aside." <u>Hayes</u>, 632 F.3d at 508; <u>Harris</u>, 885 F.2d at 1363.

14        In determining pretrial publicity "primary reliance on the judgment of the trial court

15  makes especially good sense because the judge sits in the locale where the publicity is

16  said to have had its effect and may base her evaluation on her own perception of the

17  depth and extent of news stories that might influence a juror." <u>Skilling</u>, 130 S. Ct. at 2918

18  (alternations omitted).

19              **2.    Analysis**

20        The state court did not find that the nature and extent of the media coverage in

21  this case was persistent and pervasive or created a presumption of prejudice. In

22  presenting the motion for change of venue in state court, Defendants presented the trial

23  court with evidence of a newspaper article and television news stories involving co-

24  defendant Johnson's criminal conduct, and a third newspaper article listing the

25  defendants among the 66 most dangerous and significant gang members in Bakersfield.

26  Petitioner also noted that the same information was also available on the internet. The

27  state court found the amount of coverage significantly less than that of other cases in

28  which change of venue motions were denied. Specifically, the state court found the two

newspaper articles and one television news story less than two California Supreme Court cases affirming denials of change of venue involving 39 and 18 newspaper articles, respectively. The state court noted that the fact that the newspaper article named the defendants as "shot-callers" was potentially prejudicial, but that since the level of gang affiliation was admitted at trial, no prejudice occurred. Further, the prospective jurors had, at most, vague recollections of past news coverage.

This Court finds that the state court was reasonable in determining that the level of pretrial media coverage was not pervasive and did not just a presumption of prejudice. This is not a case where a "barrage of inflammatory publicity immediately prior to trial amount[ed] to a huge wave of public passion" against Petitioner. Hayes, 632 F.3d at 510 (citing Patton v. Yount, 467 U.S. 1025, 1033 (1984)). Petitioner has not established presumed prejudice, and is not entitled to relief unless actual prejudice exists.

Actual prejudice exists when voir dire reveals that the jury pool harbors actual partiality or hostility against the defendant that cannot be laid aside." Hayes, 632 F.3d at 508; Harris, 885 F.2d at 1361. In this case, neither Petitioner nor his co-defendants renewed the motion to change venue until after vior dire. Further, Petitioner provided no evidence of actual prejudice in support of this motion. In light of the trial court's findings that each juror had, at most, vague recollections of past news coverage, assured the trial court that he or she could be unbiased notwithstanding exposure to media reports about the case, and any who appeared to have prejudged defendants' guilt were excused, Petitioner has not met his burden that that the jury actually impartial. Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). It is recommended that Petitioner's claim for habeas relief be denied.

## G.    Claim Seven – Shackling During Trial

Petitioner next claims that his federal Due Process rights, right to a fair trial, and right to an impartial jury were violated by the fact that jurors observed Petitioner in leg

and arm restraints during trial.

## 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

B.    Shackling

Dixon, the only defendant to testify, was subjected to physical restraints partway through trial. He now says the trial court's decision in this regard constituted an abuse of discretion that requires reversal. The People say the trial court's decision was sufficiently justified, and in any event, any error was harmless under the circumstances.

1.    Background

Throughout trial, defendants were all in custody, Johnson and Lee in the custody of the Kern County Sheriff's Department, and Dixon — who was serving a sentence on charges arising out of the vehicle pursuit/Tec-9 incident — in the custody of the California Department of Corrections and Rehabilitation (CDCR). Hearing on in limine motions began November 4, 2008; jury selection began November 17, 2008; and opening statements began December 12, 2008.

On November 14, 2008, the court determined that there should be at least one deputy or correctional officer in the courtroom per defendant, and that the correctional officers should be in plainclothes. On November 17, just before jury selection began, it was called to the court's attention that defendants were still handcuffed and in leg irons. The court ordered them unshackled, noting it had no evidence that any had made attempts to escape or would endanger anyone's safety.

On December 18, 2008, CDCR filed a written request for reconsideration of the order removing Dixon's restraints. The motion asserted that Dixon had a documented history of violent and disruptive crimes, as well as a history of nonconforming behavior while incarcerated, and so would pose an unreasonable safety risk if he were not restrained during trial. CDCR recommended placing him in leg restraints or a shock belt, either of which would not be visible to the jury. CDCR represented that if Dixon were unrestrained during trial, CDCR could not guarantee public safety. If the court did not order Dixon restrained, CDCR requested

145

that custody of Dixon be transferred to the Kern County Sheriff's Department until the conclusion of trial.

A supporting declaration by the litigation coordinator at Kern Valley State Prison related that Dixon had a history of violent and sex-related crimes, both in and out of prison, with a current controlling case of criminal gang activity and a noncontrolling case of voluntary manslaughter. The declaration listed Dixon's prior arrests, and related that while in CDCR custody, Dixon had received several disciplinary violations for indecent exposure, masturbation with exposure, indecent exposure with priors, disobeying written orders, tattoos, and battery on an inmate. He had been identified as a member of a criminal street gang, and was currently housed in an institution for inmates classified as level IV and requiring close supervision. The declaration asserted that, because Dixon had a history of violent behavior and had historically presented a lack of respect for law and CDCR's rules, he presented a "reasonable likelihood" that he "may" become violent or attempt to escape, with the fact he was facing a sentence of life without parole increasing the escape risk. The declaration concluded that he was considered a high risk of escape or violence, and should remain physically restrained in court, either by leg restraints or a shock belt. Without such restraint, CDCR was unable to guarantee the safety of court personnel and the public during trial.

Counsel for Dixon opposed the motion. He noted that they had been in court for five or six weeks without Dixon causing any problems; in addition, there were three CDCR officers present, and usually three deputies. Counsel observed that the portion of the probation report appended to the declaration in support of the motion was from seven years earlier; moreover, it appeared from the dates that some of the information concerned Dixon's father, not Dixon. Counsel noted that Dixon's current sentence would expire in August 2009, and that while evidence had yet to be presented in the current case, Dixon was not going to jeopardize his possible release date. Counsel further argued that Dixon would have to go by him before escaping, and that Senior Officer Sherman — a big man — was also nearby.

The court stated it had not had any problems with any of the defendants. An officer from CDCR represented that they had noiseless plastic restraints. Counsel for Lee reiterated that Dixon had been in court for weeks with no physical or verbal outbursts; there was a deputy located behind each defendant, with the closest one within six to eight feet of Dixon; Sherman, who was the People's investigating officer, was at counsel table for the People, located at the barrier between the gallery and the counsel area; and there were three plainclothed correctional officers seated in the audience.

After further discussion about CDCR's alternative request that Dixon be transferred to county custody, the court asked the CDCR officer to show the plastic restraints to counsel for Dixon, while it did some further research on the issue. It expressed concern that it had not seen anything from any defendant that would indicate any of them posed a threat. The court stated the matter would remain under submission.

By letter dated January 13, 2009, CDCR requested the opportunity personally to appear and address the court's concerns. It noted that while the district attorney's office had been present at the earlier hearing, that

office was not CDCR's legal counsel or a party to CDCR's motion.[fn132] In discussing the letter, the court observed it did not feel there was a need for physical restraints, but it set a further hearing on the matter.

**FN132**: CDCR is represented by the Attorney General (AG).

The hearing was held on January 26, 2009. CDCR represented that Dixon had an extensive, violent criminal history, and had also received a total of 13 rules violation reports while in prison. In addition, Dixon was charged at the beginning of December with battery on an inmate in a mutual combat situation and with being out of bounds in prison, thus indicating a propensity to disobey orders. CDCR further noted Dixon had received some minor violations for tattooing and grooming despite prior warnings, thus showing impulsivity and an ability to defy authority, and he also had repeated violations for sexual offenses and indecent exposure. CDCR asserted that the fact Dixon was classified at a very high level in CDCR's classification system indicated Dixon's violence and escape threat. CDCR argued that all these things established manifest need for physical restraints, which could be harmonized with Dixon's right to a fair trial because leg restraints would be silent and not seen by the jury. CDCR noted that Dixon was in civilian clothes. If he attempted to escape, CDCR officers in the courtroom would have to respond, and, if Dixon were unrestrained, might have no option but to use deadly force to stop him. Because Dixon was in civilian clothes, he would be able to blend in with anyone in the courtroom, whereas if he were restrained, the officers would be able to control him immediately rather than resorting to an escalated response or not being able to respond at all if Dixon slipped into a crowd and could not be seen.

The court observed that there were three uniformed deputies sitting behind defendants, within eight feet of Dixon; three correctional officers in plainclothes on either side of the exit doors at the back of the courtroom; and usually Senior Officer Sherman sitting "directly behind the Elmo." CDCR responded that given Dixon's past behavior inside and outside of prison, plus his recent behavior and the fact there did not need to be a risk of prejudice, additional security was warranted.

Counsel for Dixon objected to Dixon being subjected to leg restraints. Counsel pointed out that they had been in court since early November, and Dixon had not caused any problems. The court agreed with that observation. Counsel pointed out that the other two defendants were unrestrained, and that being physically restrained had psychological effects.

The court again observed that none of the defendants had caused any problems in the court's presence, and that the court had not been told of any problems in the courtroom. CDCR argued that case law did not require recent activity or disruptions in front of the court, and pointed to the recent charge of battery on an inmate. The prosecutor then observed that Johnson had been involved in a situation while in court, and so "the whole idea that everybody's been acting like choirboys throughout the course of this case is not correct." The prosecutor also noted the statement Lee made to Johnson about Agustin in the back hallway. The prosecutor stated his agreement with CDCR's position.

The sheriff's department joined in requesting physical restraints. It

argued that if there was a large crowd in the gallery, there was the potential for a civilian-clothed individual to slip from the courtroom, possibly with help from someone, even with the number of officers present. It noted an incident in another trial in which there was a power outage and the emergency lights did not immediately come on, and asserted such an event would provide Dixon an excellent opportunity to slip from the courtroom if unrestrained. It suggested that as all the evidence was presented and Dixon realized he might be convicted, the likelihood of an escape attempt would increase, regardless of however well behaved Dixon previously had been.

The prosecutor added that there had been issues with the behavior of some of the people in the audience during the course of the trial.[fn133] CDCR pointed out that both it and the sheriff's department concurred on the risk assessment, and, while not binding, the fact that trained law enforcement had assessed the security risk should be considered by the court.

> **FN133**: We are not certain of what issues the prosecutor meant. The record does reflect, however, that on December 22, 2008, the court noted it had been advised of some gang confrontations outside the courtroom. On December 29, 2008, one of the jurors reported that someone had approached his wife at lunch, mentioned the person recognized the juror, and said one of the person's nephews was on trial and not to hang him.

At the conclusion of argument, the court found a manifest need for appropriate restraints. Accordingly, it ordered that noise-free restraints be used on Dixon. It further ordered that CDCR continue to house Dixon and provide assistance from the three correctional officers who had been present throughout the trial. When court resumed following the lunch recess, counsel for Dixon announced that Dixon was wearing leg shackles.

Later during trial, Deputy Maxwell testified concerning Lee's statement to Johnson about Agustin. At the request of counsel for Lee and Dixon, the court admonished the jury, "[T]he fact that a defendant and/or witness is in custody and/or is physically restrained is not evidence. In other words, a person can be in jail because perhaps they can't make bail. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations." Jurors were again so admonished during final instructions.

Dupree Jackson was in custody at the time he testified. Although he was already seated on the witness stand when the jury entered the courtroom, he stood and was sworn in front of the jury. After breaks in his testimony, he was again seated on the witness stand when the jury was brought in.

Dixon was sworn outside of the jury's presence. He was seated on the witness stand when the jury was brought in, and jurors were informed that in their absence, he had been advised of his constitutional rights and sworn. At one point, when his attorney asked to call two witnesses out of order, the court stated, outside the jury's presence, that after the

witnesses testified, a break would be taken "to transition Mr. Dixon back to the stand outside the presence of the jury." After this and other breaks, Dixon was again seated on the witness stand when the jury was brought back in.

Emmanuel Burts, Jr., who was also in custody when he testified, was also sworn and seated on the witness stand outside the jury's presence. As in Dixon's case, the court informed jurors that Burts had been previously advised of his constitutional rights and sworn.

After the verdicts for Johnson were read, Johnson directed several expletives toward the jury and the court. He was restrained and removed from the courtroom.

2.   Analysis

"[T]he Fifth and Fourteenth Amendments [to the United States Constitution] prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." (Deck v. Missouri (2005) 544 U.S. 622, 629.) Under state law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (People v. Duran (1976) 16 Cal.3d 282, 290-291, fn. omitted (Duran); see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].)

We review a trial court's decision to shackle a defendant for abuse of discretion. (People v. Cunningham, supra, 25 Cal.4th at p. 987.) Under Duran's standard, however, "the trial court's discretion is relatively narrow. [Citation.] 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained ....' [Citation.] Moreover, '[t]he showing of nonconforming behavior ... must appear as a matter of record .... The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' [Citation.]" (People v. Cox (1991) 53 Cal.3d 618, 651, disapproved on another ground in People v. Doolin, supra, 45 Cal.4th at p. 421, fn. 22.)

A trial court must make its own independent determination of the need for physical restraints, and may not rely solely on the judgment of court security personnel (People v. Mar (2002) 28 Cal.4th 1201, 1218; People v. Hill, supra, 17 Cal.4th at p. 841) or on "rumor and innuendo" (People v. Cox, supra, 53 Cal.3d at p. 652). The court is not required to hold a formal evidentiary hearing on the matter, "but [can] base its determination on factual information properly brought to its attention. [Citation.]" (People v. Medina, supra, 11 Cal.4th at p. 731.)

We find the requisite "'manifest need'" missing in the present case. CDCR cited Dixon's criminal history. A defendant's record of violence, or the fact he or she is a prison inmate, does not by itself justify shackling. (People v. Cunningham, supra, 25 Cal.4th at p. 986; Duran, supra, 16 Cal.3d at p. 293.) Nor, in our view, does the fact of gang membership.

Dixon had received 13 rules violations during his time in prison, but nothing suggests all 13 were acquired during the term he was serving at the time of trial. Rather, it appears CDCR took into account those received during the term Dixon served for his voluntary manslaughter conviction. Despite CDCR's insistence Dixon was violent, only one incident brought to the trial court's attention involved violence, and that was a mutual combat situation.[fn134] Nothing presented to the trial court supported CDCR's assessment that Dixon was an escape risk. It appears he was charged with "being out of bounds" during the same incident that gave rise to the battery charge. This merely suggests the fight occurred somewhere not readily visible to prison personnel. The other circumstances cited by CDCR, the prosecutor, and the sheriff's department — the length of the sentence faced by Dixon, who might perceive the evidence was going against him; the fact there had been problems involving audience members; Dixon being dressed in civilian clothing in a courtroom that might suffer a power outage; and that Dixon's codefendants had not been "choirboys" — were either speculative or did not establish any individualized suspicion that Dixon himself would engage in nonconforming conduct. (See People v. Seaton (2001) 26 Cal.4th 598, 652.)

> **FN134**: Nothing suggests any of Dixon's purported sexual offenses involved force or violence or, for that matter, anyone other than himself and, we surmise, the person or persons who viewed his actions.

Weighing against the foregoing was Dixon's behavior in connection with the court proceedings. There was absolutely no suggestion any of his failures to obey rules or orders, or any violence, were related to courtroom proceedings, past or present, or involved any of the personnel charged with courtroom security or with, for example, transporting Dixon to and from his appearances. (Compare, e.g., People v. Lomax, *supra*, 49 Cal.4th at pp. 559-560, 562 [defendant's unprovoked violent attack on bailiff in courtroom holding cell sufficient to warrant restraints]; People v. Gamache, *supra*, 48 Cal.4th at pp. 368-370 [sufficient showing where defendant found with hacksaw, plans for homemade silencer, and written escape plan, and deputies intercepted letters suggesting defendant had plans to disrupt proceedings]; People v. Wallace, *supra*, 44 Cal.4th at pp. 1049-1050 [showing sufficient where defendant had 16 rules violations while awaiting trial in county jail, and violations included five jailhouse fights and possession of illegal razors]; People v. Lewis and Oliver, *supra*, 39 Cal.4th at p. 1032 [showing sufficient where based on credible reports defendant had attacked another inmate with typewriter and threatened to kill deputies, in addition to which trial court stated it had observed defendant's demeanor in court and believed defendant was not a compliant person]; People v. Cunningham, *supra*, 25 Cal.4th at pp. 987-988 [physical restraints proper, although defendant had not acted violently during courtroom appearances, where defendant had been found in possession of handcuff key, courtroom had no lock, and bailiff was sometimes required to turn away from defendant when preoccupied with various tasks]; People v. Pride (1992) 3 Cal.4th 195, 231-233 [showing sufficient where defendant, who had muscular build, made threats of violence and behaved hostilely toward deputies who transported him to and from courtroom]; People v. Livaditis (1992) 2 Cal.4th 759, 773-774 [showing sufficient where sheriff's department received information from confidential informant about possible escape attempt by defendant with

outside help, and defendant had history of prior escape attempts]; <u>People v. Sheldon</u> (1989) 48 Cal.3d 935, 945-946 [evidence indicated substantial risk defendant might attempt escape, thus justifying shackling, where defendant's confederate was found to possess handcuff key, evidence from confidential informant indicated defendant might also have access to such a key, defendant had committed five assaults on other inmates, and defendant was facing life prison term in another state]; <u>People v. Condley</u> (1977) 69 Cal.App.3d 999, 1006 [mere showing each defendant had prior felony convictions involving use of force or violence insufficient, standing alone, but reached threshold of "'manifest need'" when coupled with two recent joint escape attempts and one defendant's prior conviction for escape by means of force or violence] with, <u>e.g.</u>, <u>People v. Cox</u>, *supra*, 53 Cal.3d at p. 652 [although shackling decision not based on general policy, neither did it show necessity for restraints where, while there was undercurrent of tension and charged emotion on all sides, record did not contain single substantiation of violence or threat of violence on defendant's part].)

<u>People v. Hawkins</u> (1995) 10 Cal.4th 920 (<u>Hawkins</u>), overruled on another ground in <u>People v. Lasko</u> (2000) 23 Cal.4th 101, 110 and <u>People v. Blakeley</u> (2000) 23 Cal.4th 82, 89, comes closest to supporting the trial court's ruling. There, the California Supreme Court upheld the trial court's decision to physically restrain the defendant, stating:

> "We agree with defendant that his record of violence, or the fact that he is a capital defendant, cannot alone justify his shackling. [Citation.] But in this case, defendant's three reported fistfights in prison, together with his extensive criminal history, are sufficient to support the trial court's order to shackle defendant, inasmuch as they demonstrate instances of 'violence or nonconforming conduct' while in custody. The trial court was therefore within its discretion to order the shackling of defendant.

> "Defendant argues that three fistfights in jail after being housed there for one and one-half years is 'not unusual' and was insufficient to justify the shackling. He claims rather that shackling is justified only when a defendant has attempted to disrupt courtroom proceedings or to escape from jail .... We have never placed such preconditions on the trial court's exercise of its discretion. When, as in this case, there were multiple instances of violent and nonconforming behavior while in jail, as well as an extensive background of criminal and violent activity, we will generally not second-guess the trial court's decision to restrain a defendant." (<u>Hawkins</u>, *supra*, 10 Cal.4th at p. 944.)

In <u>Hawkins</u>, the defendant's history of violence, both in and out of custody, was significantly more extensive than that of Dixon. <u>Hawkins</u> had suffered eight prior felony convictions and had committed uncharged assaults, two of which involved him striking or fighting with police. In addition (although it is unclear whether this incident had occurred at the time the court held the hearing on the sheriff's request for physical restraints), the defendant was involved in an incident in jail in which he threatened the lives of the guards. Moreover, a syringe had been discovered in his cell. (<u>Hawkins</u>, *supra*, 10 Cal.4th at pp. 937, 943.)

151

We recognize that a trial court is entitled to take a cautious approach in light of all the information before it, and is not required to wait until confronted with a violent or disruptive incident in front of the jury before ordering restraints. (See <u>People v. Pride</u>, *supra*, 3 Cal.4th at p. 233.) In addition, the decision to impose physical restraints need not be based on the conduct of the defendant at the time of trial. (<u>People v. Livaditis</u>, *supra*, 2 Cal.4th at p. 774.) In Dixon's case, however, there was absolutely no evidence of violence or nonconforming conduct, or planned violence or nonconforming conduct, that "would disrupt the judicial process if unrestrained ...." (<u>Duran</u>, *supra*, 16 Cal.3d at p. 293, fn. 11.) Significantly, the trial court twice found no cause to impose physical restraints, once even after information concerning Dixon's conduct in prison was brought to its attention. The record does not suggest anything changed in any relevant regard between the trial court's implied denial of CDCR's request for restraints in December 2008, and its granting of the request in January 2009. The only apparent differences are that in January, a representative of CDCR appeared in person, and the prosecution — instead of merely submitting the matter as it did in December — now argued for imposition of restraints. This is not enough to warrant the change in the court's ruling. (<u>Compare</u> <u>People v. Pride</u>, *supra*, 3 Cal.4th at p. 231 & fn. 11 [although many incidents cited in support of shackling order took place before April, at which time court and counsel informally agreed physical restraints did not seem necessary, court apparently was not aware of them until June hearing on sheriff's request to impose restraints].)

The People quote the statement in <u>People v. Gamache</u>, *supra*, 48 Cal.4th at page 370, that "[g]iven time, [the defendant] might attempt anything. The trial court was entitled to prepare for that risk." Considered in isolation, this statement would permit shackling in all circumstances, because, of course, anything is possible. The statement must be read in the context in which it was made, however. In <u>Gamache</u>, the defendant had made, and arguably started to carry out, plans to disrupt court proceedings and even escape. The quoted statement responds to his argument that his escape plans should have been discounted as the product of a delusional mind.[fn135]

> **FN135**: The People also note Johnson's verbal outburst when the verdicts were read. Again, the fact that anything is possible does not justify the imposition of physical restraints. Moreover, assuming an outburst by Johnson could somehow be relevant to a determination whether to restrain Dixon, it had not occurred when the trial court made its ruling. (<u>See</u> <u>People v. Welch</u> (1999) 20 Cal.4th 701, 739 [we review correctness of trial court's ruling at time it was made and not by reference to evidence produced later].)

The record shows there were six trained individuals in the courtroom — three deputies and three CDCR officers — whose jobs were solely to provide security by monitoring defendants. The three deputies were within a few feet of defendants, and the correctional officers were between defendants and the exit. In addition, the bailiff and Senior Officer Sherman were usually in close proximity to defendants. Defendants did not object to the presence of so many guards (as long as the correctional officers were in civilian clothes, a state of affairs with which CDCR did not appear to

have a concern), and Dixon does not now claim the number was unreasonable. (See People v. Ainsworth (1988) 45 Cal.3d 984, 1003-1004.) There was no showing of "manifest need" for shackles, let alone shackles in addition to the extra security.

The error was not prejudicial, however. The California Supreme Court has "consistently held that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. [Citations.]" (People v. Anderson, supra, 25 Cal.4th at p. 596.) Here, great care was taken to ensure the restraints would not be visible to the jury, and the record contains no suggestion the efforts in this regard were unsuccessful or that Dixon's participation in his defense was impaired.

Clearly, too, the physical restraints did not prevent Dixon from testifying in his own behalf. He says, however, that the leg restraints resulted in the "conspicuous" procedure of his being the only witness to be seated and sworn before jurors entered the courtroom. As a result, he says, he and the jurors could not help but perceive he was being treated differently from everyone else, even gang members or parolees like Jackson.

We disagree. Jurors likely assumed Dixon was in custody, if not as a result of the Tec-9 incident, then from the nature of the pending charges. This is especially true since it was revealed, during Deputy Maxwell's testimony, that Lee and Johnson were in custody. More importantly, the record shows that Jackson, although sworn in the presence of the jury, was already seated on the witness stand whenever the jurors entered the courtroom. Burts, like Dixon, was seated and sworn outside the jury's presence. Also like Dixon, jurors were informed that he had been advised of his rights. Rather than assuming Dixon was being treated differently because he was shackled, it is likely jurors assumed he (and Burts) were sworn outside their presence because of some reason having to do with the need to advise them of their rights, a process Jackson did not need to undergo because he was testifying pursuant to an immunity agreement.[fn136] There is simply no evidence any juror was aware Dixon was in leg restraints when he was seated and sworn outside the jury's presence. (See People v. McWhorter, supra, 47 Cal.4th at pp. 375-376.)[fn137] Accordingly, and regardless of whether we apply the Chapman or the Watson standard (see People v. Hernandez (2011) 51 Cal.4th 733, 744-746; People v. Mar, supra, 28 Cal.4th at p. 1225, fn. 7), under the circumstances "the procedures implemented could not have influenced ... the ... verdict. '[A]ny error was clearly harmless.' [Citations.]" (People v. Cox, supra, 53 Cal.3d at pp. 652-653.)

FN136: Jurors subsequently were informed defendants had a constitutional right not to testify.

FN137: We will not assume jurors must have been aware of the physical restraints because the trial court gave an admonition on the subject. (See People v. Miller (2009) 175 Cal.App.4th 1109, 1115.) The admonition initially was given in conjunction with Maxwell's testimony, and was equally aimed at the witnesses who were in custody when they testified.

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 424-448.

## 2. Legal Standard

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial. See Estelle v. Williams, 425 U.S. 501, 503 (1976). Visible shackling of a criminal defendant during trial "undermines the presumption of innocence and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" Deck v. Missouri, 544 U.S. 622, 630-31 (2005) (quoting Illinois v. Allen, 397 U.S. 337, 344 (1970)). See also Larson v. Palmateer, 515 F.3d 1057, 1062 (9th Cir. 2008). The Supreme Court has therefore held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck, 544 U.S. at 629. Those interests include "physical security," "courtroom decorum" and "courtroom security." Id. at 624, 628. Accordingly, criminal defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest." Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002). See also Jones v. Meyer, 899 F.2d 883, 884 (9th Cir. 1990); Wilson v. McCarthy, 770 F.2d 1482, 1484 (9th Cir. 1985).

Shackling is not unconstitutionally prejudicial per se. Illinois v. Allen, 397 U.S. at 343-44; Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir. 1995) ("shackling is inherently prejudicial, but it is not per se unconstitutional"). Unjustified shackling does not rise to the level of constitutional error unless the defendant makes a showing that he suffered prejudice as a result. Ghent, 279 F.3d at 1132 (citing United States v. Olano, 62 F.3d 1180, 1190 (9th Cir 1995) and United States v. Halliburton, 870 F.2d 557, 561-62 (9th Cir. 1989.). See also Larson, 515 F.3d at 1064 (state trial court's violation of the petitioner's due process rights in requiring him to wear security leg brace during trial, found to be harmless). The Ninth Circuit has held that "the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice."

Spain v. Rushen, 883 F.2d 712, 722 (9th Cir. 1989). Thus, it has been recognized that "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." Larson, 515 F.3d at 1064.

In Larson v. Palmateer, 515 F.3d 1057 (9th Cir. 2008), the jury saw the defendant's leg shackles, and, when the shackles were removed in the midst of the trial, the Court commented to the jury that the defendant had previously been wearing the shackle for security reasons, and he would no longer be wearing it, due to a leg impairment of the defendant. Id. at 1062. Because the record reflected no justification for the visible leg shackle to be used during the first two days of trial, the Ninth Circuit agreed that the defendant's "due process rights were violated when the trial court failed to make a finding on the record justifying the necessity of physical restraints. . . ." Id. at 1063. The Ninth Circuit went on to determine, however, that, based on the record, the error did not have a substantial and injurious effect or influence in determining the jury's verdict under the harmless error standard articulated in Brecht, 507 U.S. 619 at 623.

In Ghent v. Woodford, 279 F.3d 1121 (9th Cir. 2002), issued before the Supreme Court's decision in Deck, the Ninth Circuit determined that, "[i]n order for a defendant to prevail on a claim of this nature, a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests." Id. at 1132. In addition, the defendant must show prejudice (harmful error). Id.

After reviewing the evidentiary hearing transcript on appeal and considering the arguments of the parties in Ghent, the United States Court of Appeals for the Ninth Circuit determined:

> The evidence suggests that a few jurors at most glimpsed Ghent in shackles in the hallway and as he was entering the courtroom. The jury's "brief or inadvertent glimpse" of a shackled defendant is not inherently or presumptively prejudicial, nor has Ghent made a sufficient showing of actual prejudice.

279 F.3d at 1133. See also Williams v. Woodford, 384 F.3d 567, 592 (9th Cir. 2002) ("Even if we assume that Williams's physical restraints at trial were unjustified, we conclude that the district court properly held that the error was harmless. When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial.").

In a federal habeas corpus proceeding such as this one, the federal court must determine whether any error had a "substantial and injurious effect" on the jury's verdict. Brecht v. Abrahamson, 507 U.S. at 623; Larson, 515 F.3d at 1064. See also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (Brecht harmless error review applies whether or not the state court recognized the error and reviewed it for harmlessness). In this context, a federal habeas court is to "determine whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." Holbrook v. Flynn, 475 U.S. 560, 572 (1986). In the Ninth Circuit, "only the most egregious kind of shackling has been found . . . to deny due process." Castillo v. Stainer, 983 F.2d 145, 148 (9th Cir. 1991).

### 3.    Analysis

The state court, in denying Petitioner's claim, found that even though there was not sufficient cause to shackle Petitioner, the error was harmless as the jury never saw the leg restraints used on Petitioner.  Based on the facts as recounted by the state court, which this court must presume as correct, "great care was taken to ensure the restraints would not be visible to the jury, and the record contains no suggestion the efforts in this regard were unsuccessful or that Dixon's participation in his defense was impaired." 28 U.S.C. § 2254(e)(1); Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 446. This Court, in determining if the state court decision was reasonable, may only rely upon the record before the state court. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.") Based on the evidence in the record, Petitioner has not shown that the jurors ever saw the restraints.

Petitioner instead argues that the jury would have been aware of the conspicuous procedure of transporting and swearing him in at the jury stand while the jury was not present in the courtroom. (Pet. at 37.) Petitioner has not provided any legal authority that the use of an alternate procedure to prevent the jury from seeing shackles has ever been a basis for relief. This court may only find habeas relief if there is a violation of clearly established Supreme Court law. See 28 U.S.C. § 2254(d).  The Supreme Court has clearly held that "the Constitution forbids the use of *visible* shackles…" Deck, 544 U.S. 622, 624 (2005). Having presented the Court with no evidence that Petitioner's shackles were ever visible to the jury, Petitioner is not entitled to habeas relief.

Even if it was assumed that clearly established Supreme Court law was violated, the state court was reasonable in determining that the error was harmless. The state court explained that other witnesses were also transported and sworn in outside the presence of the jury. Despite Petitioner's contention that the procedure would draw attention to the fact that he was already in custody or shackled, it is improbable that the jury understood that the movement of parties in the courtroom while they were not present was only attributable to his shackling. Moreover, even if jurors contemplated that Petitioner might have been shackled, the potential bias created from the events does not come close to approaching the standard that Petitioner was harmed, and more likely convicted in light of procedures used to prevent jurors from seeing his shackles. Petitioner has not made a sufficient showing that his shackles had an injurious effect on the verdict.

Given that the jury never saw Petitioner's restraints, any error did not have a substantial and injurious impact on the jury's verdict, and the appellate court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Habeas corpus relief is foreclosed.

### H.    Claim Eight – Juror Misconduct

Petitioner claims that the trial court erred in not dismissing two jurors whot carpooled with a third juror whot was found to have committed misconduct by blogging

157

about the case during trial. Petitioner contends that the two other jurors engaged in inappropriate conversations with the third juror during the car rides to and from the trial.

### 1.      State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

C.      Juror Misconduct

Johnson and Dixon each contend the trial court erred by refusing to discharge two jurors for misconduct when they admitted talking about the case together prior to deliberations. Dixon joins in Johnson's argument, and Lee joins in both. The People say the trial court properly declined to excuse the jurors.

1.      Background

At the outset of jury selection, the trial court instructed potential jurors not to discuss the case or anything occurring in the courtroom with anyone prior to deliberations, to maintain an open mind, and not to form an opinion until deliberations. At breaks during trial, the court admonished jurors not to talk to anyone about the case, and to maintain open minds. On February 6, 2009, however, it was brought to the court's attention that Juror No. 1244336 had had a blog since at least August 3, 2008, and that she had included comments about jury selection, and then the trial itself, in her blogs of November 17, 20, and 24, 2008; December 5, 8, 11, 15, 16, 21, and 30, 2008; January 15, 23, and 29, 2009, and February 3, 2009.[fn138] On December 16, 2008, the juror posted, "[T]his is my secret blog. I don't know how secret it really is though. I want to tell secret jury things." At least one of her posts drew a comment from a family member who "love[d]" the blogger's "hypothetical question to a case that you can not talk about (let alone blog about)." One of her posts referred to "everyone" she talked to who found out she was on the jury.

> **FN138**: The blog, which was designated court's exhibits, was brought to the prosecutor's attention by a member of the media. The prosecutor brought it to the attention of the court and defense the next day.

The People sought to have the blogging juror removed. Counsel for

158

Lee asked the court to question the blogging juror and Juror Nos. 1267086 and 1355968, with whom she carpooled, followed by an inquiry of the remaining members of the jury and alternates to investigate whether any had discussed the case in violation of the court's admonitions. Counsel for the other defendants joined.

After further discussion, Juror No. 1244336 was brought into the courtroom. Under questioning by the court, she admitted having a blog and discussing on it the general court experience, but denied saying anything about this case. Shown a printout of her blog entries, she apologized. She said she had not been talking about the case, but that "everybody" knew she was on jury duty.

Asked specifically about the two jurors who carpooled with her, Juror No. 1244336 said they tried "really hard," when in the car together, "not to deliberate," and she asserted they had "not done that." There had been times, however, when they tried to get straight something they heard. The juror pointed to a timeline that was on a poster and had been shown the jury during opening statements. She related that she could see it from where she sat, but one of the people with whom she travelled could not, and so that juror would ask about a particular date, and Juror No. 1244336 would say what she saw on the timeline.[fn139] On other occasions, as the jurors drove on Highway 58, one of them would jokingly tell the driver not to get off on Cottonwood. Juror No. 1244336 related that the jurors talked about the experience of being together, but did not express opinions concerning the case.

> **FN139**: The prosecutor subsequently explained that it had been the prosecution's intent all along ultimately to mark the timeline, a double-sized poster used during the course of opening statements, as an exhibit and move it into evidence.

The court had Juror No. 1244336 taken to a secretarial area. It then found she had committed serious and willful misconduct, and good cause to believe she would not be able to perform her duties, including the obligation to follow the court's instructions. The parties then stipulated that she was to be excused.

Juror No. 1267086 was subsequently examined. She denied discussing the facts of the case with anyone. She commuted with Juror Nos. 1244336 and 1355968, and they did not deliberate or discuss the case because the court had told them not to. They might have talked, however, about frustration because of the length of the case. Juror No. 1267086 saw their talk as "idle chitchat," not anything that might jeopardize the case. She could not think of any discussions regarding any court exhibits or timelines. She personally did not have an Internet site or use the Internet socially, but she knew Juror No. 1244336 was a photographer and so emailed her a picture of a rainbow. Juror No. 1244336 said she had used the photograph on her site, but Juror No. 1267086 had not seen anything or posted anything on the Internet to do with this case.

Asked if she had had any direct contact with any of the jurors regarding anything about this case, Juror No. 1267086 answered that they had discussed a little bit about some of the witnesses, along the lines of feeling a bit sympathetic about their circumstances. The juror assured the

159

court that nothing had affected her ability to be fair to both sides, however; the way she saw it, they had not heard the whole case. She thought there were a lot of circumstances that still had to be looked at equally and fairly both ways. She stated that to come to a judgment at this point would be wrong.

Juror No. 1267086 related that she and Juror No. 1244336 had not discussed the facts of the case. Juror No. 1267086 did not know if Juror No. 1244336 had had any communication with anyone else; although they lived in the same town, they did not socialize. With respect to the picture she sent, Juror No. 1267086 did see it and some other pictures Juror No. 1244336 took, but that was all. She did not read anything or see any references about the case. Although she could have looked at the writings, she did not. Her computer was old and slow and she was in a hurry, so she just scrolled through the blog and found the picture and logged off. She had not looked at the blog since then. It would not affect her ability to be fair and impartial.

Juror No. 1355968 was then examined. She did not recall any conversations with anyone regarding the facts of the case. Asked if she had any type of communication with Juror No. 1244336 through any Internet format, Juror No. 1355968 said no, that she did not even know how to use the Internet. She did not know what a blog was. She had not had any communication about any issue regarding people, places, exhibits, or anything along those lines, with anyone on the jury or with third parties. All she ever did was to tell her boss that she did not know when she would be back, and to ask her brother to feed her animals in case she could not get home one night. If anybody asked her, she just told them no questions, and they abided by that request.

Asked if she or any of the jurors had talked about any aspect of a witness's testimony or a photograph or document like the board that was brought up during opening statements, Juror No. 1355968 said the only thing mentioned about the timeline was that they wished it was where they could see it better. She said it was her understanding it would be in the room when they went into deliberations. Told by the court that was so if it came into evidence, she assured the court it did not affect her ability to be fair and impartial. She was more of a note-taker than some of the others, and she was concerned with chronology. She heard nothing said about emotions or feelings regarding any witness.

The court had Juror No. 1244336 brought back in and excused her. The parties subsequently requested additional inquiry of Juror Nos. 1267086 and 1355968. Counsel for Dixon and Lee argued it was obvious some discussion had taken place, and since those jurors were not being candid about it, they should be dismissed. Counsel for Lee further argued that having or not having sympathy for certain witnesses and their plight was also a violation of jurors' oaths and the court's admonitions.

Juror No. 1267086 was returned to the courtroom. She admitted asking the two jurors with whom she carpooled if they had seen the timeline, because she never had a chance to look at it and they sat closer to it than she did. That was the extent of the conversation, except for Juror No. 1267086 saying she guessed they would be able to look at it during deliberations. She did not recall what the others said in response, "[j]ust nothing, really." She did not think there had been any other

communication with them about any other piece of evidence. With regard to sympathy regarding certain witnesses, the conversation was just that it was sad so many people in the world had to go through such a hard time to live their lives and to be brought up in hard situations. There were no discussions regarding a particular witness or defendant or a particular person's plight and how it might have touched or impacted that person's involvement in this case. Juror No. 1267086 related that for her personally, it did not matter one way or the other. It was more along the lines of, she could have been born anywhere in the world, and by the grace of God was born to a good mother and father and ended up where she did. The plight or station in life of any of the people who were discussed did not cause her to have sympathy or prejudice regarding the outcome of the case, and did not impact her ability to judge each defendant and each situation individually and fairly.

Juror No. 1355968 was then brought in. She recalled the issue of the timeline arising during a conversation about what would be brought into the jury room when they deliberated. They assumed the timeline would be brought in, so the matter was just dropped. There was no discussion about the significance of any particular date or time. The juror believed the subject arose because they had started out with evidence concerning the first day, then jumped a bit, then returned to the first day. Juror No. 1355968 recalled passing the Cottonwood off-ramp, and someone — possibly her — pointing it out. Nothing further was said about it. The juror did not believe anything was said about sympathy regarding witnesses or anyone involved in the case. She did not talk about it with anyone. She believed she could still be fair and impartial.

The prosecutor urged the court not to judge Juror No. 1267086's credibility by what was said by Juror No. 1244336, whom the prosecutor termed "a complete liar." He observed that Juror No. 1267086 appeared to be very serious about what was going on and the true nature of the undertaking, and the court confirmed that her body language seemed to convey that. The prosecutor argued that she and Juror No. 1355968 both assumed — validly — that they would be able to view the timeline during deliberations, and they did not ask questions of each other about specific dates or times for events. The prosecutor further argued that any feeling of sympathy was not about any specific individuals, but, in light of some of the testimony concerning people's situations, was merely a reflection of human nature. Moreover, an offhand comment about not being able to get off on Cottonwood did not show any kind of prejudgment. The prosecutor concluded that the conversations were "very innocuous stuff" and did not come close to what Juror No. 1244336 had done, and that the other two jurors were credible and should not be removed from the case.

Counsel for Johnson argued the jurors should not be talking to each other about the case at all, and he joined in the arguments of counsel for Dixon and Lee. He asserted that all three jurors committed clear misconduct, thereby raising a presumption of prejudice, and he requested that Juror Nos. 1267086 and 1355968 be removed and alternate jurors substituted. Counsel for Dixon and Lee agreed.

The court found, from the totality of the testimony of Juror Nos. 1267086 and 1355968, including their body language and the manner in which they testified, that there was no willful failure to comply with the court's instructions or breach of duty or misconduct on their part. Further, if

161

there was misconduct, the presumption of prejudice was rebutted by their testimony. The court found no substantial likelihood of prejudice on their part, or anything that would undermine the integrity of the trial or result in any unfairness. The jury was then brought in, and the court asked if any of the other jurors had had any discussion or communication, by Internet or any other means, among themselves or with anyone else, about any piece of evidence or witness or the nature of the case. There were no positive responses. The court then explained why Juror No. 1244336 was excused, and reiterated the jurors' oaths to try the case according only to the evidence presented, and the instructions and admonitions not to discuss the case before deliberations. The court admonished jurors not to give the excusal any weight or regard, then an alternate was selected and sworn to take Juror No. 1244336's place. The court also asked Juror Nos. 1267086 and 1355968 to drive separately, which they agreed to do.

The timeline ultimately was admitted into evidence, and the prosecutor used it in summation. In the course of jury instructions, jurors were cautioned again not to decide the case based on sympathy or prejudice.

Johnson subsequently moved for a new trial based on juror misconduct. His motion was denied.

2.   Analysis

"If at any time, whether before or after the final submission of the case to the jury, a juror ... upon ... good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged ...." (§ 1089.) A trial court's decision whether to retain or discharge a juror is reviewed for abuse of discretion, and will be upheld unless it falls outside the bounds of reason. (People v. Earp, supra, 20 Cal.4th at p. 892; People v. Marshall (1996) 13 Cal.4th 799, 843.) Its discretion in this regard is broad (People v. Boyette (2002) 29 Cal.4th 381, 462, fn. 19); however, "'[b]efore an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]' [Citations.]" (People v. Farnam, supra, 28 Cal.4th at p. 141; accord, People v. Martinez (2010) 47 Cal.4th 911, 943.)

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (In re Hamilton (1999) 20 Cal.4th 273, 293-294; Smith v. Phillips (1982) 455 U.S. 209, 217; see also Ristaino v. Ross (1976) 424 U.S. 589, 595, fn. 6.) "A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (People v. Harris (2008) 43 Cal.4th 1269, 1303.)

"[W]here a verdict is attacked for juror taint, the focus is on whether

there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias. [¶] When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. [Citations.]" (In re Hamilton, supra, 20 Cal.4th at p. 294, fn. omitted.) Misconduct can be good cause for discharge of a juror under section 1089 (People v. Ledesma (2006) 39 Cal.4th 641, 743) even if it is "'neutral'" in the sense it does not suggest bias toward either side (People v. Daniels, supra, 52 Cal.3d at pp. 863-864), but removal is not necessarily the remedy required in every case (see People v. Guzman (1977) 66 Cal.App.3d 549, 559).

In determining whether discharge is required in a particular case, it must be remembered that "[m]isconduct by a juror ... usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (In re Hamilton, supra, 20 Cal.4th at p. 295; Remmer v. United States (1954) 347 U.S. 227, 229; People v. Guzman, supra, 66 Cal.App.3d at p. 559.)"Still, whether an individual verdict must be overturned for jury misconduct or irregularity ""is resolved by reference to the substantial likelihood test, an objective standard."" [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. [Citations.]

"The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection.... [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' [Citation.]" (In re Hamilton, supra, 20 Cal.4th at p. 296; see also People v. Danks (2004) 32 Cal.4th 269, 302-303.)[fn140]

> FN140: Citing Remmer v. United States, supra, 347 U.S. at page 229, defendants contend California's "'substantial likelihood'" test conflicts with United States Supreme Court authority that they say requires a showing of no actual prejudice. Remmer involved attempted jury tampering that did not come to light until after the jury returned its verdict. In his motion for a new trial, the defendant requested an evidentiary hearing on the matter, but the trial court denied the new trial motion without holding a hearing. (Id. at pp. 228-229.) In remanding the matter for a hearing, the United States Supreme Court stated in part: "The presumption [of prejudice] is not conclusive, but the burden rests heavily

upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. [Citations.]" (Id. at p. 229.) The California Supreme Court has consistently adhered to the "substantial likelihood" standard, often stating it in conjunction with Remmer (see, e.g., People v. Foster, supra, 50 Cal.4th at p. 1342; People v. Lewis (2009) 46 Cal.4th 1255, 1309), and has rejected the notion that standard is inconsistent with federal law (People v. Loker (2008) 44 Cal.4th 691, 747). Accordingly, we reject defendants' claim. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

"'Whether prejudice arose from juror misconduct ... is a mixed question of law and fact subject to an appellate court's independent determination.' [Citation.] However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (People v. Danks, supra, 32 Cal.4th at pp. 303-304.) With respect to credibility determinations, the trial court's assessment of jurors' states of mind will not necessarily be dispositive, such as when there is inherent prejudice (see Holbrook v. Flynn (1986) 475 U.S. 560, 570 [courtroom security arrangement]) or where bias is "clearly apparent" from the record (People v. San Nicolas (2004) 34 Cal.4th 614, 646). While a juror's declaration of impartiality may not be conclusive (Irvin v. Dowd (1961) 366 U.S. 717, 728; People v. Williams (1989) 48 Cal.3d 1112, 1129), neither is it irrelevant: "'[One] may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' [Citations.]" (Smith v. Phillips, supra, 455 U.S. at p. 217, fn. 7.)

At the time of trial, section 1122 provided, in pertinent part: "(a) After the jury has been sworn and before the people's opening address, the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial; .... [¶] (b) The jury shall also, at each adjournment of the court before the submission of the cause to the jury, ... be admonished by the court that it is their duty not to converse among themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them."

As previously described, defendants' jury was so instructed. Violation of the admonitions contained in section 1122 is misconduct; when the violation is in the form of discussing the case with a nonjuror, it is serious misconduct. (People v. Wilson (2008) 44 Cal.4th 758, 838, 840; In re Hitchings (1993) 6 Cal.4th 97, 117-118.) When, however, the "misconduct is '"of such a trifling nature that it could not in the nature of things have been prejudicial to the moving party and where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed."' [Citation.]" (People v. Stewart (2004) 33 Cal.4th 425, 510; see also People v. Wilson, supra, 44 Cal.4th at pp. 839-840.)

In the present case, the trial court found Juror Nos. 1267086 and 1355968 to be credible, and to not have willfully failed to comply with the court's instructions. Substantial evidence supports these determinations. Although there were technical violations of section 1122 and the court's admonitions, the violations were not pervasive, in that they occurred only occasionally insofar as the record shows with respect to these jurors, as opposed to Juror No. 1244336. They also were not substantive, as they did not involve deliberative-type discussions about the merits of the case. (Contrast People v. Cissna (2010) 182 Cal.App.4th 1105, 1118.) For example, the timeline ultimately was admitted into evidence, and, according to the testimony implicitly credited by the court, there were no discussions about particular dates or times. Moreover, insofar as we can ascertain from the printed copy of the blog that is contained in the record, it was indeed possible for Juror No. 1267086 to view the photograph she emailed to Juror No. 1244336 without reading the latter's blog entries.

Defendants argue that, through their sympathy for what could only have been prosecution witnesses, the jurors exhibited actual bias, and so the trial court's findings of fact established actual prejudice. We disagree. Jurors are not precluded from thinking about a case prior to deliberations (People v. Wilson, supra, 44 Cal.4th at p. 840); moreover, they are not instructed not to feel sympathy for someone involved, but rather not to base their decision on sympathy or prejudice. What matters is whether the individual can separate feelings and emotions from his or her duties as a juror, and evaluate the evidence fairly and decide the case solely on the evidence presented at trial.

Here, the trial court's inquiry was more than adequate (compare People v. Farnam, supra, 28 Cal.4th at pp. 139-142 with People v. McNeal (1979) 90 Cal.App.3d 830, 835-838), and that court was in the best position to observe the jurors' demeanors when it questioned them about their ability to perform their duties. In addition, it emphasized and reiterated pertinent admonitions, which, under the circumstances, dispelled the presumption of prejudice. (See People v. Tafoya (2007) 42 Cal.4th 147, 192-193.)

The record establishes that the conversations and comments engaged in by Juror Nos. 1267086 and 1355968 "'[are] not, judged objectively, "inherently and substantially likely to have influenced the juror[s]." [Citation.] Nor [do they] objectively demonstrate a substantial likelihood, or even a reasonable possibility, of actual bias. [Citations.]' [Citation.]" (People v. Lewis, supra, 46 Cal.4th at p. 1309, fn. omitted.) Accordingly, any presumption of prejudice stands rebutted, and the trial court did not abuse its discretion in refusing to discharge either or both jurors.[fn141]

> **FN141**: "Since we find no violation of section 1089, a statute that [the California Supreme Court has] previously held is consistent with state and federal constitutional proscriptions, our conclusion also necessarily disposes of defendant[s'] state and federal constitutional claims. [Citation.]" (People v. Martinez, supra, 47 Cal.4th at p. 943, fn. 6.)

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 448-470.

## 2.     Legal Standard

The Fourteenth Amendment of the United States Constitution safeguards a criminal defendant's Sixth Amendment right to be tried by a panel of impartial and indifferent jurors. See Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also Hayes v. Ayers, 632 F.3d 500, 507 (9th Cir. 2011) (quoting Irvin, 366 U.S. at 722) ("The Sixth Amendment right to a jury trial 'guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.'") "It is not required, however, that the jurors be totally ignorant of the facts and issues involved." Irvin, 366 U.S. at 722-23 (finding that mere existence of preconceived notion of guilt or innocence of accused is insufficient by itself to rebut the presumption that a prospective juror is impartial). Rather, due process requires that a defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); see also Fields v. Brown, 503 F.3d 755, 766 (9th Cir 2007). Jurors are objectionable if they have formed such strong and deep impressions that their minds are closed against conflicting testimony. See Irvin, 366 U.S. at 722 n.3. The presence of even one biased juror deprives a defendant of the right to an impartial jury. Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).

The Sixth Amendment also requires the jury verdict be based entirely on the evidence produced at trial. Turner v. Louisiana, 379 U.S. 466, 472-473 (1965). When presented with allegations of jury misconduct or juror bias, the trial court is required to determine what transpired, the impact on the jurors, and whether or not what transpired was prejudicial. Remmer v. United States, 347 U.S. 227, 229-230 (1954); Dyer, 151 F.3d at 974 ("A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances."). As the Supreme Court noted:

> [T]ampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer, 347 U.S. at 229 (citing Mattox v. United States, 146 U.S. 140, 148-150 (1892));

1 | see also Xiong v. Felker, 681 F.3d 1067, 1076 (9th Cir. 2012).

2 Further, the evaluation of claims of juror misconduct depends on whether the
3 misconduct is based on extrinsic influences or intrinsic influences. When the misconduct
4 stems from an extrinsic or external influence, prejudice is presumed unless the
5 government shows it was harmless. See United States v. Remmer, 347 U.S. at 228-29
6 (1954); Xiong v. Felker, 681 F.3d at 1076 (9th Cir. 2012) ("The presumption of prejudice
7 that arises from juror misconduct, although strong, is not conclusive; 'the burden rests
8 heavily upon the Government to establish, after notice to and hearing of the defendant,
9 that such contact with the juror was harmless to the defendant.'") The situation is
10 different when the alleged misconduct is intrinsic to the jury's deliberations.

11 Premature deliberations among jurors are "not as serious as" private
12 communication, outside contact, or tampering. Davis v. Woodford, 384 F.3d 628, 653
13 (9th Cir. 2004). "What is crucial is not that jurors keep silent with each other about the
14 case but that each juror keep an open mind until the case has been submitted to the
15 jury." Id. at 653 (internal quotation marks omitted). Thus, unless premature deliberations
16 deprive the petitioner of a fair trial, they will not warrant habeas relief. Belmontes v.
17 Brown, 414 F.3d 1094, 1124-25 (9th Cir. 2005), overruled on other grounds by, Ayers v.
18 Belmontes, 549 U.S. 7 (2006).

19 ### 3.    Analysis

20 The trial court, upon being informed that a juror was writing blog posts on the
21 internet about the case, took steps to interview the blogging juror and the two jurors that
22 were carpooling and might have had improper conversations with the blogging juror. The
23 blogging juror was dismissed.  Upon questioning, it was determined that neither of the
24 other jurors had observed or read any of the information placed on the internet by the
25 other juror. The findings of the state court are presumed correct. Indeed,Petitioner does
26 not claim that that there was evidence  the two jurors saw extrinsic evidence that could
27 have improperly biased them. As the jurors were not presented with extrinsic
28 information, no presumption of prejudice applies. See Remmer, 347 U.S. at 228-29;

<u>Xiong v. Felker</u>, 681 F.3d at 1076.

The only factual issues that were presented to the state court related to conversations among the jurors while carpooling. One of the conversations involved the contents of a timeline exhibit that one of the jurors was unable to see during the proceeding. The trial court determined upon examination that the two jurors appeared credible and it believed their testimony that there was no discussion of specific dates or events on the timeline and that the conversation ended when they agreed they would review the exhibit during deliberations. The state court found that the conversation was not substantive, and did not involve deliberative-type discussions. This Court agrees.. Nothing about the conversation implicated that the juror had prematurely decided the case. If anything, it was the opposite – the juror's statements that he or she had not observed an exhibit created an inference that the juror was attempting to collect the evidence presented so that the juror could ultimately make a determination based on all of the facts. None of the statements indicated that that the jurors were engaged in premature deliberations or no longer had an open mind about the case so as to deprive Petitioner of a fair trial. The conversation was innocuous, and not a basis for habeas relief.

Two other potential conversations or comments were made while the jurors were carpooling. One involved a juror either mentioning or joking not to get off at the Cottonwood exit, and another instance involved a juror feeling sympathy for a witness. The Supreme Court has noted that jurors need not be "totally ignorant of the facts and issues involved." <u>Irvin</u>, 366 U.S. at 722-23. Regardless of the guilt or innocence of Petitioner or his co-defendants, there was no question that victim Edwin McGowen was shot in an incident on March 21, 2007, victims Anthony Lyons, James Wallace, Vanessa Alcala (and her unborn child), were shot on April 19, 2007, and victim Adrian Bonner was shot on August 11, 2007, regardless whether Petitioner and his co-defendants were the perpetrators of the crimes. It was not unreasonable for the jurors to react to hearing about the amount of violence in the neighborhoods at or near the Cottonwood exit by

attempting to avoid the area. Even if one of the jurors joked about not exiting the freeway on that off-ramp, the comment does not indicate that the juror was not remaining open about the outcome of the case. Likewise, feeling sympathy for a witness is a human reaction, and does not, in and of itself, indicate that a juror is biased or has prematurely decided the case. Having been presented with evidence of violent crimes which resulted in the loss of life, it is not unreasonable for a juror to feel sympathetic to a witness who either saw the events or was impacted by their results. As the state court found, jurors are not instructed not to feel sympathy for someone involved, but just make sure that they do not base their decision on sympathy or prejudice. The state court conducted a sufficient inquiry, and nothing in the record indicated that the jurors were unable to separate their feelings and emotions from their duties as jurors and make an impartial decision based on the evidence presented at trial. While not determinative by itself, the jurors assured the trial court that despite the comments and interactions with the dismissed juror, they could remain impartial and fairly decide the case. (Rep. Tr. at 7899, 7905.) Further, after the juror was dismissed, the trial court repeated admonitions not to discuss the case and to only decide the case based on the evidence presented in court. Given these facts, the state court reasonably concluded that Petitioner was not deprived of his right to a fair and impartial jury.

On collateral review, trial errors - such as extraneous information that was considered by the jury - are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict. Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997)) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)); see also Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000). Had a constitutional violation occurred, habeas relief must still be denied because it did not have a substantial effect upon the jury's verdict. The improper comments by the jurors were mere observations regarding not being able to see an exhibit presented at trial and a discussion of feeling sympathy towards the position of a victim. Both remaining jurors testified that they were still able to fairly decide the case

and were properly admonished. Under these circumstances, any error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623; see also Sassounian v. Roe, 230 F.3d 1097, 1108-1109 (9th Cir. 2000) (applying Brecht to allegation of juror misconduct).

Accordingly, the court of appeal's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Habeas relief is not warranted as to this claim.

## I.    Claim Nine – Jury Instructions as to Unnamed Perpetrators

Petitioner next claims that the trial court violated his federal rights in instructing the jury with CALCRIM No. 373 regarding the testimony of potential accomplices. Alternatively, Petitioner contends that counsel was ineffective for failing to challenge the instruction.

### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

D.    Jury Instructions

The instructions given the jury in this case were lengthy and, as to some matters, quite complex. Defendants now raise claims of error with respect to several of them.

1.    Unjoined Perpetrators

Dixon says the trial court erred by giving CALCRIM No. 373 (Other Perpetrator), or at least excluding Agustin and Jackson from its purview. He says the instruction discouraged jurors from discussing the effect of potential future prosecution (and fear thereof) on those witnesses' credibility, because some speculation is inherent in any full consideration

of the impact of potential prosecution of an accomplice. The error, he says, deprived him of his state and federal constitutional rights to due process and a fundamentally fair trial, as well as his right to confront witnesses and to present a meaningful defense. Johnson and Lee join. The People say the claim of error was forfeited by defendants' failure to object to the instruction, but in any event, when considered in context with additional accomplice instructions, CALCRIM No. 373 was proper.

a.    Background

Sara Agustin and Dupree Jackson testified under agreements granting them use immunity, with respect to this case, for everything except perjury. Agustin testified to an understanding that the district attorney's office had conferred immunity from the use of any statements made while testifying in this case and any future prosecution, other than for perjury. She further testified she had not been granted immunity from federal prosecution or deportation. Jackson testified to an understanding that he could not be prosecuted for any type of criminal activity he might admit, while testifying, to having done in the past. He further testified he had not been given any other immunity agreements, including with respect to potential federal prosecution. The written immunity agreements were admitted into evidence.

During the jury instruction conference, the trial court decided it would give CALCRIM No. 373, but strike the last bracketed sentence. When asked, no party voiced any objection.

Jurors subsequently were instructed that, in determining the credibility of a witness, they could consider anything that reasonably tended to prove or disprove the truth or accuracy of the testimony, including, *inter alia*, whether the witness's testimony was influenced by a personal interest in how the case was decided, and whether the witness was promised immunity or leniency in exchange for his or her testimony. Jurors were also instructed to determine whether Agustin was an accomplice to the crime of conspiracy to participate in a criminal street gang, as charged in count nine, and participating in a street gang, as charged in count eleven. If so, jurors were told they could not convict defendants of those charges based on her uncorroborated testimony alone. Jurors were further told that if the crime of conspiracy to commit the murder of David "Fumes" Taylor was committed, then Jackson was an accomplice to that crime, and defendants could not be convicted of that offense based on Jackson's uncorroborated testimony alone. Jurors were told that the testimony of one accomplice could not corroborate the testimony of another accomplice, and to view with caution any statement or testimony of an accomplice that tended to incriminate defendants.

Pursuant to CALCRIM No. 373, jurors were told: "The evidence shows that another person or other persons may have been involved in the commission of the crimes charged against the defendants. There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial. You must not speculate about whether that other person has or those other persons have been or will be prosecuted. Your duty is to decide whether the defendants here on trial have committed the crimes charged." The court omitted the bracketed optional sentence, which would have provided: "[This instruction does not apply to the testimony of <insert names of testifying coparticipants>.]" It

did so despite the Bench Note advising that, if other alleged participants in the crime are testifying, the instruction should not be given or the bracketed portion should be given, exempting the testimony of those witnesses. (Judicial Council of Cal., Crim. Jury Instns. (2007-2008) Bench Notes to CALCRIM No. 373, p. 153.)

b.    <u>Analysis</u>

The People are correct that defendants forfeited their claim when they failed to object to, or request modification of, CALCRIM No. 373 at trial. (<u>People v. Moore</u>, *supra*, 51 Cal.4th at p. 1134; <u>People v. Sully</u>, *supra*, 53 Cal.3d at p. 1218.)[fn142] In any event, defendants' claim fails on the merits.

> **FN142**: For the most part, the cases we and the parties cite address CALCRIM No. 373's counterpart, CALJIC No. 2.11.5. That instruction provides: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not speculate *or guess* as to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted. Your [sole] duty is to decide whether the People have proved the guilt of [each] [the] defendant on trial." (Italics added.) We reject defendants' assertion that CALCRIM No. 373 is significantly (and improperly) more restrictive than CALJIC No. 2.11.5 because the latter includes the italicized language. Accordingly, cases dealing with CALJIC No. 2.11.5 are on point.

"'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' [Citation.]" (<u>People v. Smithey</u> (1999) 20 Cal.4th 936, 987.) Accordingly, "[i]n assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. [Citations.]" (<u>People v. Tate</u> (2010) 49 Cal.4th 635, 696; <u>see Estelle v. McGuire</u>, *supra*, 502 U.S. at p. 72.)[fn143]

> **FN143**: Some cases state that "'[i]n determining whether an instruction interferes with the jury's consideration of evidence presented at trial, we must determine "what a reasonable juror *could have understood the charge as meaning.*" [Citation.]'" (<u>People v. Cox</u>, supra, 53 Cal.3d at p. 667, italics added; <u>see also, e.g.,</u> People v. Garrison (1989) 47 Cal.3d 746, 780; <u>People v. Fonseca</u> (2003) 105 Cal.App.4th 543, 549.) <u>Garrison</u>, which was cited by <u>People v. Cox</u>, *supra*, 53 Cal.3d at p. 667 (which in turn was cited at p. 549 of <u>Fonseca</u>), cited <u>California v. Brown</u>, *supra*, 479 U.S. 538, as authority for the standard. In <u>Boyde v. California</u> (1990) 494 U.S. 370, however, <u>Brown</u> was one of the cases cited by the United States Supreme Court as providing differing and hence a "less than clear" "legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence ...." (<u>Boyde</u>, at pp. 378,

379.) Finding it important "to settle upon a single formulation" to be employed in deciding this kind of question, the high court determined that "the proper inquiry ... is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (Id. at pp. 379, 380.) Although later United States Supreme Court cases appeared to again endorse the "reasonable juror" standard, Boyde's "reasonable likelihood" standard was reaffirmed in Estelle v. McGuire, *supra*, 502 U.S. at pages 72-73, footnote 4.

The California Supreme Court has consistently held that an unmodified version of CALJIC No. 2.11.5 (and, by parity of reasoning, CALCRIM No. 373) should not be given when, as here, a nonprosecuted participant testifies, because the jury is entitled to consider the lack of prosecution, and incentive the witness had to lie, in assessing the witness's credibility. (E.g., People v. Williams (1997) 16 Cal.4th 153, 226-227; People v. Hardy (1992) 2 Cal.4th 86, 189-190; People v. Cox, *supra*, 53 Cal.3d at p. 667 & fn. 13; People v. Carrera (1989) 49 Cal.3d 291, 312 & fn. 10; People v. Sheldon, *supra*, 48 Cal.3d at p. 946.) That court has been less consistent as to whether, when given together with instructions that assist jurors in assessing witness credibility, such as were given in the present case, the giving of the unmodified instruction does not constitute error (e.g., People v. Moore, *supra*, 51 Cal.4th at pp. 1133-1134; People v. Williams, *supra*, 49 Cal.4th at pp. 457-458; People v. Crew (2003) 31 Cal.4th 822, 845; People v. Brown (2003) 31 Cal.4th 518, 560-561; People v. Lawley, *supra*, 27 Cal.4th at pp. 162-163; People v. Price, *supra*, 1 Cal.4th at p. 446), or constitutes error that was harmless whether assessed under Watson or Chapman (e.g., People v. Cornwell, *supra*, 37 Cal.4th at p. 88; People v. Williams, *supra*, 16 Cal.4th at p. 227; People v. Hardy, *supra*, 2 Cal.4th at pp. 190-191; People v. Sully, *supra*, 53 Cal.3d at pp. 1218-1219; People v. Carrera, *supra*, 49 Cal.3d at p. 313; People v. Garrison, *supra*, 47 Cal.3d at p. 780).

In the present case, the trial court should have expressly excluded Agustin and Jackson from CALCRIM No. 373's ambit. In light of the other instructions given on witness credibility and accomplice testimony, however, we find no reasonable likelihood jurors were misled in terms of their consideration of the testimony of those witnesses. The instructions, considered as a whole (which the jury was admonished to do), correctly stated the law.[fn144]

> **FN144**: Were we to find error, we would conclude it was harmless under any standard.

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 447-478.

## 2. Legal Standard

Petitioner contends that this instruction caused prejudice as it prevented the jury from properly incorporating the fact that Agustin and Jackson had immunity agreements in determining their respective credibility. Petitioner argues that Agustin and Jackson

were key witnesses and it hindered his defense for the jury not to take into account the impact of the immunity agreement and whether the witnesses provided more favorable testimony to the prosecution in light of the instruction.

If a jury instruction lightens the prosecution's burden of proof to something less than beyond a reasonable doubt by shifting the burden of proof to the defendant, then that instruction violates the Due Process Clause of the Fourteenth Amendment. Sandstrom v. Montana, 442 U.S. 510, 523-24 (1979) (overruled in part on other grounds by Boyde v. California, 494 U.S. 370, 380 (1990)). For an ambiguous instruction to warrant grant of a petition for habeas corpus, there must be a "reasonable likelihood" the jury applied the instruction in a way which would violate the Constitution. Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Boyde, 494 U.S. at 380). The instruction must be construed in the context of all other instructions and the entire trial record rather than in isolation. Id. (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." Middleton v. McNeil, 541 U.S. 433, 437 (2004) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).

"If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Dixon v. Williams, 750 F.3d 1027, 1033 (9th Cir. 2014). Petitioner is entitled to relief on his jury instruction claims only if he can show prejudice. Id. at 1034. Prejudice is shown for purposes of habeas relief if the trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Mere speculation that the defendant was prejudiced by trial error is insufficient; the reviewing court "must find that the defendant was actually prejudiced by the error." Calderon v. Coleman, 525 U.S. 141, 146 (1998) United States Supreme Court habeas precedent "places an 'especially heavy' burden on a defendant who . . . seeks to show constitutional error from a jury instruction that quotes a state statute." Waddington v. Sarausad, 555 U.S. 179, 190 (2009) (quoting Henderson v. Kibbe, 431 U.S. 145, 155

1    (1977)).

2                        **3.    Analysis**

3          Respondent notes that Petitioner failed to object to the jury instructions at trial and

4    is procedurally defaulted from bringing the claim. However, Respondent acknowledges

5    that Petitioner raised a claim that his counsel was ineffective for not presenting the claim

6    at trial. As Respondent only raised, but did not brief, the merits of the argument that the

7    claim was procedurally defaulted, because the Court must review the merits of the claim

8    in addressing either procedural default or Petitioner's claim of ineffective assistance of

9    counsel, and given concerns of judicial efficiency, the Court will address the merits of the

10   claim.

11         On appeal, the state court found that it was not appropriate to have provided the

12   instruction without excluding Agustin and Jackson from the instruction. The state court

13   found that jury was entitled to consider the lack of prosecution of Agustin and Jackson

14   and its effect on their respective incentive to testify in the prosecution's favor when

15   assessing their credibility. Despite the failure to include the last sentence of the

16   instruction of CALCRIM 373 omitting Agustin and Jackson from the instruction, the state

17   court found that the instruction as a whole ensured that the jury correctly weighed all the

18   relevant evidence in determining the credibility of Agustin and Jackson's testimony.

19         The state court gave several other relevant instructions to the jury to evaluate

20   Agustin and Jackson's testimony. The jury was provided CALCRIM No. 334, which

21   expressly admonished the jury to view Agustin's testimony with caution if it found her to

22   be an accomplice. (Clerk's Tr. at 2433-34.) If so, then the jury was instructed to

23   corroborate her testimony with supporting evidence. Id. The jury was likewise provided

24   the instruction regarding accomplice testimony as to Jackson. (Clerk's Tr. at 2435-36.)

25   The jury was also instructed with CALCRIM No. 336, as to Jackson, advising them that

26   Jackson's testimony must be viewed with caution as he was an in-custody informant.

27   (Clerk's Tr. 2437.) The jury was instructed pursuant to CALCRIM No. 301 that it may not

28   find Petitioner or his co-defendants guilty of counts 9 and 11 solely based upon

testimony from Agustin or Jackson, and that the jury "should carefully review all the evidence" before finding any other facts solely based upon a single witness's testimony. (Id. at 2425.) Finally, the jury was instructed pursuant to CALCRIM No. 226 to consider any offer of immunity or leniency upon the credibility or believability of a given witness. (Clerk's Tr. at 2420-2421.)

In addition to the other jury instructions, during closing arguments counsel for Petitioner and co-defendants presented argument that Agustin and Jackson's testimony was not credible based on their immunity agreement. (See e.g., Rep. Tr. at 11122-11126, 11136 [describing the "immunity package" and "money and benefits" received by Agustin and Jackson], 11200-11202 [describing Jackson as a parolee "going to do whatever he could do" to avoid returning to prison]; 11245-11250 [describing Agustin and Jackson as accomplices who were motivated to lie to avoid prosecution]).

Based on the totality of the jury instructions, there is no reasonable likelihood the jury would have improperly reviewed the credibility or believability of Agustin's or Jackson's testimony based on the language of CALCRIM 373 as presented to the jury. Nothing about the jury instructions would have confused the jury regarding the prosecution's burden to prove that Petitioner committed the charged crimes. Thus, this Court may not overturn the state court's determination on habeas review because there is no "reasonable likelihood" that the jury was misled by the CALCRIM 373 instruction in a way that shifted the prosecution's burden of proof. Any error resulting from CALCRIM No. 373's failure to exclude Agustin and Jackson did not have a substantial and injurious effect or influence on the jury's verdict. Fry, 551 U.S. at 119-20; Brecht, 507 U.S. 637. Accordingly, the Court finds that the trial court did not commit instructional error such that resulted in the violation of Petitioner's due process. See Estelle, 502 U.S. at 72. The Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Habeas relief is not warranted as to this claim.

Further, Petitioner claims that counsel was ineffective for failing to move to correct

the instruction. Regardless whether counsel's conduct was reasonable, Petitioner has not shown that he was prejudiced by counsel's conduct. As explained above, in light of the other jury instructions and the argument presented by Petitioner and co-defendants at trial, there is not a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).

### j.     Claim Ten – Jury Instructions as to Gang Evidence

Petitioner claims that the trial court violated his federal Due Process rights and a right to a fair trial by improperly instructing the jury regarding irrelevant, unreliable, untested and inflammatory gang expert testimony that was admitted at trial. (Pet. at 42-49.)     Petitioner also contends that the instructions violated his rights under the Confrontation Clause by allowing the gang expert to present hearsay testimony.

### 1.     State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See <u>Ylst</u>, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

4.     <u>Gang Evidence and Enhancements</u>

Dixon contends the instructions given on gang evidence and enhancements were erroneous in several respects. First, he says the limiting instruction for "'evidence of gang activity'" allowed jurors to consider all such gang evidence — including the gang experts' testimony and the charged gang crimes — in deciding whether defendants acted with the intent, purpose, and knowledge required to prove the gang-related crimes and not just the gang enhancements, and that the trial court never even informed jurors they could not consider other crimes or gang activities that were not proven at least by a preponderance of the evidence. Second, he says another limiting instruction allowed jurors substantively to consider evidence — including gang expert testimonial

hearsay and anecdotes — that is supposed to be limited to the nontruth basis of the opinion by telling jurors they had to determine whether the information on which the expert relied was true and accurate. Third, Dixon says yet another instruction allowed jurors to consider a charged crime, of which they found a defendant guilty, to decide the issues of the gang's primary activities and pattern of gang activity, and presumably knowledge of gang activity for purposes of the gang special circumstance. Dixon says the errors deprived him of his right to a fair trial by reducing the prosecution's burden of proof and creating a strong risk of conviction based on irrelevant and inflammatory evidence and criminal disposition, and deprived him of his confrontation rights by permitting consideration of gang expert testimonial hearsay. Johnson and Lee join. The People say that, when the challenged instructions are considered in context, there is no reasonable likelihood the jury misunderstood any of them in the manner alleged.

a.    Background

The testimony of the various gang experts is set out at length, *ante*. Some limiting instructions were given to portions of their testimony, as well as other gang-related evidence, at the time the testimony was presented to the jury. For instance, when Sherman was testifying concerning Dixon's prior offenses, the trial court admonished the jury that the evidence was received only to show a predicate offense or pattern of criminal activity. The prosecutor made it clear that evidence of offenses committed by nondefendants was for the same limited purpose. In addition, the jury was informed that Sherman's testimony concerning defendants' criminal records was being received for the limited purpose of Sherman's opinion whether the particular defendant was a gang member at the time the crime was committed. When Dixon's attorney cross-examined Sherman about the circumstances of the offense that gave rise to Dixon's manslaughter conviction, the prosecutor pointed out that the evidence on which Sherman was relying was hearsay, and came in as a basis for his opinion and not for the truth of the matter.

During the jury instruction conference, the court and counsel had an extensive discussion about CALCRIM No. 1400 (Active Participation in Criminal Street Gang (Pen. Code, § 186.22(a))). The prosecutor and Johnson's attorney expressly agreed with the notion that if the jury found a defendant guilty of a crime in this case, that crime could be considered in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity had been proved. Neither counsel for Lee nor counsel for Dixon objected. When CALCRIM No. 1403 (Limited Purpose of Evidence of Gang Activity) was discussed, the defense did not object to the court's proposed wording of the instruction. During a later discussion of the gang instructions, there were no objections to CALCRIM Nos. 1401 (Felony or Misdemeanor Committed for Benefit of Criminal Street Gang (Pen. Code, § 186.22(b)(1) (Felony) & § 186.22(d) (Felony or Misdemeanor))) or 1403.

Based on Sherman's testimony concerning the predicate offenses, the prosecution revised CALCRIM No. 1400, and the court and counsel had a further discussion about the instruction. Although specifically asked by the court, no defense attorney voiced any problem with the proposed wording of the instruction, or the modifications that were made later.

Insofar as is relevant to this issue, the trial court ultimately gave the following instructions:

• CALCRIM No. 220: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."

• CALCRIM No. 303: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

• CALCRIM No. 332: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. And, in addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. [¶] You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

• CALCRIM No. 360: "Certain medical and law enforcement personnel testified that in reaching his or her particular conclusions as an expert witness that he or she considered statements made by various individuals. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

• CALCRIM No. 375: "The People presented evidence that the defendant [Dixon] allegedly committed the offenses of voluntary manslaughter and/or shooting at an inhabited dwelling house, both of which are alleged to have occurred in 2001 that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. Proof by a preponderance of evidence is a different burden of proof than proof beyond a reasonable doubt. [¶] ... [¶] If you conclude that said defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged or that the enhancements or allegations have been proved. The People must still prove each charge, enhancement, and allegation beyond a reasonable doubt."

• CALCRIM No. 736: "The defendants are charged with the special circumstance of committing murder while an active participant in a criminal street gang, in violation of Penal Code Section 190.2(a)(22). [¶] To prove that this special circumstance is true, the People must prove that: [¶] One, the defendant intentionally killed James Wallace and/or Vanessa Alcala and/or Baby Boy Alcala; [¶] Two, at the time

179

of the killing the defendant was an active participant in a criminal street gang; [¶] Third, the defendant knew that the members of the gang engaged in or have engaged in a pattern of criminal gang activity; [¶] And, fourth, the murder was carried out to further the activities of the criminal street gang. [¶] Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. [¶] The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang. [¶] A criminal street gang will be defined in another instruction to which you should refer."

• CALCRIM No. 1400: "The defendant is charged in Count 9 with conspiracy to participate in a criminal street gang and in Count 11 with participating in a criminal street gang, in violation of Penal Code Section 186.22(a). [¶] To prove that the defendant is guilty of this crime as alleged in Count 11 and in order to define the crime which defendants are charged with conspiring to commit, Count 9, the People must prove that: [¶] One, the defendant actively participated in a criminal street gang; [¶] Two, when the defendant participated in the gang he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity; [¶] And, three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by: [¶] A, directly and actively committing a felony offense; [¶] Or, B, aiding and abetting a felony offense. [¶] ... [¶] A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] One, that has a common name or common identifying sign or symbol; [¶] Two, that has as one or more of its primary activities the commission of the sale and possession for sale of narcotics, ... and/or possession of concealed and loaded firearms, and/or threats, intimidation of witnesses and victims, ... and/or shootings and/or murders; [¶] And, three, whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity. [¶] ... [¶] A pattern of criminal gang activity as used here means: [¶] One, the commission of or attempted commission of or conspiracy to commit or any conviction of any combination of two or more of the following crimes: Shooting at a residence, voluntary manslaughter, attempted murder by gang member, possession of an assault rifle, and/or possession of cocaine for sale .... [¶] ... [¶] If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved. [¶] ... [¶] Felonious criminal conduct means committing or attempting to commit any of the following crimes: Murder, possession of a firearm by a felon as to defendant Joseph Dixon only, shooting at an occupied vehicle, robbery, sales of illegal narcotics, assault with a firearm, and/or conspiracy, other than conspiracy to commit a violation of Penal Code Section 186.22(a)."

180

• CALCRIM No. 1401: "If you find a defendant guilty of the crimes charged in Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, or 10, ... you must then decide whether for each crime the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.... [¶] To prove this allegation the People must prove that: [¶] One, the defendant committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] And, two, the defendant intended to assist, ... further, or promote criminal conduct by gang members. [¶] A criminal street gang is defined in another instruction to which you should refer."

• CALCRIM No. 1403: "You may consider evidence of gang activity, ... only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes or enhancements and special circumstance allegations charged. You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that a defendant is a person of bad character or that he has a disposition to commit crime."

b.    Analysis

"[A] defendant who believes an instruction requires clarification or modification must request it. [Citation.]" (People v. McKinnon, supra, 52 Cal.4th at p. 670; cf. People v. Hernandez (2004) 33 Cal.4th 1040, 1051-1052 [trial court has no duty to give limiting instruction on gang evidence on own motion].) Defendants made no such request here, despite ample opportunity to do so. Accordingly, most, if not all, of their claims have been forfeited. Nevertheless, we address them on the merits in light of defendants' alternative claims of ineffective assistance of counsel.

We turn first to CALCRIM No. 1403. This instruction — which, as written, gives the option of allowing consideration of evidence of gang activity in deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes, enhancements, and special circumstance allegations charged[fn150] — has been held to be "neither contrary to law nor misleading." (People v. Samaniego, supra, 172 Cal.App.4th at p. 1168.) We see no reason, in the present case, to have limited the instruction to the gang enhancements, since the evidence showed the charged crimes were all gang related, in addition to which defendants were charged with active participation in a criminal street gang.[fn151] As the evidence of gang membership and activity was clearly relevant with respect to the charged offenses (see People v. Funes (1994) 23 Cal.App.4th 1506, 1516, 1518-1519), the trial court appropriately instructed the jury on the purposes for which evidence could be considered.

**FN150**: The instruction reads, in part: "You may consider

evidence of gang activity only for the limited purpose of deciding whether: [¶] [][The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related (crime[s]/ [and] enhancement[s]/ [and] special circumstance allegations) charged(;/ .)]."

FN151: The instruction given in People v. Samaniego, *supra*, 172 Cal.App.4th 1148 did not permit consideration of the evidence of gang activity with respect to gang-related crimes, but, unlike here, there was no active participation charge under section 186.22, subdivision (a). (Samaniego, at pp. 1153, 1166.)

In light of the abundance of evidence that was admitted for limited purposes and/or as to fewer than all defendants, the trial court reasonably chose to remind jurors of limiting instructions given at the time the evidence was admitted, rather than attempting to include all that information in an instruction such as CALCRIM No. 1403. We recognize the complexity involved; as we previously observed, however, "[w]e assume that the jurors are '"intelligent persons and capable of understanding and correlating all jury instructions ... given."'" [Citation.]" (People v. Franco, *supra*, 180 Cal.App.4th at p. 720.) Moreover, "[w]e credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]" (People v. Coddington, *supra*, 23 Cal.4th at p. 594.) Here, jurors had the attorneys' arguments and instructions to guide them, and they expressed no confusion with respect to the purpose(s) for which various evidence permissibly could be used.

Defendants complain, however, that the trial court failed to instruct jurors that they could not consider other crimes or gang activities that were not proven by at least a preponderance of the evidence. To the contrary, jurors were so instructed with respect, specifically, to Dixon's prior crimes. Beyond that, jurors were instructed that if the People had the burden of proving something, this meant they had to prove it beyond a reasonable doubt unless the court specifically instructed otherwise. Jurors were also instructed that before they could rely on circumstantial evidence to conclude a fact necessary to find a defendant guilty had been proved, they had to be convinced the People had proved each fact essential to that conclusion beyond a reasonable doubt.

"'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citation.]' [Citation.]" (People v. Smithey, *supra*, 20 Cal.4th at p. 987.) Jurors were admonished to consider the instructions together, and we find no reasonable likelihood they were misled by, or misapplied, the instructions as defendants now claim. (See People v. Tate, *supra*, 49 Cal.4th at p. 696.)

Nor did the instructions improperly permit substantive use of testimonial hearsay.[fn152] Under Gardeley, *supra*, 14 Cal.4th 605 at pages 618-619, the gang experts properly related in detail the hearsay on which they relied. (See People v. Valdez, *supra*, 58 Cal.App.4th at pp. 510-511.) "Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]" (People v. Montiel

(1993) 5 Cal.4th 877, 919.) CALCRIM No. 360 is adequate for this purpose and does not conflict with CALCRIM No. 332. "[J]uries are properly instructed to assess critically the disclosed factual basis of an expert opinion." (<u>People v. Felix</u> (2008) 160 Cal.App.4th 849, 860.)

> **FN152**: Defendants acknowledge that the court gave CALCRIM No. 360, but say it only applied to "statements" made to an expert and not to documents on which the expert relied. Defendants fail to identify any documents that did not consist of written statements.'

Several appellate opinions have held that <u>Crawford</u> does not apply to hearsay forming the basis for an expert's opinion, reasoning variously that hearsay in support of expert opinion is not the sort of testimonial hearsay the use of which <u>Crawford</u> condemned (<u>People v. Ramirez</u> (2007) 153 Cal.App.4th 1422, 1427) or that hearsay relied on by experts in formulating their opinions is not testimonial because it is not offered for the truth of the facts stated (<u>People v. Cooper</u> (2007) 148 Cal.App.4th 731, 747; <u>People v. Thomas</u> (2005) 130 Cal.App.4th 1202, 1210) and the expert is subject to cross-examination concerning his or her opinions (<u>People v. Sisneros</u> (2009) 174 Cal.App.4th 142, 154). In <u>People v. Hill</u>, *supra*, 191 Cal.App.4th 1104, by contrast, the court determined that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id.* at p. 1131, fn. omitted.) Nevertheless, the court found itself bound by <u>Gardeley</u> and similar California Supreme Court precedent, and so concluded the trial court in the case before it properly determined the challenged basis evidence did not violate the hearsay rule or confrontation clause, since it was not offered for its truth but only to evaluate the expert's opinions. (<u>Hill</u>, *supra*, at p. 1131.) The court further found that most of the hearsay relied upon by the gang expert in its case would not be considered "testimonial" under <u>Crawford</u>. (<u>Hill</u>, at pp. 1135-1136.)

The United States Supreme Court itself has produced fractured opinions concerning <u>Crawford</u>'s application to expert testimony and the information on which such testimony is based. (<u>See, e.g.</u>, <u>Williams v. Illinois</u> (2012) 567 U.S. ___ [132 S.Ct. 2221]; <u>Bullcoming v. New Mexico</u> (2011) 564 U.S. ___ [131 S.Ct. 2705]; Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305.) Thus far, the California Supreme Court has attempted to make sense out of these opinions in cases involving basis evidence such as autopsy and laboratory analysis reports. (<u>People v. Rutterschmidt</u> (2012) 55 Cal.4th 650, 655-656, 658-659; <u>People v. Dungo</u> (2012) 55 Cal.4th 608, 612, 617-618; <u>People v. Lopez</u> (2012) 55 Cal.4th 569, 573, 579-582; <u>see also</u> <u>People v. Geier</u>, *supra*, 41 Cal.4th at pp. 593-594, 596-607.) It has yet to do so, however, with respect to the basis evidence of a gang expert, whose testimony is usually based, at least in part, in his or her own experience and investigation.

Until the California Supreme Court says otherwise, <u>Gardeley</u> remains good law. Not every conversation between a gang member and a gang expert constitutes "interrogation" or results in "testimonial" evidence for confrontation clause purposes within the meaning of <u>Crawford</u> and its progeny. Under neither analysis did the instructions here improperly permit the substantive use of testimonial hearsay in violation of defendants' constitutional rights.

Finally, defendants assert jurors should not have been permitted to use the charged crimes to infer gang primary activities and pattern of criminal gang activity with respect to the knowledge/active participation elements of the gang special circumstance allegations. We find no merit to this argument. The current, charged offenses may be used both to show a defendant's involvement in a gang was more than nominal or passive, as required to show active participation (People v. Castenada (2000) 23 Cal.4th 743, 752-753), and in determining whether the People have proven a pattern of criminal gang activity (People v. Loeun (1997) 17 Cal.4th 1, 10-11, People v. Bragg (2008) 161 Cal.App.4th 1385, 1401; see Gardeley, supra, 14 Cal.4th at p. 625). Although these cases do not deal with the gang special circumstance, we see no reason it should be treated any differently, and we reject defendants' claim of "bootstrapping the special circumstance on the charged offenses."

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 478-521.

## 2.    Legal Standards

Claims that a jury instruction violated state law are not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637. In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id.; see Calderon v.

1  Coleman, 525 U.S. 141, 146-47 (1998).

## 3. Analysis

Respondent notes that Petitioner failed to object to the jury instructions at trial and is procedurally defaulted from bringing the claim. However, Respondent acknowledges that Petitioner raised a claim that his counsel was ineffective for not presenting the claim at trial. As Respondent only raised, but did not brief, the merits of the argument that the claim was procedurally defaulted, and since the Court must review the merits of the claim in addressing either procedural default or Petitioner's claim of ineffective assistance of counsel and consider judicial efficiency, the Court will address the merits of the claims.

Petitioner presents various arguments in his petition that the instructions relating to gang evidence and the charged gang enhancements were prejudicial for a variety of reasons. The primary instruction regarding limitations on the use of gang expert testimony was CALCRIM No. 1403. (Clerk's Tr. at 2502.) The instruction read, "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes or enhancements and special circumstance allegations charged." The only other permissible purpose for the evidence was to determine the credibility of the expert witness in reaching his opinion. (Id.) The instruction specifically warned jurors not to use the evidence to determine that Petitioner "is a person of bad character or that he has a disposition to commit crime." (Id.) The state court reasoned that the instruction had been found to be "neither contrary to law nor misleading," and that there was no need to limit the instruction to gang enhancements since the evidence indicated that all the crimes were gang related. Based on the relevancy of gang membership and activity, the state court found that the trial court properly instructed the jury on the purposes for which that evidence could be considered.

The trial court also found that the instructions, as given, required the jury to consider Petitioner's prior crimes only if they were proven by at least a preponderance of

the evidence, and that the burden of proof as to all other issues was that of beyond a reasonable doubt. Based on the instructions as a whole, the court concluded that there was not a reasonable likelihood that the jurors were misled or misapplied the instructions provided by the trial court.

Reviewing the relevant jury instructions provided, including CALCRIM Nos. 220 (Clerk's Tr. at 2415 [Reasonable Doubt]), 303 (Id. at 2427 [Limited Purpose Evidence]), 332 (Id. at 2431 [Expert Witness Testimony]); 360 (Id. at 2441 [Statements to an Expert]), 375 (Id. at 2448-49 [Evidence of Uncharged Offense to Prove Identify, Intent, Common Plan, Etc.]), 736 (Id. at 2469 [Special Circumstances: Killing by Street gang Member]), 1400 (Id. at 2482-85 [Active Participation in Criminal Street Gang]), 1401 (Id. at 2499 [Felony Committed For Benefit of Criminal Street Gang]), and 1403 (Id. at 2502 [Limited Purpose Evidence of Gang Activity]) there is little possibility that the jury improperly used the gang activity evidence. The jury was properly instructed with regard to the burden of proof required and the limited purposes for which the gang evidence applied. Further, in addition to the instructions, during closing arguments defense counsel reminded jurors to use certain gang evidence for a limited purpose, as instructed by the court. (Rep. Tr. at 11245-46, 11273.)

Petitioner contends that the instructions should have been more specific with regard as to what gang evidence should have been admitted for each specific purpose, but provides no further support as to how he was prejudiced by lack of further detail in the instructions. Petitioner also complains that the trial court erred by not providing an instruction such as CALJIC 2.50.2 explaining that the jury should not consider gang evidence unless it was proven by a preponderance of the evidence. However, as described above, the trial court did provide the instruction by way of CALCRIM No. 375 which specifically set forth that standard. Upon reviewing the instructions provided, the jury was not improperly instructed as to the application of gang evidence and any alleged error did not have a substantial and injurious effect or influence on the jury's verdict. Fry, 551 U.S. at 119-20; Brecht, 507 U.S. 637. Accordingly, the Court finds that

186

the trial court did not commit instructional error such that resulted in the violation of Petitioner's due process. See Estelle, 502 U.S. at 72. The state court's decision denying Petitioner's claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

Petitioner also contends that his Sixth Amendment Confrontation Clause rights were violated by hearsay testimony provided by the gang expert. The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections for California, 692 F.3d 910 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. Crawford v. Washington, 541 U.S. 36 (2004). The Crawford rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements. Id. at 42, 51, 68; see also Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.").

Although the Crawford court declined to provide a comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at 52. The court also provided the following "formulations" of a "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent - that

is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52. The court in Crawford also pointed out that the Sixth Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Id. at 59, n.9. However, "state evidence rules do not trump a defendant's constitutional right to confrontation," and a reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate, nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the Confrontation Clause's application." (citation omitted). Williams v. Illinois, 132 S.Ct. 2221, 2226 (2012).

In rejecting petitioner's Confrontation Clause arguments, the California Court of Appeal specifically based its reasoning on the decisions in People v. Thomas, 130 Cal. App. 4th 1202, 30 Cal. Rptr. 3d 582 (2005), People v. Cooper, 148 Cal.App.4th 731, 747 (2007), People v. Ramirez, 153 Cal. App.4th 1422, 64 Cal. Rptr. 3d 96 (2007); and People v. Sisneros, 174 Cal.App.4th 142, 154 (2009).

In Thomas, the California Court of Appeal explained that:

> Crawford does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. Crawford itself states that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (Crawford, supra 541 U.S. at p. 59, fn. 9, 124 S. Ct. at p. 1369, fn. 9, citing Tennessee v. Street (1985) 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L.Ed.2d 425.)

Thomas, 130 Cal. App.4th at 1210. Similarly, in Ramirez, the California Court of Appeal

1  concluded that "hearsay in support of expert opinion is simply not the sort of testimonial

2  hearsay the use of which Crawford condemned." 153 Cal. App.4th at 1427.

3      The United States Supreme Court reiterated that the Confrontation Clause "has

4  no application to out-of-court statements that are not offered to prove the truth of the

5  matter asserted." Williams v. Illinois, 132 S. Ct. 2221, 2228, 183 L. Ed. 2d 89 (2012).

6  Thus, "[u]nder settled evidence law, an expert may express an opinion that is based on

7  facts that the expert assumes, but does not know, to be true." Id. The Court noted that

8  an out-of-court statement is testimonial if it has "the primary purpose of accusing a

9  targeted individual of engaging in criminal conduct" and, usually, it involves a

10  "formalized statement[ ] such as affidavits, depositions, prior testimony, or confessions."

11  Id. at 2242. Numerous federal courts have specifically held since the decision in

12  Crawford that the introduction of otherwise inadmissible evidence in support of a gang

13  expert witness' testimony does not violate the Confrontation Clause. See e.g., United

14  States v. Palacios, 677 F.3d 234, 243-44 (4th Cir. 2012); United States v. Ayala, 601

15  F.3d 256, 275 (4th Cir. 2010); see also Mendez v. Sherman, 2016 U.S. Dist. LEXIS

16  62597 (E.D. Cal. 2016) (listing cases).

17      The record indicates that whatever hearsay evidence was presented to Sherman

18  during trial, he did not testify to the truth of the statements. Rather, any such statements

19  were used by Sherman merely to form the basis for his opinions. In this regard, the jury

20  was specifically instructed that hearsay matters relied on by expert witnesses to form

21  their opinions were not offered for the truth of those matters but were to be considered

22  only in evaluating the basis of the expert's opinions. (Clerk's Tr. at 2441; CALCRIM

23  360.) Further, as an expert, Sherman could properly base his opinion on inadmissible

24  evidence, including hearsay, of a kind that experts in the field regularly consult.[1]

25      The state courts' conclusion that Sherman's expert testimony did not violate

26

27      [1] Both California and Federal rules of evidence permit testimony by an expert even where the expert's opinion is based on inadmissible hearsay evidence, as long as the evidence is of a kind experts in the field regularly consult. See Cal. Evid. Code § 801; Fed. R. Evid. 703.

28

1   Petitioner's rights under the Confrontation Clause is not contrary to or an unreasonable

2   application of clearly established federal law or an unreasonable determination of the

3   facts in light of the state court record. Accordingly, Petitioner is not entitled to federal

4   habeas relief with respect to this claim.

5       Although not raised by Petitioner, the Court notes that the California Supreme

6   Court recently decided People v. Sanchez, 63 Cal. 4th 665, 204 Cal. Rptr. 3d 102, 374

7   P.3d 320 (2016), in which it held that "case-specific statements" related by a

8   prosecution expert concerning a defendant's gang membership may constitute

9   inadmissible hearsay where the expert presents them as true statements of fact without

10  the requisite independent proof. It determined that such inadmissible statements violate

11  the Confrontation Clause if the hearsay is testimonial, unless there is a showing of

12  unavailability and the defendant had a prior opportunity for cross-examination or

13  forfeited that right. Sanchez, 63 Cal. 4th at 677. It did "not call into question the propriety

14  of an expert's testimony concerning background information regarding his knowledge

15  and expertise and premises generally accepted in the field." Id. at 685.

16      Sanchez does not alter the Court's view that Petitioner is not entitled to federal

17  habeas relief in this case. First, the California Supreme Court's foregoing determination

18  of federal constitutional law does not constitute "clearly established Federal law, as

19  determined by the Supreme Court of the United States" (28 U.S.C. § 2254(d)) and is not

20  binding on this Court. Further, even assuming that Sanchez was binding on this Court,

21  the Court would find that the admission of the testimony of the gang expert was

22  harmless, and that any failure by petitioner's counsel to object to any such testimony did

23  not prejudice Petitioner.

24      Finally, Petitioner's claim that counsel was ineffective for failing to move to

25  request further instructions limiting gang evidence is without merit. Regardless whether

26  counsel's conduct was reasonable, Petitioner has not shown that he was prejudiced by

27  counsel's conduct. As explained above, based on the jury instructions as given, there is

28  not a reasonable probability that, but for counsel's unprofessional errors, the results of

190

the proceeding would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). Petitioner is not entitled to habeas relief with respect to this claim.

### k.    Claim Eleven – Jury Instructions as to Accomplice Liability

Petitioner claims that the trial court's improper instructions regarding accomplice liability violated Petitioner's Due Process rights by lowering the prosecutions burden of proof and his right to a fair trial.

### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst</u>, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

2.    <u>Accomplice Liability</u>

Dixon contends the accomplice liability instructions were prejudicially erroneous because (1) they gave jurors no guidance on how to determine the degree of murder for a nonkiller, and (2) they inadvertently included overly broad language on the natural-and-probable-consequences doctrine. Johnson and Lee join. The People say defendants forfeited any claim of error by failing to object to the instructions, but in any event, the instructions as a whole correctly stated the law and if error occurred, it was harmless.

a.    <u>Background</u>

The evidence adduced at trial is set out in the statement of facts, *ante*. It suggested that, assuming defendants were the perpetrators of the charged offenses, one or more acted as an aider and abettor rather than the actual shooter.

During the jury instruction conference, no one objected to, or requested any modification of, CALCRIM Nos. 400 (Aiding and Abetting: General Principles) or 401 (Aiding and Abetting: Intended Crimes). With respect to CALCRIM Nos. 402 (Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)) and 403 (Natural and Probable Consequences (Only Non-Target Offense Charged)), counsel for Lee argued defendants were charged with everything possible

and Lee had asked for instructions on lesser offenses, so nothing else was left. As a result, the People withdrew their request for those instructions.

In addition to aiding and abetting, the People sought to argue conspiracy as a theory of liability for the nonconspiracy charges.[fn145] Over Lee's objection to combining CALCRIM and CALJIC instructions, the People withdrew their request for CALCRIM No. 417 (Liability for Coconspirators' Acts) in favor of a modified version of CALJIC No. 6.11 (Conspiracy — Joint Responsibility).

> **FN145**: The prosecutor noted that the natural-and-probable-consequences doctrine provided a third theory of liability, but clarified the prosecution was not asking for it in this case.

The jury subsequently was instructed that defendants were being prosecuted for first degree murder under two theories: one, that the murders were willful, deliberate, and premeditated; and two, that the murders were committed by lying in wait. Both were explained to the jury, and premeditation and deliberation were defined. Jurors were also instructed that the duration of lying in wait had to be substantial enough to show a state of mind equivalent to deliberation or premeditation. Jurors were also instructed on transferred intent, to wit, if the defendant intended to kill one person but by mistake or accident killed another person, the crime (if any) was the same for the unintended killing as for the intended killing. With respect to the multiple-murder special circumstance, jurors were instructed that if they found a defendant was guilty of first degree murder but was not the actual killer, they had to find he acted with the intent to kill in order to find the special circumstance true.

On the subject of aiding and abetting, the court instructed, pursuant to CALCRIM No. 400:

> "A person may be guilty of a crime in two ways:

> "One, he or she may have directly committed the crime. I will call that person the perpetrator.

> "Two, he or she may have aided and abetted a perpetrator who directly committed the crime.

> "*A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. Under some specific circumstances if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.*" (Italics added.)

Pursuant to CALCRIM No. 401, jurors were told, in pertinent part:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

> "One, the perpetrator committed the crime;

"Two, the defendant knew that the perpetrator intended to commit the crime;

"Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime;

"And, fourth, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

Jurors were also instructed that conspiracy was a crime and was charged in count nine, and that when the prosecution had not specifically charged conspiracy but had introduced evidence of conspiracy to prove liability for other offenses or to introduce hearsay statements of coconspirators, the evidence could be considered for that purpose. Jurors were told that "[a] conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder and/or shooting into an occupied vehicle, and with the further specific intent to commit those crimes ...." As relevant to defendants' claim of error on appeal, the court further instructed:

"Whether conspiracy is charged or uncharged, each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of the conspiracy.

"The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators.

"A member of a conspiracy is not only guilty of the particular crime that to his or her knowledge his or her confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime or act of a co-conspirator to further the object of the conspiracy even though that crime or act was not intended as a part of the agreed-upon objective and even though he or she was not present at the time of the commission of that crime or act.

"You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed-upon crime or crimes and, if so, whether the crime alleged in all counts, except for Counts 6 and 10 [both charging Dixon alone with being an ex-felon in possession of a firearm], was perpetrated by co-conspirators in furtherance of that conspiracy and was a natural and probable consequence of the agreed-upon criminal objective of that conspiracy.

"In determining whether a consequence is natural and

probable, you must apply an objective test based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident.

"A natural consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.

"Probable means likely to happen."

The jury retired to deliberate on the afternoon of March 17, 2009. On the morning of March 19, 2009, jurors sent out a note, with the time marked as 10:53 a.m., requesting "reading of 1st and 2nd degree murder & interpretation of the law." Over counsel for Lee's objection to doing anything other than directing the jury to CALCRIM Nos. 520 (First or Second Degree Murder With Malice Aforethought (Pen. Code, § 187)) and 521 (First Degree Murder (Pen. Code, § 189)), the court explained to the jury that it could not comment on the evidence, then reread those two instructions and invited jurors to write an additional note if they desired further assistance. At 3:56 that afternoon, the jury sent out a note stating it had reached a verdict.

b.    Analysis

Defendants did not object to, or request modification or clarification of, the instructions they now challenge. Generally, "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]" (People v. Lang (1989) 49 Cal.3d 991, 1024.) At least two courts have held that a challenge to the "equally guilty" language of CALCRIM No. 400 is forfeited by failure to request clarifying language. (People v. Lopez (2011) 198 Cal.App.4th 1106, 1118-1119; People v. Samaniego, supra, 172 Cal.App.4th at p. 1163.) We find it appropriate to discuss defendants' claims on the merits, however, as defendants say the instructions are not correct in law and so implicate various constitutional rights. (See People v. Smithey, supra, 20 Cal.4th at pp. 976-977, fn. 7; People v. Flood (1998) 18 Cal.4th 470, 482, fn. 7.)

We turn first to the "equally guilty" language of CALCRIM No. 400. A direct perpetrator and an aider and abettor are equally guilty of a crime in the sense that an aider and abettor does not escape treatment as a principal merely because he or she is not the actual perpetrator. Thus, section 31 provides in part: "All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, ... are principals in any crime so committed."

The problem is, the "equally guilty" language of the instruction can be read as telling jurors that the direct perpetrator and aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. So, for example, if defendants' jury found Johnson guilty, as the shooter, of first degree murder in the killing of Vanessa Alcala, the jury would have to find Dixon and Lee also guilty of first degree murder once jurors

determined they were involved. This is not the law. The California Supreme Court has held that, depending on the circumstances, an aider and abettor can be convicted of a crime greater than the offense for which the actual perpetrator is liable. (People v. McCoy (2001) 25 Cal.4th 1111, 1118-1119, 1122.) Several appellate courts have held that under the same reasoning, an aider and abettor can be convicted of a crime lesser than the offense for which the actual perpetrator is liable. (People v. Lopez, *supra*, 198 Cal.App.4th at p. 1118; People v. Nero (2010) 181 Cal.App.4th 504, 513-518; People v. Samaniego, *supra*, 172 Cal.App.4th at pp. 1163-1164.) As a result, CALCRIM No. 400, as given in defendants' case, was ambiguous, and potentially misleading, on this point.[fn146]

> **FN146**: The instruction has since been modified to remove the "equally guilty" language. (Judicial Council of Cal., Crim. Jury Instns. (2011) p. 167.)

Nevertheless, we find no prejudice from the error. As stated in People v. Samaniego, *supra*, 172 Cal.App.4th at page 1165, "An instruction that omits or misdescribes an element of a charged offense violates the right to jury trial guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of Chapman[, *supra*,] 386 U.S. 18, 24. [Citation.] Under that test, an appellate court may find the error harmless only if it determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. [Citation.] CALCRIM No. 400 misdescribes the prosecution's burden in proving the aider and abettor's guilt of first degree murder by eliminating its need to prove the aider and abettor's (1) intent, (2) willfulness, (3) premeditation and (4) deliberation, the mental states for murder."

The Samaniego court found the error harmless beyond a reasonable doubt because the jury necessarily resolved the issues against the defendant under other instructions. (People v. Samaniego, *supra*, 172 Cal.App.4th at p. 1165.) Here, jurors necessarily found defendants acted willfully with intent to kill; they were instructed, pursuant to CALCRIM No. 521, that a defendant acted willfully if he intended to kill; and, pursuant to CALCRIM No. 702, that, in order to find a multiple-murder special circumstance as to a nonkiller, they had to find the defendant acted with the intent to kill. Because jurors found all multiple-murder special circumstances true as to all defendants, jurors necessarily determined each defendant had the specific intent to kill. (See Samaniego, at p. 1165.)

Jurors also necessarily found defendants acted deliberately and with premeditation. CALCRIM No. 401 required jurors to find the perpetrator committed the crime, the defendant knew the perpetrator intended to commit the crime, the defendant intended to aid and abet the perpetrator in committing the crime either before or during the commission of the crime, and the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. The instruction further explained that "[s]omeone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." We agree with the court in People v. Samaniego, *supra*, 172 Cal.App.4th at page 1166, which said: "It would be virtually impossible for a person to know of another's intent to murder

195

and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. [Citation.]"

That the error was found prejudicial in <u>People v. Nero</u>, *supra*, 181 Cal.App.4th at pages 518-520, does not assist defendants. In that case, the jury expressly asked if an aider and abettor could be found guilty of a lesser offense. Although the correct answer was "yes," the trial court twice reread CALJIC No. 3.00, including the statement, "'Each principal, regardless of the extent or manner of the participation, is equally guilty.'" (<u>Nero</u>, at p. 512, italics omitted.) By contrast, CALCRIM No. 400, as given in the present case, uses more ambiguous language and, in any event, jurors expressed no confusion on this point. (See <u>People v. Lopez</u>, *supra*, 198 Cal.App.4th at p. 1120, fn. 6.)[fn147]

> **FN147**: The question asked by the jury about first and second degree murder is too general for us to assume jurors were confused by anything related to aider-and-abettor liability. This is especially true since, insofar as the record shows, the rereading of CALCRIM Nos. 520 and 521 remedied whatever confusion or problem existed. Neither instruction has anything to do with aiding and abetting, and the jury did not ask for further, or more specific, clarification or assistance.

Defendants next complain the instructions failed to tell jurors the nonkiller must personally premeditate or the killer's premeditated murder must be natural and foreseeable to the nonkiller.[fn148]

> **FN148**: In <u>People v. Favor</u> (2012) 54 Cal.4th 868, 871-880, the California Supreme Court rejected a virtually identical argument with respect to attempted premeditated murder. <u>Favor</u> is not necessarily dispositive of defendants' claim because, as the high court recognized, there are different degrees of murder, whereas attempted murder is not divided into degrees, and attempted premeditated murder and attempted unpremeditated murder are not separate offenses. (<u>Id.</u> at pp. 876-877.)

The People did not proceed on a natural-and-probable-consequences theory of liability insofar as aiding and abetting was concerned. "To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citations], ... the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,'[fn149] that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]" (<u>People v. Lee</u> (2003) 31 Cal.4th 613, 623-624; see <u>People v. Beeman</u> (1984) 35 Cal.3d 547, 560 (<u>Beeman</u>).) In short, "proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus — a

crime committed by the direct perpetrator, (b) the aider and abettor's mens rea — knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus — conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (<u>People v. Perez</u> (2005) 35 Cal.4th 1219, 1225.)

> **FN149**: The direct (actual) perpetrator must harbor whatever mental state is required for each crime charged. (<u>People v. Mendoza</u> (1998) 18 Cal.4th 1114, 1123.)

We conclude CALCRIM No. 401, especially when considered in conjunction with CALCRIM No. 521, adequately conveyed the premeditation requirement.

Cases addressing application of the doctrine vis-à-vis aiding and abetting are applicable even though the natural-and-probable-consequences doctrine came into play with respect to the conspiracy theory of liability.

When application of the natural-and-probable-consequences doctrine is triggered in a conspiracy case, the trier of fact must find, in addition to the elements of the conspiracy, that the defendant's coconspirator committed an offense other than the offense that was the object of the conspiracy, and the offense committed by the coconspirator was a natural and probable consequence of the target offense. (<u>See People v. Prettyman</u> (1996) 14 Cal.4th 248, 262.) "The determination whether a particular criminal act was a natural and probable consequence of another criminal act ... requires application of an objective rather than subjective test. [Citations.] This does not mean that the issue is to be considered in the abstract as a question of law. [Citation.] Rather, the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. [Citations.] Consequently, the issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act [that was the object of the conspiracy]. [Citations.]" (<u>People v. Nguyen</u> (1993) 21 Cal.App.4th 518, 531.) The crime ultimately committed need not have been specifically planned or agreed upon, nor need it have been substantially certain to result from commission of the planned act. (<u>Id.</u> at p. 530.) The defendant need not have actually foreseen the additional crime; the question is whether, judged objectively, the additional crime was reasonably foreseeable. (<u>People v. Mendoza</u>, *supra*, 18 Cal.4th at p. 1133.)

As previously noted, defendants' jury was told that "[a] conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder and/or shooting into an occupied vehicle, and with the further specific intents to commit those crimes ...." "[A] jury's finding of the dual specific intents required for conviction of conspiracy to murder necessarily establishes that the target offense of murder was premeditated and deliberated ...." (<u>People v. Cortez</u> (1998) 18 Cal.4th 1223, 1238.) We find it difficult to see how a murder committed as a result of a conspiracy to shoot into an occupied vehicle could be anything but premeditated and foreseeable. In any event, the conspiracy

instructions, coupled with CALCRIM No. 521, were adequate to ensure jurors found the nonkiller(s) personally premeditated and/or that the perpetrator's commission of premeditated murder was natural and foreseeable to the nonkiller(s).

Finally, defendants say the trial court erred by including the final, optional sentence of CALCRIM No. 400, to wit: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." They say this language failed to identify and define target and nontarget crimes, and so risked a finding of guilt based on intent to aid and abet unspecified conduct.

In <u>People v. Prettyman</u>, *supra*, 14 Cal.4th 248, the trial court instructed the jury that one who aids and abets is not only guilty of the crime aided and abetted, but is also liable for the natural and probable consequences of the commission of such crime. The court directed the jury to determine whether the defendant was guilty of the crime originally contemplated, and, if so, whether any other crime charged was a natural and probable consequence of such originally contemplated crime. (<u>Id.</u> at pp. 257-258.) The California Supreme Court found that "once the trial court ... chose to instruct the jury on the 'natural and probable consequences' rule, it had a duty to issue instructions identifying and describing each potential target offense supported by the evidence. By failing to do so, the trial court erred." (<u>Id.</u> at p. 270.) Because "a conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct," "the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." (<u>Id.</u> at p. 268, fns. omitted.)

"If the court fails to identify and define these target offenses, we must then determine whether there is a '"reasonable likelihood" that the jury misapplied the trial court's instructions on the "natural and probable consequences" doctrine ....' [Citation.]" (<u>People v. Prieto</u>, <u>supra</u>, 30 Cal.4th at p. 252; <u>accord</u>, <u>People v. Prettyman</u>, *supra*, 14 Cal.4th at p. 272.) No such reasonable likelihood exists here. In the first place, the trial court never mentioned the natural-and-probable-consequences doctrine in conjunction with aiding and abetting liability, never identified the specific circumstances under which a defendant might be found guilty of other crimes, and never directed the jury to make any sort of findings on the issue. In the second place, when it explained aiding and abetting and conspiracy theories of liability to the jury, the prosecutor did not even discuss, let alone rely on, the natural-and-probable-consequences doctrine in the context of aiding and abetting. (<u>Compare</u> <u>People v. Lucas</u> (1997) 55 Cal.App.4th 721, 731-732.) Under the circumstances, the challenged language neither introduced the concept of natural and probable consequences nor raised a risk jurors might base a finding of guilt on intent to aid and abet some unspecified "nefarious" conduct. "Where, as here, the court gives a legally correct, but irrelevant, instruction, the error 'is usually harmless, having little or no effect "other than to add to the bulk of the charge."' [Citation.]" (<u>People v. Lee</u> (1990) 219 Cal.App.3d 829, 841.)

<u>People v. Johnson</u>, 2013 Cal. App. Unpub. LEXIS 6838 at 478-497.

**2.      Legal Standard**

1    The proper legal standard for this claim was set forth above with regarding to
2    Petitioner's tenth claim for relief raising instructional error issues. See, *supra* at § III(I)(2).

### 3.    Analysis

4    Petitioner presents two claims as to why the instructions were misleading and
5    might have led to him being incorrectly convicted of a greater degree of murder as a
6    non-killer accomplice than he should have. First, Petitioner asserts that the "equally
7    guilty" language of CALCRIM No. 400 can be construed as instructing the jurors that the
8    direct perpetrator and aider and abettor must be found guilty, if at all, of the same degree
9    or level of guilt, regardless of aider and abettor's mental state. Second, Petitioner claims
10   that the next sentence of CALCRIM No. 400 explaining that "if the evidence establishes
11   aiding and abetting of one crime, a person may also be found guilty of other crimes that
12   occurred during the commission of the first crime" created a risk of the jury finding of guilt
13   based on intent to aid and abet unspecified conduct. The Court will address each in turn.

14   First, Petitioner claims that the jury instructions, specifically CALCRIM Nos. 400
15   and 401, failed to properly instruct the jury to determine whether Petitioner had the same
16   specific intent as the perpetrator. In addressing this claim, the California Court of Appeal
17   noted that the "equally guilty" language of CALCRIM No. 400 has the potential to create
18   confusion in certain cases. People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at
19   486-487 ("CALCRIM No. 400, as given in defendants' case, was ambiguous, and
20   potentially misleading, on this point."). The California Supreme Court recently addressed
21   this issue in People v. Johnson. 62 Cal.4th 600, 638-640 (2016). Under California law an
22   aider and abettor's criminal liability can sometimes be greater than or less than that of
23   the perpetrator. Id. at 638. "Aider and abettor liability for a killing is based on the
24   combined acts of all the principals and the aider and abettor's own mental state, which
25   floats free from the mental state of the perpetrator." Id. at p. 639. (citing People v. McCoy
26   25 Cal.4th 1111 (2001)). After several California courts concluded the "equally guilty"
27   language could be misleading, the CALCRIM instruction containing that language was
28   revised in 2010 to remove the word "equally" from the "equally guilty" language.

Johnson, 62 Cal.4th at 639-640.

2      However, in Johnson, the California Supreme Court found no error as "there was

3 no version of the evidence . . . suggesting that defendant's mental state was less

4 culpable than that of the actual killer." Johnson, 62 Cal.4th at 640. Further, the Court

5 found that there was nothing in the record suggesting that the jurors believed the

6 "equally guilty" language in CALCRIM No. 400 required them to determine defendant's

7 criminal liability based on the perpetrator's mental state, rather than the aider and

8 abettor's own mental state. Id.

9      Returning to Petitioner's case, the Court of Appeal determined the instructions as

10 given did not create confusion in this case. The court relied upon the totality of relevant

11 instructions given. CALCRIM No. 400 contained a brief explanation of the "general

12 principles" of accomplice liability. (Clerk's Tr. at 2450.) Next, CALCRIM No. 401 advised

13 the jury regarding guilt based on aiding and abetting, instructing the jury that a defendant

14 may be guilty of aiding a crime committed by the perpetrator if the defendant knew the

15 perpetrator intended to commit the crime, intended to aid the perpetrator commit that

16 crime, and actually did aid the perpetrator commit that crime. (Id. at 2451.) In addition,

17 the trial court instructed the jury with regard to premeditiation and the elements required

18 for the respective degrees of murder by way of CALCRIM Nos. 520 and 521. (Clerk's Tr.

19 at 2456-59.) CALCRIM No. 521 explained that a defendant is guilty of first degree

20 murder if he "acted willfully, deliberately, and with premeditation" or if he "murdered while

21 lying in wait or immediately thereafter," which consists of an intent to surprise attack the

22 victim and a waiting period equivalent to deliberation or premeditation. (Id.) CALCRIM

23 No. 702 added that, for a nonkiller to be guilty of the multiple murder special

24 circumstance, the defendant must have "acted with the intent to kill." (Id. at 2464.) Based

25 on the instructions as given, the jury could only reach a guilty verdict for first degree

26 premeditated murder if they found that either Petitioner personally fired the fatal shots

27 with premeditated specific intent to kill, or Petitioner knew that the shooter fired the fatal

28 shots with premeditated specific intent to kill and Petitioner specifically intended to aid

the shooter commit this offense and actually did aid the shooter. Under either scenario, Petitioner must have possessed a premeditated and deliberated specific intent to kill.

Further, Petitioner has presented no evidence from the record suggesting that the jurors believed the "equally guilty" language in CALCRIM No. 400 required them to determine Petitioner's criminal liability based on the perpetrator's mental state, rather than his own. The jury did request further instruction regarding the different degrees of murder, but nothing about the request indicated that the jury had any concern with regard to varying levels of culpability of Petitioner and co-defendants. However nothing about the request indicated whether the jury was questioning Petitioner's intent or that of all co-defendants. Based on all of the circumstances, the Court of Appeal reasoned that it was difficult to see how a murder committed as a result of a conspiracy to shoot into an occupied vehicle could be anything but premeditated and foreseeable. People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 494-95. This Court agrees. All of the evidence surrounding the shootings provide little reason to believe that Petitioner, as a member of a criminal street gang, possessed a premeditated and deliberate intent to kill when participating in the shootings. Sufficient evidence was presented to find that Petitioner was aware, even if he was an aider and abettor, of the intended actions of the perpetrator, and likewise possessed a willful, deliberate and premeditated intent to commit murder, when participating in the offenses. Petitioner has not raised any factual evidence from the trial that would support a finding of confusion on the part of the jury, nor is the Court aware of any facts that would support such a conclusion based on its review of the record.

The state court also rejected Petitioner's contention that the erroneous inclusion of "other crimes" phrase in CALCRIM No. 400 created additional confusion on behalf of the jury. The Court of Appeal denied the claim, finding the language to be extraneous, as the prosecution did not present a theory of liability based on the natural and probable consequences doctrine, which the "other crimes" phrase referred. The trial court never mentioned the natural and probable consequences doctrine in conjunction with aiding

1  and abetting liability, nor identified or requested the jury to find specific circumstances

2  under which Petitioner could be guilty of other crimes. The prosecutor did not present or

3  rely on the natural and probable consequences doctrine in the context of aiding and

4  abetting. Accordingly, there was no risk that the jurors based their "finding of guilt on

5  intent to aid and abet some unspecified 'nefarious' conduct." People v. Johnson, 2013

6  Cal. App. Unpub. LEXIS 6838 at 496-497.

7       A review of the record confirms that the prosecution did not present a theory of

8  liability based on the natural and probable consequences as to aiders and abettors. The

9  prosecution expressly declined to rely upon this theory of liability. (See Rep. Tr. at 9208

10  (prosecution withdrew jury instruction CALCRIM No. 402 on natural and probable

11  consequence doctrine)); (Rep. Tr. at 10938-10940 (prosecution's description of

12  accomplice liability during closing argument omitted natural and probable consequences

13  doctrine.)). Based on the evidence presented, the state court was reasonable in

14  determining that the jury ignored the language of the "other crimes" phrase of the jury

15  instruction in reaching a verdict. There is no reasonable likelihood that the jury applied

16  the "other crimes" phrase in CALCRIM No. 400 in a manner that reduced the

17  prosecution's burden of proof or otherwise had a substantial and injurious effect or

18  influence in determining the jury's verdict.

19       The state court determined that the instructions did not create confusion in this

20  instance, and comported with California law regarding the mental state required for

21  aiding and abetting liability. Federal habeas relief is foreclosed. Estelle, 502 U.S. 62, 68

22  ("We have stated many times that federal habeas corpus relief does not lie for errors of

23  state law."). Accordingly, Petitioner's claim of instructional error should be rejected.[2]

24              **I.      Claim Twelve – Cumulative Error**

25       Petitioner, in his twelfth claim, contends that the cumulative effect of the errors at

26

27       [2] To the extent that Petitioner attempts to alternatively present this claim based on a theory of ineffective assistance of counsel, the claim fails based on lack of showing that Petitioner was prejudiced by the jury instructions or counsel's conduct. Strickland, 466 U.S. 668, 686 (1984).

28

trial violated his rights.

## 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 6-7, 9.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

Cumulative Prejudice

Defendants contend the cumulative effect of the errors at trial rendered the trial fundamentally unfair. The People disagree.

A number of errors occurred at trial, some trivial and some not. No individual error furnished cause for reversal of the verdicts in their entirety. When we examine the cumulative effect of the errors found and assumed, we still find no cause for reversal. The properly admitted evidence, while primarily circumstantial, was overwhelming as to each of the three defendants. (Contrast People v. Felix (1993) 14 Cal.App.4th 997, 1008-1009.) Although the prosecutors had an unfortunate tendency to overprove their case (see People v. Williams, *supra*, 170 Cal.App.4th at p. 610), neither that nor the errors — even taken together — undermine the fairness of the trial as a whole. Although defendants did not receive a perfect trial, they received the fair one to which they were entitled. (People v. Beeler (1995) 9 Cal.4th 953, 994.)

Nor did ""gross unfairness"" or the denial of a fair trial result from the denial of severance. (People v. Ervin (2000) 22 Cal.4th 48, 69.) Our review of the record as a whole "fails to show that the jurors in this joint trial were unable or unwilling to assess independently the respective culpability of each codefendant or were confused by the limiting instructions." (Ibid.; contrast People v. Biehler (1961) 198 Cal.App.2d 290, 298, 303.) The mere possibility of juror confusion is not enough. (See Ervin, at p. 69.)

People v. Johnson, 2013 Cal. App. Unpub. LEXIS 6838 at 546-47.

## 2.    Analysis

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent, the combined effect of multiple trial errors may give rise to a

1   due process violation if it renders a trial fundamentally unfair, even where each error

2   considered individually would not require reversal. <u>Parle v. Runnels</u>, 505 F.3d 922, 927

3   (9th. Cir. 2007) (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) and

4   <u>Chambers v. Mississippi</u>, 410 U.S. 284, 290 (1973)). <u>See also</u> <u>Hayes v. Ayers</u>, 632 F.3d

5   500, 524 (9th Cir. 2011) (if no error of constitutional magnitude occurred at trial, "no

6   cumulative prejudice is possible"). "The fundamental question in determining whether the

7   combined effect of trial errors violated a defendant's due process rights is whether the

8   errors rendered the criminal defense 'far less persuasive,' <u>Chambers</u>, 410 U.S. at 294,

9   and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."

10  <u>Parle</u>, 505 F.3d at 927 (quoting <u>Brecht</u>, 507 U.S. at 637).

11      This Court has addressed each of Petitioner's claims raised in the instant petition

12  and has concluded that no error of constitutional magnitude occurred at his trial in state

13  court. This Court also concludes that the errors alleged by Petitioner, even when

14  considered together, did not render his defense "far less persuasive," nor did they have

15  a "substantial and injurious effect or influence on the jury's verdict." Accordingly,

16  Petitioner is not entitled to relief on his claim of cumulative error.

17  **IV.    Recommendation**

18      Accordingly, it is hereby recommended that the petition for a writ of habeas

19  corpus be DENIED with prejudice.

20      This Findings and Recommendation is submitted to the assigned District Judge,

21  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

22  being served with the Findings and Recommendation, any party may file written

23  objections with the Court and serve a copy on all parties. Such a document should be

24  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

25  to the objections shall be served and filed within fourteen (14) days after service of the

26  objections. The parties are advised that failure to file objections within the specified time

27  ///

28  ///

may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   April 14, 2017                    /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE